# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF TEXAS and GREG ABBOTT, in his official capacity as Governor of the State of Texas,<br><br>Defendants. | Case No. 3:21-cv-173 |

## COMPLAINT

The United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

### PRELIMINARY STATEMENT

1. No State may obstruct the Federal Government in the discharge of its constitutional responsibilities. But on July 28, 2021, the Governor of the State of Texas issued an executive order purporting—"effective immediately"—to restrict who may lawfully provide ground transportation in Texas to certain groups of migrants who have been detained by the Federal Government pursuant to U.S. immigration authorities or are otherwise subject to certain Federal authorities.

2. The United States brings this suit to challenge the executive order, attached hereto as Exhibit A, which is described as "executive order No. GA-37 relating to the transportation of migrants during the COVID-19 disaster" (executive order).

3. The executive order violates the Supremacy Clause and causes injury to the United States and to individuals whom the United States is charged to protect, jeopardizing the health and

safety of noncitizens in federal custody, risking the safety of federal law enforcement personnel and their families, and exacerbating the spread of COVID-19 in our communities. The executive order obstructs the Federal Government's arrangements with nongovernmental partners and directly interferes with the administration of federal immigration law.

4. This Court should declare the executive order to be invalid and enjoin its enforcement.

## JURISDICTION & VENUE

5. The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345, and the United States seeks remedies under 28 U.S.C. §§ 1651, 2201, and 2202.

6. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because Defendants reside within this judicial district and because a substantial part of the acts or omissions giving rise to this action arose from events occurring within this judicial district.

## PARTIES

7. Plaintiff, the United States, is responsible for regulating matters relating to immigration under its constitutional and statutory authorities.

8. Defendant, the State of Texas, is a state of the United States.

9. Defendant, Greg Abbott, is the Governor of Texas, and is being sued in his official capacity.

## RELEVANT FEDERAL LAW

10. The Supremacy Clause of the U.S. Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. Thus, a state enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or if it regulates "the activities of the Federal Government," *Mayo v. United States,* 319 U.S. 441, 445 (1943).

11. The Constitution affords Congress the power to "establish an uniform Rule of Naturalization." U.S. Const., art. I § 8, cl. 4. It also affords the President of the United States the authority to "take Care that the Laws be faithfully executed." U.S. Const., art. II § 3. Congress has exercised its authority over immigration to make laws governing the entry, admission, presence, status, and removal of noncitizens within the United States by enacting the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101 *et seq.*, and other laws regulating immigration. These laws codify the Executive Branch's authority to inspect, investigate, arrest, detain, and remove noncitizens who are suspected of being, or found to be, unlawfully in the United States. *See* 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231, 1357. Federal law also creates criminal sanctions for those who facilitate the unlawful entry, residence, or transportation of noncitizens within the United States. *See* 8 U.S.C. §§ 1323, 1324, 1327, 1328. The States and their political subdivisions cannot obstruct or discriminate against the execution of federal immigration laws. *See Arizona v. United States*, 567 U.S. 387, 394-95 (2012).

12. Federal law also explicitly recognizes the authority of the United States to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal[.]" 8 U.S.C. § 1231(g)(1); *accord* 8 U.S.C. § 1103(a)(11). The INA further vests the United States with broad discretion to release noncitizens seeking admission to the United States from custody through various mechanisms including, *inter alia*, parole under 8 U.S.C. § 1182(d)(5) and conditional release from custody under 8 U.S.C. § 1226(a)(2)(B). *See also* 8 U.S.C. § 1229c (authorizing the federal government to release removable noncitizens for as long as 120 days, in exchange for the non-citizen's commitment to depart voluntarily). Noncitizens subject to removal proceedings are provided a written Notice to Appear. 8 U.S.C. § 1229(a)(1)(G)(i). That Notice to Appear must be filed with the Executive Office for Immigration Review and provide "[t]he time and place at which the proceedings will be held." 8 U.S.C. § 1229(a)(1)(G)(i). Noncitizens may also be subject to a process known as expedited removal. 8 U.S.C. § 1225(b)(1).

