# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF TEXAS, GREG ABBOTT, in his official capacity as Governor of the State of Texas,<br><br>Defendants. | Case No. 3:21-cv-173 |

## DECLARATION OF BRIAN S. HASTINGS

1. I am the Chief Patrol Agent of the Rio Grande Valley (RGV) Sector, U.S Border Patrol (Border Patrol), U.S. Customs and Border Protection (CBP). I have been employed in this capacity since March 16, 2020. Prior to that date, I was the Chief of Law Enforcement Operations for the U.S. Border Patrol (CBP Headquarters, Washington, DC). In my capacity as the Chief Patrol Agent of the RGV Sector, I have direct oversight of nine Border Patrol stations responsible for securing 316 river miles, 317 coastal miles, and 34 counties.

2. I am responsible for executing the missions of the Border Patrol within the Rio Grande Valley RGV Sector. I make this declaration on the basis of my own

1

knowledge, as well as the documents and information made available to me in my position. I am submitting this declaration to explain the harm that the "Executive Order No. GA-37 relating to the transportation of migrants during the COVID-19 disaster" issued by the Texas Governor on July 28, 2021 would have on Border Patrol's operations, particularly with respect to the Border Patrol's significant reliance on contractors to transport migrants as part of the federal government's immigration operations.

3. The Border Patrol is comprised of 20 Border Patrol sectors. Of those, nine are located along the southwest border of the United States, with four being located completely within Texas and a fifth straddling the states of Texas and New Mexico.

4. The four Border Patrol sectors that are located completely in Texas are RGV, Laredo, Del Rio, and Big Bend. The El Paso Sector covers a portion of the border in Texas as well as New Mexico. There are over 1,200 miles of common border between Texas and Mexico. To date in Fiscal Year 2021, Border Patrol apprehended a total of approximately 860,000 migrants in these five sectors—approximately 69% of all apprehensions made by the entire Border Patrol. RGV alone has accounted for approximately 32% of all apprehensions in FY 2021.

5. I am familiar with the policies and procedures that govern the apprehension, processing, temporary detention and transport of migrants in RGV Sector, as well as those that are applicable for all of Border Patrol nationwide. I am responsible for ensuring that those policies and procedures are communicated to the agents, overseen by the supervisors, and implemented within the RGV Sector.

6. In Fiscal Year 2021, RGV has encountered a significant increase in apprehensions that has strained the capacity at RGV Border Patrol stations, which are only designed for short-term detention. Indeed, in Fiscal Year 2021, RGV's apprehensions are up approximately 529% as compared to Fiscal Year 2020.

7. When RGV Sector has historically faced an influx of apprehensions, Border Patrol has taken various steps to reduce the strain on the capacity to hold migrants who are apprehended entering the United States unlawfully. This includes activating other stations for processing, detailing agents from other sectors, and moving migrants to stations and other sectors that have fewer migrants in custody. These steps have also been taken during the ongoing influx.

8. For example, RGV Sector began transporting certain migrants, primarily those who entered as family units by bus, to other Border Patrol Sectors (e.g., Laredo Sector) to alleviate strain on capacity. Often, the U.S. Border Patrol uses contractors to provide such transportation. RGV has also constructed a new "soft-sided" facility in Donna, Texas. This facility can handle a large influx of migrants. This facility has the capacity to hold 813 migrants (based on current COVID-19 capacity recommendations). However, with the large number of migrants being apprehended this facility currently faces significant capacity constraints.

9. As part of a further effort to mitigate the high number of migrant apprehensions in RGV, the Temporary Outdoor Processing Site (TOPS), was constructed underneath the Anzalduas Bridge and serves as a short-term, open-air intake and processing area that enables CBP to intake, screen, and process certain migrant populations, all while

3

minimizing employee and migrant exposure to COVID-19 to the greatest extent possible. TOPS currently focuses on expeditiously processing those apprehended as family units in RGV Sector, and often releases migrants into the care of nongovernment organizations (NGOs) upon close coordinating with such NGOs. This coordination allows an average of 500-1,000 migrants to depart government custody and allows more safe and efficient use of CBP's enclosed facilities for custody. Moreover, releasing migrants in coordination with NGOs significantly reduces the COVID-19 risk to both CBP employees and migrants in custody because it reduces the number of individuals in enclosed facilities.

