**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF TEXAS and GREG ABBOTT, in his official capacity as Governor of the State of Texas,<br><br>Defendants. | Case No.   3:21-cv-173 |

**DECLARATION OF RUSSELL HOTT**

I, Russell Hott, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

**PERSONAL BACKGROUND**

1. I am currently employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Assistant Director for the Custody Management Division (CMD).  I have held this position since January 2021.  CMD provides policy and oversight for the administrative custody of ICE's highly transient and diverse population of immigration detainees.  CMD is composed of three divisions led by three Deputy Assistant Directors under my direct supervision: (1) the Alternatives to Detention Division; (2) the Detention Management Division; and (3) the Custody Programs Division.

1

2. As the Assistant Director, I am responsible for the effective and proficient performance of these three divisions and their various units, including the oversight of compliance with ICE's detention standards and conditions of confinement at ICE detention facilities generally.  I am further responsible for managing ICE detention operations efficiently and effectively to provide for the safety, security, and care of an average of about 19,000 detainees daily and roughly 150,000 detainees annually, at approximately 200 facilities nationwide, including family staging centers (FSCs) along the southwest border.

3. I began my career with the U.S. Government as a detention enforcement officer with the former Immigration and Naturalization Service in New York, NY in 2002.  I advanced through a variety of positions including Immigration Enforcement Agent, Deportation Officer, Instructor at the Federal Law Enforcement Training Center, Supervisory Detention and Deportation Officer, acting Assistant Field Office Director, National Program Manager, Unit Chief, acting Deputy Chief of Staff for ERO, Chief of Staff for the ICE Deputy Director, Deputy Field Office Director for both the Boston and Washington field offices, Field Office Director, and acting Deputy Assistant Director.

4. I am familiar with Governor Greg Abbott's July 28, 2021, Executive Order No. GA-37, relating to the transportation of migrants during the COVID-19 pandemic and submit this declaration to explain the extensive adverse impact it would have on ICE operations. The information in this declaration is based upon my personal knowledge and information provided to me in my official capacity.

**ICE PRACTICES NATIONWIDE**

5. As an operational program of ICE, ERO is responsible for the planning, management, and

direction of broad programs relating to the supervision, detention, and removal of noncitizens from the United States under U.S. immigration laws.   ERO's statutory responsibilities include the detention of noncitizens during the pendency of proceedings to determine whether they will be removed from the United States, as well as noncitizens subject to an administratively final removal order, pending their removal from the United States.   The immigration laws also mandate the detention of certain categories of noncitizens, including "arriving aliens," as defined in 8 C.F.R. §1.2, and certain categories of criminal and terrorist noncitizens.

6. ICE relies on express statutory authority to contract for goods and services required to carry out its authorities and responsibilities. This includes ICE's routine use of contractors for transporting noncitizens from U.S. Customs and Border Protection (CBP) custody to ICE processing and detention facilities, between ICE facilities, and from ICE facilities for removal from the United States. ICE has traditionally relied on private contractors for its transportation needs in particular, including ground transportation of its detained population to detention facilities nationwide. In addition, almost all ICE contracted detention facilities have some transportation services for local transportation provided on an as-needed basis. The use of contractors for this purpose is essential to ensuring that ICE's trained law enforcement personnel can focus on duties and operations that require law enforcement training and authorities, such as locating and apprehending fugitive noncitizens, conducting arrests, and executing final orders of removal.

7. If ICE were required to reposition personnel and assets from interior offices to handle routine ground transportation, key aspects of ICE's critical mission to protect public safety and maintain national security would not be able to be performed.   On average, ICE makes 4,000

3

arrests of priority migrants within the interior per month.  If ICE is forced to divert resources from the interior to perform transportation responsibilities, it will result in ICE not enforcing criminal and immigration laws against criminal migrants and fugitives will remain at large.

