# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | § | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | Case No. 3:21-cv-173-KC |
| v. | § | |
| | § | |
| THE STATE OF TEXAS; GREG ABBOTT., in | § | |
| his official capacity as Governor of Texas, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

Table of Contents ............................................................................................................ ii

Introduction ..................................................................................................................... 1

Background ...................................................................................................................... 2

Argument .......................................................................................................................... 7

I.       The Federal Government Faces No Irreparable Harm........................................ 7

II.      The Federal Government Is Not Likely to Succeed on the Merits. ...................... 8

         A.       Federal Law Does Not Preempt GA-37............................................ 9

         B.       GA-37 Does Not Infringe on Intergovernmental Immunity. .................. 20

         C.       Congress Did Not Give DOJ a Cause of Action...................................... 24

III.     The Equities and Public Interest Foreclose a TRO Here. .................................... 26

IV.      The First-Filed Rule Prevents the Entry of Injunctive Relief. ............................. 27

Conclusion ...................................................................................................................... 28

Certificate of Service ..................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ................................................................................. 24

*Altria Grp., Inc. v. Good,*
555 U.S. 70 (2008) ..................................................................................... 9

*Anderson v. Edwards,*
514 U.S. 143 (1995) ................................................................................... 9

*Arizona v. United States,*
567 U.S. 387 (2012) ........................................................................... 15, 25

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ................................................................................. 25

*Blackburn v. U.S.,*
100 F.3d 1426 (9th Cir. 1996) ................................................................. 21

*Boeing Corp. v. Movassaghi,*
768 F.3d 832 (9th Cir. 2014) ................................................................... 21

*Cadle Co. v. Whataburger of Alice, Inc.,*
174 F.3d 599 (5th Cir. 1999) ................................................................... 27

*Cal. Fed. Sav. & Loan Ass'n v. Guerra,*
479 U.S. 272 (1987) ................................................................................... 9

*Chacon v. Granata,*
515 F.2d 922 (5th Cir. 1975) ..................................................................... 8

*DeCanas v. Bica,*
424 U.S. 351 (1976). GA-37 ..................................................................... 14

*Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport
News Shipbuilding & Dry Dock Co.,*
514 U.S. 122 (1995) ................................................................................. 24

*Edwards v. People of State of California,*
314 U.S. 160 (1941) ........................................................................... 15, 21

*Freedom From Religion Found., Inc. v. Mack*,
   No. 21-20279, — F.4th —, 2021 WL 2887861 (5th Cir. July 9, 2021) ........... 25, 26

*GEO Grp., Inc. v. City of Tacoma*,
   No. 3:18-cv-5233, 2019 WL 5963112 (W.D. Wash. Nov. 13, 2019) ...................... 23

*Gibbons v. Ogden*,
   22 U.S. (9 Wheat.) 1 (1824) ...................................................... 14, 16, 17

*Green v. Mansour*,
   474 U.S. 64 (1985) ............................................................... 25

*Haw. Hous. Auth. v. Midkiff*,
   467 U.S. 229 (1984) .............................................................. 23

*Jacobson v. Commonwealth of Massachusetts*,
   197 U.S. 11 (1905) ............................................................ 1, 26

*La. Envt'l Soc., Inc. v. Coleman*,
   524 F.2d 930 (5th Cir. 1975) ...................................................... 8

*Mayor, Aldermen & Commonalty of City of N.Y. v. Miln*,
   36 U.S. (11 Pet.) 102 (1837) ................................................. 14, 15, 16

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ........................................................... 7, 25

*McCulloch v. Maryland*,
   17 U.S. (4 Wheat.) 316 (1819) ................................................... 20

*Mi Familia Vota v. Abbott*,
   977 F.3d 461 (5th Cir. 2020) ..................................................... 26

*Murphy v. NCAA*,
   138 S. Ct. 1461 (2018) ....................................................... 15, 16

*Nationwide Mut. Ins. Co. v. Unauth. Practice of Law Cmte.*,
   283 F.3d 650 (5th Cir. 2002) ..................................................... 23

*Nichols v. Alcatel USA, Inc.*,
   532 F.3d 364 (5th Cir. 2008) .................................................... 7, 8

*North Dakota v. United States*,
   495 U.S. 423 (1990) ........................................................ 20, 21, 24

*Puente Ariz. v. Arpaio*,
   821 F.3d 1098 (9th Cir. 2016) ............................................... 9, 10, 12

*R.R. Comm'n of Tex. v. Pullman Co.*
  ˌ 312 U.S. 496 (1941) ............................................................... 23

*Rice v. Santa Fe Elevator Corp.,*
  331 U.S. 218 (1947) ................................................................. 9

*Save Power Ltd. v. Syntek Fin. Corp.,*
  121 F.3d 947 (5th Cir. 1997) ................................................. 27

*Siegel v. LePore,*
  234 F.3d 1163 (11th Cir. 2000) ............................................... 8

*South Carolina v. Baker,*
  485 U.S. 505 (1988) ............................................................... 20

*Sutter Corp. v. P & P Indus., Inc.,*
  125 F.3d 914 (5th Cir. 1997) ................................................. 28

*Texas v. Biden,*
  No. 2:21-cv-67 (N.D. Tex) ........................................................ 3

*Texas v. Biden,*
  No. 4:21-cv-579, ECF No. 1 (N.D. Tex. Apr. 22, 2021) ............... 18, 19, 20

*Texas v. United States,*
  No. 6:21-cv-16 (S.D. Tex.) ........................................................ 3

*Texas v. United States,*
  No. 6:21-cv-3 (S.D. Tex.) .......................................................... 3

*United States v. California,*
  921 F.3d 865 (9th Cir. 2019) ............................................... 20, 22

*United States v. Salerno,*
  481 U.S. 739 (1987) ................................................................. 9

*Villas at Parkside Partners v. City of Farmers Branch,*
  726 F.3d 524 (5th Cir. 2013) (en banc) ................................... 16

*W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, S. Atl. & Gulf Coast Dist.*
  *of ILA, AFL-CIO,*
  751 F.2d 721 (5th Cir. 1985) ................................................. 28

*Washington v. United States,*
  460 U.S. 536 (1983) ............................................................... 21

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ........................................................................... 9, 12

*Ex parte Young*,
    290 U.S. 123 (1908) ....................................................................... 25, 26

