**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>    v.<br><br>THE STATE OF TEXAS and GREG ABBOTT, in his official capacity as Governor of the State of Texas,<br><br>              Defendants. | Case No. 3:21-cv-173-KC |

**UNITED STATES OF AMERICA'S REPLY IN SUPPORT OF ITS**
**EMERGENCY MOTION FOR A**
**TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

I.   The United States Faces Imminent Irreparable Harm............................................................ 1

II.  The United States Is Likely To Succeed On the Merits........................................................ 3

   A.   Federal law preempts the executive order. .................................................................. 3

   B.   The executive order violates intergovernmental immunity. ........................................ 6

   C.   The United States may sue in federal court to enforce the Supremacy Clause. ........... 9

III. The Equities and Public Interest Support Injunctive Relief................................................. 11

IV.  The First-Filed Rule Does Not Apply................................................................................ 14

CONCLUSION........................................................................................................................ 16

## **TABLE OF AUTHORITIES**

**CASES**

*Ala. Pub. Serv. Comm'n v. S. Ry. Co.*,
    341 U.S. 341 (1951) ........................................................................................... 9

*Aldridge v. Mississippi Dep't of Corr.*,
    990 F.3d 868 (5th Cir. 2021) ............................................................................. 3

*Arizona v. California*,
    283 U.S. 423 (1931) ........................................................................................... 7

*Arizona v. United States*,
    567 U.S. 387 (2012) ................................................................................... 3, 4, 10

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ..................................................................................... 9, 10

*Avoyelles Sportsmen's League, Inc. v. Marsh*,
    715 F.2d 897 (5th Cir. 1983) ........................................................................... 15

*Baker v. Puckett*,
    2019 U.S. Dist. LEXIS 125917 (E.D. Tex. June 14, 2019) ............................... 2

*Baran v. Port of Beaumont Navigation Dist. of Jefferson Cnty. Tex.*,
    57 F.3d 436 (5th Cir. 1995) ............................................................................... 8

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988) ........................................................................................... 5

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001) ........................................................................................... 5

*Burford v. Sun Oil Co.*,
    319 U.S. 315 (1943) ........................................................................................... 8

*Camp v. Pitts*,
    411 U.S. 138 (1973) ......................................................................................... 15

*Chacon v. Granata*,
    515 F.2d 922 (5th Cir. 1975) ............................................................................. 2

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ...................................................................................... 3, 4

*Demore v. Kim*,
    538 U.S. 510 (2003) ........................................................................................... 5

*Franklin Fed. Sav. Bank v. United States*,
  431 F.3d 1360 (Fed. Cir. 2005) ................................................................. 5

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000) .................................................................................... 3

*GEO Grp., Inc. v. Newsom*,
  493 F. Supp. 3d 905 (S.D. Cal. 2020), *appeal filed*, No. 20-56172 (9th Cir. Nov. 6, 2020).... 11

*Gregg v. Georgia*,
  428 U.S. 153 (1976) .................................................................................... 5

*Harris Cnty. v. CarMax Auto Superstores Inc.*,
  177 F.3d 306 (5th Cir. 1999) ..................................................................... 14

*Hawaii Housing Auth. v. Midkiff*,
  467 U.S. 229 (1984) .................................................................................... 8

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) ...................................................................................... 4

*In re Debs*,
  158 U.S. 564 (1895) .................................................................................. 10

*Int'l Fidelity Ins. Co. v. Sweet Little Mexico Corp.*,
  665 F.3d 671 (5th Cir. 2011) ........................................................ 14, 15, 16

*Int'l Paper Co. v. Ouellette*,
  479 U.S. 481 (1987) .................................................................................... 4

*Island Airlines, Inc. v. Civil Aeronautics Bd.*,
  352 F.2d 735 (9th Cir. 1965) ..................................................................... 9

*Marks v. United States*,
  430 U.S. 188 (1977) ................................................................................. 5, 6

*Mayo v. United States*,
  319 U.S. 441 (1943) .................................................................................... 7

*Mich. Canners & Freezers Ass'n v. Agricultural Marketing and Bargaining Bd.*,
  467 U.S. 461 (1984) .................................................................................... 4

*N.M. Off-Highway Vehicle All. v. U.S. Forest Serv.*,
  540 F. App'x 877 (10th Cir. 2013) ............................................................. 6

*New Orleans Pub. Serv., Inc. v. Counsel of City of New Orleans*,
  491 U.S. 350 (1989) ................................................................................. 8, 9

*North Dakota v. United States,*
   495 U.S. 423 (1990)............................................................................................ 6, 7

*Powell's Books, Inc. v. Kroger,*
   622 F.3d 1202 (9th Cir. 2010) ............................................................................ 1

*Puente Arizona v. Arpaio,*
   821 F.3d 1098 (9th Cir. 2016) ............................................................................ 4

*R.R. Comm'n of Tex. v. Pullman Co.,*
   312 U.S. 496 (1941)............................................................................................ 8

*Ramos v. Louisiana,*
   140 S. Ct. 1390 (2020)....................................................................................... 5, 7

*Schexnider v. McDermott Int'l, Inc.,*
   817 F.2d 1159 (5th Cir. 1987) ............................................................................ 16

*SPGGC, LLC v. Ayotte,*
   488 F.3d 525 (1st Cir. 2007)............................................................................... 3

*Teltech Sys., Inc. v. Bryant,*
   702 F.3d 232 (5th Cir. 2012) .............................................................................. 3

*U.S. Postal Serv. v. City of Berkeley,*
   2018 WL 2188853 (N.D. Cal. May 14, 2018) .................................................... 11

*United States v. Alabama,*
   691 F.3d 1269 (11th Cir. 2012) .......................................................................... 5, 11

*United States v. Bd. of Cnty. Commr's of Cnry. Of Otero,*
   843 F.3d 1208 (10th Cir. 2016) .......................................................................... 11

*United States v. California,*
   921 F.3d 865 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 124 (2020)...................... 10

*United States v. California,*
   2018 WL 5780003 (E.D. Cal. Nov. 1, 2018)...................................................... 11

*United States v. City of Arcata,*
   629 F.3d 986 (9th Cir. 2010) ............................................................................. 1, 11

*United States v. Com. of Pa., Dep't of Env't Res.,*
   923 F.2d 1071 (3d Cir. 1991).............................................................................. 7

*United States v. Composite State Bd. of Med. Examiners,*
   656 F.2d 131 (5th Cir. 1981) .............................................................................. 7

*United States v. Eckford,*
　　910 F.2d 216 (5th Cir. 1990) ........................................................................ 5

*United States v. Fitzgerald,*
　　201 F. 295 (8th Cir. 1912) ............................................................................ 9

*United States v. Kernen Constr.,*
　　349 F. Supp. 3d 988 (E.D. Cal. 2018) ........................................................ 11

*United States v. King Cnty.,*
　　2020 WL 2745745 (W.D. Wash. May 27, 2020) ........................................ 11

*United States v. LeMay,*
　　322 F.2d 100 (5th Cir. 1963) ........................................................................ 9

*United States v. Locke,*
　　529 U.S. 89 (2000) ........................................................................................ 5

*United States v. Morros,*
　　268 F.3d 695 (9th Cir. 2001) ........................................................................ 7

*United States v. New Jersey,*
　　2021 WL 252270 (D.N.J. Jan. 26, 2021) .................................................... 11

*United States v. South Carolina,*
　　720 F.3d 518 (4th Cir. 2013) ................................................................... 5, 11

*United States v. State Water Res. Control Bd.,*
　　988 F.3d 1194 (9th Cir. 2021) .................................................................... 10

*United States v. Supreme Ct. of N.M.,*
　　839 F.3d 888 (10th Cir. 2016) .................................................................... 10

*United States v. Texas,*
　　143 U.S. 621 (1892) .................................................................................... 10

*United States v. Virginia,*
　　139 F.3d 984 (4th Cir. 1998) ........................................................................ 6

*United States v. Washington,*
　　971 F.3d 856 (9th Cir. 2020), *as amended*, 994 F.3d 994 (9th Cir. 2020) .............................. 10

*United States v. Zadeh,*
　　820 F.3d 746 (5th Cir. 2016) ........................................................................ 3

*Villas at Parkside Partners v. City of Farmers Branch,*
　　726 F.3d 524 (5th Cir. 2013) ................................................................. 4, 5, 6

*Wells Fargo Bank of Tex. NA v. James*,
    321 F.3d 488 (5th Cir. 2003) ........................................................................ 3

*Wis. Dep't. of Industry v. Gould Inc.*,
    475 U.S. 282 (1986) ..................................................................................... 4

*Witty v. Delta Air Lines, Inc.*,
    366 F.3d 380 (5th Cir. 2004) ........................................................................ 3

**REGULATIONS**

86 Fed. Reg. 38717 (July 22, 2021) .................................................................... 15

**OTHER AUTHORITIES**

3 J. Story,
    Commentaries on the Constitution (3d ed. 1858) ....................................... 10

Catherine T. Struve, Sovereign Litigants: Native American Nations in Court,
    55 Vill. L. Rev. 929 (2010) ........................................................................ 10

Centers for Disease Control & Prevention,
    *Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons
    From Countries Where a Quarantinable Communicable Disease Exists*, Aug. 2, 2021,
    https://www.cdc.gov/coronavirus/2019-ncov/downloads/CDC-Order-Suspending-Right-to-
    Introduce-_Final_8-2-21.pdf ........................................................................ 13

Josh Holder,
    *Tracking Coronavirus Vaccinations Around the World*, N.Y. Times (July, 31 2021),
    https://www.nytimes.com/interactive/2021/world/covid-vaccinations-tracker.html ............ 12

Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children
    from Order Suspending the Right to Introduce Certain Persons from Countries Where a Quar-
    antinable Communicable Disease Exists, Centers for Disease Control and Prevention,
    https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/NoticeUnaccompaniedChildren.pdf
    (July 16, 2021) ............................................................................................ 15

Texas Executive Order GA-38,
    https://perma.cc/BGM8-EV6E ............................................................... 11, 12

The United States hereby responds to Defendants' opposition to the United States' emergency motion for a temporary restraining order or preliminary injunction as follows:

## I.   THE UNITED STATES FACES IMMINENT IRREPARABLE HARM

The United States has demonstrated that it will suffer irreparable harm in the absence of preliminary relief.  As explained in the United States' motion and supporting declarations, the executive order threatens to severely disrupt the federal government's large-scale immigration operations in Texas.  *See* United States of America's Emergency Mot. for a TRO or Prelim. Inj., at 7–19, ECF No. 3 ("Mot.") at 18–19.  Those operations hinge on the federal government's ability to use contractors, grantees, and nongovernmental organization (NGO) partners to transport noncitizens—conduct that is now prohibited by the Executive Order.  The federal government relies on transportation provided by non-law-enforcement entities for a variety of essential functions, including transportation to U.S. Customs and Border Protection (CBP) facilities, transportation of unaccompanied children to ORR facilities or sponsors, and providing access to medical care.  *See id.*  As counsel for the United States explained during the hearing, the federal government's contractors, grantees, and NGO partners have expressed significant concerns about being in violation of the executive order and suffering the consequences imposed by that order.

Texas maintains that these harms to the United States are "speculation" because "the precise contours of [the Executive Order's] enforcement are still being shaped[.]"  Defs.' Resp. in Opp'n to Pl.'s Mot. for a TRO, at 1, ECF No. 9  ("Opp'n") at 8. But Texas cannot avoid preliminary relief by offering unspecified promises that it might narrowly construe the illegal order.  *See United States v. City of Arcata*, 629 F.3d 986, 992 (9th Cir. 2010) (noting in preemption case that "the cities' promise of self-restraint does not affect our consideration of the ordinances' validity"); *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1215 (9th Cir. 2010) (permanently enjoining enforcement of state statutes under the First Amendment while explaining that "[w]e may not uphold the statutes merely because the state promises to treat them as properly limited").  As written, the order —which was "effective immediately" upon issuance—applies broadly and contains no exception for federal non-law-enforcement personnel, federal contractors, federal grantees, or NGO

partners.  Ex. 1 to Appendix, ECF No. 13 at 6.  Texas has not disclaimed that the order indeed applies to these individuals and entities, despite having the opportunity to do so since the order was issued.  Indeed, Governor Abbott's July 29, 2021, press release issued in response to Attorney General Garland's request that the Governor rescind the order took a firm stance that the executive order is needed because the federal government allegedly has "cho[sen] not to enforce immigration laws and fail[ed] to make the most robust use of Title 42 authorities," Defs.' Appendix at 15-16— thereby confirming that Texas's primary goal is to regulate and interfere with the federal government's implementation of federal immigration laws.  Counsel for Texas similarly offered no concrete modifications to the order during the motion hearing despite having had the opportunity to consult with their client.  There is thus no sense in which the United States' identified harms are "hypothetical."  Opp'n at 8.

To the extent Texas suggests that the United States should have "further consult[ed]" with Texas before filing suit, Opp'n at 6-7, that is no basis for denying emergency relief now.  As noted, Governor Abbott's response to Attorney General Garland's request for rescission of the order made clear that Texas was unwilling to rescind the order.  *See* Ex. 4 to Appendix, ECF No. 13 at 15.  So further consultation would have been futile and would only have delayed potential relief for the United States.  Nor did the meeting (convened by CBP) between CBP and the Texas Department of Public Safety on July 29 provide any basis to think litigation would be unnecessary.  Opp'n at 6.  CBP reports that the meeting was merely an instance of routine federal-state operator dialogue and that Texas provided little information concerning the executive order at that meeting.

Texas' suggestion that a plaintiff may not seek preliminary relief unless its harms "have come to pass," Opp'n at 8, is incorrect.  Legal authority cited by Texas confirms that a plaintiff may seek preliminary relief for "anticipated injury," Opp'n at 8 (quoting *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975)), and, indeed, a plaintiff generally "may not seek preliminary injunctive relief for harm already suffered."  *Baker v. Puckett*, 2019 U.S. Dist. LEXIS 125917, at *7 (E.D. Tex. June 14, 2019).  Were the rule otherwise, preliminary relief would serve no purpose in many cases because it could come only after the plaintiff had suffered the very injury it sought to

prevent and that by definition could not be remedied after the fact.  Finally, Texas has failed to respond to the United States' argument that Texas' Supremacy Clause violation alone establishes an irreparable harm that is current and ongoing.  Mot. at 17–18.  Texas has therefore conceded that point, which is dispositive on the question of irreparable harm.

## II.  THE UNITED STATES IS LIKELY TO SUCCEED ON THE MERITS

### A.  Federal law preempts the executive order.

The Texas order is preempted because it stands as an obstacle to the federal government's administration of its laws and systems.  When federal law preempts a state law, the state cannot escape preemption by claiming—as Texas does here—that the preempted law regulates private parties.  Where preemption is at issue, "the question [] is not *whom* the [state] statute regulates, but rather, against *what activity* it regulates." *SPGGC, LLC v. Ayotte,* 488 F.3d 525, 532 (1st Cir. 2007) (emphasis in original).  The Supreme Court therefore has not hesitated to strike down preempted state laws, even when such laws regulate private parties.  *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 408 (2012) (striking down state statute purporting to authorize state officials to enforce federal law against private parties); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 866 (2000) (holding a "no airbag" lawsuit brought against car manufacturer based on state law "conflicts with the objectives" of federal regulations, and "is therefore pre-empted by the Act"); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (state law prohibiting private businesses from doing business with Burma was preempted "as an obstacle to the accomplishment of Congress's full objectives").

The Fifth Circuit likewise has found state laws preempted even when such laws do not regulate federal government personnel or contractors.  *See e.g.*, *Aldridge v. Mississippi Dep't of Corr.*, 990 F.3d 868, 877 (5th Cir. 2021) (Fair Labor Standards Act preempted state employee's state law claims for improperly calculated wages); *United States v. Zadeh*, 820 F.3d 746, 755 (5th Cir. 2016) (Texas patient privacy law as it applied to private doctors was preempted by the Controlled Substances Act insofar it interfered with federal subpoena); *Teltech Sys., Inc. v. Bryant*,

702 F.3d 232, 239 (5th Cir. 2012) (state law applied to private business was conflict-preempted because it frustrated a federal objective, even though state law was exercise of police power); *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 386 (5th Cir. 2004) (finding passenger's state-law tort claim was preempted); *Wells Fargo Bank of Tex. NA v. James*, 321 F.3d 488, 495 (5th Cir. 2003) (holding that Texas regulation of private banks was preempted by federal regulation).  Of particular relevance, the Fifth Circuit, sitting *en banc*, struck down a city ordinance regulating private property as preempted by federal immigration laws.  *See Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 536-37 (5th Cir. 2013) (en banc).

Moreover, for purposes of this Court's preemption analysis, the intention behind the executive order is wholly irrelevant; rather, the question is whether the order, in its practical effect, "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Arizona*, 567 U.S. at 399 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Whatever a state law's intended goal may be, and even where the federal law and state law share the same goal, "[a] state law [ ] is pre-empted if it interferes with the methods by which the federal statute was designed to reach th[at] goal."  *Int'l Paper Co. v. Ouellette,* 479 U.S. 481, 494 (1987); *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1106 (9th Cir. 2016) (for preemption purposes, "it does not matter if [a state] passed the [challenged laws] for a good or bad purpose"); *Mich. Canners & Freezers Ass'n v. Agricultural Marketing and Bargaining Bd*., 467 U.S. 461, 477 (1984) (state statute establishing association to represent agricultural producers notwithstanding that both it and the federal Agricultural Fair Practices Act "share the goal of augmenting the producer's bargaining power"); *Wis. Dep't. of Industry v. Gould Inc.,* 475 U.S. 282, 286-87 (1986) (state statute preventing repeat violators of the National Labor Relations Act from doing business with the State is pre-empted even though state law was designed to reinforce requirements of federal Act); *Crosby*, 530 U.S. at 379 ("The fact of a common end hardly neutralizes conflicting means . . .").

Here, as explained in the United States' motion, the executive order stands as an impermissible obstacle to the enforcement of federal immigration law in at least two ways: first, by

obstructing federal officials' ability to transport and release noncitizens as part of the federal government's immigration operations, and second, by running afoul of the well-established principle that "[t]he federal government alone . . . has the power to classify non-citizens." *Villas at Parkside Partners*, 726 F.3d at 536; *Arizona*, 567 U.S. at 408 (holding that to allow state officials to determine noncitizens' legal statuses would be tantamount to "allow[ing] the State to achieve its own immigration policy"); *see generally* Mot. at 7–14.

Texas cannot escape that conclusion by invoking the presumption against preemption. Opp'n at 9. That presumption is inapplicable in areas that are "inherently federal in character," *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347–48 (2001), or "where the federal interest has been manifest," *United States v. Locke*, 529 U.S. 89, 99 (2000). That is certainly the case here, as the executive order intrudes on exclusive federal areas of immigration and federal arrangements with its contractors, grantees, and other partners. *See United States v. South Carolina*, 720 F.3d 518, 529 (4th Cir. 2013) ("[T]he presumption against preemption does not apply here because immigration is an area traditionally regulated by the federal government."); *United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012) (refusing to apply the presumption because a state law "constitute[d] a thinly veiled attempt to regulate immigration under the guise of contract law" and thus "impinge[d] on an area of core federal concern."); *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) (explaining that federal contracting is an area of "uniquely federal interests" where "obligations to and rights of the United States under its contracts are governed exclusively by federal law"); *see also Demore v. Kim*, 538 U.S. 510, 523 (2003).

Texas also claims that the Fifth Circuit's decision, *Villas at Parkside Partners*, 726 F.3d 524 is not controlling, because it did not "produc[e] a majority opinion." Opp'n at 16. While it is true that the plurality opinion cited by the United States in its motion was joined by five of the fifteen members of the *en banc* panel, it is well-established that where "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent" of a majority of its jurists, "'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds[.]'" *Marks v. United States*, 430 U.S. 188, 193-94

5

(1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1403 (2020). In *Villas at Parkside Partners*, the plurality opinion constituted the narrowest articulation of the Fifth Circuit's rationale—*i.e.*, the "common denominator" upon which a substantial majority (nine of the fifteen judges in total) of the court agreed. *United States v. Eckford,* 910 F.2d 216, 219 n.8 (5th Cir. 1990); *see also*, *e.g.*, *Franklin Fed. Sav. Bank v. United States*, 431 F.3d 1360, 1368 (Fed. Cir. 2005) ("We must treat the narrower view as the holding of the Court."); *N.M. Off-Highway Vehicle All. v. U.S. Forest Serv.*, 540 F. App'x 877, 883 (10th Cir. 2013) ("The *en banc* plurality . . . issued the narrowest and so controlling ruling[.]") (Gorsuch, J., dissenting) (citing *Marks,* 430 U.S. at 193-94). In *Villas at Parkside Partners*, in addition to the four judges who joined Judge Higginson's plurality decision, four additional judges concurred through two separate opinions, both of which would have also invalidated the local ordinance at issue on *broader* grounds than those articulated by the plurality.[1] Accordingly, under well-established principles, Judge Higginson's plurality stands as the Fifth Circuit's binding precedent over this Court—which, for the reasons already explained, compels invalidation of the executive order. *See* Mot. at 12–14.

### B. The executive order violates intergovernmental immunity.

Texas also fails to rebut the United States' showing that it is likely to succeed on the merits of its intergovernmental-immunity claim. Texas disputes that the doctrine applies to grantees and NGO partners, but essentially concedes that intergovernmental immunity extends to "entities

---

[1] Specifically, a first concurrence joined by Judges Reavley and Graves—while sweeping more broadly in its emphasis on the "'broad, undoubted' federal power 'over the subject of immigration and the status of aliens'"—likewise concluded that the ordinance "contravene[d] the federal government's exclusive authority on the regulation of immigration[,]… and … constitute[d] an obstacle to federal authority over immigration and the conduct of foreign affairs." *Villas at Parkside Partners*, 726 F.3d at 542, 543 (Reavley, J. concurring) (citation omitted). A second concurrence—authored by Judge Dennis and joined by Judges Reavley, Prado, and Graves—"agree[d] with many of the reasons Judge Higginson assigns in the lead opinion," but set forth several reasons why the ordinance was "even more fundamentally flawed" than indicated by the plurality. *Id.* at 543-44 (Dennis, J., specially concurring).

bound by contract to pursue the federal government's goals," Opp'n at 22—entities that the executive order impermissibly seeks to regulate.  That proves the United States' point:  the executive order does not merely restrict the federal government's choice of partners to transport noncitizens—a limitation that would itself be impermissible, *see Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956)—but works a much more significant interference by prohibiting *anyone* other than law-enforcement personnel from transporting noncitizens.  Mot. at 16–17.  That violates intergovernmental immunity because it "interrupt[s] the acts of the general government itself," *Johnson v. Maryland*, 254 U.S. 51, 55 (1920), and runs afoul of the rule that the "United States may perform its functions without conforming to the police regulations of a state." *Arizona v. California*, 283 U.S. 423, 451 (1931); *Mayo v. United States*, 319 U.S. 441, 445 (1943).[2]

Texas cannot sidestep intergovernmental immunity by raising the inapposite *Pullman* abstention doctrine.  "Whether it is labeled 'comity', 'federalism', or some other term, it is the unnecessary conflict between state and federal governments that is sought to be avoided" by abstention. *United States v. Composite State Bd. of Med. Examiners*, 656 F.2d 131, 136 (5th Cir. 1981); *see United States v. Morros*, 268 F.3d 695, 708–09 (9th Cir. 2001).  But "in a case in which the United States seeks relief against a state or its agency, the state and federal governments are in direct conflict before they arrive at the federal courthouse," so "any attempt to avoid a federal-

---

[2] Texas's citation to *North Dakota v. United States*, 495 U.S. 423, 436 (1990) (plurality) is misplaced.  Opp'n at 20.  There, unlike here, "the [state] regulations did not attempt to alter the criteria under which the federal government made its decision," nor did "those [state] regulations . . . otherwise enable the [S]tate to second-guess the federal government's judgment as to who should supply the federal enclave."  *United States v. Virginia*, 139 F.3d 984, 989 n.7 (4th Cir. 1998) (Luttig, J.).  Nothing in *North Dakota* abrogates the fundamental principle—affirmed in two centuries of case law both predating and postdating *North Dakota*—that States cannot regulate federal operations.  *See* Mot. at 14–17.  And in any event, the plurality opinion in *North Dakota* does not govern because "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[] on the narrowest grounds."  *Ramos v. Louisiana*, 140 S. Ct. 1390, 1403 (2020).  That was Justice Scalia's concurrence, which held that the Twenty-first Amendment "is binding on the Federal Government like everyone else, and empowers North Dakota to require that all liquor sold for use in the State be purchased from a licensed in-state wholesaler."  *North Dakota*, 495 U.S. at 425.

state conflict would be futile." *Composite*, 656 F.2d at 136. Thus, abstention doctrines do not apply when "the federal government is asserting its rights against a state" and the federal government's choice of forum should be respected since it "has a great interest in having the federal court conduct the preemption analysis." *Morros*, 268 F.3d at 708–09; *United States v. Com. of Pa., Dep't of Env't Res.*, 923 F.2d 1071, 1079 (3d Cir. 1991).

Even if abstention could apply where the federal government sues a State, abstention would not be available because there are no pending state-court proceedings with issues of state law (to which the Court may defer) that would allow this court to avoid the constitutional issues. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941). In *Pullman*, the Texas Railroad Commission issued a regulation that was challenged in federal court under a claim that the regulation violated the constitution and a pendant *state-law* claim that the Commission lacked the authority to issue the regulation in the first place. *Id.* The Court held that federal courts should abstain when state law is uncertain and a clarifying decision from *a state court* might make a federal court's constitutional ruling unnecessary. *See id.* at 500 (explaining that a state court ruling that the Commission lacked the authority would moot the constitutional question); *see also Baran v. Port of Beaumont Navigation Dist. of Jefferson Cnty. Tex.*, 57 F.3d 436, 442 (5th Cir. 1995) ("Generally, *Pullman* abstention is appropriate only when there is an issue of uncertain state law that is 'fairly subject to an interpretation [by a state court] which will render unnecessary or substantially modify the federal constitutional question.'" (modification in original)).

The *Pullman* doctrine does not apply here because Texas points to no pending state court case or any legal issue that, if decided by a state court, would independently invalidate the executive order. Texas claims that the Court should wait until DPS "formulate[s] its enforcement procedures." Opp'n at 23. But the DPS is not a state court and the formulation of its "enforcement procedures" is not a clarification of state law. That is, the possibility that Texas may narrowly construe the executive order it is implementing does not mean there is an unsettled question of state law within the *Pullman* abstention doctrine. *See Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 236 –37 (1984).

**C.       The United States may sue in federal court to enforce the Supremacy Clause.**

Texas also makes the extraordinary claim that the United States has no cause of action under the Supremacy Clause to sue in federal court when state law poses an irreconcilable conflict with federal law and impermissibly seeks to directly regulate federal operations.  But the constitutional text, history, and case law all acknowledge the obvious: "[t]he United States may lawfully maintain suits in its own courts to prevent interference with the means it adopts to exercise its powers of government and to carry into effect its policies."  *United States v. LeMay*, 322 F.2d 100, 103 (5th Cir. 1963) (quoting *United States v. Fitzgerald*, 201 F. 295, 296 (8th Cir. 1912)); *Island Airlines, Inc. v. Civil Aeronautics Bd.*, 352 F.2d 735, 744 (9th Cir. 1965).

Texas relies on *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015), to argue that "the Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action."  Opp'n at 25 (quoting *Armstrong*).  But *Armstrong* did not involve an action brought by the United States; rather, the Court's holding was that the Supremacy Clause does not create a "*private* right of action."  *Armstrong*, 575 U.S. at 326 (emphasis added).  As the Court explained, the Supremacy Clause does not "require[] Congress to permit the enforcement of its laws by *private* actors," which would "mak[e] it impossible to leave the enforcement of federal law to *federal* actors."  *Id.* (emphasis added).  "It would be strange indeed to give a clause that makes federal law supreme a reading that *limits* Congress's power to enforce that law, by imposing mandatory *private* enforcement."  *Id.*  (emphasis added).  And because "*Armstrong*'s Supremacy Clause holding [was] motivated by the desire to preserve the federal government's 'ability to guide the implementation of federal law,'" that case "counsels in favor of—not against—permitting the United States to invoke preemption [and intergovernmental immunity] in order to protect its interest."  *United States v. Supreme Ct. of N.M.*, 839 F.3d 888, 906 n.9 (10th Cir. 2016) (quoting *Armstrong*, 575 U.S. at 1384).

In other words, nothing in *Armstrong* casts any doubt on a *public* cause of action for the United States under the Supremacy Clause.  That makes sense because the Supreme Court recognized long ago that "[e]very government, [e]ntrusted by the very terms of its being with powers

9

and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other." *In re Debs*, 158 U.S. 564, 584 (1895). Thus, "[i]t would be a perfect novelty in the history of national jurisprudence, as well as of public law, that a sovereign had no authority to sue in his own courts." 3 J. Story, Commentaries on the Constitution § 1668 (3d ed. 1858). To hold otherwise would "prostrate the Union at the feet of the states" and "compel the national government to become a supplicant for justice before the judicature of those, who were by other parts of the constitution placed in subordination to it." *Id.*; *see* Catherine T. Struve, Sovereign Litigants: Native American Nations in Court, 55 Vill. L. Rev. 929, 931 (2010) ("A sovereign may sue in its own courts to enforce its law—both through criminal prosecutions and through civil suits. Such suits may vindicate the public interest or protect the sovereign's proprietary interests."). Such a conclusion "has no place in our constitutional system." *United States v. Texas*, 143 U.S. 621, 641 (1892).

That is why the United States has brought numerous cases under the Supremacy Clause in the last decade—both before and after *Armstrong*—without anyone questioning whether the federal government had a valid cause of action. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012); *United States v. State Water Res. Control Bd.*, 988 F.3d 1194 (9th Cir. 2021); *United States v. Washington*, 971 F.3d 856 (9th Cir. 2020), *as amended*, 994 F.3d 994 (9th Cir. 2020); *United States v. California*, 921 F.3d 865, 876 (9th Cir. 2019), *cert denied*, 141 S. Ct. 124 (2020); *United States v. Bd. of Cnty. Commr's of Cnty. Of Otero*, 843 F.3d 1208 (10th Cir. 2016)*; United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013); *United States v. Alabama*, 691 F.3d 1269, 1279 (11th Cir. 2012); *United States v. City of Arcata*, 629 F.3d 986, 988 (9th Cir. 2010); *United States v. New Jersey*, 2021 WL 252270 (D.N.J. Jan. 26, 2021); *GEO Grp., Inc. v. Newsom*, 493 F. Supp. 3d 905, 916 (S.D. Cal. 2020), *appeal filed*, No. 20-56172 (9th Cir. Nov. 6, 2020); *United States v. King Cnty.*, 2020 WL 2745745, at *1 (W.D. Wash. May 27, 2020); *United States v. California*, 2018 WL 5780003 (E.D. Cal. Nov. 1, 2018); *United States v. Kernen Constr.*, 349 F. Supp. 3d 988 (E.D. Cal. 2018); *U.S. Postal Serv. v. City of Berkeley*, 2018 WL 2188853 (N.D. Cal. May 14, 2018). Texas's cause-of-action argument has no merit.

10

### III.   THE EQUITIES AND PUBLIC INTEREST SUPPORT INJUNCTIVE RELIEF

As the United States explained in its motion, the equities and public interest strongly support an injunction.  Mot. at 19–20.  The executive order, however implemented, would likely exacerbate potential spread of COVID-19 because it prevents the federal government from transporting noncitizens for medical care, COVID-19 testing and consequence management, and to alleviate congestion in border facilities and border communities.  *See* Mot. at 17–19.

Texas would not be harmed by an injunction at all because the executive order does virtually nothing to advance its supposed goal of protecting the public from the threat of COVID-19.  Texas cannot evade the Constitution's ban on States' regulation of federal immigration policies and practices by hiding behind the public health emergency.  Underscoring that the claimed purpose of public health may be pretexual, the day after Governor Abbott signed the executive order at issue in this case, he prohibited local governments, schools, and many private business from taking basic precautions to stop the spread of COVID-19. Texas Executive Order GA-38, https://perma.cc/BGM8-EV6E.  In that order, the governor vacated all "COVID-19-related operating limits," *id.* ¶ 3(a); ordered that "no person may be required by any jurisdiction to wear . . . a face covering," *id.* ¶ 3(b); and to the extent any local government or school had previously required face coverings, the Governor vacated those requirements too, *see id.* ¶ 4(a).  The order also restricts private companies that receive any state funding from taking basic precautions like requiring their customers or employees be vaccinated.  *Id.* ¶ 2(c).  Moreover, Governor Abbott's response to the Attorney General's July 29 letter makes clear that the executive order is intended to effect major changes in federal immigration operations in Texas.  *See* Ex. 3 to Appendix, ECF No. 13 at 13 (proposing that the federal government "ensure that any unauthorized migrants it allows to enter the United States remain only on federally owned or operated land").

If Texas did intend the executive order to protect public health, it is strikingly over- and under-inclusive.  It is over-inclusive because it restricts movements of noncitizens *even if they are perfectly healthy*, even if they have quarantined for 14 days, and even if they are fully vaccinated—indeed, to fall within the scope of the executive order, a noncitizen need only "have been detained

by CBP for crossing the border illegally." Order at 1.  The executive order thus restricts movement of individuals from countries with robust vaccination programs.  In fact, Texas' cited source shows that a number of countries like Chile and Uruguay have a *higher* rate of vaccination than the United States as a whole—and a higher vaccination rate than Texas.  *Id.*; Opp'n at 4 (citing *See* Josh Holder, *Tracking Coronavirus Vaccinations Around the World*, N.Y. Times (July, 31 2021), https://www.nytimes.com/interactive/2021/world/covid-vaccinations-tracker.html)).  But the executive order makes no distinction between a noncitizen from Uruguay or Chile and a noncitizen from a country with lower vaccination rates.

The executive order is also under-inclusive.  The executive order imposes no public health mitigation measures on, for example, unvaccinated or untested U.S. citizens returning to Texas after vacationing in Mexico.  And while Texas pointed to lower vaccination rates in certain countries that are lower than the United States—including Mexico, El Salvador, Guatemala, Honduras, Nicaragua, Costa Rica, Ecuador, Belize, and Panama, Opp'n at 4—the executive order does not restrict the movement of other travelers from those countries, like lawful permanent residents, foreign tourists, or U.S. citizens who travel from those countries.  Texas points to no data whatsoever that noncitizens released from CBP custody have a higher rate of COVID-19 than other travelers.  And even if Texas were trying to protect the public health, it cannot do so by regulating federal immigration policies and practices.

Texas claims that migrants pose risks to the public health of Texans.  But as part of its massive immigration operations at the border, the United States is taking steps to mitigate the threat of COVID-19 in border communities.  As recognized in the new CDC Title 42 order issued yesterday (which replaces and updates an October 16, 2020 Order), the Department of Homeland Security has implemented a variety of mitigation measures to prevent the spread of COVID-19. *See* Centers for Disease Control & Prevention, *Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, Aug. 2, 2021, at 13–14, *available at* https://www.cdc.gov/coronavirus/2019-

ncov/downloads/CDC-Order-Suspending-Right-to-Introduce-_Final_8-2-21.pdf.  As further explained in the attached Declaration of David Shahoulian, DHS has taken steps to develop systems to facilitate testing, isolation, and quarantine of those individuals encountered at the border who are not immediately returned to their home countries pursuant to the CDC Order.  *See* Decl. of David Shahoulian, ¶ 3.  For example, while the large majority of single adults encountered between ports of entry are promptly expelled pursuant to the CDC Order, those who are not expelled are generally transferred to U.S. Immigration and Custom Enforcement (ICE) custody, and COVID-19 testing occurs upon intake into an ICE facility.  *Id.* ¶ 4.  Those who test positive for, or who have been exposed to, COVID-19 are cohorted to reduce the possibility of transmission.  *Id.*

Noncitizen family units encountered between ports of entry are either transferred to ICE-run or ICE-contracted facilities or released directly from CBP facilities.  *Id.* ¶ 5.  Those transferred to ICE custody are tested upon intake and separated according to test result, while those released directly from CBP facilities are generally provided testing either prior to or immediately after release from CBP custody.  *Id.*  This testing is conducted by a variety of partners, including state and local governments, NGOs, and third-party contractors.  *Id.*  For any of these family members who test positive for COVID-19 immediately after release, DHS has coordinated with appropriate state, local, and NGO partners for the provision of accommodations so that the family members can properly isolate and/or quarantine consistent with public health protocols.  *Id.*[3] And unaccompanied children who are encountered at the border are transported to the Department of Health and Human Services, which facilitates their testing for COVID-19.  *Id.* ¶ 6.  Unaccompanied children are released only after having undergone testing, quarantine and/or isolation, if required, and vaccination when possible.  *Id.* ¶ 6.

---

[3] In the Del Rio sector, which covers a 245-mile stretch of the U.S.-Mexico border along the Rio Grande River and Lake Amistad, DHS set up a system for testing and non-congregate sheltering involving third-party contractors and ICE-run or ICE-contracted facilities.  Those who test negative are released from custody, and those who test positive are generally transferred to ICE custody for quarantine and isolation.

**IV.     THE FIRST-FILED RULE DOES NOT APPLY**

Texas also argues that the United States should have filed this affirmative suit in the Fort Worth Division of the Northern District of Texas, where Texas has brought a suit to challenge, among other things, a February 2021 CDC order temporarily pausing the application of the Title 42 order—which prohibits the introduction of certain noncitizens traveling from Mexico and Canada into the United States due to the pandemic—to unaccompanied children while the CDC conducts a public reassessment of the Title 42 order. *See Texas v. Biden*, No. 4:21-cv-00579-P, (N.D. Tex), Compl. ECF No. 1.  The *Texas* suit also challenges DHS's alleged failure to apply the CDC's Title 42 order to noncitizens families or to enforce a provision in the Immigration and Nationality Act regarding the public health ground of inadmissibility.

The discretionary first-to-file rule, however, does not apply to this case.  Although "a district court *may* dismiss an injunction suit if duplicative litigation is pending in another jurisdiction, it is not *required* to do so," and application of the so-called "first-to-file" rule is "committed to the district court's discretion."  *Harris Cnty. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 319 (5th Cir. 1999).  Two actions must "substantially overlap" for first-to-file to even apply.  *Int'l Fidelity Ins. Co. v. Sweet Little Mexico Corp.*, 665 F.3d 671, 678 (5th Cir. 2011).  This entails consideration of whether both actions raise the same core issues and whether the parties will adduce substantially the same proofs in both actions.  *Id.*  Actions do not "substantially overlap" simply because questions raised in the first-filed matter implicate issues in the second-filed matter.  For instance, in *International Fidelity*, although the Fifth Circuit acknowledged "some risk of 'duplication'" between proceedings in the Court of International Trade regarding customs duties and a subsequent indemnification action brought in district court arising from the imposition of those duties, it agreed that the district court properly allowed the second-filed action to move forward.  *Id.* at 678–79.  The same conclusion is warranted here.

First, the "core issues" in this case and *Texas v. Biden* are completely different.  *Texas* centers on allegations that the federal government has "violated the Immigration and Nationality Act . . . the Public Health Service Act of 1944 . . . and the Administrative Procedure Act."  *Texas*,

Complaint, ECF No. 1, at ¶ 1.  Indeed, Texas sought a preliminary injunction on the basis that CDC's February order violated the Administrative Procedure Act for failure to provide reasoned decision-making or consider state reliance interests.  *Texas*, ECF Nos. 21 and 22.  Judge Pittman has since denied Texas's preliminary injunction motion as moot on the basis that the challenged February order has been superseded by a July CDC order, which confirmed the exception and fully explained why the exception for unaccompanied children from the Title 42 order does not pose public health concerns.[4]  That is, while Texas may decide to amend its complaint in the future, there is currently no pending controversy concerning the legality of CDC's exception of unaccompanied children from the scope of the Title 42 order in that case.  Although the complaint also challenges DHS's alleged failure to apply the Title 42 order to families and to follow immigration laws, those claims bear no resemblance to the issues here.

This is a Supremacy Clause challenge to a state executive order targeting the transportation of certain noncitizens.  The United States' claim does not implicate Texas's argument that the federal government is "violating Title 42," Opp'n at 17–20.  It is the INA that preempts the executive order, not Title 42.  The Fifth Circuit rejected a similar argument in *International Fidelity*, holding that the district court was not obligated to wait on the Court of International Trade's ruling on import duties to address indemnification, even though the applicability of the duties would ultimately impact indemnification.  *Int'l Fidelity*, 665 F.3d at 679.

Second, the proof the United States and Texas would adduce in each case is quite different.  *Texas* primarily seeks review of the federal government's actions under the Administrative Procedure Act, *id.* at ¶¶ 84-116 (alleging five separate claims of APA violations), which is limited to a review of the administrative record, *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 905 (5th Cir. 1983); *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).  By contrast, this case

---

[4] *See* Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children from Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/NoticeUnaccompaniedChildren.pdf  (July 16, 2021); *see* 86 Fed. Reg. 38717 (July 22, 2021).

centers on Texas's actual and prospective interference with federal immigration operations taking place every day in border communities like El Paso, as described in the United States' declarations. Undoubtedly, conditions at the border and the ongoing pandemic are part of the backdrop of both actions.  But those surface similarities do not give rise to the sorts of concerns about duplication of effort, intrusion on comity, or piecemeal resolution of issues that would justify depriving the Government of its choice of venue in a border division where the federal government conducts significant immigration operations.  *Int'l Fidelity*, 665 F.3d at 678; *cf. Schexnider v. McDermott Int'l, Inc.*, 817 F.2d 1159, 1163 (5th Cir. 1987) (describing, in a case regarding transfer for *forum non conveniens*, the "strong presumption in favor of a plaintiff's choice of forum").  There is no basis to reject the United States' choice and the Court should reject Texas's argument regarding the first-to-file rule.

## **CONCLUSION**

For these reasons and those raised in the United States' motion, the Court should temporarily and preliminarily enjoin the executive order.

Date: August 3, 2021                    Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General

                                        BRIAN D. NETTER
                                        Deputy Assistant Attorney General

                                        ALEXANDER K. HAAS
                                        Director, Federal Programs Branch

                                        JEAN LIN
                                        Special Litigation Counsel

                                        /s/  *Joshua M. Kolsky*
                                        JOSHUA M. KOLSKY (DC Bar 993430)
                                        ZACHARY A. AVALLONE
                                        ELLIOTT M. DAVIS
                                        STEPHEN EHRLICH
                                        MICHAEL J. GERARDI
                                        ANTONIA KONKOLY
                                        Trial Attorneys
                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street NW Washington, DC 20005
                                        Tel: (202) 305-7664
                                        Fax: (202) 616-8470
                                        E-mail: joshua.kolsky@usdoj.gov

                                        *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of this filing was served on the other parties to this action and their counsel of record through electronic filing in the Court's ECF system on August 3, 2021.

/s/ *Joshua M. Kolsky*
Joshua M. Kolsky