# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>STATE OF TEXAS; and GREG ABBOTT, in his official capacity as Governor of the State of Texas,<br><br>*Defendants.* | Civil Action No. EP-21-cv-173-KC |

## BRIEF *AMICUS CURIAE* OF
## CATHOLIC CHARITIES OF THE RIO GRANDE VALLEY

Eric C. Rassbach
Texas Bar No. 24013375
  (admitted pro hac vice)
Lori H. Windham
  (admitted pro hac vice)
D.C. Bar No. 501838
The Becket Fund for
  Religious Liberty
1919 Penn Ave. NW
  Suite 400
Washington, D.C. 20006
Phone: (202) 955-0095
Fax: (202) 955-0090
erassbach@becketlaw.org

*Attorneys for* Amicus Curiae
*Catholic Charities of the
Rio Grande Valley*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF THE AMICUS ................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 2

FACTUAL BACKGROUND ................................................................... 3

ARGUMENT ..................................................................................... 9

   I. The Order's violation of religious liberty is not in the
      public interest. ....................................................... 10

     A. The Governor's Order violates the Free Exercise Clause ............... 10

        1. The Order is not neutral ........................................... 11

        2. The Order is not generally applicable. ........................... 12

        3. The Order cannot withstand strict scrutiny. ................... 13

     B. Texas has no legitimate interest in violating state law. ............... 15

   II. The United States' Supremacy Clause arguments are
      also more likely to succeed because they vindicate the
      First Amendment right to free exercise of religion. ........................ 16

   CONCLUSION ............................................................................ 18

   CERTIFICATE OF SERVICE ......................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ams. United for Separation of Church & State v. City of Grand Rapids*,
922 F.2d 303 (6th Cir. 1990) ...................................................... 10

*Arnold v. Barbers Hill Indep. Sch. Dist.*,
479 F. Supp. 3d 511 (S.D. Tex. 2020) ........................................ 9

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984) .................................................................. 18

*Chapman v. Houston Welfare Rts. Org.*,
441 U.S. 600 (1979) .................................................................. 17

*Espinoza v. Mont. Dep't of Revenue*,
140 S. Ct. 2246 (2020) ........................................................ 17, 18

*Freedom From Religion Found., Inc. v. Mack*,
No. 21-20279, 2021 WL 2887861 (5th Cir. July 9, 2021) ............... 9-10

*Fulton v. City of Philadelphia*,
141 S. Ct. 1868 (2021) ...................................................... 11, 12, 13

*Gonzales v. O Centro Espírita Beneficente União*,
546 U.S. 418 (2006) .................................................................. 13

*Kite v. Marshall*,
454 F. Supp. 1347 (S.D. Tex. 1978) ........................................... 9

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*,
138 S. Ct. 1719 (2018) .............................................................. 11

*Merced v. Kasson*,
577 F.3d 578 (5th Cir. 2009) ..................................................... 16

*Moore v. Brown*,
868 F.3d 398 (5th Cir. 2017) ..................................................... 9

*Nken v. Holder*,
556 U.S. 418 (2009) ................................................................ 9

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984) ............................................................... 15

*Tandon v. Newsom*,
141 S. Ct. 1294 (2021) ......................................................... 12

*Texas v. United States*,
No. 6:21-CV-00003, 2021 WL 2096669 (S.D. Tex. Feb. 23,
2021) ...................................................................................... 10

**Statutes**

42 U.S.C. § 2000bb ..................................................................... 10

Texas Religious Freedom Restoration Act, Tex. Civ. Prac. &
Rem. Code Ann. § 110.003 *et seq.* ................................ 10, 16

**Other Authorities**

Cathechism of the Catholic Church § 2241 ............................... 4

Pope Francis, *Fratelli Tutti* (Oct. 3, 2020) .............................. 4

Tex. Const. art. 1, § 6 ................................................................. 10

Texas Governor, *Governor Abbott Issues Executive Order
Restricting Transportation Of Migrants Due To COVID-19*
(July 28, 2021) ......................................................................... 6

Texas Governor, *Office Of The Governor Issues Statement On
Federal Judge Halting Executive Order GA-37* (August 3,
2021) ........................................................................................ 7

## INTEREST OF THE *AMICUS*

*Amicus* Catholic Charities of the Rio Grande Valley is a ministry of the Catholic Church in the Roman Catholic Diocese of Brownsville. The Diocese of Brownsville, led by Bishop Daniel E. Flores, is entrusted with the religious ministries of the Catholic Church across four counties in the Rio Grande Valley (Cameron, Hidalgo, Starr, and Willacy). Catholic Charities is a ministry through which the Diocese attends to its religious duty to provide mercy and service to the least among us. As part of that work of charity, Catholic Charities operates a Humanitarian Respite Center in McAllen, Texas, which ministers to the urgent physical needs of migrant families, primarily mothers and children.

Catholic Charities submits this brief to provide the Court with information about the severe negative effect Governor Abbott's Executive Order would have on Catholic Charities' ability to carry out its religious mission, and in particular its ability to provide care to migrants at the Humanitarian Respite Center in McAllen. *Amicus* also offers this brief to explain how the Order's unconstitutional restrictions on religious freedom tip the equities toward issuance of a preliminary injunction.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In this dispute between the state and federal governments, the arguments have focused on legal abstractions and fears related to COVID. Left out have been the flesh-and-blood people who stand to suffer because of Governor Abbott's ill-conceived Executive Order. Migrants released into this country by Border Patrol have real human needs that ought to be met precisely because they are human beings.

Catholic Charities of the Rio Grande Valley seeks merely to "give a cup of water in Jesus' name," and to provide other services to migrants who arrive at Catholic Charities' Humanitarian Respite Center, often just after experiencing harrowing trauma. Indeed, it is Catholic Charities' God-given task to give—to give water, to give food, to give shelter from the sun, to give medical treatment, and, at a fundamental level, to give respect for migrants' common human dignity.

And though it is bad enough that Texas would prevent a church from helping women and babies who are suffering from hunger, heat, and exposure to the elements, the Order also fails on its own terms. Measured against the Governor's ostensible goal of preventing the spread of COVID, the effect of the Order will likely be to spread COVID far *more* quickly in Texas. By forcing Border Patrol to release mothers and children in the middle of McAllen or other border cities—without the COVID testing and transportation to quarantine locations that Catholic Charities provides—the Executive Order endangers Texans and exposes them to COVID unnecessarily. Indeed, at a time when the Governor himself is asking hospitals to postpone medical procedures in an

effort to stop the spread of the Delta variant of COVID, the notion that putting *fewer* COVID-positive migrants in quarantine would help stop COVID makes little sense.

The harsh on-the-ground effects of the Order, and its unreasonableness, are not without legal consequence. First, by unconstitutionally interfering with the free exercise of religion, and violating the Texas Religious Freedom Restoration Act to boot, the Order cannot possibly be in the public interest for purposes of analyzing the federal government's motion for a preliminary injunction. Second, the federal government has a higher likelihood of success on its Supremacy Clause claims because Texas's actions invoke the federal government's duty to protect First Amendment rights. In short, the Order's attack on the religious freedom of Catholic Charities to serve migrants is all the more reason to grant the requested preliminary injunction.

## FACTUAL BACKGROUND

### *Catholic Charities and the Humanitarian Respite Center*

Catholic Charities is a ministry of the Roman Catholic Diocese of Brownsville, which spans four counties in South Texas. The current Bishop of the Diocese of Brownsville is the Most Rev. Daniel E. Flores. *See* Declaration of Sister Norma Pimentel, M.J. ("Decl.") at ¶ 3.

Catholic Charities operates a Humanitarian Respite Center in McAllen, Texas, which provides basic essential services to migrants who have been recently processed and released by Border Patrol after entering the country. Decl. ¶ 4. The Executive Director of Catholic Charities is Sister Norma

Pimentel, M.J., who supervises the operation of the Humanitarian Respite Center.

The Respite Center gives migrants a place to briefly rest safely, offering meals, hot showers, and clean clothes, while attending to migrants' health needs. Decl. ¶ 7. The Center also provides migrants with safe refuge out of the hot sun while they arrange for transportation either to stay with a family member or to find more permanent shelter. Integrated into the work of the Respite Center is an emphasis—ingrained in all its staff and volunteers—on treating every person they encounter with respect, recognizing their inherent human dignity. *Id*.

As a Catholic ministry, this work of charity flows directly from Catholic Charities' Gospel-inspired mission to restore human dignity to those denied it. Decl. ¶ 8. In carrying out this work, Catholic Charities follows the encyclicals of Pope Francis, which emphasize that migrants "possess the same intrinsic dignity as any person," and the same "inalienable dignity of each human person, regardless of origin, race or religion." Pope Francis, *Fratelli Tutti*, ¶ 39 (Oct. 3, 2020). They also follow the Catechism of the Catholic Church, which proclaims the duty to "to welcome the foreigner" in search of security. Catechism of the Catholic Church § 2241. Serving those in need, and especially those served through the Respite Center, is part of Catholic Charities' sincere religious exercise. Decl. ¶ 8.

On average, the Respite Center serves over a thousand migrants a day. Decl. ¶ 7. These migrants arrive between 7am and midnight, often dropped off by Border Patrol. Decl. ¶ 5.

The vast majority of the migrants served by the Respite Center are families, and many are mothers traveling alone with their children. Decl. ¶ 9. Single men and unaccompanied minors are not a part of the Center operations. *Id.* Most of the women and children who arrive at the Respite Center have been through serious trauma and struggle, which can include assaults. *Id.* Sister Pimentel instills in her staff and volunteers the principle that by offering these families respect and welcome, the Center can help those who suffer take a first step toward healing. As Sister Pimentel testified, "As I have witnessed many times in my work at the Respite Center, the transformation can begin when they are received by someone who cares." *Id.*

At the Respite Center, volunteer doctors and nurses assist the mothers who are pregnant or nursing, and it provides over-the-counter medication where it will help with pains or illness. Decl. ¶ 10. Volunteer attorneys also meet with the families. *Id.* During this time, staff and volunteers also help migrants attempt to contact their family members, and assist migrants in securing safe transport from the Center. When leaving the Center, migrants sometimes seek transportation to stay with a family member, to a hospital if additional medical care is needed, or to a more permanent shelter. *Id.*

The Respite Center works hard to prevent the spread of COVID-19. Decl. ¶¶ 5-6. It provides COVID-19 tests to migrants as soon as they arrive at the Center. Border Patrol does not test for COVID-19. Decl ¶ 5. Only those who test negative are admitted to the Center for services. *Id.* Those who test positive for COVID-19 are separated from both others in the Respite Center and the broader community. Decl. ¶ 6. Catholic Charities works with hotels as

well as sites provided by city and county officials to provide quarantine spaces to those who test positive for COVID-19. *Id.* When necessary, ground transportation is provided to quarantine locations. *Id.*

### *Governor Abbott's Order*

The Governor's Executive Order, GA-37, prohibiting the ground transportation of migrants was issued on July 28, 2021. According to the Order, "[n]o person, other than a federal, state, or local law-enforcement official, shall provide ground transportation" to any "group of migrants" previously detained by Border Patrol for crossing the border illegally or otherwise subject to immediate removal. *See* Order, ECF No. 1, Ex. A at 2. The Order also authorized DPS to stop, on "reasonable suspicion," any vehicle that might be transporting migrants and "reroute" the vehicle back to its "point of origin" or "impound" the vehicle. *Id.* In a contemporaneous press statement, the Governor blamed migrants for spreading COVID-19, suggesting that "[t]he dramatic rise in unlawful border crossings has also led to a dramatic rise in COVID-19 cases among unlawful migrants who have made their way into our state," and arguing that Texas "must do more to protect Texans." Office of the Texas Governor, *Governor Abbott Issues Executive Order Restricting Transportation Of Migrants Due To COVID-19* (July 28, 2021), https://perma.cc/88GL-8LYR.

Then, in an August 3, 2021 press statement released after this Court enjoined the Order, Abbott downplayed the decision, noting that "[t]he Court's recent order is temporary and based on limited evidence," and claimed that the "Biden Administration has knowingly—and willfully—released COVID-19

positive migrants into Texas communities[.]" Office of the Texas Governor, *Office Of The Governor Issues Statement On Federal Judge Halting Executive Order GA-37* (August 3, 2021), https://perma.cc/F2KW-AV69.

### *The Threat to Catholic Charities*

On the afternoon of July 28, officers of the Texas Department of Public Safety contacted Sister Pimentel, asking for a meeting regarding the Governor's Order. Decl. ¶ 11. Sister Pimentel and the Most Rev. Mario Alberto Avilés, Auxiliary Bishop of Brownville, met with a DPS director and another officer in person. The director stated that the Governor's Order would prohibit Catholic Charities from transporting migrants in vehicles of any kind to any location. *Id.*

The DPS director further stated that when the Order was in effect, he would station a patrol car by the entrance of the Respite Center to watch for and identify people when they leave, and to stop any vehicle suspected of transporting migrants. Decl. ¶ 12. He informed Bishop Avilés and Sister Pimentel that if a driver did not follow an order to return with the migrants to the Respite Center, DPS officers would impound the vehicle. *Id.*

### *Negative Effects on Catholic Charities and the Migrants It Serves*

Catholic Charities is concerned that the Governor's Order prohibiting ground transportation will worsen the COVID-19 crisis and put at risk the health and safety of those the Center serves as well as those in the surrounding community for several reasons. Decl. ¶ 13.

First, the Order would prevent Catholic Charities from safely quarantining those who test positive for COVID-19. Quarantine is necessary to protect those

using the Respite Center and those living in the McAllen community. Decl. ¶ 14.

Second, the Order would prevent Catholic Charities from providing necessary transport for urgent healthcare needs, particularly for pregnant and nursing mothers and children, who may require medical care at a hospital or in another clinical setting. Decl. ¶ 15.

Third, the Order would prevent Catholic Charities from ensuring that migrants are safely transported to a known location while awaiting any further action by the federal government regarding their immigration status. It would endanger lives by increasing the opportunities for traffickers and others who are not committed to providing safe, non-coercive transportation to families in need of assistance. Decl. ¶ 16.

Fourth, it would undermine Texas's interest in following the law, as the Respite Center provides migrants the opportunity to speak with attorneys and learn more about their legal rights and the legal process. Decl. ¶ 17.

Fifth, it would make it impossible for Catholic Charities to transport migrants to the McAllen Airport to reunify with families, or to shelters, as needed. Decl. ¶ 18.

Sixth, and most importantly, preventing Catholic Charities from helping migrants leave the Respite Center means that the Center cannot admit new migrants once it has reached capacity. As a result, Catholic Charities would have to turn away mothers and babies seeking temporary shelter, food, and medical assistance. Decl. ¶ 19. If the Center cannot provide humanitarian aid to women and children dropped off at the Center by Border Patrol, these

families would likely be left to their own devices on the street, without access to life's basic necessities. Decl. ¶ 20.

In short, if left in place, the Order will prevent Catholic Charities from doing its religious work, in cooperation with the federal government's immigration enforcement authorities, attending to the health and safety of migrants, particularly mothers and very young children, as well as protecting the health of the broader community. Decl. ¶ 21.

## ARGUMENT

Because the Order violates the religious liberty of Catholic Charities, the equitable injunction factors tip in favor of granting the federal government's motion. "In order to obtain a preliminary injunction, a movant must demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction is in the public interest." *Moore v. Brown*, 868 F.3d 398, 402-03 (5th Cir. 2017). The third and fourth injunction factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). And the "[p]ublic interest is never served by a state's depriving an individual of a constitutional right." *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp. 3d 511, 531 (S.D. Tex. 2020) (quoting *Kite v. Marshall*, 454 F. Supp. 1347, 1351 (S.D. Tex. 1978)). Indeed, "the public interest always lies 'in a correct application of the [First Amendment].'" *Freedom From Religion Found., Inc. v. Mack*, No. 21-20279, 2021 WL 2887861, at *8 (5th Cir.

July 9, 2021) (quoting *Ams. United for Separation of Church & State v. City of Grand Rapids*, 922 F.2d 303, 306 (6th Cir. 1990)).[1]

Here, Texas's religious liberty violations affect application of the preliminary injunction factors in two ways. First, it is never in the public interest to violate the First Amendment and the Texas Religious Freedom Restoration Act. Second, the United States is more likely to succeed on its Supremacy Clause claims because First Amendment protections are at stake.

# I. The Order's violation of religious liberty is not in the public interest.

The Order violates at least two religious liberty laws: the Free Exercise Clause of the United States Constitution and the Texas Religious Freedom Restoration Act, Tex. Civ. Prac. & Rem. Code Ann. § 110.003 *et seq*.[2] As a result, the merged third and fourth preliminary injunction factors tip heavily in the United States' favor.

## A. The Governor's Order violates the Free Exercise Clause.

The Order violates the Free Exercise Clause. The Order burdens Catholic Charities' religious exercise by subjecting Catholic Charities staff and volunteers to surveillance and stopping by law enforcement officers and Catholic Charities' vehicles to possible impoundment. Laws burdening

---

[1]   As Texas has pointed out in other litigation against the United States, government "ha[s] no legitimate interest in the implementation of an unlawful [policy]." *Texas v. United States*, No. 6:21-CV-00003, 2021 WL 2096669, at *48 (S.D. Tex. Feb. 23, 2021) (quoting Texas brief).

[2]   The Order also implicates other religious freedom protections, such as the Texas Constitution's protection of free exercise of religion, Tex. Const. art. 1, § 6, and the federal government's ability to comply with its own obligations under the federal Religious Freedom Restoration Act, 42 U.S.C. § 2000bb. Given the accelerated nature of this proceeding, we do not address them here.

religious exercise are "subject to strict scrutiny under the Free Exercise Clause" if they are not "neutral and generally applicable." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021). The Order is neither neutral nor generally applicable.

### 1. The Order is not neutral.

The Order violates the Free Exercise Clause because it is not neutral toward religious actors. "The Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018). Here, Texas failed to act neutrally with regard to Catholic Charities' Respite Center. Texas specifically targeted Catholic Charities and the Respite Center. First, in the text of the Order, the Governor specifically referred to an incident concerning migrants that had been assisted by Catholic Charities. *See* ECF No. 1, Ex. A at 2.

Second, the day the Order was issued, Texas Department of Public Safety officials convened a meeting with Catholic Charities to inform it of the Order and its enforcement. Decl. ¶ 11. The DPS officials told Catholic Charities that under the Order Catholic Charities would be put under constant surveillance, with a patrol car stationed in front of the Respite Center. Decl. ¶ 12. Under the Order, Catholic Charities vehicles DPS suspected of carrying migrants would also be subject to being stopped by DPS officers. And, if Catholic Charities continued transporting migrants, its vehicles would be impounded. *Id*. Third, in its briefing Texas admitted that unnamed NGOs were of particular concern to the State in its desire to promulgate and enforce the Order. *See* ECF No. 9 at 12 (arguing Texas's interest in enforcement against "so-called 'partners'"

who "appear to be non-governmental organizations (NGOs) with their own purposes and goals").

Texas's actions are non-neutral. *See Fulton*, 141 S. Ct. at 1877 ("Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."). If a policy is crafted to penalize a particular religious ministry—or its enforcement is targeted at a religious ministry—it is not neutral and must face strict scrutiny under the Free Exercise Clause.

### 2. *The Order is not generally applicable.*

The Order separately violates the Free Exercise Clause because it is not generally applicable. It is not generally applicable because it categorically exempts state, local, and federal actors from its transportation ban, while prohibiting the religious ministry of Catholic Charities. *See* ECF No. 1, Ex. A at 3. "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). Texas justifies the Order's restrictions as a means to decrease the spread of COVID; but exempting local, state, and federal actors from the Order undermines that interest no less than exempting federal government partners like Catholic Charities. COVID doesn't care whether the driver of the vehicle is a federal employee or just a federal partner; and Texas has no more control over the movements of Border Patrol agents than it has over the federal government's contractors and partners.

Texas has treated transportation by Catholic Charities' religious ministry less favorably than it has treated identical transportation by Border Patrol and other government actors. The Order is therefore not generally applicable and subject to strict scrutiny under the Free Exercise Clause.

### 3. *The Order cannot withstand strict scrutiny.*

The Order's lack of general applicability and neutrality both independently trigger strict scrutiny. Strict scrutiny is an affirmative defense, so at trial Texas would bear the burden of proving that the Order survives strict scrutiny. Because "the burdens at the preliminary injunction stage track the burdens at trial," Texas bears the burden of proof on its affirmative defense at the preliminary injunction stage as well. *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 429 (2006).

To satisfy strict scrutiny, Texas must show that its Order "advances interests of the highest order and is narrowly tailored to achieve those interests." *Fulton*, 141 S. Ct. at 1881 (cleaned up). Courts cannot "rely on broadly formulated interests" in this analysis; instead, they must "scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Id*. (cleaned up); *O Centro*, 546 U.S. at 430-31 (strict scrutiny only "satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened.").

Governor Abbott's Order cannot survive strict scrutiny. As applied to Catholic Charities, the Order does not advance either of Texas's alleged compelling interests.

13

*First*, preventing Catholic Charities from providing emergency aid (and COVID testing) to migrants does not further the State's purported interest in the rule of law. Catholic Charities furthers the rule of law by enabling migrants to speak with attorneys who can help families understand their rights and the legal process. And by helping migrants connect with families and find a stable place to reside, Catholic Charities helps *decrease* the likelihood that migrants become homeless. Without food, water, and shelter, migrants are also *less* likely to appear at legal hearings and take the necessary steps that have been set for them by federal law enforcement. A family which has a roof over its head and support from other family members is more likely to follow the legal immigration process.

The work of the Respite Center also keeps migrants away from traffickers and unscrupulous operators who engage in risky and often illegal modes of transportation. The Respite Center provides safe transportation, free from coercion or any hidden agenda. This is why the federal government sends migrants to Catholic Charities, rather than leaving them to their own devices. Migrants are safer—and so are Texas cities and highways—when the Respite Center is able to do this work.

*Second*, the Order as applied to Catholic Charities does not further the State's interest in combating the spread of COVID. The Respite Center provides COVID testing for migrants and helps safely quarantine COVID positive migrants and families. If these families were simply released onto the streets of McAllen or other border cities (as Border Patrol would likely do without the Center), those with COVID would be less likely to follow

14

quarantine protocols, less likely to receive follow up testing, and more likely to spread COVID. The Order, as applied to the Respite Center, would thus actually *undermine* Texas's claimed interests, not promote them.

The Order is also not the least restrictive means of advancing either of Texas's stated interests. By undermining both interests, the Order by definition is not the least restrictive means of advancing the interests. And, while immigration and unlawful border crossings are a serious and complex problem, one thing is clear: impounding Catholic Charities' vehicles for ministering to migrant children and families who have already crossed the border and been released by federal law enforcement into the United States is not the least restrictive means of either advancing the rule of law or preventing further spread of COVID.

### B. Texas has no legitimate interest in violating state law.

In addition to violating the Constitution and federal law, the Order also violates state law. While questions of state law are not directly before this Court, they are relevant to the question of the public interest in issuing a preliminary injunction, since violating state civil rights law is not in the public interest.[3] Nor can Texas have a significant—much less compelling—interest in taking actions which violate state law. But that is precisely what Texas would do if it were to apply the Order to Catholic Charities.

Texas law states that "a government agency may not substantially burden a person's free exercise of religion," unless it can prove that doing so "is in furtherance of a compelling governmental interest" and "is the least restrictive

---

[3]   The rule of *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89 (1984) is thus not involved.

means of furthering that interest." Tex. Civ. Prac. & Rem. Code Ann. § 110.003. This law, which was passed to provide even greater protection than the federal Free Exercise Clause, applies regardless of whether the government's action is neutral or generally applicable. *See Merced v. Kasson*, 577 F.3d 578, 586-88 (5th Cir. 2009) (discussing history of TRFRA). The Order violates TRFRA as applied to *Amicus*: it would burden Catholic Charities' religious exercise of caring for migrants by deploying law enforcement to attempt to stop them from carrying out that work. *See id.* at 590 ("at a minimum, the government's *ban* of conduct sincerely motivated by religious belief substantially burdens an adherent's free exercise of that religion"). And, for the reasons discussed above, the Order is not "in furtherance of a compelling governmental interest" as applied to Catholic Charities. Indeed, it would undermine those interests by violating the law and stopping Catholic Charities from transporting individuals to quarantine sites. Nor is it the least restrictive means available to Texas, as it has other methods at its disposal to stem COVID and unlawful border crossings, including enforcement against traffickers and enforcement of quarantine protocols.

Since Texas would violate state law if it were to enforce the Order against Catholic Charities, the public interest—and the overall balance of the equities—favor an injunction here.

## II. The United States' Supremacy Clause arguments are also more likely to succeed because they vindicate the First Amendment right to free exercise of religion.

The Order's violation of the First Amendment outlined above also goes to the first preliminary injunction factor—whether the United States' claims are

likely to succeed. Since the United States' Supremacy Clause interests are heightened when First Amendment rights are at stake, it has a correspondingly higher likelihood of success.

The United States brings two claims against Texas under the Supremacy Clause. But "[the Supremacy] Clause is not [itself] a source of any federal rights." *Chapman v. Houston Welfare Rts. Org.*, 441 U.S. 600, 613 (1979). Instead, the Clause "'secure[s]' federal rights by according them priority whenever they come in conflict with state law." *Id*. Therefore, "all federal rights, whether created by treaty, by statute, or by regulation, are 'secured' by the Supremacy Clause." *Id*. This somewhat unique feature of the Supremacy Clause means that its application and interpretation frequently turn on the nature of the rights the Clause is invoked to protect. Here, for example, the federal government relies on the Supremacy Clause to protect its substantive interests in uniform immigration policy and intergovernmental immunity. *See* Compl., ECF No. 1 at 10-11.

In this way, the Supremacy Clause "creates a rule of decision": when a state's actions and federal law conflict, courts apply federal law. *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2262-63 (2020) (cleaned up). Proper interpretation and application of the Supremacy Clause, therefore, cannot be blind to the substantive values it protects in any given case. Here, the federal government has a strong and overriding interest in ensuring the religious liberty secured by the First Amendment. As the Supreme Court has explained, interpretation of the Supremacy Clause must ensure that the Free Exercise Clause's substantive protections trump competing state laws. *Id*. at 2262

(describing the Free Exercise Clause as "[t]hat '*supreme* law of the land'"). But Texas's narrow reading of the Supremacy Clause would allow state law to trump a constitutionally protected right. Such an interpretation of the Supremacy Clause cannot be valid. *Cf. Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 508, n. 27 (1984) (federal courts have "an obligation to test challenged judgments against the guarantees of the First and Fourteenth Amendments") (cleaned up). It is therefore proper, when considering the federal government's Supremacy Clause arguments, to take into account obligations under the First Amendment, as well as the impact of Texas's actions on constitutional rights. Here, those First Amendment interests—and the United States' duty to vindicate them—makes the United States all the more likely to succeed on its claims, thus fulfilling the first preliminary injunction factor.

## CONCLUSION

The people of the Diocese of Brownsville and Catholic Charities of the Rio Grande Valley work to alleviate suffering and recognize the dignity of each human person. This is one way that they live out their Catholic faith, and their work has made a positive difference in the lives of thousands. In this legal battle between the state and federal governments, they merely ask to be left to serve in peace, their religious exercise protected, so they can continue providing migrants with food, COVID testing, and transportation to a place where they may find shelter. An injunction against the Order would protect religious freedom and the wellbeing of those Catholic Charities serves.

18

Respectfully submitted this 12th day of August 2021.

/s/ Eric C. Rassbach
Eric C. Rassbach (admitted pro hac vice)
Texas Bar No. 24013375
Lori H. Windham (admitted pro hac vice)
D.C. Bar No. 501838
The Becket Fund for
Religious Liberty
1919 Penn Ave. NW
Suite 400
Washington, D.C. 20006
Phone: (202) 955-0095
Fax: (202) 955-0090
erassbach@becketlaw.org

*Attorneys for* Amicus Curiae
*Catholic Charities of the*
*Rio Grande Valley*

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of August 2021, I electronically filed the foregoing *amicus curiae* brief with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Alexander K. Haas
Jean Lin
Zachary A. Avallone
Brian Boynton
Michael Joseph Gerardi
Elliott M. Davis
Joshua M. Kolsky
United States Department of Justice
1100 L Street NW
Washington, DC 20005
Tel.: 202-305-7664
Fax: 202-616-8470
E-mail: joshua.kolsky@usdoj.gov

*Attorneys for Plaintiff*

Judd E. Stone
Patrick K. Sweeten
William T. Thompson
Office of the Attorney General
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: 512-463-2100
Fax: 512-457-4410
Email: judd.stone@oag.texas.gov

*Attorneys for Defendants*

  /s/ Eric C. Rassbach
Eric C. Rassbach