# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br><br>ANNUNCIATION HOUSE; ANGRY TIAS & ABUELAS OF THE RIO GRANDE VALLEY; JENNIFER HARBURY; and FIEL HOUSTON,<br><br>    Consolidated Plaintiffs,<br><br>v.<br><br>THE STATE OF TEXAS and GREG ABBOTT, in his official capacity as Governor of the State of Texas,<br><br>    Defendants,<br><br>STEVEN MCCRAW, in his official capacity as Director of the State of Texas Department of Public Safety,<br><br>    Consolidated Defendant. | §§§§§§§§§§§§§§§§§§§§§§§§§§§§§§<br><br>EP-21-CV-173-KC (Consolidated) |

## **ORDER**

On this day, the Court considered Plaintiff United States of America's Emergency Motion for a Temporary Restraining Order or Preliminary Injunction. ECF No. 3. Because Governor Abbott's Executive Order GA-37 authorizes Texas Department of Public Safety officers to make and act upon immigration determinations, the province of federal law, it violates

-1-

the Supremacy Clause of the United States Constitution.  As with the other States and their governors, Texas and Governor Abbott have broad authority to prevent and limit the spread of the coronavirus SARS-CoV-2, but they have presented no evidence in this case that GA-37 will be effective to achieve this goal.  Plaintiff's Motion is **GRANTED**.

I. **BACKGROUND**

On July 28, 2021, Governor Greg Abbott issued Executive Order No. GA-37, titled "Relating to the transportation of migrants during the COVID-19 disaster" ("Order").  Tex. Exec. Order No. GA-37 (July 28, 2021), https://gov.texas.gov/uploads/files/press/EO-GA-37_transportation_of_migrants_during_COVID_IMAGE_07-28-2021.pdf.  The Order mandates that "[n]o person, other than a federal, state, or local law enforcement official, shall provide ground transportation to a group of migrants who have been detained by [United States Customs and Border Patrol ("CBP")] for crossing the border illegally or who would have been subject to expulsion under the Title 42 order."  Order at 2 ¶ 1.  The Order directs the Texas Department of Public Safety ("DPS") to "stop any vehicle upon reasonable suspicion of a violation of paragraph 1, and to reroute such a vehicle back to its point of origin or a port of entry if a violation is confirmed."  *Id.* ¶ 2.  The Order further authorizes DPS to impound any vehicle "being used to transport migrants in violation of paragraph 1, or that refuses to be rerouted in violation of paragraph 2."  *Id.* ¶ 3.

On July 30, 2021, the United States filed this action against the State of Texas and Governor Abbott, in his official capacity as governor of Texas, alleging that the Order is preempted by federal law and that it violates the doctrine of intergovernmental immunity.  ECF No. 1.  The same day, the United States filed their Emergency Motion for a Temporary

Restraining Order ("TRO") or Preliminary Injunction, seeking to enjoin the enforcement of the Order. ECF No. 3. After a hearing on August 3, 2021, this Court granted the United States' Motion for a TRO, enjoining the enforcement of the Order for ten days. ECF No. 18. On August 13, 2021, this Court held a hearing on the preliminary injunction and extended the TRO for an additional fourteen days. ECF No. 40.

## II.    DISCUSSION

### A.    Standard

The decision whether to grant a preliminary injunction is within the discretion of a district court. *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989). "[A] preliminary injunction is [meant] to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits." *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 560 (5th Cir. 1971) (per curiam) (citations omitted); *see also* Fed. R. Civ. P. 65; W.D. TEX. LOC. R. CV-65. To prevail on a request for a preliminary injunction, a movant must show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat that [the movant] will suffer irreparable harm if the injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the [non-movant], and (4) that the injunction will not disserve the public interest." *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008) (citing *Planned Parenthood of Hous. & S.E. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005)). Because a preliminary injunction is an "extraordinary remedy," the movant must "clearly carr[y] the burden as to all four elements." *Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003) (citing *Kern River Gas Transmission Co. v. Coastal Corp.*, 899 F.2d 1458, 1462 (5th Cir. 1990)).

### B.    Success on the Merits

The United States seeks a preliminary injunction on the basis that the Order violates the Supremacy Clause of the United States Constitution and the related doctrine of intergovernmental immunity.  The United States argues that Order creates an obstacle to the enforcement of federal immigration law because it impermissibly requires state agents to make federal immigration determinations and disrupts the federal government's ability to transport noncitizens.  Mot. at 7–14.  Because the Order purports to regulate federal actors executing national policy, the United States also argues that it is invalid under the doctrine of intergovernmental immunity.  Mot. at 14–17. For the reasons below, the United States has established a substantial likelihood of success on merits on the grounds that the Order stands as an obstacle to federal immigration enforcement.

### 1.    Obstacle preemption

First, the United States argues that the Order is preempted because it obstructs the enforcement of federal immigration law in violation of the Supremacy Clause.  "As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States" by preempting state law.  *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  State laws are preempted by Congress when "compliance with both federal and state regulations . . . is a physical impossibility."  *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963) (citations omitted).  The doctrine also preempts state laws that stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S.

363, 372–73 (2000). To determine whether a state law creates an impermissible obstacle, courts must "examin[e] the federal statute as a whole and identify its purpose and intended effects." *Crosby*, 530 U.S. at 373.

In this case, the United States argues that the Order creates impermissible obstacles to the enforcement and operation of the federal immigration laws. The Constitution gives "[t]he Government of the United States [ ] broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012); *see also Hines*, 312 U.S. at 68 ("The power to restrict, limit, [and] regulate . . . aliens as a distinct group is not an equal and continuously existing concurrent power of state and nation [;]. . . whatever power a state may have is subordinate to supreme national law."). Grounded in this authority, the Immigration and Nationality Act of 1956 ("INA"), 8 U.S.C. § 1101, *et. seq.* is a "'comprehensive federal statutory scheme for regulation of immigration and naturalization' [that] set[s] 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Chamber of Com. of the U.S. v. Whiting*, 563 U.S. 582, 587 (2011) (quoting *DeCanas v. Bica*, 424 U.S. 351, 353, 359 (1976)). The INA provides standards governing alien registration, specifies which aliens may be removed, creates procedures for removal and mechanisms for noncitizens to seek discretionary relief, and vests broad authority in federal immigration officials. *Arizona*, 567 U.S. at 395–96.

The United States argues that the Order interferes with this federal scheme in two ways. First, it requires Texas officials to make determinations based on immigration status, in violation of the holding of *Arizona v. United States*. Mot. at 12–14. Second, it obstructs the federal government's ability to transport aliens when they leave CBP custody, interfering with the

operations of the federal immigration regime. Mot. at 7–12. Because the Order authorizes DPS agents to make and act on immigration determinations, the province of federal law, it is facially invalid.

### a. Preemption under *Arizona v. United States*

Relying on *Arizona v. United States*, the United States argues that the Order is facially preempted because it allows state officials to impose consequences on noncitizens based on their immigration status without federal direction and supervision. Mot. at 12. As the Supreme Court explained in *Arizona*, state officials may not make independent determinations related to removal or removability because they are reserved for the federal government. 387 U.S. at 409 ("By authorizing state officers to decide whether an alien should be detained for being removable, [the provision] violates the principle that the removal process is entrusted to the discretion of the Federal Government.").

In that case, the Court considered a state law authorizing state officers to "arrest a person if the officer has probable cause to believe . . . [the person] has committed any public offense that makes [him] removable from the United States." 567 U.S. at 407. Because this "authority could be exercised without any input from the Federal Government about whether an arrest is warranted in a particular case," the Court invalidated the provision. *Id.* at 408, 410. The Court noted that if state officials could arrest based on their own removability determination, it would "allow the State to achieve its own immigration policy." *Id.* at 408.

The *en banc* Fifth Circuit applied *Arizona* in *Villas at Parkside Partners v. City of Farmers Branch.* 726 F.3d 524 (5th Cir. 2013).[1]  The court considered a municipal housing ordinance that criminalized the occupancy of rental housing by noncitizens that local officials had determined were "not lawfully present." *Id.* at 523.  This put "local officials in the impermissible position of [punishing] persons based on their immigration status without federal direction and supervision." *Id.*  Because "[t]he federal government alone [ ] has the power to classify non-citizens," the court struck down the ordinance.  *Id* at 563.

Based upon *Arizona* and *Villas at Parkside Partners*, the issue in this case is whether the Order directs DPS to make immigration determinations that are reserved for the federal government.  Enforcement of the Order requires DPS officers to determine whether a group of noncitizens have been "detained by CBP for crossing the border illegally" or "would have been subject to the Title 42 Order." Order at 2.  First, a determination that a noncitizen has been detained for crossing the border "illegally" is a cut-and-dry immigration determination; the answer obviously turns on whether the noncitizen has violated the federal immigration laws.  DPS officers may not make such determinations.

Second, a determination that a person "would have been subject to expulsion under "the Title 42 order" also turns on immigration status.  *See* Order at 2.  Pursuant to its authority under Title 42 of United States Code Section 265, the Centers for Disease Control and Prevention ("CDC") issued an order in March 2020 authorizing expedited expulsion of "covered aliens," in

---

[1] Texas argues that because *Villas at Parkside Partners* was decided by a plurality of the Fifth Circuit, its opinion does not control here.  Because the plurality is the narrowest grounds on which the case was decided, it is the controlling opinion. *See Marks v. United States*, 430 U.S. 188, 193-94 (1977).

light of the COVID-19 pandemic.  85 Fed. Reg. 17,060, 17,067 (Mar. 26, 2020).  Since then, the Title 42 order has been replaced or amended several times.  *See* 85 Fed. Reg. 65,806 (October 2020); 86 Fed. Reg. 38,717 (July 2021); 86 Fed. Reg. 42,828 (August 2021).  The current version of the order[2] covers "persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a [Port of Entry] or U.S. Border Patrol station . . . subject to certain exceptions," which "includes noncitizens who do not have proper travel documents, noncitizens whose entry is otherwise contrary to law, and noncitizens who are apprehended at or near the border seeking to unlawfully enter the United States."  86 Fed. Reg. 42,841.  Determining whether an individual is covered by the Title 42 order thus involves deciding whether that person lacks valid documentation or entered the country unlawfully, among other immigration-related determinations.  Both classifications DPS officers would be required to make to enforce GA-37—whether a noncitizen had been detained for crossing the border in violation of the law and whether that individual "would have been subject to expulsion under Title 42"— are impermissible.

Furthermore, GA-37 contains no requirement or even suggestion that DPS agents will make these determinations with the "direction and supervision" of federal government.  *See Arizona,* 567 U.S. at 409.  In the "limited circumstances in which state officers may perform the

---

[2] Title 42 has evolved since GA-37 was signed in July. Thus, there is ambiguity in whether GA-37 applies those transporting noncitizens who "*would have been* subject to expulsion under the Title 42 order" as the Title 42 order existed at the time the GA-37 was signed or whether it purports to incorporate changes to the Title 42 order.   To the extent that GA-37 applies to noncitizens who would have been subject to a *prior* version of the Title 42 order, GA-37 would allow state officials to enforce a policy that the federal government has explicitly rejected.

functions of an immigration officer," the federal government must generally certify or otherwise actively consult with the state officer. *Id.* at 408; *see* 8 U.S.C. § 1252c (authority to arrest in specific circumstance after consultation with the federal government); § 1357(g)(1); (authority of specific state officers to arrest pursuant to formal certification of the Attorney General); § 1357(g)(2) (requiring state officers certified to make immigration-related arrests to receive training on enforcement of the immigration laws). Texas presents no evidence that the federal government will have "any input" in the immigration determinations that GA-37 requires DPS officers to make.

Texas attempts to distinguish this case from *Arizona* by arguing that the object of the Order is public health, an area of traditional state authority, rather than immigration. By its terms, the purpose of the Order is to improve "public health in Texas" and manage "a public health disaster" in the state. Order at 1–2. By contrast, the state law in *Arizona* aimed "to discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States." 567 U.S. at 393. Texas argues that, while "state-level prohibitions on transporting migrants [may] raise preemption issues if pursued for purposes of regulating immigration," the Order is valid because its object is public health. Opp'n at 16.

Regardless of the object of the Order, its effect is clear: it disrupts federal enforcement of the immigration laws by authorizing state officials to make immigration determinations. "In assessing the impact of a state law on the federal scheme, [courts] have refused to rely solely on the legislature's professed purpose and have looked as well to the effects of the law." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 105 (1992). To consider only the regulation's purpose would be "at odds with the approach taken in nearly all [the Court's] Supremacy Clause

cases" and "would enable state legislatures to nullify nearly all unwanted federal legislation" by identifying some other policy that may be furthered by the state law. *Perez v. Campbell*, 402 U.S. 637, 651–652 (1971). This is not to say that the purpose of a state regulation is irrelevant or that Texas may not take any action to protect its citizens from COVID-19. But "any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause." *Id.* at 652. Because this is the effect of the Order, it is preempted.

### b.      Disruption to federal immigration operations in Texas

The United States also argues that enforcement of the Order will disrupt immigration operations in Texas by interfering with the United States' ability to transport noncitizens using federal contractors and NGO-partners. Mot. at 7. And it provides evidentiary support for its claim that it must regularly transport noncitizens for a variety of reasons. CBP generally has discretion to transfer noncitizens leaving its custody to one of several other federal agencies including Immigration and Customs Enforcement and the Department of Health and Human Services. Hastings Decl. ¶ 10, ECF No. 3-1. Further, noncitizens released from jail may be transported to CBP custody for removal. *Id.* ¶ 22. Noncitizens are often transferred between government agencies or private facilities for other reasons including detention and to receive healthcare. *See id*. ¶¶ 23, 27; Sualog Decl. ¶ 11, ECF No. 3-3.

Certain federal laws also explicitly require the transfer of noncitizens in some circumstances. Under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), 8 U.S.C. § 1232, certain unaccompanied children must be transferred to the custody of the Office of Refugee Resettlement within seventy-two hours of being identified

as an unaccompanied child. 8 U.S.C. § 1232(a)(4), (b)(3). Under the Flores Settlement Agreement, which arose out of a lawsuit challenging the release of detained children by federal immigration agencies, CBP must transfer noncitizen children accompanied by a parent to a licensed facility with his or her family or release the child to the parent within three days. *Stipulated Settlement Agreement, Flores v. Reno*, No. CV-85-4544-RJK(Px) (C.D. Cal. Jan. 17, 1997).

To make these transfers, the federal government regularly employs transportation methods that would be prohibited by the Order. As explained by the Chief Patrol Agent of the Rio Grande Valley Sector of U.S. Border Patrol, which accounted for thirty-two percent of all border apprehensions in Fiscal Year 2021, CBP relies heavily on contractors to transport noncitizens leaving CBP custody. Hastings Decl. ¶ 4, 15, ECF No. 3-1. CBP also coordinates with partner-NGOs which then transport noncitizens to transit stations so that the noncitizens can travel after being released by federal authorities. *Id.* ¶ 25. If the United States were unable to employ contractors and other parties, federal law enforcement officers would have to conduct all or most noncitizen transfers. As explained by the Chief Patrol Agent, this would take those law enforcement officers away from more pressing responsibilities related to national security, further disrupting federal operations. *Id.* ¶ 28; Hott Decl. ¶ 8, ECF No. 3-2 ("It is important that ICE focuses its finite law enforcement resources on its public safety mission and targeted enforcement operations"); *see id* ¶¶ 7, 20, 23.

It is not clear whether every application of GA-37 would disrupt the United States' ability to transport noncitizens. Texas argues that facial relief is inappropriate here because "no one disputes" that certain applications of the Order against private parties would be valid. Opp'n at

-11-

9. Indeed, to succeed on a facial challenge, the United States must "establish that no set of circumstances exists under which the [executive order] would be valid.'" *Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Here, the immigration officials' declarations support the United States' obstacle preemption argument, at least to the extent that the Order interrupts the federal activities discussed here. But because the Order is facially preempted under *Arizona*, this Court need not decide whether its disruptions to the United States' ability to transport noncitizens *also* render it invalid in every application. What matters under *Arizona* is that the Order authorizes state officials to make and act on federal immigration determinations—not the identities of the parties that the Order is enforced against. Because the Order directs state officials to make these determinations without any direction or supervision by federal authorities, the Order is facially preempted.

### 2. Intergovernmental immunity

The United States also argues that the Order violates the doctrine of intergovernmental immunity because it seeks to directly regulate the official operations of federal actors and partners. Mot. at 14. This doctrine, rooted in the Supremacy Clause, bars state regulations that "retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by [C]ongress to carry into effect the powers vested in the national government." *M'Culloch v. Maryland*, 17 U.S. 316 (1819); *see also Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020). A state regulation is invalid if it "regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 436 (1990) (quoting *South Carolina v. Baker*, 485 U.S. 505, 520 (1988)).

In this case, at least as applied to federal officials and contractors, the Order purports to regulate the United States directly. The Order bars activities that non-law enforcement federal officials and federal contractors regularly engage in as part of federal immigration operations, namely transporting groups of noncitizens that the Order targets. "For purposes of intergovernmental immunity, federal contractors are treated the same as the federal government itself." *United States v. California*, 921 F.3d 865, 882 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 124 (2020) (citing *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988)). Texas apparently concedes that intergovernmental immunity extends to federal contractors. *See* Opp'n at 22. Thus, at least to the extent that the Order seeks to prohibit federal contractors—as well as any non-law enforcement federal officials—from carrying out their federal duties, it violates intergovernmental immunity.

The parties dispute whether intergovernmental immunity extends to "NGO-partners," recipients of federal money that also engage in transporting groups of noncitizens as part of the immigration regime. Mot. at 16; Opp'n at 22. The record does not provide the details necessary for the Court to determine whether the doctrine applies to entities that receive grants to transport noncitizens but may not be contractually bound. But because the Order is facially invalid under the principles of obstacle preemption, it is unnecessary to determine the precise scope of the intergovernmental immunity doctrine in this case.

### 3. Cause of action under the Supremacy Clause

Finally, Texas argues that the United States lacks a cause of action under the Supremacy Clause because Congress did not grant the government a cause of action under this constitutional

provision. Opp'n at 24–26. Relying on *Armstrong v. Exceptional Child Center, Inc.*, Texas claims that "the Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action." 575 U.S. 320, 324–25 (2015) (citation omitted).

This argument fails because *Armstrong* holds only that the Supremacy Clause does not create a *private* cause of action, but that case does not limit the federal government's ability to enforce the supremacy of its laws. 575 U.S. at 326 (discussing whether "the Supremacy Clause includes a private right of action"). At issue in *Armstrong* was whether Supremacy Clause "requires Congress to permit the enforcement of its laws by private actors." *Id.* In that case, healthcare providers sued Idaho's Department of Health and Welfare, arguing that state Medicaid laws reimbursed providers at rates lower than permitted by the federal Medicaid Act. *See id.* at 323–24. The Court determined that the Supremacy Clause did not confer a private right of action, but it did not limit the federal government's ability to sue under the provision. *See id.* at 326.

Thus, the United States has brought many lawsuits under the Supremacy Clause in the years since *Armstrong* without any questioning of the Supremacy Clause as the basis for a federal cause of action. *See United States v. Washington*, 971 F.3d 856 (9th Cir. 2020), *as amended*, 994 F.3d 994 (9th Cir. 2020); *United States v. California*, 921 F.3d 865, 876 (9th Cir. 2019), *cert denied*, 141 S. Ct. 124 (2020); *United States v. Bd. of Cnty. Commr's of Cnty. Of Otero*, 843 F.3d 1208 (10th Cir. 2016)*; United States v. New Jersey*, 2021 WL 252270 (D.N.J. Jan. 26, 2021); *United States v. Kernen Constr.*, 349 F. Supp. 3d 988 (E.D. Cal. 2018); *U.S. Postal Serv. v. City of Berkeley*, 2018 WL 2188853 (N.D. Cal. May 14, 2018). *Armstrong* does not prevent the federal government from enforcing federal supremacy, so Texas' argument fails.

### C. Irreparable Harm

Having established a likelihood of success on the merits, Plaintiffs must also establish a substantial threat of irreparable harm if an injunction is not issued. *Nichols*, 532 F.3d at 372. The United States argues that the Order causes it per se irreparable harm by violating the Supremacy Clause and threatens imminent irreparable harm by disrupting federal immigration operations in Texas. For both reasons, the United States has established a substantial threat of irreparable harm.

#### 1. Per se irreparable harm under the Supremacy Clause

The United States argues that, if the Order violates the Supremacy Clause, failure to enjoin the Order causes per se irreparable harm to the federal government. Mot. at 17–18. Texas did not respond to this argument in its Opposition brief, and after the United States pointed this failure out in its Reply, Reply at 3, ECF No. 17, Texas still did not address the issue at the hearing on this Motion. As such, Texas has conceded that the United State has suffered per se irreparable harm on these grounds.

More importantly, the United States' position is well supported. Indeed, "[i]f a statute is expressly preempted, a finding with regard to likelihood of success fulfills the remaining [preliminary injunction] requirements." *See Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010); *see also United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (noting, in the context of obstacle preemption, that "an alleged constitutional infringement will often alone constitute irreparable harm") (citations omitted); *City of El Cenizo v. Texas*, 264 F. Supp. 3d 744, 809 (W.D. Tex. 2017) (noting, in the context of field preemption,

that "courts at all levels have recognized that a violation of constitutional rights constitutes irreparable harm as a matter of law and no further showing of irreparable injury is necessary" and citing cases). Neither the Supreme Court in *Arizona* nor the Fifth Circuit in *Villas as Parkside Partners*, cases very similar to this one, questioned whether the government party was irreparably harmed. Neither will this Court today. Because the United States has established a likelihood that the Order violates the Supremacy Clause, irreparable harm is presumed.

### 2. Imminent harm to United States' immigration operations in Texas

The United States also argues that the Order threatens imminent disruption to its immigration operations in Texas. Mot. at 18–19. The Government has provided sufficient evidence to show that the federal immigration regime requires regular transportation of noncitizens and that federal officials must employ contractors and NGO-partners to conduct transport in order to operate the immigration system successfully. If enforced, the Order would prohibit the federal government from employing contractors and other partners to transport noncitizens and would require federal law enforcement to shoulder this responsibility. The evidence provided by the United States shows that this would irreparably disrupt immigration enforcement. As such, the United States faces imminent irreparable harm if the Order is enforced.

Texas argues that the United States has not yet experienced any injury because the Order has not yet been enforced. Opp'n at 8. But plaintiffs may seek preliminary injunctive relief for "anticipated injury" if that injury is imminent. *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). The "very purpose of injunctive remedies . . . is to prevent the occurrence of [irreparable]

injuries in the first instance." *Id*. By its own terms, the Order was "effective immediately" when it was signed on July 28, 2021, and Texas has provided no evidence that it will not enforce the Order in the very near future. Order at 2.

Relatedly, Texas argues that the United States' claimed injuries are speculative because the precise contours of the Order's application are not yet clear. Opp'n at 8. Texas suggests that DPS may decide to enforce the Order in a way that does not disrupt the United States' transportation of groups of noncitizens. But on its face, the Order exempts only law enforcement—not contractors and other parties, upon which the United States has demonstrated it depends, to transport noncitizens. Thus, it is reasonable to assume that the Order means what it says and may be enforced against federal contractors and NGO-partners, and the stated harm would be imminent upon enforcement. The United States has carried its burden to show that the failure to enjoin the Order would create a substantial risk of irreparable harm.

### D. Balance of Harms and Public Interest

When the federal government is a party, the balance of equities and public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In this case, the balance of equities and public interest favor the United States. The Order seems to do little to protect public health despite its purported motivations. Texas presents no evidence that noncitizens entering the United States at the border pose a particular health risk such that restricting their transportation would improve health and safety. Texas alleges that that in June 2021, CBP reported a 900% increase in COVID-positive migrants detained at the border. *See* Griff Jenkins & Adam Shaw, *COVID Cases Among Migrants in Rio Grande Valley Sector Surge 900% as Border Numbers Continue to Rise*, Fox News (July 20, 2021), https://www.foxnews.com/politics/covid-cases-

migrants-rio-grande-valley-sector-border-numbers.  But there is no evidence that this rate was higher than rates among U.S. citizens—or any other group—in the same time frame.  Indeed, recent data shows that "migrants generally test positive at similar or lower rates than Americans living in the counties where they are tested." Michelle Hackman, *Why Illegal U.S. Border Crossings Likely Aren't Fueling the COVID-19 Surge*, Wall St. J. (Aug. 21, 2021) ("Most public-health experts say it isn't likely that migrants are contributing significantly to transmissions within the U.S., since nearly all are tested and quarantined before release.").  And Texas' single anecdotal example of noncitizens posing a public health risk—a migrant family apparently coughing without wearing masks in a restaurant—is not sufficient evidence that the Order will be effective in combating COVID-19 in Texas. *See* Opp'n at 18.

Of course, this is not to say that Texas and its Governor are barred from taking measures to protect its citizens from COVID-19.  Like the other States and their governors, Texas and Governor Abbott have broad authority to prevent and limit the spread of the coronavirus SARS-CoV-2, but they have presented no evidence in this case that GA-37 will be effective to achieve this goal.  In sum, the balance of equities and public interest favor the United States.

### III.  CONCLUSION

For the reasons set forth herein, Plaintiff's Motion for a Preliminary Injunction, ECF No. 3, is hereby **GRANTED**.

**IT IS HEREBY ORDERED THAT DEFENDANTS, THEIR AGENTS, OFFICERS, AND EMPLOYEES, AND ALL OTHER PERSONS AND ENTITIES IN ACTIVE CONCERT OR PARTICIPATION WITH THEM ARE ENJOINED FROM TAKING ANY ACTION TO ENFORCE THE EXECUTIVE ORDER.**

**IT IS FURTHER ORDERED** that this preliminary injunction shall remain in force until resolution of this action on the merits.

**SO ORDERED**.

SIGNED this 26th day of August, 2021.

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE