**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| ANNUNCIATION HOUSE; ANGRY TIAS & ABUELAS OF THE RIO GRANDE VALLEY; JENNIFER HARBURY; FIEL HOUSTON<br><br>Plaintiffs,<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of the State of Texas; and STEVEN MCCRAW, in his official capacity as Director of the State of Texas Department of Public Safety<br><br>Defendants. | Case No. ___3:21-cv-178___ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      Governor Abbott's Executive Order No. GA-37, if permitted to go into effect, will subject Texans and those traveling through our State to a unilateral state immigration enforcement regime in direct conflict with federal law.  The executive order directs state law enforcement officers to pull over any driver they suspect of transporting migrants—primarily migrants whom the federal government has released from federal custody and permitted to live in the United States while they pursue asylum and other claims.  It directs state officers to make their own determinations about passengers' immigration status, wholly independent of the federal government, and to impose harsh penalties based on those unilateral immigration decisions.  It opens the door to profiling, standardless detention, questioning, vehicle seizure, rerouting, and heavy fines.  The executive order is already having a profound chilling effect on people's movement in border communities and throughout the State.

1

2.     The executive order seeks to override federal immigration decisions in multiple ways.  Other than law enforcement officers, it bars anyone from transporting the very people whom the federal government has intentionally released so that they can live in the United States during their immigration proceedings.  Based on the Governor's decision that the federal government should not have released these people, the executive order prevents them from taking buses to join their families where their immigration cases and ICE check-ins are located.  It prevents them from using transport to attend to the basic tasks of life.  And it authorizes DPS officers to reroute them directly back to CBP stations, despite CBP's decision to release them.  These people have a federal statutory right to seek asylum and explicit federal permission to live in the United States.  Texas cannot veto those federal decisions.

3.     The executive order threatens all Texans with a harsh new regime of immigration arrests and questioning.  Any vehicle with a group of passengers whom state troopers suspect of falling into the executive order's complex immigration categories will be in jeopardy of detention and harassment.  Drivers—including shelter providers, bus companies, taxi drivers, family members of migrants, and a host of others—will risk fines and the impoundment of their vehicles.  Drivers and passengers are subject to state troopers' unilateral decisions as to whether they suspect passengers in cars, vans, and buses fall within the executive order's immigration categories.  State officers have no ability or authority to make that determination.

4.     The order creates two new immigration categories invented from whole cloth.  The first, individuals "detained by CBP for crossing the border illegally," includes people who have recently entered the country *and* people who were detained and released by CBP years ago.  This group includes people who have won asylum in court and are now permanent residents, as well as some DACA recipients.  The second new disfavored immigration class is individuals

who "would have been subject to expulsion under the Title 42 order." This is a complex border policy first implemented in March 2020, and whether it applies to any individual depends on multiple immigration-status determinations.  Knowing whether a person falls within these categories requires detailed knowledge both of the person's immigration history and of the relevant immigration laws.

5.     The order imposes severe consequences based on state officers' guesses at these unilateral classifications.  It directs officers to stop drivers, impound vehicles, and reroute cars and buses either to their point of origin or all the way back to the border from any point in the State.  Migrants will be sent back to CBP stations despite CBP's decision to release them. Drivers are subject to fines of up to $1,000 per violation and seizure of their vehicles—even if they have no knowledge of their passengers' immigration situation, or whether they fit the complex legal categories referenced in the executive order.

6.     The order will thus subject individuals and service providers to severe penalties for daily humanitarian activities, such as giving a ride to neighbors, family members, clients, or fellow congregants.  Absent basic transportation, many asylum seekers will be unable to get medical care, join family, or attend their immigration court hearings.  All Texans could be required to prove their status in order to prevent lengthy investigations into their immigration status.

7.     While the order is not geographically limited, it will necessarily have a greater impact on our border communities.  These communities are culturally diverse, politically engaged, economically driven, and every bit as American as any other.  Yet the order will subject border residents to the threat of profiling and detention at any turn.

8.      Further, the order will upend the federal immigration system in countless ways.  It will strand thousands of asylum seekers in border communities and shelters.  It will prevent shelters from working with the federal government to provide COVID-19 testing and vaccines to migrants.  It will prevent asylum seekers from being transported to their U.S. addresses in order to attend immigration court proceedings.

9.      The order violates the Supremacy Clause of the U.S. Constitution by attempting to regulate immigration—a function that is constitutionally committed exclusively to the federal government—and by conflicting with federal law in several ways.  "Power to regulate immigration is unquestionably exclusively a federal power," *De Canas v. Bica*, 424 U.S. 351, 354 (1976), and "[f]ederal governance of immigration and alien status is extensive and complex," *Arizona v. United States*, 567 U.S. 387, 395 (2012).

10.     Yet the order seeks to regulate immigration directly, explicitly disapproving and seeking to thwart "the admittance and movement of migrants under the Biden Administration." It denies a basic life necessity—transport—to the very people whom the federal government has authorized to live within the United States.  And it requires the precise unilateral immigration actions that the Supreme Court and Fifth Circuit have repeatedly rejected—actions that are undeniably premised on people's immigration status and on immigration classifications of the state's own making.

11.     The executive order comes on the heels of other efforts by Governor Abbott to unilaterally "deter" migration across the southern border, including a state declaration of disaster in May 2021 premised on his disagreements with federal immigration policy, partially used as the legal basis to justify this order, and the deployment of DPS troopers to border areas in order to "deter" irregular border crossings independent of the federal government.

12. If the order remains in effect, it will loom over Texas residents, particularly those in border communities, as well as immigrants and those providing them aid—threatening them with profiling, harassment, and punishment.  It will entirely disrupt the system of travel for migrants from border areas to the rest of the State and country, where they then check in with DHS and attend immigration hearings.  In short, the executive order unconstitutionally interferes with both the liberty of people in Texas and with the federal government's exclusive regulation of immigration.   It is facially unconstitutional and must be enjoined in its entirety.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343 because this action seeks to redress the deprivation, under color of state law, of Plaintiffs' civil rights and to secure equitable or other relief for the violation of those rights.

14. Venue is proper in the Western District of Texas because a substantial portion of the relevant events occurred in the District and because Defendants reside in the District.  28 U.S.C. § 1391(b).

## PARTIES

**Plaintiffs**

15. Annunciation House is a non-profit organization that has offered hospitality to hundreds of thousands of migrants, immigrants, and refugees in El Paso—including shelter, clothing, food, and other basic necessities—since 1978.  Annunciation House is one of the largest shelter providers on the U.S.-Mexico border.  Transportation of migrants in groups is essential to Annunciation House's work.  Migrants released by Customs and Border Protection

("CBP") and Immigration and Customs Enforcement ("ICE") are transported by a local nonprofit and by CBP and ICE contractors to Annunciation House shelters, in vehicles with approximately 12 to 15 migrants each.  Annunciation House also contracts with a local company once or twice a week to transport migrants in passenger vans in groups of approximately 15.

16.     Angry Tias & Abuelas of the Rio Grande Valley ("Angry Tias") is a non-profit volunteer organization that assists asylum seekers in the Rio Grande Valley.  Angry Tias assists roughly 10,000 migrants each year.  The organization provides humanitarian assistance and funds shelter, transportation, and legal assistance.  Angry Tias has an ongoing retainer with a local taxi company, whom they pay to transport migrants recently released from federal immigration custody to bus stations, airports, and hotels.  Angry Tias funds roughly 25 trips that involve at least two migrants in the vehicle per month; two to six migrants may ride in taxis funded by Angry Tias together at a time.  Additionally, Angry Tias members drive recently arrived asylum seekers, including those recently released from federal immigration custody, in the Rio Grande Valley to medical appointments, bus stations, and airports. These trips include groups of multiple asylum seekers per vehicle.

17.     Jennifer Harbury is a retired public interest lawyer who assists migrants in the Rio Grande Valley, including through humanitarian support for migrants released by CBP and ICE. She hosts released migrants in her home as part of this humanitarian work—most recently a mother and her five-year-old child.  When Ms. Harbury hosts migrants, she transports them to medical visits, legal appointments, ICE check-ins, stores, and religious and leisure activities.

18.     FIEL Houston ("FIEL") is a non-profit, immigrant-led civil rights organization based in Houston, Texas.  The organization's mission includes empowering immigrant youth and their families.  Its work includes regular know-your-rights programs regarding questioning and

detention by law enforcement, as well as legal services for its members such as assistance with immigration matters.  FIEL has approximately 11,000 members, of whom roughly 7,000 are undocumented.  More than three quarters of FIEL members are part of mixed-status families, with some family members with immigration status while others are undocumented.  FIEL members include a large number of migrants who fall within the terms of the executive order.  FIEL also has many members who were released from CBP custody after crossing the border but before March 2020—before COVID.

**Defendants**

19.     Gregory Abbott is the Governor of the State of Texas.  Governor Abbott issued Executive Order No.GA-37.  Texas law provides that "[t]he governor may . . . direct the activities of [the Texas Department of Public Safety] during a public disaster . . . or to perform the governor's constitutional duty to enforce law."  Tex. Gov't Code § 411.012.  Governor Abbott is sued in his official capacity.

20.     Steven C. McCraw is the Director and Colonel of the Texas Department of Public Safety.  He is "directly responsible . . . for the conduct of the department's affairs" and serves as "executive director of the department," among other duties and responsibilities.  Tex. Gov't Code § 411.006(a)(1)-(2).  He is sued in his official capacity.

## STATEMENT OF FACTS

### A.  Asylum Seekers and Other Migrants in Texas

21.     Migrants, including asylum-seeking families, children, and individuals, enter the country in several ways.  Some are permitted to enter the country by the Department of Homeland Security ("DHS") at a port of entry.  Other migrants cross the Rio Grande to enter the United States.  These individuals often immediately locate a Border Patrol agent or other law

enforcement official in order to seek asylum and other protection in the United States. When they do, they may be taken into CBP custody.

22.     Migrants who are processed or released from custody are given a directive to check in with ICE or a Notice to Appear before an immigration judge.

23.     These recently-arrived migrants who have been processed by DHS, including those who have been released by CBP, must then travel to the address that they have provided DHS in order to check in with ICE or appear in immigration court at their ultimate destination. That ultimate destination is often a place in the country where they have family or other community support.

24.     Once migrants are released from DHS custody, they typically stay at one of the many shelters in networks along the border before traveling on to their final destination. While staying at shelters, migrants sometimes require transportation to medical treatment. Plaintiff Annunciation House often drives families to medical facilities together when a member of the family needs medical care.

25.     In order to leave the border area, migrants often use ground transportation—particularly buses. This is because buses are a much less expensive mode of transportation, and most asylum seekers have little money for their journey. Bus stations in El Paso, McAllen, and Brownsville, for example, are major transit hubs for migrants. Groups of migrants typically travel on a single bus at the same time. To reach the bus station, migrants will often use shared ground transportation, such as vans run by shelters or multi-passenger taxis.

26.     Migrants will then travel on, typically to major cities in Texas like San Antonio and Houston. For those not staying in those cities, they may briefly stay in a shelter in those

cities before continuing on to their ultimate destination, which may be in Texas or elsewhere in the United States.

27.     Migrants also fly out of airports in the Texas-Mexico border area. To reach airports, migrants often travel in vehicles. For example, Plaintiff Annunciation House frequently takes migrants from their shelters to the El Paso International Airport in vehicles carrying up to 15 passengers at a time. Other migrants take taxis to the airport: Plaintiff Angry Tias funds such trips to the airport for migrants.

28.     Humanitarian volunteers regularly drive migrants in the border area. Plaintiff Jennifer Harbury regularly hosts migrants and drives them to medical care, legal assistance, the grocery store, and leisure activities. She recently hosted a family in her home and drove them to daily activities.  Volunteer members of Plaintiff Angry Tias drive asylum seekers who have been released from immigration detention centers to destinations in the Rio Grande Valley.

29.     In all of these travels, asylum-seeking families regularly travel together in vehicles as a group. They take buses to their onward destinations together; they travel in vehicles to airports or to bus stations together; and they otherwise travel in vehicles within the border area together.

**B.  Legal Background: Comprehensive Federal Immigration System**

30.     The federal government has exclusive power over immigration matters.  The U.S. Constitution grants the federal government the power to "establish a uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3.  The federal government's power to control immigration is inherent in national sovereignty.  *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 394-95 (2012).  In

part, this is because of the "importan[ce] and delica[cy]" for foreign relations of protecting

noncitizens' rights within the United States. *Hines v. Davidowitz*, 312 U.S. 52, 64 (1941).

31.    In contrast, "[t]he States enjoy no power with respect to the classification of

aliens." *Plyler v. Doe*, 457 U.S. 202, 225 (1982). Moreover, any person "with the privilege of

entering and abiding in the United States" has the privilege of "entering and abiding in any state

in the Union." *Truax v. Raich*, 239 U.S. 33, 39 (1915).

32.    Congress has created a comprehensive system of federal laws regulating and

enforcing immigration in the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1101 *et

seq.*

33.    The INA was amended in 1980 by the United States Refugee Act of 1980, Pub. L.

No. 96-21, to codify certain protections for those fleeing violence and danger. The INA thus

contains particular protections for people seeking protection in the United States—whether or not

they cross at a port of entry. Under U.S. law, every noncitizen "who is physically present in the

United States or who arrives in the United States" has the right to apply for asylum. 8 U.S.C. §

1158(a)(1).

34.    People who enter the United States at a place other than a port of entry may seek

protection and permission to remain in the United States, just as people who cross at a port of

entry may. They may receive protection through a number of avenues in addition to asylum,

including withholding of removal, 8 U.S.C. § 1231(b)(3)(A), the Convention Against Torture, *id.*

§ 1231 note, and Special Immigrant Juvenile Status, *id.* § 1101(a)(27)(J).

35.    The INA contains complex and exclusive procedures for determining immigration

and citizenship status, and for determining whether an individual may lawfully remain in the

United States, either temporarily or permanently.

36.     Under federal law, there is no single, readily ascertainable category or characteristic that establishes whether a particular person may or may not remain in the United States.  The answer to that question is a legal conclusion that can only be reached through the processes set forth in the INA and may depend on the discretionary determinations of federal officials.

37.     The INA carefully calibrates the nature and degree of penalties applicable to each possible violation of its terms.  For example, 8 U.S.C. § 1324 provides criminal penalties for individuals who "transport or move" a noncitizen with knowledge or reckless disregard that they have entered or remained in the United States in violation of law and in furtherance of the violation.

38.     State and local law enforcement officers have no general authority to enforce federal civil immigration law.  Federal law specifically authorizes state officers to assist in immigration enforcement only in narrowly defined circumstances, and otherwise reserves immigration enforcement authority to the federal government.  For example, 8 U.S.C. § 1357(g) allows state officers to sign an agreement with DHS that allows them to help enforce immigration law in limited ways, and with supervision.

39.     The Texas Department of Public Safety does not have a 287(g) agreement that authorizes officers who encounter alleged noncitizens to question or arrest them for federal immigration enforcement purposes.

C. **Governor Abbott's Anti-Immigrant Statements and May 31, 2021 Proclamation of a Disaster Due to Migration**

40.     Governor Abbott has repeatedly opposed asylum seekers and refugees entering Texas.  In November 2015, he unsuccessfully sought to block the resettlement of Syrian refugees

in Texas.  In January 2020, he unsuccessfully sought to stop the resettlement of refugees in

Texas under the federal refugee resettlement program.

      41.     In early March 2021, Governor Abbott rejected a DHS offer to use Federal

Emergency Management Agency funds to support testing and possible quarantine of migrant

families at the Texas-Mexico border.  Also in early March 2021, Governor Abbott ended mask

requirements and restrictions on business occupancy in Texas.  Governor Abbott then attributed

the spread of COVID-19 in Texas to the Biden administration's release of migrants from custody

in south Texas.

      42.     On May 31, 2021, Governor Abbott issued a proclamation declaring a state of

disaster in 34 Texas counties due to the number of people "unlawfully crossing the Texas-

Mexico border."  Contrary to the suggestion in the Governor's order banning transport, his May

31 disaster declaration did not mention COVID-19.  It did, however, declare a disaster due in

part to "a violation of sovereignty and territorial integrity"—making clear that Governor

Abbott's concern was with limiting migration.  *Id.* at 3.  In his May 31 proclamation, Governor

Abbott repeatedly emphasized his differences with the federal government's policies at the

Texas-Mexico border.  He stated that he would deploy large numbers of DPS troopers to the

border under the state's Operation Lone Star program in order to "deter" irregular "border

crossings." *Id.* at 2.

**D.  Executive Order No. GA-37**

      43.     On July 28, 2021, Governor Abbott issued Executive Order No. GA-37.  The

order purports to bar the transportation of migrants in the State of Texas under certain

circumstances.

44.     The executive order's stated justification is the Governor's disagreement with and desire to curtail "the admittance and movement of migrants under the Biden Administration" purportedly because of COVID-19 concerns.

45.     The order provides that "on a statewide basis effective immediately[,] [n]o person, other than a federal, state, or local law-enforcement official, shall provide ground transportation to a group of migrants who have been detained by CBP for crossing the border illegally or who would have been subject to expulsion under the Title 42 order."

46.     The order "direct[s]" the Texas Department of Public Safety "to stop any vehicle upon reasonable suspicion" that it is transporting migrants subject to the Order, and to reroute such a vehicle back to its point of origin or a port of entry if a violation is confirmed."

47.     The order "authorize[s]" DPS "to impound a vehicle that is being used to transport migrants" subject to the Order, "or that refuses to be rerouted."

48.     The order contains no scienter requirement.  Cars can be impounded or forced to drive to the border even if the driver did not know that they are transporting migrants subject to the order.

49.     The order does not define "group."  Nor does it define "subject to expulsion."

50.     The order does not provide a limitation on the duration of vehicle impoundment that it purports to authorize.  Nor does it provide any mechanism for a vehicle owner to obtain the release of the vehicle from impoundment.

51.     The order relies on two disaster declarations, including the May 31 proclamation, for authority. Under the Texas Emergency Management Plan, "failure to comply with . . . any executive order . . . issued by the governor during a state of disaster, is an offense punishable by a fine not to exceed $1,000."

52.     Drivers can thus be fined up to $1,000 per violation.

53.     One day after he issued executive order GA-37 banning transport, Governor Abbott issued Executive Order No. GA-38, which dramatically restricts localities' authority to address COVID-19.  GA-38 bars "COVID-19-related operating limits for any business or other establishment," explaining that "business activities and legal proceedings" may go forward "without COVID-19-related limitations imposed by local governmental entities or officials." Any imposition of COVID-19-related operating limits by a local governmental entity or official is subject to a fine of up to $1,000.

54.     GA-38 also prohibits school districts, public health authorities, counties, and cities from requiring that individuals wear masks.  Its only exceptions are for state nursing homes, hospitals, and prison and detention centers.  Any mask requirement by a government entity or official is subject to a fine of up to $1,000.

55.     GA-38 further prohibits governmental entities from requiring individuals to obtain COVID-19 vaccines while they remain under emergency use authorization.  It bars state agencies and political subdivisions of the state from requiring proof of vaccination for entry to any place or receipt of services.  The prohibition on vaccine requirements has an exception only for nursing homes and assisted living facilities.

**E.  The Title 42 Order**

56.     Executive Order GA-37 applies to individuals who "would have been subject to expulsion under the Title 42 order."  This is a clear reference to a series of orders and rules issued by the Centers for Disease Control and Prevention ("CDC") since March 2020, purportedly pursuant to Title 42 of the United States Code.

57.     In March 2020, the CDC issued a 30-day "Order Under Sections 362 and 365 of the Public Health Service Act [42 U.S.C. §§ 265, 268] Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists."  85 Fed. Reg. 17,060-17,088 (Mar. 26, 2020) (effective date Mar. 20, 2020).

58.     The Title 42 Order is constantly subject to revision, and applying it requires an officer to follow each of these revisions, which have significantly altered the scope of the policy over time.  For instance, in July 2020, the CDC issued an order exempting unaccompanied children from the Title 42 procedures.  86 Fed. Reg. 38,717 (July 22, 2021) (effective date July 16, 2021).

59.     On August 2, 2021, the CDC re-issued the order in its latest form (hereinafter "Title 42 Order").  Order Suspending the Right To Introduce Certain Persons From Countries Where A Quarantinable Communicable Disease Exists (Aug. 2, 2021).

60.     The Title 42 Order suspends the right to introduce certain persons, referred to as "covered noncitizens," into the United States.  Title 42 Order at 23.  "Covered noncitizens" are "noncitizens who do not have proper travel documents, noncitizens whose entry is otherwise contrary to law, and noncitizens who are apprehended at or near the border seeking to unlawfully enter . . . between POE[s]."  *Id.*

61.     The Title 42 Order directed the "immediate suspension of the introduction" of certain persons, referred to as "covered aliens."  85 Fed. Reg. at 17,067.  "Covered aliens" are those seeking to enter the United States through Canada or Mexico who "seek[] to enter . . . at POEs [ports of entry] who do not have proper travel documents, aliens whose entry is otherwise contrary to law, and aliens who are apprehended near the border seeking to unlawfully enter the United States between POEs."  85 Fed. Reg. at 17,061.

15

62.     Whether the Title 42 Order applies to an individual thus depends on the sufficiency of any travel documents and whether the individual's entry is contrary to law.

63.     The Title 42 Order also contains a complex set of evolving exemptions, which, at various points in time, have included U.S. citizens and legal permanent residents ("LPRs"), the spouses and children of citizens and LPRs, people from foreign countries with valid travel documents, people from countries in the visa waiver program who present at ports of entry, people who are permitted to enter via specific DHS-approved processes developed in consultation with the CDC, and unaccompanied children.  Title 42 Order at 23; 85 Fed. Reg. at 17,061.

64.     The Title 42 Order further states that DHS officers may, in their discretion, determine that a noncitizen "should be excepted from [this] Order based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests."  Title 42 Order at 23.

65.     Ascertaining whether an individual is subject to the Title 42 Order and applying the exemptions thus require determinations of an individual's citizenship, status, travel documents, nationality, and the time, place, and manner of the individual's entry into the United States.

66.     For individuals subject to the Title 42 Order, the policy contemplates their forcible return to the country from which they entered (Canada or Mexico) or their home country.  *Id.* at 14.

67.     The CDC required the enforcement of the Title 42 Order by DHS "because CDC does not have the capability, resources, or personnel needed to do so."  Title 42 Order at 23.

DHS then "developed operational plans for implementing [the Title 42] Order," which the CDC reviewed and approved.  *Id.*

68.     Upon information and belief, the CDC has not reviewed or approved any operational plans for the enforcement of the Title 42 Order by Texas law enforcement agencies or personnel.

## F.  The Impact of the Executive Order on Migrant Transport at the Southern Border and on Plaintiffs

69.     The executive order, if implemented, will have catastrophic consequences for migrant transport at the southern border and for people throughout Texas, who reasonably fear that the order will lead to more interactions with state troopers.  Plaintiffs will experience a number of dire consequences.

70.     The Order will grind migrant transportation out of the border areas to a halt.  As described above, the vast majority of migrants use Greyhound buses to travel out of the border areas.  Families travel together; many migrants will typically travel on the same bus.  The primary system of transportation for migrants out of border areas will end.

71.     Airports do not provide a viable alternative, because migrants reach airports by traveling in vehicles. This is often, generally, with other migrants—and migrant families typically travel together.  Nor can most asylum seekers afford flights.

72.     Traveling individually in vehicles is also not an alternative, even if it is permissible under the executive order.  Migrants often travel together as families, and it would be both impractical and cruel to require parents to separate from their children and travel individually to onward destinations.  There is also no cheap, individual ground transportation out of border areas, and the volume of migrants makes each person traveling individually in a separate vehicle completely impractical.

73.     Further, the Order will keep Texans from transporting multiple people in vehicles because they fear that they will be subject to stops, detention, interrogation about their immigration status, "rerouting" of their vehicles, impoundment, and heavy fines. This is especially so because under the Order, DPS officers have no clear way to determine whether their passengers were arrested by CBP and why, or whether they could have fallen under the CDC's Title 42 Order but not its exceptions.

74.     Plaintiff FIEL has received calls and messages from members concerned that they will be profiled and subject to unlawful detention.  Members have reported that they fear going to work, transporting their children to school, and traveling to medical appointments.  Plaintiff Annunciation House has been contacted by a non-profit organization that brings groups of migrants from CBP and ICE detention to Annunciation House shelters, expressing grave concerns about its ability to keep functioning under the executive order.  Individual Annunciation House volunteers have expressed concern that they will lose their vehicles as a result of driving migrants.

75.     If the executive order goes into effect, Plaintiff Annunciation House will be seriously hindered in providing support to migrants in the El Paso area through its shelters.  The executive order threatens to force Annunciation House to close.  The executive order will prevent migrants from journeying out of the border areas to their ultimate destinations.  If migrants cannot continue on to destinations outside of border areas, Annunciation House will not be able to accept new guests, and Annunciation House is not set up to provide long-term housing.  Annunciation House also anticipates that many volunteers will stop driving due to the executive order and that it will not be able to replace them.  This will prevent Annunciation

House from transporting migrants from the shelters to their ultimate destinations—a key component of the aid they currently provide migrants.

76.     Plaintiff Angry Tias will be greatly hindered in aiding migrants in the Rio Grande Valley.  Individual volunteer members of the Angry Tias will be forced to choose between their humanitarian work and the executive order's harsh penalties.  Some will stop driving, while others will risk detention, heavy fines, and vehicle impoundment.  One member will certainly stop driving, as she cannot risk vehicle impoundment as the sole caregiver to her 87-year-old husband with late-stage Alzheimer's disease.

77.     Plaintiff Angry Tias will also need to shift their work to focus on providing housing and humanitarian assistance to families stranded in the Rio Grande Valley.

78.     Plaintiff Jennifer Harbury owns uses her own car to carry out humanitarian transportation.  If her car is impounded, she will lose her only form of transportation.  She will be unable to carry out her volunteer work.  She is also a 70-year-old retiree and cannot afford to pay fees to reclaim her vehicle or to pay for alternate forms of transportation in the Rio Grande Valley, which lacks a robust public transit infrastructure.

79.     Plaintiff FIEL Houston will experience harm on behalf of its members and organizationally.  FIEL is already receiving calls and messages from members deeply concerned that the executive order will upend their daily lives.  FIEL members fear travelling to work, to their children's schools, to church, and to obtain medical care.  FIEL members will likely change their daily routines as a result.  FIEL members include at least 10 families who arrived in the United States after the issuance of the first Title 42 order in March 2020 and who were released from immigration custody.  FIEL also has many members who were released from CBP custody after crossing the border but before March 2020 who are likewise subject to the order.

80.     To respond to the executive order as an organization, FIEL will develop informational literature, offer additional know-your-rights trainings, respond to member inquiries regarding the executive order, and handle an increased number of legal intakes related to the executive order.  FIEL is already responding to member inquiries about the effects of the executive order.

## CLAIMS FOR RELIEF

### Count One: Preemption; 42 U.S.C. § 1983

81.     The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof, and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land."

82.     The Supremacy Clause mandates that federal law preempts state law in any area over which Congress expressly or impliedly has reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law.

83.     Executive Order GA-37 violates the Supremacy Clause because it attempts to regulate matters that are exclusively reserved to the federal government and because it operates in a field over which Congress has exercised exclusive authority.

84.     The executive order further violates the Supremacy Clause because it conflicts with federal laws, contradicts federal admission and release decisions, imposes burdens and penalties not authorized by and contrary to federal law, creates its own immigration classifications, and directs state officers to take unilateral immigration enforcement actions.

### Count Two: Intergovernmental Immunity; 42 U.S.C. § 1983

85.     Under the Supremacy Clause, States may not regulate the federal government directly or discriminate against those with whom it deals.

86.     Executive Order GA-37 directly regulates the federal government by prohibiting service providers from helping implement the federal immigration scheme by providing transport to migrants.

87.     The order discriminates against the federal government and those with whom it deals by forbidding them from providing transport to migrants.

### Count Three: Fourth Amendment; 42 U.S.C. 1983

88.     The Fourth Amendment to the U.S. Constitution prohibits "unreasonable searches and seizures." The Fourth Amendment's guarantees are applied to the States through the Fourteenth Amendment.

89.     Executive Order GA-37 requires officers to unreasonably stop and impound vehicles without a legally justified basis.

90.     The order authorizes officers to detain individuals without reasonable suspicion of unlawful activity pursuant to the individuals' or their traveling companions' perceived characteristics related to immigration, in violation of the Fourth Amendment.

91.     The order authorizes officers to unreasonably seize individuals and vehicles in violation of the Fourth Amendment.

### PRAYER FOR RELIEF

WHEREFORE Petitioners-Plaintiffs request that the Court grant the following relief:

a.  Declare that Executive Order GA-37 is unconstitutional in its entirety;

b.  Preliminarily and permanently enjoin Defendants from enforcing Executive Order GA-37;

c.  Award Plaintiffs their costs and reasonable attorneys' fees in this action pursuant to

42 U.S.C. § 1988; and

d.  Grant any other and further relief that this Court may deem fit and proper.

Dated: August 4, 2021

Spencer Amdur*
Katrina Eiland*
Cody Wofsy*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
samdur@aclu.org
keiland@aclu.org
cwofsy@aclu.org

Respectfully Submitted,

*/s/ Adriana Pinon*
Kathryn Huddleston*
Adriana Pinon, TX Bar No. 24089768
Bernardo Rafael Cruz*
Brantley Shaw Drake*
Andre Segura*
ACLU FOUNDATION OF TEXAS, INC.
5225 Katy Freeway, Suite 350
Houston, TX 77007
Tel. (713) 942-8146
Fax: (713) 942-8966
khuddleston@aclutx.org
apinon@aclutx.org
brcruz@aclutx.org
sdrake@aclutx.org
asegura@aclutx.org

Omar Jadwat*
Noor Zafar*
Ming Cheung*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660
ojadwat@aclu.org
nzafar@aclu.org
mcheung@aclu.org

*Attorneys for Plaintiffs*

*\*Pro hac vice application forthcoming*

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

ANNUNCIATION HOUSE; ANGRY TIAS & ABUELAS OF THE RIO GRANDE VALLEY; JENNIFER HARBURY; FIEL HOUSTON

## DEFENDANTS

GREG ABBOTT, in his official capacity as Governor of the State of Texas; and STEVEN MCCRAW, in his official capacity as Director of the State of Texas Department of Public Safety

**(b)** County of Residence of First Listed Plaintiff    El Paso
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Travis
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Please see attachment.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☒ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened |
| ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 1983

Brief description of cause: EO GA-37 is preempted and violates supremacy clause

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE   Hon. Kathleen Cardone   DOCKET NUMBER   3:21-cv-00173

DATE
8/4/2021

SIGNATURE OF ATTORNEY OF RECORD
/s/ Adriana Pinon

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

**List of Attorneys**

Kathryn Huddleston
Bernardo Rafael Cruz
Brantley Shaw Drake
Adriana Pinon
Andre Segura
Brantley Shaw Drake
ACLU FOUNDATION OF TEXAS, INC.
5225 Katy Freeway, Suite 350
Houston, Texas 77007
Tel: (713) 942-8146
khuddleston@aclutx.org
brcruz@aclutx.org
sdrake@aclutx.org
apinon@aclutx.org
asegura@aclutx.org
sdrake@aclutx.org

Spencer Amdur
Katrina Eiland
Cody Wofsy
AMERICAN CIVIL LIBERTIES UNION FOUNDATION,
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
samdur@aclu.org
keiland@aclu.org
cwofsy@aclu.org

Omar Jadwat
Noor Zafar
Ming Cheung
AMERICAN CIVIL LIBERTIES UNION FOUNDATION,
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660
ojadwat@aclu.org
nzafar@aclu.org
mcheung@aclu.org