## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF TEXAS and GREG ABBOTT, in his official capacity as Governor of the State of Texas,<br><br>Defendants. | Case No. 3:21-cv-173 |

## <u>UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ...................................................................................................................... 1

I.      TEXAS EXECUTIVE ORDER NO. GA-37 ................................................................. 1

II.     FEDERAL IMMIGRATION LAWS AND OPERATIONS ................................................. 2

III.    PROCEDURAL HISTORY ........................................................................................... 3

STANDARD OF REVIEW ........................................................................................................ 4

ARGUMENT ........................................................................................................................... 4

I.      THE UNITED STATES HAS ARTICLE III STANDING ................................................. 4

II.     THE UNITES STATES HAS A CAUSE OF ACTION TO SEEK TO SET ASIDE
        EXECUTIVE ORDER NO GA-37 ............................................................................... 6

III.    THE COMPLAINT STATES A CLAIM UNDER THE SUPREMACY CLAUSE ............ 8

        A.      Executive Order No. GA-37 Is Preempted by Federal Law ........................... 8

        B.      Executive Order No. GA-37 Violates Intergovernmental Immunity ........................... 17

CONCLUSION ....................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Ali-Shabazz v. Tex. Dep't of Pub. Safety*,
No. 6:12-cv-112, 2013 WL 12153573 (E.D. Tex. Mar. 8, 2013) ............................................. 5

*Arizona v. California*,
283 U.S. 423 (1931) .................................................................................................. 18

*Arizona v. United States*,
567 U.S. 387 (2012) ........................................................................................... *passim*

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015) ................................................................................................ 7, 8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................................... 4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................................... 4

*Blackburn v. United States*,
100 F.3d 1426 (9th Cir. 1996) ................................................................................. 17

*Boeing Co. v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014) ................................................................................... 18

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) ................................................................................................. 16

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) ....................................................................................... 13, 14, 16

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011) ..................................................................................................... 9

*Chy v. Freeman*,
92 U.S. 275 (1875) ....................................................................................................... 9

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ................................................................................................. 15

*Dada v. Mukasey*,
554 U.S. 1 (2008) ......................................................................................................... 2

*De Canas v. Bica*,
424 U.S. 351 (1976) ................................................................................................ 8, 9

*Farmers & Mechanics Sav. Bank of Minneapolis v. Minnesota*,
    232 U.S. 516 (1914)................................................................................ 17

*Florida Lime & Avocado Growers, Inc. v. Paul*,
    373 U.S. 132 (1963)................................................................................ 8

*Freightliner Corp. v. Myrick*,
    514 U.S. 280 (1995)................................................................................ 8

*Gade v. Nat'l Solid Waste Mgmt. Ass'n*,
    505 U.S. 88 (1992)................................................................................ 8

*Gartrell Constr. Inc. v. Aubry*,
    940 F.2d 437 (9th Cir. 1991) .................................................................. 13

*GEO Grp., Inc. v. City of Tacoma*,
    No. 3:18-cv-05233, 2019 WL 5963112 (W.D. Wash. Nov. 13, 2019).................... 18

*Geo Grp., Inc. v. Newsom*,
    15 F.4th 919, 928 (9th Cir. 2021) ...................................................... 15, 18

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)................................................................................ 8, 9, 15

*In re Debs*,
    158 U.S. 564 (1895)................................................................................ 6

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987)................................................................................ 15

*Island Airlines, Inc. v. Civ. Aeronautics Bd.*,
    352 F.2d 735 (9th Cir. 1965) .................................................................. 6

*Johnson v. Maryland*,
    254 U.S. 51 (1920)................................................................................ 19

*Leslie Miller, Inc. v. Arkansas*,
    352 U.S. 187 (1956)................................................................................ 19

*Loa-Herrera v. Trominski*,
    231 F.3d 984 (5th Cir. 2000) .................................................................. 3

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)................................................................................ 4

*M'Culloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819).................................................................. 17

*Mathews v. Diaz*,
  426 U.S. 67 (1976) ................................................................................................ 9

*Mayo v. United States*,
  319 U.S. 441 (1943) ............................................................................................ 17

*Michigan Canners & Freezers Ass'n, Inc. v. Agricultural Marketing and Bargaining Bd.*,
  467 U.S. 461 (1984) ............................................................................................ 15

*Organized Vill. of Kake v. Egan*,
  80 S. Ct. 33 (1959) ................................................................................................ 5

*Osborn v. Bank of U.S.*,
  22 U.S. (9 Wheat.) 738 (1824) ............................................................................ 20

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
  461 U.S. 190 (1983) .............................................................................................. 8

*Pennsylvania v. West Virginia*,
  262 U.S. 623 (1923) .............................................................................................. 5

*Plyler v. Doe*,
  457 U.S. 202 (1982) ............................................................................................ 11

*Puente Arizona v. Arpaio*,
  821 F.3d 1098 (9th Cir. 2016) ............................................................................ 15

*Reimer v. Smith*,
  663 F.2d 1316 (5th Cir. 1981) .............................................................................. 5

*Seminole Tribe of Fl. v. Florida*,
  517 U.S. 44 (1996) ............................................................................................ 4, 6

*Shaughnessy v. United States ex rel. Mezei*,
  345 U.S. 206 (1953) .............................................................................................. 9

*Trump v. Vance*,
  140 S. Ct. 2412 (2020),
  *remanded*, 480 F. Supp. 3d 460 (S.D.N.Y. 2020) ...................................... 17, 18

*Union Pac. R.R. Co. v. Peniston*,
  85 U.S. (18 Wall.) 5 (1873) ................................................................................ 18

*United States v. Alabama*,
  443 F. App'x 411 (11th Cir. 2011) ........................................................................ 5

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012) ...................................................................... 7, 16

*United States v. Arizona*,
   703 F. Supp. 2d 980 (D. Ariz. 2010) ........................................................................ 5

*United States v. Bd. of Cty. Comm'rs of Cnty. of Otero*,
   843 F.3d 1208 (10th Cir. 2016) ............................................................................... 7

*United States v. California*,
   921 F.3d 865 (9th Cir. 2019),
   *cert denied*, 141 S. Ct. 124 (2020) ..................................................................... 7, 18

*United States v. City of Arcata*,
   629 F.3d 986 (9th Cir. 2010) ............................................................................... 7, 18

*United States v. LeMay*,
   322 F.2d 100 (5th Cir. 1963) .................................................................................. 6

*United States v. Locke*,
   529 U.S. 89 (2000) ............................................................................................... 16

*United States v. Louisiana*,
   340 U.S. 899 (1950) ............................................................................................... 5

*United States v. S. Ct. of N.M.*,
   839 F.3d 888 (10th Cir. 2016) ............................................................................... 7

*United States v. Salerno*,
   481 U.S. 739 (1987) .......................................................................................... 16, 17

*United States v. South Carolina*,
   720 F.3d 518 (4th Cir. 2013) ............................................................................... 7, 16

*United States v. State Water Res. Control Bd.*,
   988 F.3d 1194 (9th Cir. 2021) ................................................................................ 7

*United States v. Texas*,
   143 U.S. 621 (1892) ............................................................................................... 4

*United States v. Texas*,
   340 U.S. 900 (1950) ............................................................................................... 5

*United States v. Washington*,
   971 F.3d 856 (9th Cir. 2020),
   *as amended*, 994 F.3d 994 (9th Cir. 2020) .......................................................... 7

*Villas at Parkside Partners v. City of Farmers Branch*,
   726 F.3d 524 (5th Cir. 2013) ..................................................................... 10, 11, 17

*Valle del Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) .................................................................... *passim*

*Wisconsin Dep't of Industry v. Gould Inc.*,
   475 U.S. 282 (1986) .................................................................................... 15

*Wyandotte v. Transp. Co. v. United States*,
   389 U.S. 191 (1967) .................................................................................. 6, 7

**Statutes**

8 U.S.C. § 1101 ............................................................................................... 2

8 U.S.C. § 1103 ............................................................................................... 2

8 U.S.C. § 1182 ............................................................................................... 2

8 U.S.C. § 1225 ............................................................................................... 2

8 U.S.C. § 1226 ............................................................................................... 2

8 U.S.C. § 1227 ............................................................................................... 2

8 U.S.C. § 1228 ............................................................................................... 2

8 U.S.C. § 1229 ............................................................................................ 3, 13

8 U.S.C. § 1231 ............................................................................................... 2

8 U.S.C. § 1232 ............................................................................................ 3, 11

8 U.S.C. § 1324 ....................................................................................... 13, 14, 17

8 U.S.C. § 1357 ............................................................................................... 2

Ariz. Rev. Stat. Ann. § 13–3883(A)(5) ......................................................... 10

**The Constitution**

U.S. Const., art. I § 8, cl. 4 ............................................................................ 2

U.S. Const., art. VI, cl. 2 ............................................................................... 8

**Rules**

Fed. R. Civ. P. 12(b)(1) ................................................................................. 4

Fed. R. Civ. P. 15 ....................................................................................... 6, 8

**Regulations**

86 Fed. Reg. 42,828 (Aug. 5, 2021)..............................................................................2

85 Fed. Reg. 65,806 (Oct. 16, 2020).............................................................................2

**Other Authorities**

3 J. STORY, COMMENTARIES ON THE CONSTITUTION § 1668 (3d ed. 1858) ..............................6, 7

**INTRODUCTION**

In our constitutional system, the power to regulate immigration is exclusively vested in the federal government. The immigration framework set by Congress and administered by federal agencies reflects a careful and considered balance of law enforcement, foreign relations, and humanitarian concerns—concerns that belong to the nation as a whole, not a single state. That framework does not permit a patchwork of state and local immigration policies throughout the country. Although a State may regulate legitimate areas of local concern, it may not do so in a manner that interferes with the operation of federal immigration laws.

Texas's Executive Order No. GA-37 has crossed this constitutional line. In acknowledged disagreement with the federal government's conduct of immigration operations along the southern border, Governor Greg Abbott issued the order seeking to prohibit the transportation of noncitizens whom the State deems to have "illegally" crossed the border or believes would have been subject to expulsion pursuant to an order under Title 42 of the U.S. Code. This Court has already properly enjoined enforcement of the executive order, correctly holding that the executive order "authorizes Texas Department of Public Safety [("DPS")] officers to make and act upon immigration decisions, the province of federal law," Order on Preliminary Injunction at 1, ECF No. 52 ("PI Order"), and "interfere[d] with th[e] federal [immigration] scheme," *id.* 5. For those same reasons in the Court's PI Order, and as elaborated upon below, the Court should deny Texas's Motion to Dismiss. Texas offers only a tepid defense of the executive order that all but concedes its overreach, giving no reason for this Court to change course.

**BACKGROUND**

**I.      TEXAS EXECUTIVE ORDER NO. GA-37**

On July 28, 2021, Texas's Governor issued Executive Order No. GA-37—entitled "Relating to the transportation of migrants during the COVID-19 disaster"—seeking to mandate that "[n]o person, other than a federal, state, or local law enforcement official, shall provide ground transportation to a group of migrants who have been detained by [US. Customs and Border Protection (CBP)] for crossing the border illegally or who would have been subject to expulsion under

1

the Title 42 order."  Compl., ECF No. 1, Ex. A at 2, ¶ 1.  "Title 42 order" refers to an October 2020 order issued by the Centers for Disease Control and Prevention (CDC) to suspend the introduction of certain noncitizens traveling from Canada and Mexico into the United States during the COVID-19 pandemic, subject to certain exceptions.  *See* 85 Fed. Reg. 65,806 (Oct. 16, 2020), *superseded by* 86 Fed. Reg. 42,828 (Aug. 5, 2021).  The Texas executive order directs "[t]he Texas Department of Public Safety … to stop any vehicle upon reasonable suspicion of a violation of" its directives, "and to reroute such a vehicle back to its point of origin or a port of entry if a violation is confirmed."  Compl., Ex. A, at 2 ¶ 2.  It also authorizes DPS to impound vehicles used in transporting migrants.  *Id.* at 2 ¶ 3.

## II.     FEDERAL IMMIGRATION LAWS AND OPERATIONS

The Constitution affords Congress the power to "establish an uniform Rule of Naturalization."  U.S. Const., art. I § 8, cl. 4.  Congress has exercised its constitutional authority to make laws governing the entry, admission, presence, status, and removal of noncitizens within the United States by enacting the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, and other laws regulating immigration.  These laws codify the federal government's authority to inspect, investigate, arrest, detain, and remove noncitizens who are suspected of being, or found to be, unlawfully in the United States, *see* 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231, 1357, and to arrange for appropriate places of detention for noncitizens detained pending removal or a decision on removal, *see* 8 U.S.C. §§ 1103(A)(11), 1231(g).  In addition, the INA grants the federal government broad discretion to release noncitizens encountered or apprehended at the border from custody through various mechanisms, including parole under 8 U.S.C. § 1182(d)(5) or conditional parole under 8 U.S.C. § 1226(a)(2)(B).[1]  *See also Dada v. Mukasey,* 554 U.S. 1, 10–11 (2008).

---

[1] To underscore the immigration officials' broad discretion, Congress also made clear that such release is not subject to judicial review.  *See* 8 U.S.C. § 1226(e) ("The [Secretary of DHS's] discretionary judgment regarding the application of [Section 1226] shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole."); §1252(a)(2)(B)(ii) ("[N]o court shall have jurisdiction to review ...  any other decision or action

In executing the immigration laws, the federal government must transport noncitizens between locations in a variety of circumstances, Compl. ¶ 15, and it relies on non-law enforcement federal personnel, contractors, grantees and other partners to do so, *id.* ¶ 16.  For example, unaccompanied noncitizens children need to be transferred from Department of Homeland Security ("DHS") facilities to facilities operated by the Office of Refugee Resettlement ("ORR") and its grantees, between ORR facilities, or to their sponsors.  *Id.* ¶¶ 13, 15; 8 U.S.C. § 1232(a)(4), (b)(3), (c)(2)(A).  Noncitizens in DHS custody need to be transferred between different facilities of the same agency, between different agencies, or to nongovernmental organizations ("NGOs") with whom the federal government has partnered.  Compl. ¶¶ 13, 15.  In addition, noncitizens released by DHS need transportation to destinations within Texas and elsewhere throughout the United States, so that they may appear before immigration courts for removal proceedings or to report to U.S. Immigration and Customs Enforcement ("ICE") offices around the country for additional processing.  *Id.*; 8 U.S.C. § 1229(a)(1)(G)(i).

## III.    PROCEDURAL HISTORY

Because the Texas executive order threatened to severely disrupt the federal government's immigration operations, the United States sued the State of Texas and its governor on July 30, 2021, and simultaneously sought to temporarily or preliminarily enjoin the order's enforcement. ECF Nos. 1, 3.  This Court issued a temporary restraining order on August 3, 2021, Order, ECF No. 18, and a preliminary injunction on August 26, 2021, upon finding that the United States had established, among other things, "a substantial likelihood of success on merits on the grounds that the [executive order] stands as an obstacle to federal immigration enforcement," PI Order at 4, and

---

of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security."); *see also Loa-Herrera v. Trominski*, 231 F.3d 984, 990 (5th Cir. 2000) (explaining that release decisions are not subject to judicial review, including challenges to "the *manner* in which that discretionary judgment is exercised, and whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints").

violates intergovernmental immunity "at least to the extent that [it] seeks to prohibit federal contractors—as well as any non-law enforcement federal officials—from carrying out their federal duties," *id.* at 13.

## STANDARD OF REVIEW

Defendants have moved to dismiss this case for lack of jurisdiction and for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(1), (6).  At this early stage of the case, "general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing, because courts "presum[e] that general allegations embrace those specific facts that are necessary to support the claim."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citation omitted).  And to withstand a Rule 12(b)(6) motion, a complaint only has to contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court should accept as true all of the reasonably pled factual allegations in the complaint and construe all reasonable inferences in favor of the United States.  *Id.*

## ARGUMENT

### I.    THE UNITED STATES HAS ARTICLE III STANDING

Texas contends that the United States lacks standing to sue because its injury is (1) not traceable to, and cannot be redressed by, the Governor and (2) cannot be redressed by an injunction against the State of Texas.  Texas's Mot. to Dismiss 3-5, ECF No. 67 ("MTD").  Although the preliminary injunction has been in effect for more than two months, Texas asserts that it lacks clarity as to "which Texas officials are supposed to refrain from enforcing GA-37" should the Court issue a permanent injunction.  *Id.* at 5.  Texas's argument has no merit.

The Supreme Court has long recognized that "[t]he Federal Government can bring suit in federal court against a State" to "ensur[e] the State['s] compliance with federal law." *Seminole Tribe of Fl. v. Florida*, 517 U.S. 44, 71 n.14 (1996) (citing *United States v. Texas*, 143 U.S. 621, 644–45 (1892)).  In cases where States are defendants, it is not unusual to simply enjoin the State

and leave it to the State to determine what actions should be taken by which state officers and employees to achieve compliance.[2]  Naming the State of Texas as a defendant, therefore, appropriately ensures that the judgment in this case will run against state agencies tasked with enforcing the executive order.

Texas nevertheless argues that compliance with an injunction against the State of Texas would be impossible because the complaint identifies only one state official, Governor Abbott, who does not himself enforce executive orders he issues.  MTD at 5.  But the executive order itself refutes the notion that there is no "clarity about who is supposed to do what" should the Court permanently enjoin its enforcement; it specifically charges Texas DPS to carry out its directives. Indeed, Texas DPS was purportedly in the process of developing "the necessary policies to guide enforcement" when the United States brought suit.  *See* Texas's Opp'n to Mot. for TRO or PI, ECF No. 9, at 7; *see also id.* at 8 (recognizing that "DPS [would] enforce GA-37").  Moreover, Texas DPS is undoubtedly "an arm of the state," *Ali-Shabazz v. Tex. Dep't of Pub. Safety*, No. 6:12-cv-112, 2013 WL 12153573, at *2 (E.D. Tex. Mar. 8, 2013); *see also Reimer v. Smith*, 663 F.2d 1316, 1322 (5th Cir. 1981) (Texas DPS is "a Texas State agency"), that would need to comply with any permanent injunction the Court issues in this case enjoining the executive order's enforcement.

---

[2] *See*, *e.g.*, *Pennsylvania v. West Virginia*, 262 U.S. 623, 624 (1923) (ordering "[t]hat the defendant state, and her several officers, agents and servants, are hereby severally enjoined from enforcing, or attempting to enforce" an unconstitutional law); *United States v. Alabama*, 443 F. App'x 411, 420 (11th Cir. 2011) (per curiam) (injunction pending appeal barring "the State of Alabama's enforcement" of two challenged provisions); *United States v. Arizona*, 703 F. Supp. 2d 980, 1008 (D. Ariz. 2010) (preliminary injunction affirmed in part in *Arizona*, *supra*, which "enjoin[ed] the State of Arizona and [the Governor] from enforcing the following Sections" of the challenged law); *United States v. South Carolina*, No. 11-cv-2958 D. Ct. Dkt. 153, at 1 (D. S.C. Mar. 4, 2014) (permanently enjoining the "State of South Carolina," as well as the State's Governor and Attorney General, from "implementing" certain provisions of challenged law); *cf. United States v. Texas*, 340 U.S. 900 (1950) (in suit against the State, enjoining "the State of Texas, its privies, assigns, lessees, and other persons claiming under it," from engaging in certain activities); *United States v. Louisiana*, 340 U.S. 899 (1950) (similar); *Organized Vill. of Kake v. Egan*, 80 S. Ct. 33, 34 (1959) (Brennan, J., in chambers) (in suit against State and its governor, entering a temporary restraining order "restraining the State of Alaska and its Governor, and the agents of both" from enforcing a state prohibition).

The Court would simply enjoin, as it did with the preliminary injunction, "defendants, their agents, officers, and employees, and all other persons and entities in active concert or participation with them." PI Order at 18. Such an injunction against Texas would fully redress the United States' injury and should be straightforward for Texas to implement. It would also render moot Texas's contentions about Governor Abbott's lack of authority to enforce the Executive Order. (Of course, if Governor Abbott so chooses, he could rescind the executive order.) As a result, the United States has standing to challenge the executive order.[3]

## II.     THE UNITED STATES HAS A CAUSE OF ACTION TO SEEK TO SET ASIDE EXECUTIVE ORDER NO. GA-37

Texas next argues that the United States lacks a cause of action to sue under the Supremacy Clause. MTD at 6–7. The Court already rejected this argument when issuing the preliminary injunction. *See* PI Order at 13–14. Texas offers nothing new to call the ruling into doubt.

As the Supreme Court recognized over a century ago, "[e]very government, intrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other[.]" *In re Debs*, 158 U.S. 564, 584 (1895); *see also Seminole Tribe*, 517 U.S. at 71 n.14; *United States v. LeMay*, 322 F.2d 100, 103 (5th Cir. 1963) ("The United States may lawfully maintain suits in its own courts to prevent interference with the means it adopts to exercise its powers of government and to carry into effect its policies." (citation omitted)); *Island Airlines, Inc. v. Civ. Aeronautics Bd.*, 352 F.2d 735, 744 (9th Cir. 1965). *Debs* reflects the "general rule that the United States may sue to protect its interests," *Wyandotte v. Transp. Co. v. United States*, 389 U.S. 191, 201 (1967), and that right does not depend on the existence of a statutory cause of action. Thus, "[i]t would be a perfect novelty in the history of national jurisprudence, as well as of public law, that a sovereign had no authority to sue in his own courts." 3 J. STORY,

---

[3] Should the Court conclude otherwise, the United States will amend its complaint to add Texas DPS as a defendant or otherwise seek leave to do so. *See* Fed. R. Civ. P. 15(a)(1) ("[a] party may amend pleading once as a matter of course" under certain circumstances); *id.* Rule 15(a) (2) ("The court should freely give leave [to amend pleadings] when justice so requires.").

COMMENTARIES ON THE CONSTITUTION § 1668 (3d ed. 1858).  To hold otherwise would "prostrate the Union at the feet of the states" and "compel the national government to become a suppliant for justice before the judicature of those, who were by other parts of the constitution placed in subordination to it."  *Id*.

Indeed, in the last decade alone, the United States has brought numerous cases for equitable relief to protect the federal government's interests, based on this well-established authority.  *See, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012); *United States v. State Water Res. Control Bd.*, 988 F.3d 1194 (9th Cir. 2021); *United States v. Washington*, 971 F.3d 856 (9th Cir. 2020), *as amended*, 994 F.3d 994 (9th Cir. 2020); *United States v. California*, 921 F.3d 865, 876 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 124 (2020); *United States v. Bd. of Cty. Comm'rs of Cnty. of Otero*, 843 F.3d 1208 (10th Cir. 2016); *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013); *United States v. Alabama*, 691 F.3d 1269, 1279 (11th Cir. 2012); *United States v. City of Arcata*, 629 F.3d 986, 988 (9th Cir. 2010).

Texas relies on *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324–25 (2015), to argue that the Supremacy Clause does not create a cause of action.  MTD at 7.  But, as this Court has already observed, *Armstrong* did not involve an action brought by the United States; rather, the Supreme Court's holding was that the Supremacy Clause does not create a "*private* right of action." *Armstrong*, 575 U.S. at 326 (emphasis added); *see also* PI Order at 14 ("*Armstrong* holds only that the Supremacy Clause does not create a *private* cause of action.").  As the *Armstrong* Court explained, the Supremacy Clause does not "*require*[] Congress to permit the enforcement of its laws by *private* actors," which would "mak[e] it impossible to leave the enforcement of federal law to *federal* actors." *Armstrong*, 575 U.S. at 326 (emphasis added).  And because "*Armstrong's* Supremacy Clause holding [was] motivated by the desire to preserve the federal government's 'ability to guide the implementation of federal law,'" that case "counsels in favor of—not against—permitting the United States to invoke preemption [and intergovernmental immunity] in order to protect its interest." *United States v. S. Ct. of N.M.*, 839 F.3d 888, 906 n.9 (10th Cir. 2016)

(quoting *Armstrong*, 575 U.S. at 1384). The Court in *Armstrong* also recognized that absent displacement by Congress, a cause of action in equity may be asserted by the United States to bring preemption challenges. *See Armstrong*, 575 U.S. at 1385.[4] In sum, *Armstrong* actually supports a cause of action for the United States under the Supremacy Clause.

## III.   THE COMPLAINT STATES A CLAIM UNDER THE SUPREMACY CLAUSE

### A.   Executive Order No. GA-37 Is Preempted by Federal Law

The Supremacy Clause of the U.S. Constitution provides that federal laws and treaties are "the supreme Law of the Land." U.S. Const., art. VI, cl. 2. In some cases, the Constitution—of its own force—can preempt state action in a field exclusively reserved for the federal government. *See De Canas v. Bica*, 424 U.S. 351, 356 (1976). Federal statutes may also preempt—either expressly or impliedly—state laws and other actions. *See Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). The Supreme Court has recognized two methods by which state or local laws may be impliedly preempted. "Field preemption" exists when a "scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room to supplement it" because "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or because "the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983) (internal quotations marks omitted). "Conflict preemption" occurs when a party cannot comply with both state and federal law, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963), or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).

---

[4] If necessary, the United States is prepared to amend its complaint to invoke a cause of action in equity. *See* Fed. R. Civ. P. 15.

As relevant here, it has long been recognized that the "[p]ower to regulate immigration is unquestionably exclusively a federal power." *De Canas*, 424 U.S. at 354; *see also Arizona*, 567 U.S. at 394 ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."); *Mathews v. Diaz*, 426 U.S. 67, 84 (1976) ("[I]t is the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the conditions of entry and residence of aliens.").  Control of immigration is a "fundamental sovereign attribute," *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953), so that, among other reasons, "a single State" could not, "at her pleasure, embroil us in disastrous quarrels with other nations," *Chy v. Freeman*, 92 U.S. 275, 280 (1875); *see also Arizona*, 567 U.S. at 409 (decisions respecting an individual's immigration status "touch on foreign relations and must be made with one voice"—*i.e.*, exclusively by the federal government).

Cognizant of these significant national interests, Congress established in the INA "a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 587 (2011) (quoting *DeCanas*, 424 U.S. at 353, 359); *see also* PI Order at 5 (observing that "[t]he INA provides standards governing alien registration, specifies which aliens may be removed, creates procedures for removal and mechanisms for noncitizens to seek discretionary relief, and vests broad authority in federal immigration officials").  To be sure, the INA does not preempt "every state enactment which in any way deals with [noncitizens]," and "local regulation[s]" affecting noncitizens do not exceed state authority based on "some purely speculative and indirect impact on immigration." *DeCanas*, 424 U.S. at 355.  But even a regulation in an area of traditional state authority is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (quoting *Hines*, 312 U.S. at 67).

Against this backdrop—and as this Court has already correctly recognized—Texas's executive order is preempted by the INA, in at least two independent ways.

9

*First*, the executive order is preempted because it "authorizes DPS agents to make and act on immigration determinations, the province of federal law[.]"  PI Order at 6.  This conclusion is compelled by *Arizona*, in which the Supreme Court invalidated a provision of a state law authorizing state officers, "without a warrant, [to] arrest a person if the officer has probable cause to believe … [the person] has committed any public offense that makes [him] removable from the United States."  567 U.S. at 407 (quoting Ariz. Rev. Stat. Ann. § 13–3883(A)(5)).  Emphasizing that the challenged "state authority could be exercised without any input from the Federal Government about whether an arrest is warranted in a particular case"—which "would allow the State to achieve its own immigration policy"—the Court noted that "[t]he result could be unnecessary harassment of some aliens … who federal officials determine should not be removed."  *Id.* at 408.  The Court reasoned that "[b]y authorizing state officers to decide whether an alien should be detained for being removable, [the Arizona law] violates the principle that the removal process is entrusted to the discretion of the Federal Government."  *Id.* at 409.  *Arizona* accordingly invalidated the state law provision because the provision "create[d] an obstacle to the full purposes and objectives of Congress."  *Id.* at 410.

Applying the well-established rule that "[t]he federal government alone … has the power to classify non-citizens," the Fifth Circuit reached a similar result in *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 536–37 (5th Cir. 2013).  At issue there was a local ordinance requiring local building inspectors to conduct their own "unlawful presence" inquiries for prospective tenants of rental housing within the locality.  In holding that the ordinance was preempted, the Fifth Circuit rejected the locality's argument that the ordinance was permissible because it purportedly "relie[d] entirely on the federal determination of lawful or unlawful presence," *id.* at 535, in that it required building inspectors to verify "with the federal government whether the occupant is an alien lawfully present in the United States," *id.* at 526 (citation omitted).  As the Fifth Circuit explained, "the Supreme Court has made clear that there are 'significant complexities involved in [making] … the determination whether a person is removable,' and the decision is 'entrusted to the discretion of the Federal Government.'"  *Id.* at 536 (quoting *Arizona*, 567

U.S. at 409).  Given the federal government's authority to resolve these complexities, *Villas* held that "even a determinative federal answer on this question—which … would be impossible to obtain—would not bring the Ordinance's arrest procedures into compliance with federal law." *Id.* at 535; *see also Plyler v. Doe*, 457 U.S. 202, 236 (1982) (Blackmun, J., concurring) ("[T]he structure of the immigration statutes makes it impossible for the State to determine which aliens are entitled to residence, and which eventually will be deported.").

These same principles likewise require a finding of preemption here.  As this Court has already correctly recognized,

> Based upon *Arizona* and *Villas at Parkside Partners*, the issue in this case is whether the [executive order] directs DPS to make immigration determinations that are reserved for the federal government.  Enforcement of the Order requires DPS officers to determine whether a group of noncitizens have been "detained by CBP for crossing the border illegally" or "would have been subject to the Title 42 Order." [Executive] Order at 2.  First, a determination that a noncitizen has been detained for crossing the border "illegally" is a cut-and-dry immigration determination; the answer obviously turns on whether the noncitizen has violated the federal immigration laws.  DPS officers may not make such determinations.

> Second, a determination that a person []would have been subject to expulsion under "the Title 42 order" also turns on immigration status…. Determining whether an individual is covered by the Title 42 order … involves deciding whether that person lacks valid documentation or entered the country unlawfully, among other immigration-related determinations.  Both classifications DPS officers would be required to make to enforce GA-37—whether a noncitizen had been detained for crossing the border in violation of the law and whether that individual "would have been subject to expulsion under Title 42"— are impermissible.

PI Order at 6–7.  This Court further reasoned that the executive order does not even purport to rely on any federal assessment or determination of whether a given noncitizen crossed the border "illegally" or "would have been subject to expulsion under the Title 42 order."  *See id.* at 8–9.  Instead, the executive order directs DPS to "reroute … back to its point of origin or a port of entry" any vehicle containing "migrants who have been detained by [CBP] for crossing the border illegally" or who—in *Texas's* view—"would have been subject to expulsion under the Title 42 Order."  *Id.* at 2.  But *Arizona* and *Villas* make clear that such determinations are within the exclusive

11

purview of the federal government.  Accordingly, the executive order impermissibly intrudes into an area of exclusive federal authority, and is preempted.

*Second*, the executive order is preempted because it obstructs federal immigration operations.  To begin, it impedes the federal government's ability to transport noncitizens.  As discussed above, in order to maintain the operations of the federal immigration system, the federal government must routinely—and indeed, constantly—either transport or arrange for transport of noncitizens between locations in a variety of circumstances.  *See* Compl. ¶¶ 19–22.  Immigration laws sometimes also require certain transfers to take place within prescribed periods of time.  For example, federal law generally requires that an unaccompanied noncitizen child be transferred from DHS facilities to ORR within 72 hours, and further requires ORR to promptly place the child in the least restrictive setting that is in the best interest of the child, such as with a suitable sponsor.  *Id.* ¶¶ 13, 15; 8 U.S.C. § 1232(a)(4), (b)(3), (c)(2)(A).[5]  In making these necessary transfers, the federal government routinely makes use of non-law enforcement federal personnel, contractors, grantees and other partners.  *See, e.g.*, Compl. ¶ 21 (noting that ICE spends over $200 million annually on contracts with private providers and county governments in Texas for transportation services, covering over 8,000 miles per day).

As this Court has recognized, *see* PI Order at 10–11, in attempting to limit the federal government's ability to use non-law enforcement officers to transport noncitizens, the executive order impedes the federal government's ability carry out its immigration functions in its desired manner.  *See, e.g.*, *Arizona*, 567 U.S. at 402, 406 (finding preempted a state law that conflicted with the "method of enforcement" of immigration laws available to the United States through the INA and thus "diminish[ed] the Federal Government's control over enforcement and detract[ed]

---

[5] As this Court has also noted, there are other constraints on the timing of a noncitizen child's transfer.  Pursuant to the terms of the *Flores* Settlement Agreement, which has governed the care and custody of children in immigration custody since 1997, CBP generally must release noncitizen children accompanied by a parent (family units) to the parent within three days or five days of apprehension, or in the event of an emergency or influx as expeditiously as possible; or place the family in a non-secure licensed facility.  *See* PI Order at 11.

from the integrated scheme of regulation created by Congress" (citation omitted)).  Forcing federal law enforcement officers to handle noncitizen transportation also would divert them from law enforcement operations, impacting those operations and national security.

Moreover, the Texas executive order puts federal contractors, grantees and other partners in the untenable position of either performing their designated federal functions and risking impoundment of their vehicles or complying with the executive order—again, "result[ing] in interference with federal government functions."  *Gartrell Constr. Inc. v. Aubry*, 940 F.2d 437, 438 (9th Cir. 1991) (invalidating statute that purported to preclude a contractor from performing services on a federal construction project without first obtaining a license from the state); *cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law").

Furthermore, the executive order interferes with the federal government's release of noncitizens.  As discussed above, the INA grants the federal government broad discretion to release noncitizens from custody through various mechanisms.  Noncitizens released by CBP may need independent transportation to their ultimate destinations and some will need transportation to appear at a later date for further immigration proceedings or processing at a specified location.  For example, a noncitizen may be released with a Notice to Appear requiring him to appear before the immigration court at a certain date and time, *see, e.g.*, 8 U.S.C. § 1229(a)(G)(i), and the noncitizen must be able to get to the location.  The executive order is so broad that it would cover a noncitizen's attempt to attend immigration court or report to immigration authorities, as well as citizens assisting with such efforts.  The executive order may also interfere with releases that are required by federal law, *see, e.g.*, 8 U.S.C. § 1229a(c)(4) (relief from removal), § 1158 (asylum), § 1229b (cancellation of removal), and § 1229c (voluntary departure).

Finally, the executive order is preempted because it attempts to regulate conduct that the INA already addresses—*i.e.*, the transportation of noncitizens.  Specifically, 8 U.S.C. § 1324 provides, in relevant part, that:

> Any person who—
>
> (ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law … shall be punished as provided in subparagraph (B).

8 U.S.C. § 1324(a)(1)(A)(ii).  The section further details a set of graduated punishments for violations, *id.* § 1324(a)(1)(B)(i)-(iv), (a)(2)(A)-B), (a)(3)(A), (a)(4), (b), prescribes special evidentiary rules, *id.* § 1324(b)(3), (d), and mandates the creation of an educational program on the penalties for harboring noncitizens, *id.* § 1324(3).

In *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013), the Ninth Circuit considered an Arizona law that attempted to both (1) add steeper criminal penalties (ranging from misdemeanors to felonies) for the conduct proscribed in § 1324 and (2) criminalize certain activities *not* encompassed by § 1324.  *See id.* at 1012-13.  *Valle* held that the Arizona law was both field and conflict preempted because "Section 1324 is … part of a larger federal scheme of criminal sanctions for those who facilitate the unlawful entry, residence, or movement of aliens within the United States," and "the scheme governing the crimes associated with the movement of unauthorized aliens in the United States … provides 'a full set of standards' designed to work as a 'harmonious whole.'"  *Id.* at 1024, 1025 (quoting *Arizona*, 567 U.S. at 401).  "By seeking to punish conduct that Congress chose not to punish," the *Valle* Court held, the Arizona statute clearly "pose[d] an obstacle to the accomplishment of the full purposes and objectives of Congress," and "disrupt[ed] the uniformity of the federal scheme because some harboring activities involving unauthorized aliens are now punishable in Arizona but not elsewhere."  *Id.* at 1028.

So too here.  The Texas executive order "sweeps more broadly than its federal counterpart by adding … new categor[ies] of prohibited activities" and new penalties—the impoundment of vehicles.  *Id.*  In so doing, it "disrupts the uniformity of the federal scheme because some [trans-

portation] activities involving unauthorized aliens are now punishable in [Texas] but not else-
where." *Id.*  The reasoning of *Valle* thus applies *a fortiori* here, and provides yet another inde-
pendent basis upon which the Texas executive order is preempted.

Texas offers only two tepid arguments in attempting to refute preemption, neither of which
withstands scrutiny.  First, Texas argues that the presumption against preemption applies, because
the "object" of the executive order is—purportedly—"public health."  MTD at 7; *see also id.* (as-
serting that, because the executive order facially states that it was issued for the purpose of pro-
tecting Texas residents from the spread of COVID-19, it necessarily "flows from the State's police
power without claiming a power over immigration").  Aside from the fact that the executive order
"seems to do little to protect public health," as this Court has already observed, PI Order at 17, the
intention behind the executive order is irrelevant to the preemption analysis.  Rather, the question
is whether the order, in its practical effect, "'stands as an obstacle to the accomplishment and
execution of the full purposes and objectives of Congress.'"  *Arizona*, 567 U.S. at 399 (quoting
*Hines*, 312 U.S. at 67).  Whatever a state law's intended goals may be, it is "pre-empted if it
interferes with the methods by which the federal statute was designed to reach th[at] goal."  *Int'l
Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). [6]  Here, for all of the reasons set forth above and
as this Court has already found, "[r]egardless of the object of the [executive order], its effect is

---

[6] *See also Michigan Canners & Freezers Ass'n, Inc. v. Agricultural Marketing and Bargaining
Bd.*, 467 U.S. 461, 477 (1984) (state statute establishing association to represent agricultural pro-
ducers notwithstanding that both it and the federal Agricultural Fair Practices Act "share the goal
of augmenting the producer's bargaining power"); *Wisconsin Dep't of Industry v. Gould Inc.*,
475 U.S. 282, 286–87 (1986) (state statute preventing repeat violators of the National Labor Re-
lations Act from doing business with the State is preempted even though state law was designed
to reinforce requirements of federal act); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363,
379 (2000) ("The fact of a common end hardly neutralizes conflicting means …."); *Geo Grp.,
Inc. v. Newsom*, 15 F.4th 919, 928 (9th Cir. 2021) (rejecting California's claim that the presump-
tion applied to law purportedly based on health and safety because looking at "the language of
AB 32 as well as its context, it becomes clear that the California law regulates the federal gov-
ernment's detention of undocumented and other removable immigrants"); *cf. Puente Arizona v.
Arpaio*, 821 F.3d 1098, 1106 (9th Cir. 2016) (for preemption purposes, "it does not matter if [a
state] passed the [challenged laws] for a good or bad purpose[]").

clear: it disrupts federal enforcement of the immigration laws by authorizing state officials to make immigration determinations." PI Order at 9.

Moreover, as discussed above, the executive order does indeed "claim[] a power over immigration" because it expressly purports to authorize Texas state agents to act as immigration officers and seeks to impede federal immigration operations. MTD at 7. And because the executive order attempts to regulate areas that are "inherently federal in character," *Buckman Co*, 531 U.S. at 347–48, the presumption invoked by Texas does not apply. *See South Carolina*, 720 F.3d at 529 ("[T]he presumption against preemption does not apply here because immigration is an area traditionally regulated by the federal government"); *Alabama*, 691 F.3d at 1296 (refusing to apply the presumption to a state law "constitut[ing] a thinly veiled attempt to regulate immigration under the guise of contract law," and thus "imping[ing] on an area of core federal concern"); *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) (explaining that federal contracting is an area of "uniquely federal interests," where the "obligations to and rights of the United States under its contracts are governed exclusively by federal law"); *United States v. Locke*, 529 U.S. 89, 91 (2000) ("[A]n assumption of non-preemption is not triggered when the State regulates in an area where there has been a history of significant federal presence.") (internal quotation and alteration omitted). Accordingly, neither the executive order's purported purpose, nor the presumption against preemption, can save the executive order from being preempted.

Equally without merit is Texas's second argument in defense of the executive order—that the United States fails to meet the standard for a facial challenge requiring that there is "no set of circumstances" under which the executive order would be valid, *United States v. Salerno*, 481 U.S. 739, 745 (1987)). *See* MTD at 9–11. But as this Court has already held—even if it is "not clear whether every application" of the executive order is preempted, "[w]hat matters under *Arizona* is that the [executive order] authorizes state officials to make and act on federal immigration determinations—not the identities of the parties that the [executive order] is enforced against." PI Order at 12. "Because the [executive order] directs state officials to make these determinations without any direction or supervision by federal authorities, the [executive order] is facially preempted."

16

*Id.*  Moreover, as explained above, by prohibiting broad swaths of transportation activities—including those of private parties—that are permissible under 8 U.S.C. § 1324, the Texas executive order disrupts the "'full set of standards' designed to work as a 'harmonious whole'" established by § 1324, and as such is facially preempted.  *Whiting*, 732 F.3d at 1025 (quoting *Arizona*, 567 U.S. at 401).  Indeed, neither the Supreme Court in *Arizona* nor the Fifth Circuit in *Villas* applied the "no set of circumstances" standard in cases strikingly similarly to this one.[7]

For all of the reasons given above, the Court should affirm the sound analysis of its prior opinion and deny Texas's motion to dismiss the United States' conflict preemption claim.

### B.     Executive Order No. GA-37 Violates Intergovernmental Immunity

This Court has already held that the executive order likely violates intergovernmental immunity.  PI Order at 12.  Intergovernmental immunity arises from the Supremacy Clause and bars state regulations that "retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by [C]ongress to carry into effect the powers vested in the national government."  *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 317 (1819).  This doctrine is deeply rooted in history, and the Supreme Court recently reaffirmed that "the Constitution guarantees 'the entire independence of the General Government from any control by the respective States,'" and reiterated that States can neither "control the operations of the constitutional laws enacted by Congress," nor impede the Executive Branch's "execution of those laws." *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020) (quoting *Farmers & Mechanics Sav. Bank of Minneapolis v. Minnesota*, 232 U.S. 516, 521 (1914) & *M'Culloch*, 17 U.S. at 436), *remanded*, 480 F. Supp. 3d 460 (S.D.N.Y. 2020).

Simply put, "under the intergovernmental immunity component of the Supremacy Clause to the United States Constitution, states may not directly regulate the Federal Government's operations or property."  *Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996); *Mayo v. United States*, 319 U.S. 441, 445 (1943) (the "activities of the Federal Government are free from

---

[7] The dissenting judges in *Villas*, however, would have applied the *Salerno* standard, 726 F.3d at 564–65, but a majority of the en banc Court clearly disagreed.

regulation by any state"); *Arizona v. California*, 283 U.S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a state."); *Union Pac. R.R. Co. v. Peniston*, 85 U.S. (18 Wall.) 5, 36–37 (1873) (a state tax on federal operations "is a direct obstruction to the exercise of Federal powers"); *City of Arcata*, 629 F.3d at 991 (recognizing that a regulation violates the doctrine of intergovernmental immunity if it "seek[s] to directly regulate the conduct of agents of the federal government"); *see also Vance*, 140 S. Ct. at 2442–43 & n.5 (Alito, J., dissenting) (collecting cases showing that "two centuries of case law prohibit the States from taxing, regulating, or otherwise interfering with the lawful work of federal agencies, instrumentalities, and officers").[8]

But that is exactly what the Texas executive order does.  It seeks to directly regulate non-law-enforcement federal officials in the performance of their duties, and thus, plainly violates the doctrine of intergovernmental immunity.  Compl. ¶¶ 15–31; Compl. Ex. A at 2.  It makes no difference that the federal government relies heavily on contractors to transport noncitizens.  As courts have consistently held, "[f]or purposes of intergovernmental immunity, federal contractors are treated the same as the federal government itself."  *California*, 921 F.3d at 882 n.7, *cert. denied*, 141 S. Ct. 124 (2020); *see Boeing Co. v. Movassaghi*, 768 F.3d 832, 840 (9th Cir. 2014) (holding unconstitutional a state law that "directly interfere[d] with the functions of the federal government" by "mandat[ing] the ways in which [a contractor] renders services that the federal government hired [it] to perform"); *GEO Grp., Inc. v. City of Tacoma*, No. 3:18-cv-05233, 2019 WL 5963112, at *5 (W.D. Wash. Nov. 13, 2019) ("The intergovernmental immunity doctrine . . . appl[ies] to federal contractors insofar as the challenged law 'regulate[s] what the federal contractors [have] to do or how they [do] it pursuant to their contracts.'") (quoting *Boeing*, 768 F.3d at 839).

That is why this Court already concluded that "at least as applied to federal officials and

---

[8] Texas's motion to dismiss also discusses the discrimination prong of intergovernmental immunity, which prevents States from "discriminat[ing] against the Federal Government or those with whom it deals."  *Geo Grp.*, 15 F.4th at 937 (internal citation omitted); *see* MTD at 11–12.  The United States has not advanced such a theory, but it reserves the right to do so at a later stage in this litigation.

contractors, the Order purports to regulate the United States directly" by "bar[ring] activities that non-law enforcement federal officials and federal contractors regularly engage in as part of federal immigration operations." PI Order at 13. Indeed, forbidding anyone other than law enforcement officials from transporting migrants would have devastating consequences on federal immigration operations, law enforcement activities, and national security. The Constitution does not allow one State's regulations to hamstring federal operations and jeopardize the security of the nation. *Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920) (holding that state laws cannot "control the conduct of" individuals "acting under and in pursuance of the laws of the United States").

Texas argues that intergovernmental immunity does not apply because the executive order, on its face, has general application. MTD at 11–12 (citing cases discussing *discrimination*-based intergovernmental immunity). But even generally applicable laws violate intergovernmental immunity if they directly regulate federal operations. In *Johnson v. Maryland*, for example, the Supreme Court held that even licensing requirements of general applicability may be invalid when they limit the federal government's choice of contractor, explaining that the question in such licensing cases "is whether the State can interrupt the acts of the general government itself," and concluding that the answer was plainly no. 254 U.S. at 55. And in *Leslie Miller, Inc. v. Arkansas*, the Supreme Court struck down an Arkansas licensing requirement as it applied to government contractors, explaining that the requirement "does not merely touch the Government servants remotely by a general rule of conduct; it lays hold of them in their specific attempt to obey orders." 352 U.S. 187, 190 (1956) (emphasis added). The executive order extends even beyond the regulations that the Supreme Court struck down in *Johnson* and *Leslie Miller*. It targets a distinctly federal function: the transportation of noncitizens who, in Texas's view, illegally entered the United States under federal law. And it does not merely restrict the federal government's choice of contractors to transport noncitizens; it eliminates the possibility of such choice by prohibiting anyone other than law-enforcement personnel from transporting noncitizens.

If States could regulate—or outright ban—federal officials and partners from performing their duties on behalf of the United States, the federal government would grind to a halt. Just as a

State cannot prevent a federal "contractor [] supplying a military post with provisions" from "making purchases within any State, or from transporting the provisions to the place at which the troops were stationed," *Osborn v. Bank of U.S.*, 22 U.S. (9 Wheat.) 738, 867 (1824) (Marshall, C.J.), neither can a State prevent federal officials or their contractors from transporting noncitizens to destinations determined by the federal government.  As this Court has already recognized when it granted the United States' motion for preliminary injunction, the United States has pled a valid claim based on intergovernmental immunity.

## CONCLUSION

For these reasons, the Court should deny Defendants' motion to dismiss.

Date: November 8, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel

/s/*Michael J. Gerardi* _____
MICHAEL GERARDI
ZACHARY A. AVALLONE
STEPHEN EHRLICH
JOSHUA M. KOLSKY
ANTONIA KONKOLY
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW Washington, DC 20005
Tel: (202) 616-0680
Fax: (202) 616-8470
E-mail: michael.j.gerardi@usdoj.gov

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I certify that a copy of this filing was served on the other parties to this action and their counsel of record through electronic filing in the Court's ECF system on November 8, 2021.


/s/*Michael J. Gerardi*
Michael J. Gerardi
Trial Attorney