# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br>          Plaintiff, <br><br> ANNUNCIATION HOUSE; ANGRY TIAS & ABUELAS OF THE RIO GRANDE VALLEY; JENNIFER HARBURY; and FIEL HOUSTON, <br><br>          Consolidated Plaintiffs, <br><br>     v. <br><br> THE STATE OF TEXAS and GREG ABBOTT, in his official capacity as Governor of the State of Texas, <br><br>          Defendants, <br><br> STEVEN MCCRAW, in his official capacity as Director of the State of Texas Department of Public Safety, <br><br>          Consolidated Defendant. | EP-21-cv-173-KC (Consolidated) |

## PLAINTIFF UNITED STATES OF AMERICA'S
## MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................ 1

I.      The Texas Executive Order ................................................................................. 1

II.     Movement of Noncitizens Within the Federal Immigration System ...................... 2

III.    Procedural History ............................................................................................. 4

LEGAL STANDARD ..................................................................................................... 5

ARGUMENT .................................................................................................................. 5

I.      This Case Is Properly Before This Court ............................................................. 5

        A.      Standing .................................................................................................. 5

        B.      Cause of Action ...................................................................................... 7

II.     The Executive Order Is Preempted By Federal Law ............................................ 7

III.    The Executive Order Violates Supremacy Clause Immunity .............................. 14

IV.     The Court Should Permanently Enjoin Enforcement of the Executive
        Order ................................................................................................................ 17

CONCLUSION ............................................................................................................. 18

## TABLE OF AUTHORITIES

**Cases**

*Am. Ins. Ass'n v. Garamendi,*
539 U.S. 396 (2003) ................................................................................. 8

*Arizona v. California,*
283 U.S. 423 (1931) ................................................................................. 14

*Arizona v. United States,*
567 U.S. 387 (2012) ........................................................................... *passim*

*Barton v. Barr,*
590 U.S. 222 (2020) ................................................................................. 1

*Boeing Co. v. Movassaghi,*
768 F.3d 832 (9th Cir. 2014) ................................................................... 16

*Buckman Co. v. Plaintiffs' Legal Comm.,*
531 U.S. 341 (2001) ................................................................................. 10

*Chamber of Com. of U.S. v. Whiting,*
563 U.S. 582 (2011) ................................................................................. 8

*Church of Scientology of Cal. v. United States,*
506 U.S. 9 (1992) ..................................................................................... 6

*Crosby v. Nat'l Foreign Trade Council,*
530 U.S. 363 (2000) ............................................................................. 8, 9

*Dada v. Mukasey,*
554 U.S. 1 (2008) ..................................................................................... 9

*DeCanas v. Bica,*
424 U.S. 351 (1976) ............................................................................ 8, 12

*Farmers & Mechanics Sav. Bank of Minneapolis v. Minnesota,*
232 U.S. 516 (1914) ................................................................................. 14

*Gartrell Constr. Inc. v. Aubry,*
940 F.2d 437 (9th Cir. 1991) ................................................................... 10

*GEO Grp., Inc. v. Newsom,*
  50 F.4th 745 (9th Cir. 2022) ........................................................................ 10, 15

*GEO Grp., Inc. v. City of Tacoma,*
  Case No. 3:18-cv-05233, 2019 WL 5963112 (W.D. Wash. Nov. 13, 2019) ..................... 16

*Hines v. Davidowitz,*
  312 U.S. 52 (1941) ...................................................................................... 7, 8, 9

*Hughes v. Talen Energy Mktg., LLC,*
  136 S. Ct. 1288 (2016) ...................................................................................... 9

*In re Debs,*
  158 U.S. 564 (1895) .......................................................................................... 7

*Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388 (2006) ........................................................................................ 17

*Johnson v. Maryland,*
  254 U.S. 51 (1920) ..................................................................................... 15, 16

*Kansas v. Garcia,*
  589 U.S. 191 (2020) .......................................................................................... 8

*Leslie Miller, Inc. v. Arkansas,*
  352 U.S. 187 (1956) ........................................................................................ 16

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) .......................................................................................... 5

*Mayo v. United States,*
  319 U.S. 441 (1943) ........................................................................................ 14

*M'Culloch v. Maryland,*
  17 U.S. (4 Wheat.) 316 (1819) .......................................................................... 14

*New Orleans Pub. Serv., Inc. v. Council of New Orleans,*
  491 U.S. 350 (1989) ..................................................................................... 17, 18

*Nken v. Holder,*
  556 U.S. 418 (2009) ........................................................................................ 18

*Plyler v. Doe,*
  457 U.S. 202 (1982) ..................................................................................... 12, 13

*Pub. Utils. Comm'n of California v. United States*,
    355 U.S. 534 (1958) ............................................................................... 16, 17

*Reimer v. Smith*,
    663 F.2d 1316 (5th Cir. 1981) ..................................................................... 6

*Trump v. Vance*,
    140 S. Ct. 2412 (2020) ............................................................................ 14, 15

*Union Pac. R.R. Co. v. Peniston*,
    85 U.S. (18 Wall.) 5 (1873) ......................................................................... 14

*United States v. Abbott*,
    85 F.4th 328 (5th Cir. 2023) ..................................................................... 5, 6

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) .................................................................. 18

*United States v. Am. Bell Tel. Co.*,
    128 U.S. 315 (1888) ..................................................................................... 7

*United States v. Arizona*,
    641 F.3d 339 (9th Cir. 2011) ..................................................................... 17

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019) ..................................................................... 16

*United States v. City of Arcata*,
    629 F.3d 986 (9th Cir. 2010) ................................................................ 14, 15

*United States v. San Jacinto Tin Co.*,
    125 U.S. 273 (1888) ..................................................................................... 7

*United States v. Texas*,
    557 F. Supp. 3d 810 (W.D. Tex. 2022) .......................................... *passim*

*United States v. Texas*
    586 F. Supp. 3d 574 (W.D. Tex. 2022) ................................................. 5, 7

*United States v. Texas*
    --- F. Supp. 3d ----, 2024 WL 861526 (W.D. Tex. Feb. 29, 2024) ..................... 18

*United States v. Texas*,
    97 F.4th 268 (5th Cir. 2024) ................................................................ 7, 13

*United States v. Town of Windsor,*
    765 F.2d 16 (2d Cir. 1985) ........................................................................... 15, 16

*United States v. Washington,*
    596 U.S. 832 (2022) ............................................................................................. 14

*Uzuegbunam v. Preczewski,*
    592 US 279, 141 S. Ct. 792 (2021) ...................................................................... 6

*Villas at Parkside Partners v. City of Farmers Branch,*
    726 F.3d 524 (5th Cir. 2013) ......................................................................... 12, 14

*Witty v. Delta Air Lines, Inc.,*
    366 F.3d 380 (5th Cir. 2004) ............................................................................... 9

*Wyandotte Transp. Co. v. United States,*
    389 U.S. 191 (1967) ............................................................................................. 7

**Statutes**

6 U.S.C. § 112 ................................................................................................................ 4

6 U.S.C. § 279 ................................................................................................................ 3

8 U.S.C. § 1101 ............................................................................................................... 1

8 U.S.C. § 1182 ........................................................................................................... 2, 9

8 U.S.C. § 1229a ......................................................................................................... 2, 13

8 U.S.C. § 1229c ............................................................................................................ 9

8 U.S.C. § 1231 .............................................................................................................. 3

8 U.S.C. § 1232 .............................................................................................................. 3

Ariz. Rev. Stat. Ann. § 13–3883 ............................................................................... 11

Tex. Gov't Code § 411.012 .......................................................................................... 6

**Rules**

Fed. R. Civ. P. 56 ...................................................................................................... 5, 18

## INTRODUCTION

This Court previously entered a preliminarily injunction against enforcement of the Texas Governor's July 28, 2021 Executive Order No. GA-37 entitled "Relating to the transportation of migrants during the COVID-19 disaster" ("GA-37"), which, among other things, prohibits the transportation of certain migrants in Texas by anyone other than law enforcement personnel.  Although the pandemic has ended, the Governor has refused to rescind GA-37.  The Court should now permanently enjoin GA-37 and grant summary judgment in the Government's favor.

Under the Supremacy Clause of the Constitution, a State may not interfere with the enforcement of federal laws or regulate the federal government's operations.  But GA-37 seeks to do just that.  It presents an obstacle to the Government's enforcement of immigration laws and violates Supremacy Clause immunity (also called intergovernmental immunity).  GA-37's implementation would cause immediate and irreparable harm to the Government and the public because the Government's massive immigration operations in Texas depend heavily on its ability to use contractors and grantees operating under cooperative agreements to transport noncitizens.[1]  GA-37 is invalid and should be permanently enjoined.

## BACKGROUND

### I.    The Texas Executive Order

On July 28, 2021, the Texas Governor issued GA-37.  Plaintiff's Statement of Facts ("SOF") at ¶ 1.  GA-37 mandates that "[n]o person, other than a federal, state, or local law-enforcement official, shall provide ground transportation to a group of migrants who have been detained by CBP for crossing the border illegally or who would have been subject to expulsion under the Title 42 order."  *Id.* ¶ 3.  It further directs the Texas

---

[1] This motion uses the term "noncitizen" to be synonymous with the term "alien" as it is used in the Immigration and Nationality Act ("INA").  *See* 8 U.S.C. § 1101(a)(3); *Barton v. Barr*, 590 U.S. 222, 226 n.2 (2020).

Department of Public Safety ("DPS") "to stop any vehicle upon reasonable suspicion of a violation" of this prohibition and "to reroute such a vehicle back to its point of origin or a port of entry if a violation is confirmed." *Id.* Finally, the executive order authorizes DPS to impound vehicles that are transporting migrants or refuse to be rerouted. *Id*. The governor purported to issue GA-37 because the federal government had allegedly "thwarted" CDC's then-operative "Title 42 order," which prohibited the introduction of certain noncitizens into the United States in order to prevent the spread of COVID-19. *Id.* ¶ 2. GA-37 also asserts that "busloads of migrants, an unknown number of whom are infected with COVID-19, are being transported to communities across the State of Texas, exposing Texans to the spread of COVID-19." *Id.*

Despite the expiration of the Governor's emergency declaration regarding COVID-19 in June 2023, *see* SOF ¶4 & Ex. 2 (final proclamation issued May 2023), Texas has maintained that GA-37 remains in effect due to a separate border-related emergency declaration governing certain counties in Texas, *see* SOF Ex. 3 (Proclamation of July 28, 2024); *see also* SOF Ex. 4 (Proclamation of May 31, 2021); *id.* ¶¶ 3-4.

## II.      Movement of Noncitizens Within the Federal Immigration System

"Federal governance of immigration and alien status is extensive and complex." *Arizona v. United States*, 567 U.S. 387, 395 (2012). "Congress has specified categories of aliens who may not be admitted to the United States." *Id.* (citing 8 U.S.C. § 1182). "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Id.* "Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all. If removal proceedings commence, aliens may seek asylum and other discretionary relief allowing them to remain in the country or at least to leave without formal removal." *Id.* at 396 (citing 8 U.S.C. § 1229a(c)(4); § 1158 (asylum), § 1229b (cancellation of removal), and § 1229c (voluntary departure)).

2

In enforcing immigration laws, the Executive Branch must have unimpeded ability to transport migrants.  For example, under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), 8 U.S.C. § 1232, which Congress enacted to combat child trafficking and provide for the care of unaccompanied noncitizen children during the pendency of their removal proceedings, unaccompanied noncitizen children so identified ordinarily must be transferred to the custody of the Office of Refugee Resettlement ("ORR") at the Department of Health and Human Services within 72 hours.  SOF ¶ 29; *see also* 8 U.S.C. § 1232(a)(4), (b)(3); 6 U.S.C. § 279(a).  Once transferred, the child generally must be promptly placed in the "least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1232(c)(2)(A); *see also* SOF ¶ 29.  ORR does not itself operate care facilities, but has 286 grantee facilities throughout the country, including 66 in Texas.  SOF ¶ 8. ORR enters into "cooperative agreements" with those grantees, and so they are functionally similar to government contractors.  *Id.*  ORR also assesses whether there is a suitable sponsor for the child so that he or she may be released from ORR custody as quickly as is safe and appropriate.  *Id.*  In sum, unaccompanied noncitizen children must be transferred promptly from CBP custody to ORR facilities and then, insofar as is possible, to appropriately vetted sponsors.  *Id.*  During the current fiscal year (FY 2024), approximately 12,000 unaccompanied noncitizen children were transferred from CBP's El Paso Sector alone to ORR's care facilities throughout Texas and the rest of the country.  *Id.* ¶ 9.

Other noncitizens also must be transported for a variety of practical and legal reasons.  DHS is authorized by statute to arrange for places of detention for those "aliens detained pending removal or a decision on removal," 8 U.S.C. § 1231(g)(1), and such decisions necessarily require the transportation of individuals prior to final disposition and removal.  SOF ¶ 10.  Noncitizens also need to be transferred between government or private facilities for a variety of reasons, including medical appointments and court appearances.  *Id.* ¶ 6.  And noncitizens released by U.S. Customs and Border Protection

("CBP") need independent transportation to reach their final destinations, to report to U.S. Immigration and Customs Enforcement ("ICE") offices, or to appear before an immigration court. *Id.* ¶ 18.

By statute, DHS has broad authority to "make contracts . . . as may be necessary and proper to carry out the Secretary's responsibilities." 6 U.S.C. § 112(b)(2). To ensure efficient operation of the immigration system runs, the federal government relies on contractors who are not law-enforcement officers to transport noncitizens. Congress provides ICE annual appropriations to pay for transportation contracts, and in FY 2024, ICE expects to purchase 900,000 contractor guard hours related to transportation. SOF ¶ 16. ICE's contractors have transported more than one million noncitizens within the State of Texas from the start of FY 2021 through the current fiscal year. *Id.* ¶ 20. In CBP's El Paso Sector, which covers El Paso and neighboring communities in Texas and New Mexico, CBP contractors transported 224,000 migrants in FY 2023. *Id.* ¶ 17. ORR also relies on grantee private-care facilities and their employees to transfer unaccompanied noncitizen children between facilities, and to send them to their sponsors. *Id.* ¶ 24.

Limiting the Government's ability to transport noncitizens to law-enforcement officials would have serious adverse effects on the federal government's immigration operations. *Id.* ¶ 25. It will increase the number of people and the length of stay in government facilities. *Id.* ¶ 26. It will hinder noncitizens' access to healthcare. *Id.* ¶ 27. And it may require the federal government to repurpose law-enforcement officials from their border-enforcement duties, which will have negative effects on border security and other critical law-enforcement functions. *See id.* ¶ 28.

## III.    Procedural History

The Government filed this civil action on July 30, 2021, ECF No. 1, and immediately thereafter, this Court issued a TRO on August 3, 2021, and a preliminary injunction on August 26, 2021, *United States v. Texas* ("*PI Order*"), 557 F. Supp. 3d 810

(W.D. Tex. 2022). The Court later denied Defendants' motion to dismiss, *United States v. Texas* ("*MTD Order*"), 586 F. Supp. 3d 574 (W.D. Tex. 2022), and further stayed this litigation pending Governor Abbott's appeal of the denial of his motion to dismiss the complaint filed by the private plaintiffs. ECF No. 89. On appeal, the Fifth Circuit ordered Governor Abbott's dismissal from the suit by the private plaintiffs, with prejudice. *United States v. Abbott* ("*Immunity Appeal*"), 85 F.4th 328 (5th Cir. 2023). Thereafter, Defendants answered the complaint on June 24, 2024. ECF No. 110. Pursuant to the parties' agreed-upon schedule, the Government now moves for summary judgment.

## LEGAL STANDARD

Under Rule 56, summary judgment is proper if a movant "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As explained below, the Government is entitled to judgment as a matter of law.

## ARGUMENT

I.      **This Case Is Properly Before This Court**

        A.      **Standing**

At the motion to dismiss stage, this Court concluded that the Government met its burden of establishing Article III standing to pursue its claims. *See MTD Order*, 586 F. Supp. 3d at 580-82; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). That conclusion remains correct. As this Court previously explained, "courts commonly enjoin states and their governors from enforcing unconstitutional laws or otherwise entertain suits in which the United States seeks an injunction against a state." *MTD Order*, 586 F. Supp. 3d at 581-82 (collecting cases).

As established in the attached declarations of Mr. Good, Ms. Burke, and Ms. Blake, the United States will suffer certain injury if GA-37 goes into effect. SOF ¶¶ 25-29. That injury can be redressed by enjoining the State from implementing GA-37. The executive

order charges Texas DPS, "a Texas State agency," *Reimer v. Smith*, 663 F.2d 1316, 1322 (5th Cir. 1981), with stopping and impounding vehicles for violations of the executive order. GA-37 at 3, ¶¶ 2-3.  An injunction prohibiting the State, the Governor, and their agents from enforcing the executive order would straightforwardly prohibit Texas DPS from carrying out the provisions of the executive order (as has been the case since the Court entered its preliminary injunction order in 2021, which Defendants did not appeal).  *See PI Order* at 822 (enjoining "Defendants, their agents, officers, and employees, and all other persons and entities in active concert or participation with them" from "taking any action to enforce the executive order.").

The Government's injury could also be redressed by relief against Governor Abbott.  Defendants previously argued that the United States has no standing to pursue its claims against the Governor because only Texas DPS, and not the Governor, has the authority to actually *enforce* GA-37.   Texas MTD at 3-4. Separately, in addressing Defendants' sovereign immunity defense, the Fifth Circuit recently held that the Governor should be dismissed from the suit brought by the private plaintiffs because he does not have a duty to enforce the executive order.  *See Immunity Appeal*, 85 F.4th at 334 ("GA-37 expressly tasks someone other than the Governor with its enforcement."). Nonetheless, the Texas statutes cited by the Fifth Circuit do suggest that the Governor has the ability to enforce the EO, or could, at a minimum, direct DPS to enforce the EO. *See id.* at 335 (citing Tex. Gov't Code § 411.012 ("The governor may assume command and direct the activities of the commission and [DPS] during a public disaster . . . or to perform the governor's constitutional duty to enforce law.")).  Even if the Governor "cannot provide full redress to the Government's injuries, the ability 'to effectuate a partial remedy' satisfies the redressability requirement [for purposes of Article III standing]." *Uzuegbunam v. Preczewski*, 592 US 279, 141 S. Ct. 792, 801 (2021) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)).

In sum, an injunction against either Governor Abbott or the State of Texas would redress the injury to the Government's prerogatives under the Supremacy Clause. As such, this case satisfies the constitutional minimum requirements of Article III and may proceed to summary judgment.

### B.      Cause of Action

To the extent Defendants assert that the Government lacks a cause of action, the United States has a right to sue in equity to enjoin preempted laws. The Supreme Court has long recognized the United States' authority to apply to its own courts to protect its sovereign interests. *See, e.g.*, *In re Debs*, 158 U.S. 564, 582 (1895); *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 279 (1888); *United States v. Am. Bell Tel. Co.*, 128 U.S. 315 (1888); *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967) ("[T]he general rule [is] that the United States may sue to protect its interests."); *see also MTD Order*, 586 F. Supp. 3d at 582-83; *PI Order*, 557 F. Supp. 3d at 820. The Fifth Circuit recently also removed any doubt about the existence of a cause of action in such circumstances, stating: "[w]e see no basis in the precedent of this court or the Supreme Court for concluding that the United States lacks a cognizable path for seeking to enjoin an allegedly preempted state law." *United States v. Texas*, 97 F.4th 268, 278 (5th Cir. 2024).

## II.      The Executive Order Is Preempted By Federal Law

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394; *see also Texas*, 97 F.4th at 278-79 ("For nearly 150 years, the Supreme Court has held that the power to control immigration—the entry, admission, and removal of noncitizens—is *exclusively* a federal power.") (emphasis in original). Thus, the "power to restrict, limit, [and] regulate . . . aliens as a distinct group is not an equal and continuously existing concurrent power of state and nation [;]. . . whatever power a state may have is subordinate to supreme national law." *Hines v. Davidowitz*, 312 U.S. 52, 68 (1941). This exclusive allocation of immigration authority to the federal government reflects both its inseparability from

conduct of foreign policy and the paramount importance of preserving the federal government's ability to speak "with one voice" in dealing with other nations. *Arizona*, 567 U.S. at 409; *see also Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 424 (2003); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000). "Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws." *Arizona*, 567 U.S. at 395. Even "[p]erceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Id.*

Cognizant of these significant national interests, Congress, in enacting the INA, has "established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 587 (2011) (quoting *DeCanas v. Bica*, 424 U.S. 351, 353, 359 (1976)). To be sure, the INA does not preempt "every state enactment which in any way deals with aliens," and "local regulation[s]" affecting aliens do not exceed state authority based on "some purely speculative and indirect impact on immigration." *DeCanas*, 424 U.S. at 355; *cf. Kansas v. Garcia*, 589 U.S. 191, 212 (2020) (generally applicable state law about "fraud, forgeries, and identity theft" that "appl[ied] to citizens and [noncitizens] alike" was not preempted because there was "no suggestion that the [state] prosecutions frustrated any federal interests"). But even a regulation in an area of traditional state authority is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (quoting *Hines*, 312 U.S. at 67).

Courts recognize three types of preemption: express preemption, field preemption, and conflict preemption. Under the doctrine of conflict preemption, "state laws are preempted when they conflict with federal law." *Id.* at 399. This includes cases "where the challenged state law 'stands as an obstacle to the accomplishment and

execution of the full purposes and objectives of Congress.'" *Id.*; *see also Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1297 (2016).  Whether a state regulation poses "a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373.  The Court must examine and consider the federal scheme, including those elements expressed and implied. *Id.*  "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id.* at 373; *see also Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 384 (5th Cir. 2004) (recognizing that state laws that "interfere[] with the achievement of federal objectives" are invalid under the doctrine of obstacle preemption).

This Court correctly concluded at the preliminary injunction stage that GA-37 is obstacle preempted because it directly and impermissibly interferes with the achievement of statutorily authorized federal objectives in at least two ways.  *PI Order*, 557 F. Supp. 3d at 815-19.

First, GA-37 obstructs federal officials' ability to lawfully release and transport noncitizens.  The INA gives the Executive Branch broad, nonreviewable discretion to release noncitizens from custody through various mechanisms including parole under 8 U.S.C. § 1182(d)(5) and conditional release from under § 1226(a)(2)(B).  *See also, e.g.*, 8 U.S.C. § 1229c (authorizing the Secretary to release removable noncitizens for as long as 120 days, in exchange for the noncitizen's commitment to depart voluntarily); *Dada v. Mukasey*, 554 U.S. 1, 10–11 (2008).  Other immigration laws affirmatively *require* the transfer of certain noncitizens within prescribed periods of time.  For example, the TVPRA generally requires that an unaccompanied noncitizen child be transferred (often from DHS) to ORR within 72 hours after a determination has been made that the minor

is an unaccompanied noncitizen child, absent exceptional circumstances.[2] SOF ¶ 29. But GA-37, which requires any such transfer be conducted by law enforcement personnel only, would pose an obstacle to meeting this timeline. *Id.* ¶¶ 20, 29.

Additionally, to maintain the operation of the immigration system, immigration officials must routinely either transport or arrange for transport of noncitizens between locations. For example, noncitizens released from state custody must be transported to CBP facilities for final disposition and removal, and others need to be transferred between government or private facilities for a variety of reasons. SOF ¶ 25.

The executive order is preempted because it "results in interference with Federal Government functions"—and here specifically, with federal law enforcement. *Gartrell Constr. Inc. v. Aubry*, 940 F.2d 437, 438 (9th Cir. 1991) (invalidating statute that purported to preclude a contractor from performing services on a federal construction project without first obtaining a license from the state); *see also GEO Group, Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (state law prohibiting private detention facilities was obstacle preempted because it interfered with DHS's discretion to use contractors to house detainees); *cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) ("[T]the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law"). The executive order makes it more difficult for the federal government to transport noncitizens in its desired manner. *See, e.g., Arizona*, 567 U.S. at 402 ("Permitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted."). Allowing only law-

_____

[2] There are other constraints on the timing of a noncitizen child's transfer. Pursuant to the terms of the Flores Settlement Agreement, which has governed the care and custody of children in immigration custody since 1997, CBP must release noncitizen children accompanied by a parent or legal guardian within three to five days of apprehension, or as expeditiously as possible, or transfer the child to a licensed facility. *See Flores v. Reno*, No. CV 85-4544-RJK(Px), (C.D. Cal. Jan. 17, 1997) (Settlement Agreement).

enforcement officers to transport noncitizens would have serious consequences for border operations and national security.  SOF ¶¶ 25-29; *see also* Burke Decl. ¶ 8 ("It is important that ICE focuses its finite law enforcement resources on its public safety mission and targeted enforcement operations").

The executive order is also preempted because it puts federal partners in the untenable position of either following federal instructions—risking penalty under the order, including impoundment of their vehicles—or complying with the executive order and declining to perform their designated federal functions.  The order thus creates an impermissible conflict, making it problematic for the federal government to work with its chosen partners to transport noncitizens in the manner it deems appropriate.  *See Arizona*, 567 U.S. at 406.

Second, GA-37 is separately preempted because it authorizes state officials to make certain federal law determinations that are reserved to the federal government.  Specifically, it provides that only law enforcement personnel may transport migrants who have been detained by CBP for crossing the border illegally or who would have been subject to expulsion under the Title 42 order.  GA-37 at 2 ¶ 1.

In *Arizona*, the Supreme Court found conflict-preempted a state law provision authorizing state officers, "without a warrant, [to] arrest a person if the officer has probable cause to believe . . . [the person] has committed any public offense that makes [him] removable from the United States."  567 U.S. at 407 (quoting Ariz. Rev. Stat. Ann. § 13–3883(A)(5)).  Emphasizing that the challenged "state authority could be exercised without any input from the Federal Government about whether an arrest is warranted in a particular case," the Court found that "[t]he result could be unnecessary harassment of some aliens (for instance, a veteran, college student, or someone assisting with a criminal investigation) who federal officials determine should not be removed."  *Id.* at 408.  The Court reasoned that "[b]y authorizing state officers to decide whether an alien should be

detained for being removable, [the provision in question] violates the principle that the removal process is entrusted to the discretion of the Federal Government." *Id.* at 409.

Similarly, in *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 536–37 (5th Cir. 2013), the Fifth Circuit plurality opinion held "that because the power to classify non-citizens is reserved exclusively to the federal government," a Texas locality's ordinance that required local building inspectors to conduct their own "unlawful presence" inquiries was preempted by federal law.  The ordinance prohibited, among other things, noncitizens and landlords from entering into a lease unless the prospective tenant first obtained a "license"—which, in turn, required a local official to purport to verify "with the federal government whether the [prospective tenant] is an alien lawfully present in the United States."  *Id.* at 526 (citation omitted).  The ordinance allowed for arrests, detentions, and prosecutions based on an occupant's failure to obtain a rental license.  *Id.* at 535.

In finding the ordinance preempted, the Fifth Circuit specifically rejected the locality's argument that the ordinance "relie[d] entirely on the federal determination of lawful or unlawful presence," noting that "even a determinative federal answer on this question—which . . . would be impossible to obtain—would not bring the Ordinance's arrest procedures into compliance with federal law."  *Id.*  This is so because the ordinance impermissibly arrogated to state authorities the ability to determine a noncitizen's legal status—a determination that is within the sole authority and discretion of the federal government.  *Id.* ("The federal government alone, however, has the power to classify non-citizens.") (citing *Arizona,* 567 U.S. at 407–08, and *DeCanas,* 424 U.S. at 354).  As the Fifth Circuit further explained, the ordinance improperly "reaches non-citizens who may not have lawful status but face no federal exclusion from rental housing, and exposes those non-citizens to arrests, detentions, and prosecutions based on [state officials'] assessment of 'unlawful presence.'"  *Id.* at 532; *Plyler v. Doe*, 457 U.S. 202, 236 (1982) (Blackmun, J., concurring) ("[T]he structure of the immigration statutes makes it impossible for the State

to determine which aliens are entitled to residence, and which eventually will be deported."); 8 U.S.C. § 1229a(a)(3); *see also* 8 U.S.C. § 1229a(a)(3) (setting out the "sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States"). More recently, the Fifth Circuit relied on *Villas at Parkside Partners* to find it "problematic" that a Texas law would allow state courts to "determine if a noncitizen has entered [the United States] illegally." *Texas*, 97 F.4th at 291 (finding the Texas law likely conflicts with federal law).

Here, the Court has already determined that GA-37 directs DPS to make immigration determinations reserved for the federal government. *PI Order*, 557 F. Supp. 3d at 816-18. As the Court explained, requiring "DPS officers to determine whether a group of noncitizens have been 'detained by CBP for crossing the border illegally . . . is a cut-and-dry immigration determination; the answer obviously turns on whether the noncitizen has violated the federal immigration laws." *Id*. at 816-17. "DPS officers may not make such determinations." *Id*. at 817.

Moreover, GA-37 would require DPS officers to determine whether the noncitizens "would have been subject to expulsion under the Title 42 Order." *Id*. That too "turns on immigration status" because it involves deciding whether a "person lacks valid documentation or entered the country unlawfully, among other immigration-related determinations." *Id*. To be sure, no Title 42 order is currently in effect, but GA-37 would still authorize state officers to assess Title 42's applicability as to, for instance, individuals who may have entered the country when a Title 42 order was still in place.

GA-37 further disrupts federal enforcement of the immigration laws by authorizing state officials to reroute a stopped vehicle to "a port of entry" based on the state officials' immigration determination. GA-37 at 2 ¶ 2. But it "is for the Executive to decide whether, and if so, how to pursue noncitizens illegally present in the United States." *Texas*, 97 F.4th at 283. By arrogating this authority to itself, Texas is putting its

13

"local officials in the impermissible position" of imposing consequences on noncitizens "based on their immigration status without federal direction and supervision." *Villas at Parkside Partners*, 726 F.3d at 532 (citing *Arizona*, 567 U.S. at 406–07).  Accordingly, the executive order is invalid on this independent ground as well.

### III.     The Executive Order Violates Supremacy Clause Immunity

GA-37 also violates the Government's Supremacy Clause immunity (sometimes referred to as intergovernmental immunity), as this Court concluded at the preliminary injunction stage. *PI Order*, 557 F. Supp. 3d at 819-20.  "The Constitution's Supremacy Clause generally immunizes the Federal Government from state laws that directly regulate or discriminate against it." *United States v. Washington*, 596 U.S. 832 (2022).  This means that "states have no power . . . to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by [C]ongress to carry into effect the powers vested in the national government." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 317 (1819).  "The Constitution guarantees 'the entire independence of the General Government from any control by the respective States,'" and States can neither "control the operations of the constitutional laws enacted by Congress," nor impede the Executive Branch's "execution of those laws." *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020) (quoting *Farmers & Mechanics Sav. Bank of Minneapolis v. Minnesota*, 232 U.S. 516, 521 (1914) & *M'Culloch*, 17 U.S. at 436); *see also Washington*, 596 U.S. at 838-39.  Under the Supremacy Clause, therefore, the "activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943); *Arizona v. California*, 283 U.S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a state."); *Union Pac. R.R. Co. v. Peniston*, 85 U.S. (18 Wall.) 5, 36–37 (1873) (a state tax on federal operations "is a direct obstruction to the exercise of Federal powers"); *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) (recognizing that a regulation violates the doctrine of intergovernmental immunity if it "seek[s] to directly

regulate the conduct of agents of the federal government"); *United States v. Town of Windsor*, 765 F.2d 16, 18 (2d Cir. 1985) ("Absent congressional consent, direct state regulation of the activities of the [Federal] Government is barred by the Supremacy Clause."); *see also Vance*, 140 S. Ct. at 2442–43 & n.5 (Alito, J., dissenting) (collecting cases showing that "two centuries of case law prohibit the States from taxing, regulating, or otherwise interfering with the lawful work of federal agencies, instrumentalities, and officers").

Recently, the Ninth Circuit held that a state law regulating which entities may perform work for the Government in immigration law enforcement violated Supremacy Clause immunity. In *GEO Group*, a state statute, AB 32, prohibited the operation of private detention facilities within the state, when ICE relies exclusively on private detention centers in that state for immigration detention. 50 F.4th at 752. In finding AB 32 invalid, the Ninth Circuit explained that the Supremacy Clause "precludes states from dictating to the federal government who can perform federal work," *id.* at 754, but AB 32 "prevent[ed] ICE from hiring the personnel of its choice." *Id.* As the court reasoned, AB 32 would have forced ICE "to cease its ongoing immigration detention operations in California and adopt an entirely new approach in the state," and in so doing "breach the core promise of the Supremacy Clause." *Id.* at 756-58.

Here, GA-37 similarly violates this "core promise." It seeks to regulate how the federal government transports migrants and specifically, whom the federal government may use to do so, and thus, plainly violates Supremacy Clause immunity. *Id.* The Constitution does not allow one State's regulations to hamstring federal operations and jeopardize the security of the nation. *Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920) (holding that state laws cannot "control the conduct of" individuals "acting under and in pursuance of the laws of the United States"). The public safety concerns articulated in GA-37 are irrelevant to the legal issue before the Court because the constitutional question is not "[w]hether [GA-37] is better or worse" at protecting public safety, but

"whether [GA-37] regulates federal activity," which it indisputably does. *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014).

Nor does it matter that the federal government relies on contractors and grantees to move noncitizens, rather than conducting those operations itself. SOF ¶ 12. "For purposes of [Supremacy Clause] immunity, federal contractors are treated the same as the federal government itself." *United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019); *Boeing*, 768 F.3d at 840 (holding unconstitutional a state law that "directly interfere[d] with the functions of the federal government" by "mandat[ing] the ways in which [a contractor] renders services that the federal government hired [it] to perform"); *Town of Windsor*, 765 F.2d at 19 (town barred by Supremacy Clause immunity to enforce its building requirements against the United States and its two contractors regarding the construction of certain nuclear facilities); *GEO Grp., Inc. v. City of Tacoma*, Case No. 3:18-cv-05233, 2019 WL 5963112, at *5 (W.D. Wash. Nov. 13, 2019) ("The intergovernmental immunity doctrine . . . appl[ies] to federal contractors insofar as the challenged law 'regulate[s] what the federal contractors [have] to do or how they [do] it pursuant to their contracts.'") (quoting *Boeing Co.*, 768 F.3d at 839). Supreme Court precedent supports this principle. In *Johnson v. Maryland*, the Supreme Court held that even licensing requirements of general applicability may be invalid when they limit the federal government's choice of contractor, explaining that the question in such licensing cases "is whether the State can interrupt the acts of the general government itself," and concluding that the answer was plainly no. 254 U.S. at 55. And in *Leslie Miller, Inc. v. Arkansas*, the Supreme Court struck down an Arkansas licensing requirement as it applied to Government contractors, explaining that the requirement "does not merely touch the Government servants remotely by a general rule of conduct; it lays hold of them in their specific attempt to obey orders." 352 U.S. 187, 190 (1956) (emphasis added); *see also Pub. Utils. Comm'n of California v. United States*, 355 U.S. 534, 537 n.2, 544 (1958) (invalidating a state law that prohibited common carriers from transporting federal property at reduced

16

rates without first obtaining the State's permission, even though the regulated parties were private contractors using privately owned vehicles to transport property on non-federal highways).

GA-37 extends beyond the regulations struck down in *Johnson* and *Leslie Miller*.  It targets a distinctly federal function: the transportation of noncitizens as part of the federal immigration operations.  And it does not merely restrict the federal government's choice of contractors to transport noncitizens; it eliminates the possibility of such choice by prohibiting anyone other than law-enforcement personnel from transporting noncitizens. The executive order is invalid on its face and this Court should enjoin it in its entirety.

## IV.   The Court Should Permanently Enjoin Enforcement of the Executive Order

In order to obtain a permanent injunction under "well-established principles of equity," the Government "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Consideration of these factors compels the conclusion that a permanent injunction against the executive order should issue here.

First, the Government has established irreparable harm that cannot be compensated by legal remedies.  As the Court held when granting the preliminary injunction, the Government suffers *per se* irreparable injury from a violation of the Supremacy Clause.  *PI Order*, 557 F. Supp. 3d at 821, *see also United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (noting, in the context of obstacle preemption, that "an alleged constitutional infringement will often alone constitute irreparable harm"), *aff'd in part, rev'd on other grounds*, 567 U.S. 387 (2012); *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366–67 (1989) (noting that irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of" the

Supremacy Clause); *United States v. Texas* ("*SB 4 Litigation*"), --- F. Supp. 3d ----, 2024 WL 861526, at *38 (W.D. Tex. Feb. 29, 2024).

Second, as the Court previously found, *PI Order*, 557 F. Supp. 3d at 821-22, and as the declarations submitted by the Government with this motion amply illustrate, implementation of the executive order "would irreparably disrupt immigration enforcement." The consequences for immigration operations if CBP and ICE were forced to reassign, and ORR were forced to rely on, law-enforcement personnel to engage in transportation activities that normally could be performed by contractors would be catastrophic. SOF ¶ 28. Among other things, it would increase processing times and decrease enforcement at checkpoints, ultimately "decreasing border security enforcement" and "increasing threats to national security." *Id.* It would also put recent migrants, noncitizens being removed, and U.S. citizens at unnecessary risk. *Id.*

The final two factors—the balance of equities and the public interest—manifestly favor the United States as well, as this Court previously concluded. *PI Order*, 557 F. Supp. 3d at 822. Those factors merge where, as here, the Government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The frustration of federal law is "not in the public interest," and Defendants face "no harm" from the "nonenforcement of [an] invalid" executive order, particularly when the key motivation of GA-37—to limit the spread of COVID-19—no longer exists. *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *SB 4 Litigation*, 2024 WL 861526, at *40. Defendants also have no "legitimate interest in enforcing an unconstitutional law." *SB 4 Litigation*, 2024 WL 861526, at *41.

## CONCLUSION

For these reasons, the Court should grant summary judgment in the Government's favor pursuant to Rule 56, and permanently enjoin GA-37.

Date: August 23, 2024                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney
                                         General

                                         JEAN LIN
                                         Acting Director

                                         /s/___Joshua M. Kolsky_____
                                         JOSHUA M. KOLSKY
                                         MICHAEL GERARDI
                                         Senior Trial Counsel
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street NW Washington, DC 20005
                                         Tel: (202) 305-7664
                                         Fax: (202) 616-8470
                                         E-mail: joshua.kolsky@usdoj.gov

                                         Attorneys for Plaintiff United States

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of this filing was served on the other parties to this action and their counsel of record through electronic filing in the Court's ECF system on August 23, 2024.

/s/ Joshua Kolsky
Joshua Kolsky