13. Congress has provided for the care and well-being of unaccompanied non-citizen children during the pendency of their immigration proceedings. *See* 6 U.S.C. § 279(a). To combat child trafficking, Congress enacted the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), (codified in relevant part at 8 U.S.C. § 1232), to ensure that unaccompanied non-citizen children are safely repatriated to their country of nationality or of last habitual residence. Under the TVPRA, unaccompanied children from noncontiguous countries, as well as those children who are trafficking victims or cannot make an independent decision to voluntarily depart the United States, must be transferred to the custody of the Office of Refugee Resettlement (ORR) of the U.S. Department of Health and Human Services (HHS) within 72 hours of being identified as an unaccompanied child, absent exceptional circumstances. 8 U.S.C. § 1232(a)(4), (b)(3). Once transferred, the child must be promptly placed in the "least restrictive setting that is in the best interest of the child," subject to considerations of whether the child is a danger to self or others. *Id.* § 1232(c)(2)(A). ORR assesses whether there is a suitable sponsor for the child so that he or she may be released from ORR custody as quickly as is safe and appropriate. A vast majority of unaccompanied children in ORR's custody are ultimately released to a sponsor during the pendency of their immigration proceedings. The TVPRA authorizes ORR to "award grants to, and enter into contracts with, voluntary agencies to carry out" its responsibilities for unaccompanied children. *Id.* § 1232(i).

14. Section 265 of Title 42 of the United States Code authorizes the Centers for Disease Control and Prevention (CDC) to suspend the introduction into the United States of persons determined by the CDC to increase the danger of the spread of a communicable disease. In light of the COVID-19 pandemic, CDC exercised its Title 42 authority to issue an order in March 2020 temporarily suspending the introduction into the country of certain noncitizens traveling from Canada and Mexico. *See* 85 Fed. Reg. 17,060 (Mar. 26, 2020). The March 2020 order authorized the expulsion of certain noncitizens to the country from which they entered the United States, their country of origin, or another location as quickly as practicable. *Id.* at 17,067. In October 2020, CDC issued a new Title 42 order to replace the March 2020 order (as amended and extended). *See*

85 Fed. Reg. 65,806 (Oct. 16, 2020). Section 268 of Title 42 provides that customs officers within the Department of Homeland Security (DHS) aid in the enforcement of Title 42 orders. On July 16, 2021, CDC issued an order excepting unaccompanied non-citizen children from the October Order. *See* 86 Fed Reg. 38,717 (July 22, 2021).

### THE UNITED STATES' TRANSPORTATION OF NONCITIZENS DURING IMMIGRATION ENFORCEMENT

15. As part of the execution of U.S. immigration laws, there are a variety of circumstances in which noncitizens must be transported between locations. For example, unaccompanied children need to be transferred from DHS facilities to facilities operated by ORR, between ORR facilities, or to their sponsors, who are typically family members. At all times during this process, unaccompanied children are in the legal custody of the Federal Government. Noncitizens in the custody of DHS need to be transferred between different facilities of the same agency, between different agencies, or to nongovernmental organizations with whom the Federal Government has partnered. And noncitizens released by U.S. Customs and Border Protection (CBP) need transportation, frequently through privately arranged travel by bus or rail, to destinations within Texas and elsewhere throughout the United States. Such onward travel is necessary for noncitizens to reach their final destination within the United States and, if released from custody, to appear before immigration courts for removal proceedings, as they are required to do by federal law, or to report to U.S. Immigration and Customs Enforcement (ICE) offices around the country for additional processing.

16. The United States uses a variety of means to transport noncitizens in Texas, making use of federal personnel, contractors, and grantees.

17. Some of the federal personnel who participate in the transport of noncitizens on behalf of the United States in Texas are not "law-enforcement official[s]" in the ordinary sense of the phrase (*i.e.*, officials tasked with enforcing criminal law)—a distinction of potential significance under the new Texas executive order.

5

18. There are numerous circumstances in which federal agencies rely upon contractors to provide transportation of noncitizens necessary for the administration of federal immigration law.

19. In the Rio Grande Valley Sector alone, CBP has used contactors to transport approximately 120,000 noncitizens in this fiscal year to date. Because CBP stations are only designed for short-term holding, it is essential that CBP be able to transfer noncitizens out of CBP custody in a timely manner, and CBP relies on contractors for these transfers. Noncitizens are transferred to ICE or, in the case of unaccompanied children, to HHS. CBP also relies on contractors to transfer noncitizens between different CBP facilities and to transport noncitizens released from jail or prison to CBP facilities often for removal from the United States. Noncitizens who are in CBP custody may also require transportation by ambulance to local healthcare services for treatment of various physical injuries and medical conditions. Finally, in light of the pandemic, CBP closely coordinates with, and releases noncitizens to, various nongovernmental organizations, which perform the critical role of promptly conducting COVID-19 testing and providing safe placement for isolation and quarantine consistent with public health mitigation measures. The nongovernmental organizations also transport noncitizens released by CBP, often to bus stations where the noncitizens board commercial buses to travel to their destinations in the United States where they will continue to participate in immigration proceedings.

20. ICE, through its Enforcement and Removal Operations directorate (ERO), is responsible for managing all aspects of the immigration enforcement process, including identification and arrest, domestic transportation, detention, bond management, and supervised release, including alternatives to detention. In addition, ERO removes noncitizens with final orders of removal from the United States to more than 170 countries around the world.

21. ICE routinely uses contractors to transport noncitizens from CBP custody to ICE processing and detention facilities, between ICE facilities, and from ICE facilities for removal from the United States. ICE has traditionally relied on private contractors for its transportation needs in particular, including ground transportation of its detained population to detention facilities

nationwide. In addition, almost all ICE contracted detention facilities have some transportation services for local transportation provided on an as-needed basis. ICE also relies on contractors to transfer unaccompanied children from either ICE or CBP to ORR facilities. ICE spends over $200 million annually on contracts with private providers and county governments in Texas for transportation services, covering over 8,000 miles per day.

22. ORR operations depend on contractors to transport unaccompanied children. First, ORR receives unaccompanied children in its custody from either CBP or ICE, both of whom rely on contractors to transport unaccompanied children encountered in Texas to ORR's grantee care providers. Second, ORR uses grantees and contractors to transport unaccompanied children between facilities within the ORR network. For example, a child may require an immediate transfer from one of ORR's emergency facilities to a grantee care provider within ORR's network due to pregnancy or other medical issues, a vulnerability such as trafficking concerns, or safety concerns for self and others. ORR may also choose to move certain unaccompanied children with long anticipated stays from temporary emergency facilities to grantee facilities. Third, ORR uses grantees and contractors to transport unaccompanied children from shelter facilities to sponsors who will provide care for the children.

## THE EXECUTIVE ORDER

23. Governor Abbott issued the executive order on July 28, 2021.[1] The executive order states that Governor Abbott had issued a disaster proclamation on May 31, 2021, because "the surge of individuals unlawfully crossing the Texas-Mexico border poses an ongoing and imminent threat of disaster for certain counties and agencies in the State of Texas, including the potential for the spread of COVID-19[.]" It further states that President Biden has "fail[ed] to enforce the Title 42 order" and that this failure, "combined with his refusal to enforce the immigration laws enacted by Congress, is having a predictable and potentially catastrophic effect on public health in Texas." *Id.*

---

[1] https://perma.cc/T3NL-E58J, permanent record of: https://gov.texas.gov/uploads/files/press/EO-GA-37_transportation_of_migrants_during_COVID_IMAGE_07-28-2021.pdf.

24. Ostensibly to address these circumstances, the executive order provides the following "on a statewide basis effective immediately:"

> No person, other than a federal, state, or local law-enforcement official, shall provide ground transportation to a group of migrants who have been detained by CBP for crossing the border illegally or who would have been subject to expulsion under the Title 42 order.
>
> The Texas Department of Public Safety (DPS) is directed to stop any vehicle upon reasonable suspicion of a violation of paragraph 1, and to reroute such a vehicle back to its point of origin or a port of entry if a violation is confirmed.
>
> DPS is authorized to impound a vehicle that is being used to transport migrants in violation of paragraph 1, or that refuses to be rerouted in violation of paragraph 2.

*Id.*

25. On July 29, 2021, the Attorney General of the United States wrote to Governor Abbott, urging him to "immediately rescind" the executive order and explaining several ways in which it violates federal law.

26. To date, Governor Abbott has not rescinded the executive order.

**THE EXECUTIVE ORDER'S EFFECT ON FEDERAL OPERATIONS**

27. The executive order will severely disrupt the Federal Government's efforts to carry out its responsibilities under the federal immigration laws.

28. For example, as discussed above, ORR relies heavily on contractors and grantees to transport unaccompanied children to ORR custody, between facilities within ORR's network, and from such facilities to sponsors. Unless enjoined, the executive order will directly impede CBP and ICE's ability to transfer unaccompanied children to ORR in a timely fashion, as required by the TVPRA, and will prevent necessary transfers of unaccompanied children between facilities and from facilities to sponsors, also as required by federal law. The inability to release unaccompanied children to sponsors not only denies such children the care and companionship of their sponsors, who are typically family members, but it keeps unaccompanied children in ORR custody longer, which decreases the available bed-space in ORR's facilities and prevents ORR

from accepting new referrals from CBP. ORR's inability to accept new referrals from CBP will result in the prolonged detention of unaccompanied children in increasingly overcrowded CBP facilities. Accordingly, the executive order's restriction on transportation will result in immediate backups of unaccompanied children at both CBP and ORR facilities. Increased density in these facilities will endanger unaccompanied children and facility personnel by increasing the risk of COVID-19 transmission, preventing unaccompanied children from being placed in the most appropriate facility, and delaying unaccompanied children's release to their sponsors.

29. ICE also relies on contractors to transport noncitizens in order to conduct its federal operations, as discussed above. Unless enjoined, the executive order will impede ICE's operations in Texas, resulting in excessive numbers of noncitizens at CBP facilities, which could lead to a health endemic at those facilities. ICE also would be unable to repatriate noncitizens who have been ordered removed or excluded from the United States. Furthermore, without the ability to utilize its contract support to transport of noncitizens to hospitals, emergency medical needs would not be met, thereby risking the health and lives of individuals.

30. The executive order would also significantly impact CBP operations and would impede CBP's ability to coordinate transportation with partners. If CBP is unable to transfer noncitizens out of CBP facilities, CBP detention numbers and the average time individuals are in its custody will rise, conditions will deteriorate, and there will be a greater risk of COVID-19 transmission to noncitizens and staff. The inability to transport unaccompanied children and family units will also hinder CBP's compliance with the TVPRA and the Federal Government's legal obligations under a 1997 settlement agreement. *See Flores v. Meese*, No. 85-cv-4544 (C.D. Cal.), ECF No. 101, Ex. 1 ¶ 40.

31. Federal immigration enforcement also depends on noncitizens having appropriate to transportation so that they can appear before immigration courts for removal proceedings or report to ICE offices around the country for additional processing. By restricting transportation

available to noncitizens, the executive order, unless enjoined, will interfere with these aspects of immigration enforcement.

## CLAIMS FOR RELIEF

### Count One: Preemption

32. Plaintiff hereby incorporates paragraphs 1 through 31 as if fully set forth herein.

33. The executive order is preempted by federal law. States laws and other regulations are preempted under the Supremacy Clause if they conflict with federal law. Thus, a state law or regulation is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67.

34. States have no authority to interfere with the United States' "broad, undoubted power over the subject of immigration" by impairing the United States' release of individuals and the ability of those individuals to comply with federal immigration law. *See Arizona*, 567 U.S. at 395-416.

35. The executive order purports to authorize state agents to act as immigration officers and interferes with the Federal Government's ability to lawfully release and transport noncitizens, and to conduct federal immigration hearings, to which noncitizens must travel in order to appear.

36. The executive order also purports to authorize the Texas Department of Public Safety to determine whether individuals are "subject to expulsion under the Title 42 order" and to take action against those transporting such individuals based on that determination. However, the power to determine whether an individual is "subject to expulsion under the Title 42 order" is reserved exclusively to the Federal Government.

37. The executive order therefore violates the Supremacy Clause and is invalid.

### Count Two: Violation of Intergovernmental Immunity

38. Plaintiff hereby incorporates paragraphs 1 through 37 as if fully set forth herein.

10

39. The doctrine of intergovernmental immunity arises from the Supremacy Clause of the U.S. Constitution and reflects the principle that "states have no power . . . to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by [C]ongress to carry into effect the powers vested in the national government." *M'Culloch v. Maryland*, 17 U.S. 316, 317 (1819); *see also Mayo*, 319 U.S. at 445 ("[T]he activities of the Federal Government are free from regulation by any state."); *Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920) (holding that state laws cannot "control the conduct of" individuals "acting under and in pursuance of the laws of the United States"); *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) (recognizing that a regulation violates the doctrine of intergovernmental immunity if it "seek[s] to directly regulate the conduct of agents of the federal government").

40. States also may not regulate the Federal Government through its contractors. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988) ("[A] federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation."); *United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019) ("For purposes of intergovernmental immunity, federal contractors are treated the same as the federal government itself."), *cert. denied,* 141 S. Ct. 124 (2020); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 840 (9th Cir. 2014) (holding unconstitutional a state law that "directly interfere[d] with the functions of the federal government" by "mandat[ing] the ways in which [a contractor] renders services that the federal government hired [it] to perform").

41. The executive order directly regulates the activities of the Federal Government and its contractors, grantees, and nongovernmental partners. The executive order expressly prohibits any "person, other than a federal, state, or local law-enforcement official" from providing "ground transportation to a group of migrants who have been detained by CBP for crossing the border illegally or who would have been subject to expulsion under the Title 42 Order." The executive order also directs State authorities to stop and reroute vehicles suspected of a violation of this

prohibition and impound vehicles. The executive order contains no exception for non-law enforcement federal personnel or for federal contractors or grantees.

42. The executive order therefore violates intergovernmental immunity and is invalid.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests the following relief:

1. A declaratory judgment stating that the executive order violates the Supremacy Clause and the doctrine of intergovernmental immunity, and therefore is invalid, null, and void;

2. Preliminary and permanent injunctions against the State of Texas, and its officers, agents and employees, from enforcing the executive order;

3. The United States' costs in this action; and

4. Any other relief the Court deems just and proper.

Dated July 30, 2021

Respectfully submitted

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel

/s/ *Joshua M. Kolsky*
ZACHARY A. AVALLONE
ELLIOTT M. DAVIS
STEPHEN EHRLICH
JOSHUA M. KOLSKY, D.C. Bar No. 993430
ANTONIA KONKOLY
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW Washington, DC 20005
Tel.: 202-305-7664
Fax: 202-616-8470

E-mail: joshua.kolsky@usdoj.gov

*Attorneys for Plaintiff*

# EXHIBIT A



GOVERNOR GREG ABBOTT

July 28, 2021

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
11:30 AM O'CLOCK
JUL 28 2021

Secretary of State

Mr. Joe A. Esparza
Deputy Secretary of State
State Capitol Room 1E.8
Austin, Texas 78701

Dear Deputy Secretary Esparza:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

Executive Order No. GA-37 relating to the transportation of migrants during the COVID-19 disaster.

The original executive order is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

# Executive Order

**BY THE
GOVERNOR OF THE STATE OF TEXAS**

Executive Department
Austin, Texas
July 28, 2021

**EXECUTIVE ORDER
GA 37**

*Relating to the transportation of migrants during the COVID-19 disaster.*

---

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on March 13, 2020, certifying under Section 418.014 of the Texas Government Code that the novel coronavirus (COVID-19) poses an imminent threat of disaster for all counties in the State of Texas; and

WHEREAS, in each subsequent month effective through today, I have renewed the COVID-19 disaster declaration for all Texas counties; and

WHEREAS, I issued a disaster proclamation on May 31, 2021, certifying under Section 418.014 that the surge of individuals unlawfully crossing the Texas-Mexico border poses an ongoing and imminent threat of disaster for certain counties and agencies in the State of Texas, including the potential for the spread of COVID-19; and

WHEREAS, in each subsequent month effective through today, I have amended and renewed the border disaster declaration; and

WHEREAS, in a so-called "Title 42 order," President Trump took action to protect Americans from COVID-19 by rapidly expelling migrants who could carry the disease across the border; and

WHEREAS, the Biden Administration has kept in place the Title 42 order, and for good reason; and

WHEREAS, despite the emergence of the highly contagious delta variant of COVID-19, and the fact that vaccination rates are lower in the countries that newly admitted migrants come from and pass through, President Biden has thwarted the Title 42 order's effect by admitting into the United States and the State of Texas, migrants who are testing positive for COVID-19; and

WHEREAS, President Biden's failure to enforce the Title 42 order, combined with his refusal to enforce the immigration laws enacted by Congress, is having a predictable and potentially catastrophic effect on public health in Texas; and

WHEREAS, to take just one data point, reports show that U.S. Customs and Border Protection (CBP) has recently seen a 900 percent increase in the number of migrant detainees who tested positive for COVID-19 in the Rio Grande Valley; and

WHEREAS, busloads of migrants, an unknown number of whom are infected with COVID-19, are being transported to communities across the State of Texas, exposing

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
11:30 AM O'CLOCK

JUL 28 2021

Texans to the spread of COVID-19, as has already been reported in cities like La Joya, among others; and

WHEREAS, President Biden's refusal to enforce laws passed by the United States Congress cannot be allowed to compromise the health and safety of Texans by knowingly exposing them to COVID-19; and

WHEREAS, in the Texas Disaster Act of 1975, the legislature charged the governor with the responsibility "for meeting ... the dangers to the state and people presented by disasters" under Section 418.011 of the Texas Government Code, and expressly granted the governor broad authority to fulfill that responsibility; and

WHEREAS, under Section 418.012, the "governor may issue executive orders ... hav[ing] the force and effect of law;" and

WHEREAS, under Section 418.018(c), the "governor may control ingress and egress to and from a disaster area and the movement of persons and the occupancy of premises in the area;" and

WHEREAS, the admittance and movement of migrants under the Biden Administration is exposing Texans to COVID-19 and creating a public health disaster in Texas;

NOW, THEREFORE, I, Greg Abbott, Governor of Texas, by virtue of the power and authority vested in me by the Constitution and laws of the State of Texas, do hereby order the following on a statewide basis effective immediately:

1. No person, other than a federal, state, or local law-enforcement official, shall provide ground transportation to a group of migrants who have been detained by CBP for crossing the border illegally or who would have been subject to expulsion under the Title 42 order.

2. The Texas Department of Public Safety (DPS) is directed to stop any vehicle upon reasonable suspicion of a violation of paragraph 1, and to reroute such a vehicle back to its point of origin or a port of entry if a violation is confirmed.

3. DPS is authorized to impound a vehicle that is being used to transport migrants in violation of paragraph 1, or that refuses to be rerouted in violation of paragraph 2.

This executive order shall remain in effect and in full force unless it is modified, amended, rescinded, or superseded by the governor.

Given under my hand this the 28th day of July, 2021.

*[signature]*

GREG ABBOTT  
Governor

FILED IN THE OFFICE OF THE  
SECRETARY OF STATE  
11:30AM O'CLOCK

JUL 28 2021

ATTESTED BY:

[signature]

JOE A. ESPARZA  
Deputy Secretary of State

FILED IN THE OFFICE OF THE  
SECRETARY OF STATE  
11:30AM O'CLOCK

JUL 2 8 2021