10. Certain classes of migrants without lawful immigration status are subject to mandatory detention and may not be released from immigration custody. For other migrants without lawful immigration status, U.S. Border Patrol generally has discretion to either maintain custody for transfer to the custody of Immigration and Customs Enforcement (ICE), the U.S. Department of Health and Human Services (HHS), Office of Refugee Resettlement (ORR) or release them from custody.

11. Further, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) and Flores Settlement Agreement impose limitations on U.S. Border Patrol's ability to detain migrants for extended periods. The TVPRA generally requires that an unaccompanied alien child (migrant unaccompanied child) be transferred to the HHS-ORR within 72 hours after determining that the minor is a migrant unaccompanied child. Similarly for migrant children accompanied by a parent or legal guardian (family units), the Flores Settlement Agreement generally

requires that CBP release the child to the parent within 3 days of apprehension or place the family in a nonsecure licensed facility. Thus, Border Patrol must generally prioritize processing and the transfer out of CBP custody of migrant unaccompanied children and family units.

12. As of July 29, 2021, there were 8,336 migrants in RGV Sector detention facilities. Of these, 6,459 were pending processing, and the average hold time for migrants in custody was 57.22 hours. The detention facilities in the other Texas Border Patrol Sectors are also strained due to the influx of migrants. For instance, as compared to the prior fiscal year, Del Rio Sector has seen an approximate 827% increase in migrant apprehensions. El Paso Sector has seen an approximate 283% increase in migrant apprehensions, and Laredo Sector has seen an approximate 206% increase in migrant apprehensions. Just like in RGV, this significant increase in apprehensions has strained Border Patrol's processing and detention capability in those sectors and has impacted the ability of ICE and HHS to assume custody of migrants.

13. In RGV Sector during this fiscal year, Border Patrol has released approximately 100,700 migrants, of which approximately 9,000 were released last week. Nearly 8,500 family unit migrants were released from CBP custody last week after coordination with an NGO.

14. To date this fiscal year, RGV Sector has transferred approximately 33,700 migrants into the custody of Enforcement and Removal Operations (ERO) of ICE. Last week, RGV Sector transferred at least 3,600 migrants into the custody of ERO. This fiscal year, approximately 51,000 migrant unaccompanied children were transferred from

RGV Sector into the custody of HHS-ORR. Included in the last week, approximately 2,200 migrant unaccompanied children were transferred from RGV Sector into the custody of HHS-ORR.

15. Just in RGV Sector alone, out of all migrants released from Border Patrol custody or transferred to the custody of another agency, such as ICE-ERO or HHS-ORR, for this fiscal year, approximately 120,000 were transported by a contractor of Border Patrol. Indeed, last week, approximately 9,600 migrants were transported from RGV Border Patrol custody by a contractor of Border Patrol.

16. The ability of ICE and its contractors to transfer migrants out of Border Patrol custody is essential as Border Patrol stations are only designed for short term detention.

17. I am familiar with the July 28, 2021 Executive Order issued by Texas Governor Greg Abbott (GA-37) relating to the transportation of migrants.

18. My understanding of this Executive Order is that it prohibits persons (except for federal, state, or local law enforcement officials) from providing ground transportation to a group of migrants who have been detained by CBP for crossing the border illegally or who would have been subject to expulsion under Title 42.

19. The Executive Order would significantly impact CBP operations, would impede CBP's ability to coordinate transportation with other federal partners, and prevent CBP's ability to obtain medical treatment for migrants requiring immediate medical attention.

20. As stated, Border Patrol must generally prioritize processing and the transfer out of custody of migrant unaccompanied children and family units based on the requirement of TVPRA and the Flores Agreement. In order to accomplish this prioritization, CBP coordinates the transfer and transportation of migrant unaccompanied children and family units with contractors from ICE and HHS-ORR. It is my understanding migrant unaccompanied children are transported to shelters throughout Texas and in some instances, to other states.

21. If the Executive Order prevents transportation of migrant unaccompanied children and family units, it would cause migrant unaccompanied children and family units to be held within CBP facilities for a longer period of time, thereby preventing CBP's compliance with both the TVPRA and the Flores Settlement Agreement. Impeding CBP's operations in this manner would also significantly increase the number of people held in CBP facilities and lengthen the average time in custody; increase the risk of COVID-19 transmission to migrants and employees; and prolong the government's placement of migrant unaccompanied children into the care and custody of HHS ORR and, from there, to an appropriate sponsor.

22. CBP utilizes assistance from ICE contract services for the transportation of migrants released from jail or prison. These migrants are transported to CBP facilities for final disposition and oftentimes, for removal from the United States.

23. CBP's daily operations rely heavily on the assistance of ICE contract services to transport migrants released from CBP custody which may include transport to ICE facilities for release or detention. CBP's inability to transfer migrants to ICE contract

7

services for transportation interferes with CBP's operation and impacts detention numbers and conditions.

24. Based on my experience and position, I expect that the Executive Order would also negatively impact CBP's inability to coordinate release of migrants to NGOs, which partner with CBP to play an important role in conducting COVID-19 testing and other mitigation management. This would also impede operations. Specifically, CBP coordinates with NGOs upon the release of migrants to receive prompt COVID-19 testing prior to being released into the community in order to promote public safety in the border communities. For any family members who test positive for COVID-19 immediately after release, CBP coordinates with appropriate NGOs for the provision of non-congregate accommodations so that the family members released from CBP custody can properly isolate and/or quarantine consistent with public health protocols. Without the assistance of NGOs, CBP would experience an increase in the number of people in custody because CBP would not be able to readily release migrants after coordination with NGOs who provide additional transportation and resources. For similar reasons, CBP would experience impacted detention conditions.

25. Further, NGOs routinely transport migrants released by Border Patrol to bus stations where the migrants board commercial busses to their ultimate destinations in the United States. If bus companies are barred by the Executive Order from transporting migrants released by Border Patrol, this will result in NGOs being unable to intake additional migrants and will ultimately impair Border Patrol's operations. This would likely result in migrants remaining in the local border communities without any

8

assistance or shelter by the NGOs, causing unsafe conditions for both migrants and the community. Indeed, prohibiting transportation within the State of Texas directly interferes with the migrant's ability to get to the next step in the immigration process. They often must travel in order to report to ICE offices throughout the country or even to appear before immigration courts.

26. Migrants who are in CBP custody oftentimes require transportation by ambulance to local healthcare services for treatment of various physical injuries and medical conditions. The Executive Order impedes CBP's ability to provide adequate medical attention and care otherwise available at local healthcare facilities for these migrants because the ambulance drivers are not law enforcement officials and therefore, would not fall under the exception within the Executive Order.

27. CBP utilizes contract services to assist with transportation of migrants between CBP facilities within the state of Texas. For instance, if a CBP facility in RGV is at or near capacity, CBP may need to rely on contractors to transport migrants to another sector within Texas (e.g., Laredo) that has more processing capacity. Additionally, CBP's operations would be impacted if transport between facilities was prohibited or delayed because this would impact detention numbers, the time in custody and detention conditions within CBP facilities.

28. If contract services to transport migrants were no longer available as a result of the Executive Order, CBP would be faced with untenable choices such as continuing operations with increased numbers of migrants in their facilities or have CBP law-enforcement officials transport these migrants. That later option would be required to

take law-enforcement officials from enforcement duties to engage in transportation activities that normally could be performed by contractors. This would severely impact CBP's daily operations by decreasing border security enforcement at the southwest border thereby increasing threats to national security; decreasing enforcement at checkpoints; and increasing duration for processing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of July, 2021.

_____
Brian S. Hastings
Chief Patrol Agent
Rio Grande Valley Sector
U.S. Border Patrol
U.S. Customs and Border Protection
Edinburg, Texas