8. It is important that ICE focuses its finite law enforcement resources on its public safety mission and targeted enforcement operations like Operation SOAR (Sex Offender Arrest and Removal), a coordinated enforcement operation that builds on ongoing efforts to arrest and remove noncitizen sex offenders from our communities. In Fiscal Year (FY) 2021 through July 24, 2021, ICE ERO apprehended 30,681 noncitizens with criminal convictions; 7,917 noncitizens with pending criminal charges, and 13,630 other immigration violators.  13,779 of all ICE ERO administrative arrests were made at large.

9. Congress provides ICE annual appropriations to pay for transportation contracts, based on its annual budget submissions that request funding for ERO transportation contracts. Congress expects ICE to leverage contractor support in the movement of noncitizens as reflected in ICE's FY 2020, and FY 2021 Budget Requests.[1]

10. Further, in FY 2019, ERO Transportation and Removal Program purchased 17.9 million miles of contractor transportation and over 1.3 million contractor guard hours directly related to transportation.   The decentralized ground transportation network allows field offices to control local transportation networks and assets. ICE spent $175.5M in FY 2020, and $136M in FY 2021 to date on ground transportation in Texas alone.

11. In addition to removing noncitizens with a final order of removal and transporting adult

---

[1] *See* U.S. Immigration and Customs Enforcement, FY 2020 Congressional Budget Justification, *available at* https://www.dhs.gov/sites/default/files/publications/19_0318_MGMT_CBJ-Immigration-Customs-Enforcement_0.pdf; U.S. Immigration and Customs Enforcement, FY 2021 Congressional Budget Justification, *available at* https://www.dhs.gov/sites/default/files/publications/u.s._immigration_and_customs_enforcement_0.pdf.

noncitizens to, from, and between its detention facilities, ICE transfers unaccompanied noncitizen children (UCs) to the care of the Department of Health and Human Services, (HHS) Office of Refugee Resettlement (ORR), upon the assignment of bed space and transports family units internally to ICE FSCs. ERO is responsible for transporting UCs from the DHS apprehending agency to the designated ORR facility. The Juvenile and Family Residential Management Unit coordinates with ORR directly to place UCs encountered in the interior of the United States by other DHS components. In FY 2019, ICE transported 64,718 UCs through contractors, at a total contracted transportation cost of approximately $93.5M. In FY 2021, ICE transported 64,916 UCs within the state Texas.  In FY 2021, ICE transported 25,389 family unit members within the state of Texas.

12. In order to fulfill all of ICE's obligations as outlined in the paragraphs above, ICE must be able to transport noncitizens. The mode of transportation, including ground transportation, and the route of travel is contingent upon where the noncitizen is encountered, the applicable custody provisions and processes, and where the noncitizen will be housed and processed prior to their release from ICE custody.

13. Ground transportation includes the pick-up, transfer, and removal of noncitizens, as well as transportation to and from court, scheduled medical appointments, and emergency medical services.  Ground transportation provides integral support to other ICE activities, including custody management, enforcement, removals, and local field operations.

**ICE PRACTICES IN TEXAS**

14. ICE transfers noncitizens to, from, and within the State of Texas.  Given the landmass of Texas, ICE leverages local, county transportation contracts for short-range requirements, as well as utilizes its private ground transportation contractors for long-range requirements.  ICE

is currently transporting from CBP custody an average of 1,117 noncitizens daily from the southwest border, the majority of which stem from encounters along the border of Texas and Mexico, almost exclusively by contractors. The sheer number of noncitizens encountered by CBP along the southwest border and transferred to ICE custody makes it impossible for it to use law enforcement officers – as opposed to contractors – to transport them while still executing its law enforcement responsibilities.

15. ICE currently has more than 20 contracts with private service providers and county governments in the State of Texas for transportation services that incorporate over 8,000 miles per day.  These include major transportation contracts within the San Antonio, El Paso, Houston and Dallas areas with local companies that amount to over $200M annually.

16. As noted above, ICE is also transporting UCs from CBP to ORR custody. The care and custody of noncitizen minors, including their transportation, must comply with specialized laws and regulations, including the Homeland Security Act of 2002, the Trafficking Victims Protection Reauthorization Act (TVPRA), Violence Against Women Reauthorization Act of 2013, and the *Flores* Settlement Agreement. Immigration laws also require the transfer of custody of certain noncitizen minors encountered by DHS to the custody of HHS.

17. ICE also transports family units composed of adult parents or legal guardians with their minor children to FSCs. Because this transport involves minors, some of the special requirements applicable to UCs, such as the *Flores* Settlement Agreement, also apply to the transportation of family units composed of adult parents or legal guardians and minor children. This requires specially trained staff that understand all applicable legal requirements.  ICE uses the contractor, MVM Inc., to transport family units and UCs.  They hire specially trained staff that have a background in child welfare and can provide appropriate care while fulfilling all

legal requirements.  By using contractors, ICE is able to ensure the wellbeing of children during what can be a confusing and challenging process.

18. In FY 2021 to date, ICE's main private transportation contractor for families and UCs, MVM Inc., has transported approximately 97,443 noncitizens.

19. Even with the use of contractors, the current volume of noncitizens encountered at or near the border means that ICE is stretched to the limit transporting individuals away from high saturation points to locations for food, shelter, medical care, and safety, it will further exacerbate the current challenges at various CBP stations along the border.  The volume of encounters will quickly outpace any available space and could create a health endemic at those locations.  And without the ability to utilize its contract support to transport migrants to hospitals, emergency medical needs would not be supported, and lives would be at stake for heart attacks, high-risk pregnancies, highly contagious diseases, aneurisms, strokes, and more. Given that ICE has incorporated contractor support in its budget and operational planning, ICE does not have the fleet, manpower, or infrastructure necessary to provide and sustain support to the border enforcement in the midst of an unprecedented global pandemic.

20. Additionally, there are some noncitizens whose criminal history means that the presence of law enforcement officers during transport is required to safeguard the public.  Use of contractors for the transport of UCs, family units, and noncitizens who do not pose a risk to the community allows ICE to shift scarce law enforcement resources where they are most needed

21. Further, ICE has a very limited number of detention beds near saturation points along the Southwest border and its overall bed capacity got reduced by 15,000 beds to meet the requirements imposed by the COVID-pandemic to account for social distancing and cohorting

needs.  It is important that ICE has ability to transport noncitizens in its custody across Texas and nationwide. It is equally important that noncitizens released from CBP custody are able to timely travel to their intended destinations within the United States to comply with their immigration obligations by reporting to local ICE offices and promptly have their immigration proceedings commenced.

22. Finally, contractor support allows ICE to effectuate the repatriation of migrants who have been ordered removed from the United States.  Without contractor support, ICE would not be able to safely and effectively transport migrants to the southwest border or to international airports for purposes of removal.

23. If ICE is forced to discontinue the use of contractors for the transport of noncitizens, ICE will not be able to replace these contracts with federal law enforcement officers to handle the transportation.  In addition to not having sufficient fleet, ICE must maintain its practice of allocating scarce law enforcement resources to a critical aspect of its mission – public safety. This means that, without contracted fleet, ICE will not be able to transport noncitizens away from the border, worsening the situation.  ICE will also be prevented from another of its missions – removing noncitizens subject to final orders of removal, thereby allowing priority noncitizens with criminal convictions to remain in the United States.  In short, contractors are an integral to ICE operations.  Without these contracts, recent migrants, noncitizens being removed, and U.S. citizens will all be put at unnecessary risk.

This declaration is based upon my personal and professional knowledge, information obtained from other individuals employed by ICE, and information obtained from various records and systems maintained by DHS.  I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above captioned case.

Signed on July 30, 2021.

Russell Hott
Assistant Director for Custody Management Division
ICE Enforcement and Removal Operations