## Statutes

8 U.S.C.
    § 1182(a)(1)(A)(i) ................................................................................. 18
    § 1182(d)(5) .......................................................................................... 11
    § 1222(a) ............................................................................................... 18
    § 1232(b)(3) .......................................................................................... 11

42 U.S.C. § 265 ......................................................................................... 17

52 U.S.C. § 10308(d) ................................................................................ 24

U.S. Code Title 8 ...................................................................................... 13

U.S. Code Title 42 ............................................................................*passim*

## Other Authorities

8 C.F.R. § 232.3 ....................................................................................... 18

86 Fed Reg 38717 ..................................................................................... 17

*Border Agents, Communities*, KSAT12 San Antonio (July 28, 2021),
    https://www.ksat.com/news/local/2021/07/28/ lawmakers-ask-biden-
    administration-to-prioritize-health-of-border-agents-communities ................... 19

COVID-19 Country Specific Information, available at https:
    //travel.state.gov/content/travel/en/traveladvisories/COVID-19-
    Country-Specific-Info rmation.ht .............................................................. 2

Fed. R. Civ. P. 12(b)(6) ............................................................................ 24

Griff Jenkins & Adam Shaw, *COVID Cases Among Migrants in Rio
    Grande Valley Sector Surge 900% as Border Numbers Continue to
    Rise*, Fox News (July 20, 2021) ........................................................... 5, 6

Josh Holder, *Tracking Coronavirus Vaccinations Around the World*,
    N.Y. Times (July, 31 2021) ...................................................................... 4

June 1, 2021 Memorandum from Alejandro N. Mayorkas, available at
https://www.dhs.gov/sites/default/files/
publications/21_0601_termination_of_mpp_program.pdf. (last
visited Aug. 1, 2021) ................................................................ 3

*Migrants*, FOX29 San Antonio (July 30, 2021),
https://foxsanantonio.com/features/coronavirus/county-judge-
calling-on-federal-government-to-stop-the-release-of-migrants .......................... 18

Morrison, *Surge Raises Suspicions Migrants are Propelling COVID-19
Outbreaks*, Yahoo News (July 29, 2021, 1:59 PM) .................................. 5

*Public Health Determination Regarding an Exception for
Unaccompanied Noncitizen Children From the Order Suspending
the Right To Introduce Certain Persons From Countries Where a
Quarantinable Communicable Disease Exists*, 86 Fed Reg 38717
(July 16 2021). "Aliens and Nationality" ................................................. 13

*Quarantine and Isolation,* Centers for Disease Control,
https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/
quarantine.html (last visited Aug. 1, 2021) ............................................. 5

*Questions and Answers*, Centers for Disease Control,
https://www.cdc.gov/ coronavirus/2019-
ncov/hcp/faq.html#Transmission (last visited Aug. 1, 2021) .................................. 2

Rahul Subramanian, et al., *Quantifying Asymptomatic Infection and
Transmission of COVID-19 in New York City Using Observed Cases,
Serology, and Testing Capacity,* available at
https://www.pnas.org/content/118/9/e2019716118 (last visited Aug.
1, 2021) ................................................................................... 2

*Renewal of Determination That a Public Health Emergency Exists* (July
19, 2021) (available at https://www.phe.gov/emergency/
news/healthactions/phe/Pages/COVID-19July2021.aspx) ................................ 22

Southwest Land Border Encounters, available at
https://www.cbp.gov/newsroom/stats/southwest-land-border-
encounters .................................................................................. 4

Southwest Land Border Encounters, available at
https://www.cbp.gov/newsroom/stats/southwest-land-border-
encounters (last visited Aug. 1, 2021) .................................................. 5

Statement by Homeland Security Secretary Alejandro N. Mayorkas
Regarding the Situation at the Southwest Border, available at
https:// www.dhs.gov/news/2021/03/16/statement-homeland-
security-secretary-alejandron-mayorkas-regarding-situatio..................................3

*Texas Dashboard*, Tex. Health & Hum. Servs,
https://txdshs.maps.arcgis.com/apps/dashboards/ed483ecd702
b4298ab01e8b9cafc8b83. (last visited Aug. 1, 2021)..............................................2

*Texas,* Tex. Health & Hum. Servs (Mar. 4, 2020),
https://www.dshs.texas.gov/news/releases/2020/20200304.aspx (last
visited Aug. 1, 2021).............................................................................................2

*Unaccompanied Children Released to Sponsors by State*, available at
https: //www.acf.hhs.gov/orr/grant-funding/unaccompanied-
children-released-sponsors-stat...........................................................................4

## INTRODUCTION

Texas faces twin emergencies: (1) the COVID-19 pandemic, including the rapid spread of the Delta variant, and (2) the surge of migrants at Texas's international border. The migrant crisis feeds into the pandemic because the Biden Administration's open-borders policies allow COVID-infected migrants to spread the disease in Texas.

Governor Abbott issued Executive Order GA-37 to quell the "potentially catastrophic effect on public health in Texas" caused by the confluence of the migrant crisis and the pandemic. Exhibit 1 at 1. In GA-37, Governor Abbott generally precluded (with exceptions) providing transportation to groups of migrants who pose a danger of transmitting COVID-19 into Texas communities. Suffering from the ongoing release of migrants who may spread COVID-19, Texas was not required to sit on its hands: "Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 27 (1905).

But the federal government seeks to judicially nullify GA-37 through a blunderbuss and sweeping application of preemption and intergovernmental immunity. There is no merit to those arguments. GA-37 is a public-health regulation as the core of Texas's police power. It prevents the transport of groups of potentially infected individuals within Texas to avoid the spread of COVID-19 into Texas communities. It does not interfere with any federal functions.

BACKGROUND

On March 4, 2020, the Texas Department of State Health Services reported the first instance of a Texas resident testing positive for COVID-19. *See DSHS Announces First Case of COVID-19 in Texas,* Tex. Health & Hum. Servs (Mar. 4, 2020), https://www.dshs.texas.gov/news/releases/2020/20200304.aspx (last visited Aug. 1, 2021). Since then, more than 2.6 million Texans have contracted COVID, leading to almost 52,000 deaths statewide. *See COVID-19 in Texas Dashboard*, Tex. Health & Hum. Servs, https://txdshs.maps.arcgis.com/apps/dashboards/ed483ecd702b4298ab01e8b9cafc8b83. (last visited Aug. 1, 2021).

The COVID-19 crisis has presented an unprecedented challenge to public health and has caused devastating economic damage and societal disruption. As the world has learned, COVID-19 is highly contagious. *See Clinical Questions about COVID-19: Questions and Answers*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Transmission (last visited Aug. 1, 2021). COVID can often be spread by infected individuals who exhibit little to no visible symptoms. *See* Rahul Subramanian, et al., *Quantifying Asymptomatic Infection and Transmission of COVID-19 in New York City Using Observed Cases, Serology, and Testing Capacity,* available at https://www.pnas.org/content/118/9/e2019716118 (last visited Aug. 1, 2021). Governments across the world have curtailed international travel and imposed significant restrictions on the movement of people within and across their borders. *See* COVID-19 Country Specific Information, available at https://travel.state.gov/content/travel/en/traveladvisories/COVID-19-Country-Specific-Information.html.

2

Across the world, that is, save our southern border. In the six months since he has taken office, President Biden's immigration policy has created a humanitarian crisis at the border by systematically dismantling key border controls and immigration protections. Critical immigration programs such as the highly successful Migrant Protection Protocols (MPP) were discarded. *See* June 1, 2021 Memorandum from Alejandro N. Mayorkas, available at https://www.dhs.gov/sites/default/files/publications/21_0601_termination_of_mpp_program.pdf. (last visited Aug. 1, 2021). The Administration has also issued orders seeking to pause most congressionally mandated removals of aliens, and prioritization of immigration enforcement actions that has resulted in a failure to take custody of aliens convicted of crimes of moral turpitude and drug offenses as mandated by Congress. Each of these actions—that effectively erect an open border policy at the southern border—have been challenged by Texas as unlawful. *See Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex.) (MPP); *Texas v. United States*, No. 6:21-cv-3 (S.D. Tex.) (100-day pause on removals preliminarily enjoined); *Texas v. United States*, No. 6:21-cv-16 (S.D. Tex.) (prioritization).

The result of these policies has been a devastating (and entirely predictable) explosion of illegal immigration, human trafficking, and criminal acts against migrants. DHS Secretary Mayorkas himself admitted the federal government is "on pace to encounter more individuals on the southwest border than we have in the last 20 years." *See* March 16, 2021, Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border, available at https://www.dhs.gov/news/2021/03/16/statement-homeland-security-secretary-alejandron-

mayorkas-regarding-situation. And the Office of Refugee Settlement in the U.S. Department of Health and Human Services reports that, through June 30, 2021, unaccompanied children are being released to sponsors at a rate of 950 per month *in Texas alone* for this fiscal year (FY 2021), up from 195 per month in Texas for FY 2020. *See Unaccompanied Children Released to Sponsors by State*, available at https://www.acf.hhs.gov/orr/grant-funding/unaccompanied-children-released-sponsors-state. DHS's own data shows that total encounters with aliens at the southwest border has increased from 74,019 in December 2020 to 188,829 in June 2021. *See* Southwest Land Border Encounters, available at https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

The migrant crisis and the COVID-19's pandemic have converged in Texas to exact disastrous consequences, particularly along Texas's one-thousand-mile border with Mexico. The unprecedented surge of migrants crossing into Texas from foreign countries has exacerbated the risk of community spread of COVID. Many migrants come from countries with far lower vaccination rates than the United States. *See* Josh Holder, *Tracking Coronavirus Vaccinations Around the World*, N.Y. Times (July, 31 2021), https://www.nytimes.com/interactive/2021/world/covid-vaccinations-tracker.html (reflecting that Mexico, El Salvador, Guatemala, Honduras, Nicaragua, Costa Rica, Ecuador, Belize, and Panama all have significantly lower COVID vaccination rates than the United States). And the journey itself often entails crowded, unsanitary conditions that leave migrants vulnerable to exposure to the virus. The CDC recommends that in such instances, individuals undergo a 14-day quarantine to

mitigate the risk of further transmission. *See Quarantine and Isolation,* Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine.html (last visited Aug. 1, 2021). Experience has shown, however, that migrants who have evaded or been released from federal custody do not follow these procedures before entering the State's interior.

The numbers speak for themselves. For the four-month period from March through June 2021, Customs and Border Patrol data shows over 721,000 attempted entries along the Southwest border. *See* Southwest Land Border Encounters, available at https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Aug. 1, 2021). In the Rio Grande Valley alone, 330,000 migrants have been recorded in the last 10 months, up 478% from the same time last year. Morrison, *Surge Raises Suspicions Migrants are Propelling COVID-19 Outbreaks*, Yahoo News (July 29, 2021, 1:59 PM), https://news.yahoo.com/surge-raises-suspicions-migrants-propelling-185900170.html. And reports have indicated Customs and Border Patrol observed a 900% increase in the number of migrant detainees who tested positive for COVID-19. *See* Griff Jenkins & Adam Shaw, *COVID Cases Among Migrants in Rio Grande Valley Sector Surge 900% as Border Numbers Continue to Rise*, Fox News (July 20, 2021), https://www.foxnews.com/politics/covid-cases-migrants-rio-grande-valley-sector-border-numbers.

Against this grim backdrop, and to address the serious threat to public health posed by these two crises, Governor Abbott issued Executive Order No. GA-37. Exhibit 1. The Executive Order is chiefly concerned with migrants who are "admitted"

into the country with COVID-19 and who are permitted to roam free throughout the State, unwittingly contributing to the spread of virus. Subject to exceptions, it precludes the transportation of migrants who "have been detained by CBP for crossing the border illegally or . . . would have been subject to expulsion under the Title 42 order." *Id.* And it authorizes law enforcement to re-route migrants back to their port of entry or point of origin. *Id.* GA-37 is limited to intra-state movement by its own terms. *Id.*

Following the issuance of the Governor's order, DPS began working on policies governing how to enforce GA-37. Exhibit 5 ¶ 15. Developing enforcement policies is a time-consuming process that requires coordination with other state and federal entities. *Id.* ¶¶ 15–17. As part of its efforts to develop those policies, DPS consulted with the head of CBP (Raul Ortiz) on July 29, 2021, and a non-profit group that had been transporting migrants the next day. *Id.* ¶¶ 18–19. DPS sought to work with other interested parties wherever possible to develop enforcement guidelines. *Id.* ¶ 11. DPS considers federal immigration authorities to be "partners, not adversaries." *Id.* ¶ 19.

On July 29, 2021, Attorney General Garland wrote Governor Abbott a letter demanding that he rescind GA-37. *See* Exhibit 2. That letter expressed myriad concerns about GA-37. *Id.* at 2. Though the Attorney General expressed a desire to confer with Texas in an effort to avoid a lawsuit (citing the Justice Manual), the DOJ called the clerk's office the same day to warn the Court that a TRO filing was imminent. The next day, DOJ provided notice that DOJ intended to seek a TRO that

day—without further consultation with Texas or Governor Abbott, and without GA-37 having been enforced once.

**ARGUMENT**

The Court should deny the motion for a temporary restraining order. A TRO is an even more "extraordinary and drastic remedy" than a preliminary injunction. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). A TRO "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Id.* Plaintiff has not "clearly carried the burden of persuasion on all four requirements." *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008) (quotation omitted).

First, the federal government faces no imminent irreparable harm that could justify extraordinary relief. DPS cannot begin enforcing GA-37 until after it develops the necessary policies to guide enforcement, which will not occur for about a week. *See* Exhibit 5 ¶ 16. Second, the federal government is unlikely to prevail on the merits. GA-37 is a lawful exercise of the State's power to protect public health, neither preventing the federal government from enforcing federal immigration law nor discriminating against the federal government. Indeed, the Department of Justice cannot sue because Congress did not grant it a cause of action. Finally, the equities and public interest counsel against restraining a sovereign State from implementing an important public-health protection during a pandemic.

## I.    The Federal Government Faces No Irreparable Harm.

The federal government's bid for a TRO should be denied at the outset because the United States cannot satisfy the key temporal prerequisite for such expedited, emergency relief: a "substantial threat of irreparable injury if the injunction is not

7

granted." *Nichols*, 532 F.3d at 372. "A [TRO] is appropriate only if the anticipated injury is imminent and irreparable." *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). Thus, "the asserted irreparable injury must be neither remote nor speculative." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted). Yet such unsubstantiated speculation is all the federal government offers.

The United States tries to establish irreparable injury by conjuring up extreme and hypothetical harms that it believes will be visited upon it when DPS begins to enforce GA-37. *See* ECF No. 3 at 17–18. It cannot show that these imagined harms have come to pass because *the Executive Order has not yet been enforced* and will not be enforced at least until DPS adopts implementing policies. Exhibit 5 ¶¶ 16, 25. Moreover, as explained below, Plaintiff's alarmist rhetoric appears to be premised on a fundamental misreading of the Executive Order, which on its face exempts federal, state, and local law-enforcement officials from its restrictions and therefore does not interfere with the federal government's enforcement of immigration law. *Infra* Section II.A.

The federal government's claim to irreparable injury is, at bottom, premature. Because the Executive Order has not yet been enforced and the precise contours of that enforcement are still being shaped, the federal government cannot establish any "immediate" non-speculative injures. *La. Env't Soc., Inc. v. Coleman*, 524 F.2d 930, 933 (5th Cir. 1975). For that reason alone, this Court should deny the TRO. *See id.*

## II.    The Federal Government Is Not Likely to Succeed on the Merits.

Texas and Governor Abbott are likely to prevail on the merits.

### A.     Federal Law Does Not Preempt GA-37.

Courts "start with the assumption that the historic police powers of the States were not to be superseded . . . unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). This presumption against preemption applies "[i]n all pre-emption cases." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). But it "applies with particular force when Congress has legislated in a field traditionally occupied by the States." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008).

The federal government brings a facial, pre-enforcement preemption challenge against GA-37 on the theory that the order "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 281 (1987) (quotation marks omitted); *see* ECF No. 3-4 at 2 (seeking to enjoin "any action to enforce the executive order"); *Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995). "[A] facial challenge is 'the most difficult challenge to mount successfully, since the [plaintiff] must establish that no set of circumstances exists under which the [executive order] would be valid.'" *Edwards*, 514 U.S. at 155 n.6 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

Even if the United States can dream up "some applications" of GA-37 that would impermissibly "implicate federal immigration priorities," that "does not mean that the [order] as a whole" should be enjoined. *Puente Ariz. v. Arpaio¸* 821 F.3d 1098, 1108 (9th Cir. 2016) (emphasis added). Showing "that a possible application" of" GA-37 "violated federal law" would "not sustain [Plaintiff's] burden." *Edwards*, 514 U.S.

at 155 n.6. To succeed on its chosen theory, the federal government must show that *every* application of GA-37 would stand as an obstacle to federal immigration law—and it cannot.

### 1.    GA-37 Is Not An Obstacle to the Enforcement of Federal Immigration Laws.

The federal government's preemption arguments are doomed. Start with the facial nature of the United States' preemption argument. The federal government makes no effort to clear the "high bar" of showing that "no set of circumstances exists" under which GA-37 is lawful. *Puente Ariz.,* 821 F.3d at 1104. Instead, it argues (wrongly) that GA-37 would be preempted in "certain applications . . . not evident from the [Executive Order's] text," *id.* at 1108, for example, against federal agencies. *See* ECF No. 3 at 9–10.

But "[j]ust because [Texas] could . . . enforce" the Executive Order in ways that arguably are in tension with certain federal immigration laws, that "does not mean that the [Executive Order] as a whole should be struck down." *Puente Ariz.*, 821 F.3d at 1107–08. After all, no one disputes that Texas could, consonant with federal immigration law, enforce the Executive Order against private parties who are illegally assisting migrants infected with COVID-19 to evade federal custody by ferrying them across the border and throughout Texas. The United States does not even argue that *this* application of GA-37 would be invalid—let alone that there is "no set of circumstances" where it should be. This Court should therefore reject the United States' facial challenge to GA-37.

The federal government's inability to show that GA-37 is preempted in *all* applications is not its only problem: the government cannot even show that GA-37 is preempted in *any* specific application. First, take the federal government's assertion that enforcement of GA-37 will render it unable to "release noncitizens from custody through various mechanisms including parole under 8 U.S.C. § 1182(d)(5) and conditional release under § 1226(a)(2)(B)." ECF No. 3 at 9. There is nothing at all in GA-37 that prevents the federal government from releasing aliens on parole or conditional release. GA-37 merely forbids "provid[ing] ground transportation to a group of migrants" who are likely to contribute to the spread COVID-19. Exhibit 1 ¶ 1. It says nothing about "release[ing] noncitizens from custody." ECF No. 3 at 9.

Second, the federal government is wrong to suggest that GA-37 prevents it from "transfer[ring] . . . certain noncitizens between federal agencies." ECF No. 3 at 10 (citing 8 U.S.C. § 1232(b)(3)). Again, GA-37 expressly exempts "federal, state, or local law-enforcement official[s]." Exhibit 1 ¶ 1. Nothing prevents others from transporting individual migrants (*e.g.*, a migrant who needs to be taken to the hospital for medical treatment), as opposed to the "group[s]" covered by GA-37. *Id.* ¶ 1.

Third, the United States' vague references to "federal partners" likewise cannot support its preemption argument. ECF No. 3 at 11. The federal government fails to point a single federal law describing these "federal partners," establishing a relationship with them, giving them federal responsibilities, or granting them the right to disregard state public health-and-safety orders. This is the opposite of the

"clear and manifest intent of Congress" that is required to supplant state control over matters traditionally within their police powers. *Wyeth*, 555 U.S at. 565 (quoting *Lohr*, 518 U.S. at 485); *Puente Ariz.*, 821 F.3d at 1105.

The so-called "partners" appear to be non-governmental organizations (NGOs) with their own purposes and goals—namely serving the interests of illegal aliens rather than operating pursuant to federal law. By the United States' own admission, those NGOs have no formal legal relationship with the federal government, are not enforcing federal law, and are transporting migrants after they have left federal custody. ECF No. 3 at 5. Instead of pursuing federal objectives set by Congress, the NGOs seemingly provide transportation so that aliens can reach whatever "ultimate destinations" the aliens have chosen. ECF No. 3 at 5.

Finally, the federal government's suggestion that GA-37 will prevent migrants from travelling to immigration hearings is meritless. ECF No. 3 at 11. GA-37 does not prohibit individual migrants from traveling, much less from travelling to appear before an ICE agent or an immigration judge. GA-37 applies only to certain parties providing ground transportation to a "group" of migrants. Exhibit 1 ¶ 1.

GA-37 does not impede immigration enforcement. After all, President Biden's "refusal to enforce the immigration laws enacted by Congress" contributed to the "predictable and potentially catastrophic effect on public health in Texas" that necessitated that order. *Id* at 1. Nothing in the order suggests it will be enforced against migrants traveling to appear at immigration proceedings—and in any event, that would be the sort of as-applied challenge that can be pursued in the unlikely

event that Texas's as-yet-to-be-promulgated enforcement protocols applied to such migrants.

### 2. GA-37 Does Not Improperly Require State Officials to Make Discretionary Determinations about Federal Immigration Status.

Plaintiff argues that GA-37 is preempted because it "impos[es] consequences on noncitizens based on their immigration status without federal direction and supervision." ECF No. 3 at 14 (quotation marks omitted). Not so. GA-37 does not regulate immigration, and it does not turn on "immigration status."

GA-37 is a public-health measure making a public-health designation; for example, GA-37's purpose, stated in its text, is to improve "public health in Texas" and ameliorate "a public health disaster in Texas." Exhibit at 1–2.

Plaintiff emphasizes GA-37's reference to "the Title 42 Order," ECF No. 3 at 14, but the term "Title 42" comes from the fact that the relevant statutory provision is found in Title 42 of the U.S. Code: "The Public Health and Welfare." That is why the Title 42 Order was issued by the Centers for Disease Control and Prevention within the U.S. Department of Health and Human Services, not Customs and Border Protection within the Department of Homeland Security. *See Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children From the Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 86 Fed Reg 38717 (July 16 2021). "Aliens and Nationality" are covered in Title 8 of the U.S. Code—which GA-37 does not depend on.

Federal law does not prohibit Texas from protecting public health during a pandemic. "[H]ealth laws of every description" are within the States' police powers. *Mayor, Aldermen & Commonalty of City of N.Y. v. Miln*, 36 U.S. (11 Pet.) 102, 133 (1837) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 203 (1824)). That GA-37 is within Texas's police power is shown by "its purpose, the end to be attained." *Id.*; *see also Gibbons*, 22 U.S. (9 Wheat.) at 203 (analyzing "[t]he object of inspection laws" in determining that they remain within a State's police power).

The fact that GA-37 applies to people transporting migrants does not make it any less of an internal issue suitable for the State's police power. Even when "aliens are the subject of a state statute," that "does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas v. Bica*, 424 U.S. 351, 355 (1976). GA-37 does neither of those things.

Even if GA-37 "may have a remote and considerable influence on" migrants, that does not mean that "that a power to regulate [immigration] is the" only "source" of authority that can support GA-37. *Gibbons*, 22 U.S. (9 Wheat.) at 203. "[T]he general power of the states to regulate their own internal police" supports efforts "to guard against . . . physical pestilence" from "infectious disease" brought by travelers. *Miln*, 36 U.S. (11 Pet.) at 142–43. "Can anything fall more directly within the police power and internal regulation of a state, than that which concerns the care and

14

management of . . . persons that may be thrown into the country, and likely to endanger its safety?" *Id.* at 148 (Thompson, J., concurring).[1]

Acknowledging State authority over public-health problems posed by migrants with COVID-19 does not "cast any reproach upon foreigners who may arrive in this country." *Id.* "But if all power to guard against these mischiefs is taken away, the safety and welfare of the community may be very much endangered." *Id.*

The federal government relies on *Arizona v. United States*, 567 U.S. 387 (2012), but in that case, an Arizona statute was preempted because "[i]ts stated purpose" was "to 'discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States." *Id.* at 393. The Arizona law "violate[d] the principle that the removal process is entrusted to the discretion of the Federal Government" "[b]y authorizing state officers to decide whether an alien should be detained for being removable." *Id.* at 409. That was a problem because "[a] decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States." *Id.* "Decisions of this nature touch on foreign relations and must be made with one voice." *Id.* As the Supreme Court later explained, the key to its decision in *Arizona* was that Congress "confer[red] a federal right" on aliens "to be free from [state-level immigration] requirements." *Murphy v. NCAA*, 138 S. Ct. 1461, 1481 (2018).

---

[1] The Supreme Court has not cut back on States' authority to prevent "physical pestilence" even though it has reconsidered the part of *Miln* discussing efforts to prevent purported "moral pestilence." *Edwards v. People of State of California*, 314 U.S. 160, 176–77 (1941).

That principle does not apply here. GA-37's "stated purpose" is to promote public health, not regulate immigration. For that reason, GA-37 does not turn on removability, and it does not allow state officers to decide who "should be detained"— much less based on federal immigration status. *Id.* Nor does it address who should "continue living in the United States" or "touch on foreign affairs." *Id.* And Congress certainly has not conferred any federal-law right to disregard state-level public-health restrictions: "[I]t cannot be claimed, that [those providing transportation to migrants], are exempted from any duty imposed by the laws of a state, after their arrival within its jurisdiction; or have a right to wander, uncontrolled, after they become mixed with the general population of the state." *Miln*, 36 U.S. (11 Pet.) at 147 (Thompson, J., concurring).

Plaintiff next relies on *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524 (5th Cir. 2013) (en banc), but it fails to mention that the court fractured without producing a majority opinion. *See id.* at 525–26 (showing that only five of fifteen judges joined the opinion Plaintiff cites). Thus, the federal government is wrong to say that "the Fifth Circuit held" any of the propositions it quotes. ECF No. 3 at 12. In any event, *Villas* does not apply for the same reasons *Arizona* does not apply. It analyzed an immigration classification, not a public-health classification. *See Villas*, 726 F.3d at 536 ("the legality of a non-citizen's presence").

Perhaps state-level prohibitions on transporting migrants would raise preemption issues if pursued for purposes of regulating immigration. But GA-37 does no such thing. It has an entirely different "object": public health. *Gibbons*, 22 U.S. (9

16

Wheat.) at 203. Thus, it flows from the State's police power without claiming a power over immigration. That matters. "All experience shows, that the same measures, or measures scarcely distinguishable from each other, may flow from distinct powers." *Gibbons*, 22 U.S. (9 Wheat.) at 204.

### 3.    The Biden Administration Is Violating Title 42.

The federal government's fundamental complaint seems to be that GA-37 may pose inconveniences for aliens released into the United States. *See* ECF No. 3 at 4–5 (discussing aliens' abilities to reach "their ultimate destinations" after being released from federal custody). Some level of inconvenience for potentially COVID-infected illegal aliens is an unavoidable result of protecting public health during a pandemic. Indeed, every Texan has been asked to suffer significant inconveniences over the course of the last eighteen months. But regardless, public-health-justified inconvenience for migrants cannot support preemption.

The federal government cannot credibly argue that GA-37 interferes with its ability to physically release migrants. For example, preventing third parties from providing transportation to groups of migrants does nothing to prevent the federal government from releasing individuals from detention.

But even if it did, federal law still would not preempt GA-37. After all, the federal government is not supposed to be releasing these migrants anyway; the CDC's Title 42 Order determined "that a suspension of the right to introduce such persons . . . is required in the interest of the public health." 42 U.S.C. § 265; *see* 86 Fed Reg 38717. Exceptions to that rule are themselves unlawful—a claim Texas is

currently pursuing in the Northern District of Texas. *See* Complaint, *Texas v. Biden*, No. 4:21-cv-579, ECF No. 1 (N.D. Tex. Apr. 22, 2021).

Indeed, even apart from Title 42, the federal government is obligated to detain aliens "[f]or the purpose of determining whether" they are "inadmissible . . . by reason of being afflicted with" covered "diseases." 8 U.S.C. § 1222(a). This is a mandatory duty: "[A]liens shall be detained . . . ." *Id.*; *see also* 8 C.F.R. § 232.3 ("shall"). COVID-19 is covered because it is a "communicable disease of public health significance." 8 U.S.C. § 1182(a)(1)(A)(i).

Instead of complying with its non-discretionary duty to detain aliens until determining whether they have COVID-19, the federal government is simply releasing the aliens from federal custody without testing them.[2] The fact that NGOs sometimes test aliens for COVID-19 after they are released does little to protect public health. *See* ECF No. 3 at 2 (explaining that CBP "coordinates with NGOs when releasing" aliens, who receive "COVID-19 testing" from the NGO only *after* being released). By then, the individual has exposed any number of others residing in Texas to this potentially deadly disease.

Consider, for example, a family of migrants released in La Joya, Texas. The family went to a public restaurant and began "coughing and sneezing without covering their mouths." Exhibit 6. They "were not wearing face masks." *Id.* When a

---

[2] Alejandra Guzman-Tracy, *County Judge Calling on Federal Government to Stop the Release of Migrants*, FOX29 San Antonio (July 30, 2021), https://foxsanantonio.com/features/coronavirus/county-judge-calling-on-federal-government-to-stop-the-release-of-migrants (quoting Val Verde County Judge Lewis Owens as complaining that hundreds of aliens are being released at a local gas station and that "[t]he policy is that they're not being tested for COVID").

citizen complained, a La Joya police officer learned that the family "had been apprehended by Border Patrol days prior" but "were released because they were sick with Covid-19." *Id.* Incidents like this one necessitated GA-37: "[B]usloads" of migrants, an unknown number of whom are infected with COVID-19, are being transported to communities across the State of Texas, exposing Texans to the spread of COVID-19, as has already been reported in cities like La Joya, among others. Exhibit 1 at 1–2.

The Executive Branch is not following congressional commands. Lawmakers have noticed. Representative Tony Gonzales, for example, has emphasized that migrants "must be tested" and that the federal government must "ensure that we're not releasing COVID-positive migrants into any community."[3]

Texas has challenged the Biden Administration's unlawful actions, under both the Administrative Procedure Act and the Immigration and Nationality Act. *See* Complaint, *Texas v. Biden*, No. 4:21-cv-579, ECF No. 1 (N.D. Tex. Apr. 22, 2021). Judge Pittman has already considered one motion for preliminary injunction, which subsequent agency action mooted, and granted Texas leave to amend its complaint. He underscored the stakes of the Biden Administration's failures: "Negligently allowing even one COVID-19-positive UAC into the country in the middle of a pandemic would be problematic, but willfully admitting thousands of COVID-19

---

[3] Tiffany Huertas, *Lawmakers Ask Biden Administration to Prioritize Health of Border Agents, Communities*, KSAT12 San Antonio (July 28, 2021), https://www.ksat.com/news/local/2021/07/28/lawmakers-ask-biden-administration-to-prioritize-health-of-border-agents-communities/.

positive UAC is deplorable." Order, *Texas v. Biden*, No. 4:21-cv-579, ECF No. 54 at 6 n.6 (N.D. Tex. July 29, 2021).

Even if GA-37 impeded the federal government's ability to release migrants potentially infected with COVID-19, GA-37 would not violate federal law. It would vindicate federal law. Because the Biden Administration's actions are themselves unlawful, the Supremacy Clause does not protect them from any inconveniences posed by state law. Under our Constitution, "the supreme Law of the Land" includes "the Laws of the United States," not federal agency action in derogation of those laws. U.S. Const. art. VI, cl. 2.

## B.   GA-37 Does Not Infringe on Intergovernmental Immunity.

GA-37 does not infringe on the federal government's intergovernmental immunity—which the federal government grossly overstates.

**1.** As an initial matter, Plaintiff argues that the doctrine forbids state actions that "retard, impede, burden, or in any manner control" how the federal government executes federal laws, ECF No. 3 at 14 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 317 (1819)), but that argument "has now been 'thoroughly repudiated.'" *North Dakota v. United States*, 495 U.S. 423, 436 (1990) (quoting *South Carolina v. Baker*, 485 U.S. 505, 520 (1988)). Rather, a "state regulation is invalid only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *Id*. And the "Supreme Court has clarified that a state 'does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them.'" *United States*

*v. California*, 921 F.3d 865, 881 (9th Cir. 2019) (quoting *Washington v. United States*, 460 U.S. 536, 544–45 (1983)).

GA-37 does nothing of the sort. It explicitly treats federal law-enforcement officers the same way it treats state and local law-enforcement officers. It uniformly prohibits *anyone* who is not a federal, state, or local law-enforcement officer from furnishing ground transportation to certain groups of migrants—just as North Dakota was allowed to uniformly regulate every liquor distributor operating within its borders, whether it sold to the federal government or not, and as Washington was allowed to impose a tax on every government building contractor operating within its borders, whether it contracted only with the federal government or not. *See North Dakota*, 495 U.S. at 436–438; *Washington*, 460 U.S. at 544–546.

Unlike prohibited state actions, GA-37 does not discriminate. It does not subject facilities where detainees are held to different standards than it subjects other facilities or require state authorities to second-guess the decisions of federal officials. *Compare California*, 921 F.3d at 885–86 (enjoining state statute that did so). It does not impose elevated standards for inspection and cleanliness on federal contractors and projects. *Compare Boeing Corp. v. Movassaghi*, 768 F.3d 832, 839–40 (9th Cir. 2014) (enjoining state statute that did so).

Nor can the Government rely on *Blackburn v. U.S.*, 100 F.3d 1426, 1435 (9th Cir. 1996), for the proposition that "states may not directly regulate the Federal Government's operations or property." ECF No. 3 at 15. *Blackburn* involved California's attempts to impose penalties on the federal government for maintaining

in a national park structures that didn't comport with California safety codes. *Id.* GA-37 does not regulate activities on federal property. It addresses only "ground transportation [of] a group of migrants," an exercise of the State's police power to protect the health of its citizens from transmission of a communicable disease that has caused a national health emergency that the federal government itself extended only days ago. *See* Xavier Becerra, *Renewal of Determination That a Public Health Emergency Exists*, (July 19, 2021) (available at https://www.phe.gov/emergency/ news/healthactions/phe/Pages/COVID-19July2021.aspx).

**2.** Even if intergovernmental immunity does preclude the application of GA-37 to the government itself, the federal government cites no authority for the proposition that intergovernmental immunity extends to its "grantees" or "NGO partners." ECF No. 3 at 16. The most it can point to are cases holding that "federal contractors are treated the same as the federal government itself" for such purposes. *Id.* (quoting *California*, 921 F.3d at 882 n.7). It is one thing to protect entities bound by contract to pursue the federal government's goals. It is another thing to immunize from state law every recipient of federal monies. And it is yet another thing entirely to claim that power for every entity the federal government chooses to call a "partner"—a term far too ambiguous to have any real content.

**3.** The federal government's reliance on GA-37's "whereas" clauses cannot overcome this conclusion. *See* ECF No. 3 at 15. Those are not GA-37's operative provision, and they do not alter the rights and duties of anyone in the State. The operative provisions plainly do not impose different burdens based on an affiliation

with the federal government. Plaintiffs' speculation about "the alleged motives behind" GA-37 are irrelevant to intergovernmental immunity. *GEO Grp., Inc. v. City of Tacoma*, No. 3:18-cv-5233, 2019 WL 5963112, at \*4 (W.D. Wash. Nov. 13, 2019).

If anything, the federal government's own arguments undercut its request for a TRO. If, as the motion for a TRO argues, the constitutional question of intergovernmental immunity is avoided altogether by interpreting GA-37 as "exempting *all* federal officials, contractors, and other non-governmental partners," *see* ECF No. 3 at 15 n.3, then there is no justification for considering a TRO at this time, before DPS has even formulated its enforcement procedures.

Moreover, if the Court has a question about whether the Executive Order should be so construed, it should abstain, under the *Pullman* doctrine, from hearing the Government's case. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501–02 (1941). Under *Pullman*, the Court "should abstain from exercising its jurisdiction 'when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided.'" *Nationwide Mut. Ins. Co. v. Unauth. Practice of Law Cmte.*, 283 F.3d 650, 652–53 (5th Cir. 2002) (quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984)). According to the federal government's own argument, both elements of the *Pullman* test are met here: It is bringing a federal constitutional challenge to a state action, and resolving an unclear issue of state law—here, what conduct enforcement of GA-37 will reach—could make it unnecessary to rule on that constitutional question. *Id.* at 653; *see* ECF No. 3 at 15

n.3 (describing order as "vague and ambiguous" and stating that construing it may "avoid the constitutional question altogether").

### C.    Congress Did Not Give DOJ a Cause of Action.

Finally, Plaintiff cannot succeed on the merits because it lacks a cause of action. After all, a plaintiff must have a cause of action to bring a lawsuit. Fed. R. Civ. P. 12(b)(6). Congress sometimes expressly provides the federal government a cause of action to enforce federal law: for example, the Voting Rights Act provides that "the Attorney General may institute for the United States . . . an action for preventative relief." 52 U.S.C. § 10308(d). Or, rarely, Congress implicitly creates a right of action in a federal statute. *Alexander v. Sandoval*, 532 U.S. 275, 290–91 (2001). But here, the federal government does not rely on any cause of action, express or implied. The complaint cites no cause of action at all. *See* ECF No. 1 ¶¶ 32–42.

The Executive Branch's statute-free approach to suing Texas undermines Congress's decision to provide a statutory cause of action for some claims but not for others. "[T]he United States Code displays throughout that when an agency in its governmental capacity is meant to have standing, Congress says so." *Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 129 (1995) (holding Congress had not given a federal agency the ability to seek judicial review).

Ignoring the need for a statutory cause of action, the federal government styles its causes of action as the Supremacy Clause and a "Violation of Intergovernmental Immunity." As intergovernmental immunity arises from the Supremacy Clause, *see North Dakota*, 495 U.S. at 434–36 (plurality op.), these are two ways of saying the

same thing: that the Supremacy Clause itself provides the federal government with a cause of action. But the Supreme Court has expressly held "that the Supremacy Clause is not the 'source of any federal rights,' and certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015) (citations omitted). And while the federal government has relied on the Supremacy Clause to sue States in the past, *e.g. Arizona*, 567 U.S. at 393–94, those suits pre-date *Armstrong*.

To be sure, "federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Armstrong*, 575 U.S. at 326–27. That is the basis for an equitable cause of action under *Ex parte Young*, 290 U.S. 123 (1908). *See Armstrong*, 575 U.S. at 326–27. But if the federal government means to rely on *Ex parte Young* for its cause of action, it must abide by that action's limitations. Thus, even when "no one . . . is arguing about sovereign immunity," "the *second* of *Ex parte Young*'s holdings" is relevant to "whether [the federal government] has an equitable cause of action against" Texas and Governor Abbott. *Freedom From Religion Found., Inc. v. Mack*, No. 21-20279, — F.4th —, 2021 WL 2887861, at *4 n.3 (5th Cir. July 9, 2021).

*Ex parte Young* cannot help the federal government here. For one, an *Ex parte Young* action cannot be brought against the State itself. *See Green v. Mansour*, 474 U.S. 64, 68 (1985) (explaining that *Ex parte Young* rests on the theory that suit is "not one against the State"). For another, an *Ex parte Young* act must be brought against a state officer *enforcing* a challenged order, not the officer issuing that order.

*Mi Familia Vota v. Abbott*, 977 F.3d 461, 467 (5th Cir. 2020). Governor Abbott issues executive orders; he does not enforce them. *Id*. at 467–68. Instead, the federal government may bring an *Ex parte Young* action, if at all, only against an "official [with] a sufficient 'connection' with the enforcement of an allegedly unconstitutional law." *Id*. at 467; *see also Freedom From Religion Found., Inc.*, 2021 WL 2887861, at *4 (similar).

That is neither Texas nor Governor Abbott. The federal government therefore lacks even an *Ex parte Young* cause of action against either the State or Governor Abbott, and it necessarily cannot prevail on the merits.

## III.   The Equities and Public Interest Foreclose a TRO Here.

The equities and public interest strongly favor Texas's efforts to protect the public health. Courts are rightly reluctant to enjoin public-health measures. As the Supreme Court explained during a previous epidemic: "Smallpox being prevalent and increasing at Cambridge, the court would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case." *Jacobson*, 197 U.S. at 28.

Further, the federal government has no legitimate interest in releasing potentially infected aliens, not only because of the public-health consequences but also because federal law forbids it. *See supra* Part II.A.3. Certainly, nothing in law or equity supports the federal government's ability to import an unknown number of potential COVID-19 cases into Texas communities with impunity while also

rendering the state powerless to safeguard its population from increased exposure to COVID-19.

Finally, a TRO at this stage would not help the federal government. Because enforcement against those providing transport to groups of potentially infected migrants will begin only after DPS can issue procedures to govern that enforcement, a TRO would not provide any real-world benefit to the federal government.

But a TRO would seriously injure Texas for at least two reasons. First, the requested TRO is so broad that it could prevent DPS from even developing enforcement procedures for GA-37. *See* ECF No. 3-4 at 2 (enjoining "any action to enforce the executive order"). Second, the overbroad relief requested by the federal government would prevent the eventual enforcement of GA-37 against private parties that have no relationship with the federal government. There is no argument that such applications are unconstitutional—and so any order affecting those applications of GA-37 would be especially inequitable.

## IV.   The First-Filed Rule Prevents the Entry of Injunctive Relief.

In light of the "substantial overlap" between this new case and the first-filed Title 42 case in the Northern District of Texas, the Court should deny the TRO, allow Texas to file a motion to transfer, and permit Judge Pittman decide how to proceed. *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997). Because there is, at the very least, a "likelihood of a substantial overlap between the two suits," determining whether to consolidate the two cases "is reserved only for the first-filed court." *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 605–06 (5th Cir. 1999). "[T]he 'first to file rule' not only determines which court may decide the merits of

substantially similar cases, but also establishes which court may decide whether the second suit filed must be dismissed, stayed or transferred and consolidated." *Sutter Corp. v. P & P Indus., Inc.*, 125 F.3d 914, 920 (5th Cir. 1997).

An injunction to "preserve the status quo"—even if it were otherwise proper—cannot issue because "it [is] up to" the first-filed court "to determine whether an injunction [is] necessary." *W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, S. Atl. & Gulf Coast Dist. of ILA, AFL-CIO*, 751 F.2d 721, 730 (5th Cir. 1985) (vacating a district court's preliminary injunction).

## CONCLUSION

The Court should deny Plaintiff's motion for a temporary restraining order.

Date: August 2, 2021                    Respectfully submitted.

KEN PAXTON                               PATRICK K. SWEETEN
Attorney General of Texas               Deputy Attorney General for Special Litigation
                                        Tx. State Bar No. 00798537
BRENT WEBSTER
First Assistant Attorney General        WILLIAM T. THOMPSON
                                        Deputy Chief, Special Litigation Unit
                                        Tx. State Bar No. 24088531
*/s/ Judd E. Stone II*
JUDD E. STONE II
Solicitor General                       OFFICE OF THE ATTORNEY GENERAL
Tx. State Bar No. 24076720              P.O. Box 12548 (MC-009)
                                        Austin, Texas 78711-2548
                                        Tel.: (512) 463-2100
                                        Fax: (512) 457-4410
                                        judd.stone@oag.texas.gov
                                        patrick.sweeten@oag.texas.gov
                                        will.thompson@oag.texas.gov

                                        COUNSEL FOR DEFENDANTS

### CERTIFICATE OF SERVICE

I certify that on August 2, 2021, a true and accurate copy of the foregoing document was

filed electronically (via CM/ECF) and served on all counsel of record.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN