**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CAUSE NO. EP-21-CV-173-KC** |
| | § | |
| **THE STATE OF TEXAS and GREG ABBOTT, in his official capacity as Governor of the State of Texas,** | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

| | | |
|---|---|---|
| **ANNUNCIATION HOUSE; ANGRY TIAS & ABUELAS OF THE RIO GRANDE VALLEY; JENNIFER HARBURY; and FIEL HOUSTON,** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CAUSE NO. EP-21-CV-178-KC** |
| | § | |
| **GREG ABBOTT, in his official capacity as Governor of the State of Texas; and STEVEN MCCRAW, in his official capacity as Director of the State of Texas Department of Public Safety,** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

## <u>ORDER</u>

On this day, the Court considered Annunciation House, Angry Tias and Abuelas of the Rio Grande Valley, Jennifer Harbury, and FIEL Houston's (collectively, "Plaintiffs" or "Private Plaintiffs") Motion for Summary Judgment ("Pls.' Mot. Summ. J."), ECF No. 120, and the State of Texas, Greg Abbott, and Freeman F. Martin's Corrected Cross-Motion for Summary

Judgment ("Defs.' Mot. Summ. J."), ECF No. 129. For the following reasons, Plaintiffs' Motion is **GRANTED** in part and **DENIED** in part, and Defendants' Motion is **GRANTED** in part and **DENIED** in part.

## I.     BACKGROUND

The following facts are undisputed unless otherwise noted.[1]

### A.     Factual Background

On July 28, 2021, Texas Governor Greg Abbott issued Executive Order GA-37, titled "Relating to the transportation of migrants during the COVID-19 disaster." Tex. Exec. Order No. GA-37 ("GA-37") (July 28, 2021), https://gov.texas.gov/uploads/files/press/EO-GA-37_transportation_of_migrants_during_COVID_IMAGE_07-28-2021.pdf. The Order's stated rationale was public health. *Id.* at 2. Governor Abbott declared that COVID-19 posed "an imminent threat of disaster" across Texas and expressed concern that migrants were "carry[ing] the disease across the border." *Id.* He criticized then-President Joe Biden for failing to enforce the still-active "Title 42 Order"—a pandemic-era policy issued during President Donald Trump's first term to facilitate the rapid expulsion of migrants on the grounds that it would contain the virus's spread. *Id.* According to Governor Abbott, President Biden's approach, combined with his "refusal to enforce the immigration laws enacted by Congress," was having a "catastrophic effect on public health in Texas." *Id.*

Thus, citing authority under section 418.012 of the Texas Government Code, Governor Abbott ordered that no person—other than law enforcement—may transport "a group of migrants who have been detained by [Customs and Border Protection ("CBP")] for crossing the

---

[1] In accordance with the Court's Standing Order Regarding Motions for Summary Judgment, the parties submitted Proposed Undisputed Facts ("PUFs") with their respective Motions. *See* Pls.' PUF, ECF No. 120-1; Defs.' PUF, ECF No. 129-1. The parties also submitted Responses to the other's PUFs ("RPUFs"). *See* Pls.' RPUF, ECF No. 132-1; Defs.' RPUF, ECF No. 125-1. The Court has reviewed these submissions and cites them as appropriate throughout this Order.

border illegally or who would have been subject to expulsion under the Title 42 Order." *Id.* at 3. The Order directs the Texas Department of Public Safety ("DPS") to stop vehicles based on reasonable suspicion of a violation, reroute them to their point of origin or a port of entry and, if necessary, impound them. *Id.*

Following its issuance, DPS began developing plans to implement GA-37. Pls.' Proposed Undisputed Facts ("PUF") ¶ 3, ECF No. 120-1; Defs.' Resp. PUF ("RPUF") ¶ 3, ECF No. 125-1. To date, however, the Order has not been enforced. Defs.' PUF ¶ 12, ECF No. 129-1; Pls.' RPUF ¶ 12 (denying only "to the extent [the statement] suggests that Defendants are not planning to enforce GA-37"), ECF No. 132-1. In May 2023, as part of a broader rollback of pandemic-related restrictions, the Title 42 Order was formally rescinded. Pls.' Mot. Summ. J. 1; Defs.' Mot. Summ. J. 1; *see also CDC Public Health Determination and Termination of Title 42 Order*, CDC Archive, https://archive.cdc.gov/www_cdc_gov/media/releases/2022/s0401-title-42.html (last visited June 30, 2025). GA-37 thus now applies only to individuals previously detained by CBP. *See* Pls.' Mot. Summ. J. 5; Defs.' Mot. Summ. J. 1.

### B. Procedural History

On July 30, 2021, the United States filed suit against the State of Texas and Governor Abbott, alleging that GA-37 was preempted by federal law and violated the doctrine of intergovernmental immunity, in contravention of the Supremacy Clause. *See generally* U.S. Compl., ECF No. 1. The United States sought declaratory and injunctive relief to bar enforcement of GA-37. *Id.* at 12.

Days later, on August 4, 2021, Annunciation House, Angry Tias and Abuelas of the Rio Grande Valley, Jennifer Harbury, and FIEL Houston jointly filed a separate suit against

Governor Abbott and Texas DPS Director Freeman F. Martin in their official capacities.[2]  *See*

*generally* Pls.' Compl., ECF No. 57.  Their claims largely mirrored those of the United States but

included an additional Fourth Amendment challenge.  *Id.* ¶¶ 88–91.  They likewise sought

declaratory and injunctive relief.  *Id.* at 21–22.  On August 26, 2021, the Court consolidated the

two actions.  Order Consolidating Cases, ECF No. 51.

That same day, the Court granted the United States' Emergency Motion for a Temporary

Restraining Order or Preliminary Injunction, ECF No. 3.  Order Granting Prelim. Inj., ECF No.

52.  The Court found that the United States had shown a substantial likelihood of success on the

merits—namely, that GA-37 was preempted by federal law—a substantial threat of irreparable

harm, and that the balance of equities and the public interest favored injunctive relief.  *See*

*generally id.*  Accordingly, the Court enjoined "Defendants, their agents, officers, and

employees, and all other persons and entities in active concert or participation with them" from

taking "any action to enforce [GA-37]."  *Id.* at 18.  That injunction remains in effect.

On October 11, 2021, Governor Abbott and Texas moved to dismiss the United States'

claims, arguing lack of jurisdiction and failure to state a claim, Mot. Dismiss I, ECF No. 67, and

Governor Abbott and Director Martin moved to dismiss Private Plaintiffs' claims on the same

grounds, Mot. Dismiss II, ECF No. 68.

The Court denied the Motion to Dismiss the United States' claims in full.  Order Denying

Mot. Dismiss I, ECF No. 82.  As to Private Plaintiffs' claims, the Court granted in part and

denied in part the Motion to Dismiss.  *See* Order Granting in Part & Denying in Part Mot.

Dismiss II, ECF No. 83.  The Court held that Private Plaintiffs lacked standing to bring

Supremacy Clause claims because the Supremacy Clause does not itself create a private right of

---

[2] Plaintiffs initially sued Stephen M. McCraw in his official capacity as Director of DPS, but because
Martin has since assumed that role, he is automatically substituted as a party.  *See* Fed. R. Civ. P. 25(d).

action.  *Id.* at 9–10.  But the Court allowed the Fourth Amendment claims to proceed and

rejected the argument that Governor Abbot was not a proper defendant under *Ex Parte Young*.

*Id.* at 10–11, 15–17.

Two developments later modified these rulings.  First, on March 18, 2022, Governor

Abbott appealed the Courts' *Ex Parte Young* ruling.  Notice Appeal, ECF No. 85.  On October

27, 2023, the Fifth Circuit reversed this Court, holding that Governor Abbott could not be sued

in this context and that sovereign immunity barred the claims against him.  *United States v.

Abbott*, 85 F.4th 328 (5th Cir. 2023).  The Court therefore dismissed all claims against Governor

Abbott with prejudice.  Dec. 20, 2023, Order, ECF No. 94.

Second, on January 18, 2024, Private Plaintiffs moved for reconsideration of the Court's

dismissal of their Supremacy Clause claims.  Mot. Reconsideration, ECF No. 95.  In July 2024,

the Court granted the Motion.  July 30, 2024, Order, ECF No. 112.  Relying in part on a recent

Fifth Circuit decision, the Court held that while the Supremacy Clause does not create a cause of

action for damages, it does not bar individual plaintiffs from seeking injunctive relief to prevent

enforcement of a preempted state law.  *Id.* at 4–6 (citing *United States v. Texas (Texas I)*, 97

F.4th 268, 277 (5th Cir. 2024)).  The Court therefore reinstated Private Plaintiffs' Supremacy

Clause claims.  *Id.* at 7.

On August 23, 2024, Private Plaintiffs and the United States filed Motions for Summary

Judgment.  *See* Pls.' Mot. Summ. J.; U.S. Mot. Summ. J., ECF No. 121.  Private Plaintiffs seek

summary judgment only on their Supremacy Clause claims—not their Fourth Amendment

claims.  Pls.' Mot. Summ. J. 11 n.5.  Governor Abbott and Director Martin filed a Response,

ECF No. 125, and Private Plaintiffs filed a Reply, ECF No. 131.  Shortly thereafter, Governor

Abbott, Director Martin, and the State of Texas filed a Cross-Motion for Summary Judgment on

all claims.  *See generally* Defs.' Mot. Summ. J.  Private Plaintiffs filed their Response, ECF No. 132, and Defendants replied, *see* Defs.' Reply, ECF No. 139.

While the Motions were pending, Donald Trump was inaugurated as the 47th President of the United States.  He nominated Pam Bondi as Attorney General, who was confirmed on February 4, 2025.  In light of these developments, the Court ordered the United States to clarify whether it intended to maintain its positions and continue prosecuting the case. Mar. 5, 2025, Order, ECF No. 143.  On April 30, the United States filed a Stipulation of Dismissal, ECF No. 146, under Federal Rule of Civil Procedure 41(a)(1)(A)(ii), informing the Court that it no longer wished to pursue its claims.  The Court accordingly dismissed the United States' claims without prejudice and denied its Motion for Summary Judgment as moot.  May 1, 2025, Order, ECF No. 147.

As it now stands, then, only Private Plaintiffs' claims remain and therefore only Director Martin remains as a Defendant.

### C.    Plaintiffs

There are four remaining Plaintiffs: Annunciation House, Angry Tias, FIEL Houston, and Harbury.  Collectively, they are nonprofit organizations and one individual, who provide shelter, transportation, and legal advocacy for migrants and asylum seekers in Texas.  Each Plaintiff has submitted a sworn declaration from an individual with personal knowledge describing that Plaintiff's specific roles, responsibilities, and operations.  Annunciation House submitted a declaration from its director, *see* Garcia Decl., ECF No. 58-2, as did FIEL, *see* Espinosa Decl., ECF No. 58-5.  Angry Tias submitted a declaration from one of its members, *see* Sandefur Decl., ECF No. 58-3, and Harbury submitted a declaration in her own name, *see* Harbury Decl., ECF No. 58-4.

6

Defendants do not dispute the substance of these declarations and offer no evidence to the contrary. The Court therefore considers them competent summary judgment evidence. *See Brewer v. Am. Power Source, Inc.*, 517 F. Supp. 2d 881, 889 (N.D. Miss. 2007) ("[F]ederal courts routinely rely upon such affidavits in determining summary judgment issues."), *aff'd*, 291 F. App'x 656 (5th Cir. 2008).

### 1.    Annunciation House

Annunciation House is a nonprofit organization based in El Paso, Texas, that provides hospitality to "migrants, immigrants, and refugees." Garcia Decl. ¶ 2. Its services include providing shelter, food, clothing, and other necessities. *Id.* It operates four shelter buildings in the El Paso area, with a combined capacity of approximately six hundred beds, and is designed for short-term stays—typically just a few days—while migrants arrange travel to their destinations elsewhere in the United States. *Id.* ¶ 4.

Annunciation House primarily serves migrants released from federal custody, especially by CBP and to a lesser extent by Immigration and Customs Enforcement ("ICE"). *Id.* ¶¶ 9, 10. These migrants are generally brought to the shelters in groups of about fifteen by third-party providers such as Project Amistad, a nonprofit contractor for El Paso County, and El Paso Shuttle, a private transportation service. *Id.* ¶¶ 14–17. At least one such transport typically arrives each day. *Id.* ¶ 17.

Because most migrants do not remain in El Paso after their release, they must quickly secure travel to other destinations. *Id.* ¶ 18. Many lack both the funds to rent a car and valid U.S. driver's licenses. *Id.* ¶ 19. So, they travel by bus or commercial flight and rely on local transportation—including taxis, rideshare services, or rides from Annunciation House

volunteers—to reach the transit hubs.  *Id.* ¶¶ 20–21.  While in El Paso, they sometimes need transport to medical appointments and other essential services.  *Id.* ¶ 25.

To meet these needs, Annunciation House owns and operates seven vehicles:  two fifteen-passenger vans, two minivans, two pickup trucks, and one sedan.  *Id.* ¶ 22.  Volunteers use these vehicles several times a week to transport migrants to bus stations, airports, appointments, and the like.  *Id.* ¶¶ 23–25.

After GA-37 was issued, both Annunciation House volunteers and affiliated drivers with Project Amistad expressed fear of being stopped by law enforcement and having their vehicles impounded while transporting migrants.  *Id.* ¶ 28.  Accordingly, Annunciation House's director testifies that many volunteers will stop providing rides if GA-37 is enforced.  *Id.* ¶ 30.  Further, without the ability to transport migrants out of its shelters, Annunciation House would be forced to provide long-term care for them—something that it is not staffed, trained, or resourced to do. *Id.* ¶¶ 31–32.  As a result, the director asserts, Annunciation House would have no choice but to shut down its operations entirely.  *Id.* ¶ 32.

### 2.    Angry Tias & Abuelas

Angry Tias & Abuelas is a grassroots volunteer organization that provides humanitarian assistance to asylum seekers in the Rio Grande Valley of South Texas.  Sandefur Decl. ¶ 2.  Each year, it serves approximately ten thousand migrants, offering shelter, transportation, legal assistance, and other services.  *Id.* ¶ 4.

To facilitate migrant transportation, Angry Tias maintains an ongoing retainer agreement with a local taxi company, Imperial Taxi, which provides approximately fifty rides per month to bus stations, airports, and temporary shelters.  *Id.* ¶¶ 8–9.  In addition, members of Angry Tias

regularly transport migrants themselves—typically in small groups of two or three—to medical appointments, shelters, or transit hubs.  *Id.* ¶ 7.

The vast majority of migrants that the organization assists—approximately ninety percent—ultimately leave the Rio Grande Valley by bus, often traveling in large groups.  *Id.* ¶ 6. Angry Tias routinely provides these individuals with food and water before their departure to "final destinations" within the United States.  *Id.* ¶ 5.

An Angry Tias member testifies that enforcement of GA-37 would severely disrupt these efforts.  She states that the Order would jeopardize the organization's contract with Imperial Taxi, deter volunteers from transporting migrants, and prevent families from traveling together. *Id.* ¶¶ 11–13.  To care for the migrants unwilling or unable to leave the Valley through other means, Angry Tias would instead be forced to divert limited resources toward housing and supporting stranded families, leaving the organization "unable to provides the services that [it] ordinarily would to families traveling to their onward destinations."  *Id.* ¶ 13.

### 3.    FIEL Houston

FIEL Houston is an immigrant-led civil rights organization based in Houston, Texas. Espinosa Decl. ¶ 1.  Its mission is to empower immigrant youth and their families through civic engagement, access to education, and broader immigration advocacy.  *Id.*

FIEL has approximately eleven thousand members, the majority of whom are undocumented, with some currently pursuing asylum claims.  *Id.* ¶¶ 2, 7.  The remainder include DACA recipients and lawful permanent residents, many of whom were arrested by Border Patrol upon entry and later released.  *Id.* ¶ 14.

According to its executive director, FIEL experienced a surge of calls and messages from its members following the issuance of GA-37.  *Id.* ¶ 6.  Members expressed fear that they would

be "subject to unlawful detention or other civil rights abuses" under the Order. *Id.* The director further testifies that GA-37 has created an environment in which members risk being profiled or stopped by DPC officers simply for driving in groups—effectively deterring some from leaving their homes. *Id.* ¶¶ 11–12.

### 4.    Jennifer Harbury

Harbury is a humanitarian volunteer who assists migrants released by CBP or ICE. Harbury Decl. ¶¶ 3, 6. She is a founder of Angry Tias but also conducts independent volunteer work. *Id.* ¶¶ 5, 7. Harbury regularly provides food, water, information, and guidance to migrants as they navigate the immediate aftermath of their release. *Id.* ¶ 6.

She also hosts migrants in her home and typically transports them—after their release— from detention centers to her residence. *Id.* ¶¶ 7, 8. During their stay, she drives them to medical appointments, legal consultations, stores, churches, and required ICE check-ins. *Id.* ¶¶ 9–13. She often transports multiple migrants at once. *Id.* ¶ 9.

Harbury testifies that if GA-37 were enforced and her car impounded for transporting migrants, she would be unable to continue her volunteer work. *Id.* ¶¶ 26–27. She further explains that the vehicle is her only mode of transportation and, as a seventy-year-old retiree, she cannot afford to pay impoundment fees or secure alternative transportation. *Id.* ¶ 27.

## II.    DISCUSSION

### A.    Standard

A court must enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). "A fact is 'material' if its resolution in favor of one

party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996).

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1046–47 (5th Cir. 1996).  To show the existence of a genuine dispute, the nonmoving party must support its position with citations to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials[,]" or show "that the materials cited [by the movant] do not establish the absence . . . of a genuine dispute, or that [the moving party] cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c).

The court resolves factual controversies in favor of the nonmoving party, but factual controversies require more than "conclusory allegations," "unsubstantiated assertions," or "a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted) (en banc).  Further, when reviewing the evidence, the court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh evidence. *Man Roland, Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 478 (5th Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).  Thus, the

ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

Where, as here, both sides move for summary judgment on the same claims, each party must independently demonstrate the absence of a genuine dispute of material fact to prevail on its respective motion.

### B.    Analysis

As an initial matter, Private Plaintiffs "do not contest judgment" on their Fourth Amendment claims. Pls.' Resp. 12 n.5. Defendants' Motion is therefore granted in part, and the Fourth Amendment claims are dismissed.

### 1.    Standing

Turning to the Supremacy Clause claims, Defendants first argue that Plaintiffs lack standing. Defs.' Mot. Summ. J. 3–4. Plaintiffs respond that they have standing because GA-37 regulates their conduct and exposes them to penalties if they continue their work. Pls.' Mot. Summ. J. 9–10. Although this Court previously held that Plaintiffs had standing to seek injunctive relief, *see* Order Granting in Part & Denying in Part Mot. Dismiss II 7–13; July 30, 2024, Order 3–7, standing is jurisdictional and may be revisited at any stage of the litigation. *See In re Bennett Funding Grp., Inc.*, 336 F.3d 94, 102 (2d Cir. 2003) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). The Court therefore reexamines the issue here, with the benefit of a more developed record.

Article III confines federal jurisdiction to actual "cases" or "controversies." U.S. Const. art. III; *see also Arizonans for Off. Eng. v. Arizona*, 520 U.S 43, 64 (1997). To satisfy that requirement, a plaintiff must have "standing"—that is, a "concrete stake" in the outcome of the

dispute. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000); *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008). Standing requires three elements: (1) an injury-in-fact; (2) that is fairly traceable to the defendant's conduct; and (3) that is likely to be redressed by the requested relief. *Lujan*, 504 U.S. at 561; *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 609–10 (5th Cir. 2017).

Historically, when multiple plaintiffs seek the same injunctive relief, only one must have standing, as all would benefit equally from the remedy regardless of their individual standing. *La Union del Pueblo Entero v. Abbott*, 770 F. Supp. 3d 974, 1032 (W.D. Tex. 2025) (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)). And here, Plaintiffs all seek the same remedy: a permanent, statewide injunction entirely barring any enforcement of GA-37. *See* Pls.' Compl. 21. But Plaintiffs filed both their suit and their Motion for Summary Judgment before the Supreme Court's recent decision in *Trump v. Casa, Inc.*, 145 S. Ct. 2540 (June 27, 2025). That decision fundamentally alters the relevant legal landscape.

In *Casa*, the Court held that the Government was likely to succeed in its argument that the Judiciary Act of 1789 does not authorize federal courts to issue "universal injunctions."[3] *Id.* at 2554 ("Because the universal injunction lacks a historical pedigree, it falls outside the bounds of a federal court's equitable authority under the Judiciary Act."). The Court emphasized that Article III limits judicial relief to the parties "actually or constructively" before the court—not to laws in the abstract—and that an injunction must be no broader than necessary to provide those parties complete relief. *Id.* at 2552, 2562–63.

---

[3] Although *Casa* addressed a nationwide injunction, nationwide and statewide injunctions are both forms of universal injunctions. *See Henry v. Sheriff of Tuscaloosa Cnty.*, 135 F.4th 1271, 1328 (11th Cir. 2025); *Walls v. Sanders*, 733 F. Supp. 3d 721, 751 (E.D. Ark. 2024) ("[T]here is a second sub-species of universal injunctions: the statewide injunction."). *Casa* is therefore equally applicable here. *See United States v. Texas (Texas II)*, No. 24-50149, 2025 WL 1836640, at *38 (5th Cir. July 3, 2025) (applying *Casa* to state statute).

Accordingly, because a court "cannot adjudicate directly upon a person's right without having him either actually or constructively before it," *id.* at 2552 (quoting *Gregory v. Stetson*, 133 U.S. 579, 586 (1890)), and because a party is not "actually or constructively" before the court without standing, each Plaintiff must independently establish standing. The Court therefore considers whether each Plaintiff satisfies the requisite elements.

### a.    Injury-in-Fact

To establish Article III standing, a plaintiff must demonstrate an injury-in-fact that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). In a pre-enforcement challenge, that standard is typically met where the plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). The threatened prosecution need not involve the pressing of criminal charges. *Baughcum v. Jackson*, 92 F.4th 1024, 1036–37 (11th Cir. 2024) (citing *Driehaus*, 537 U.S. at 158–59). A plaintiff satisfies this requirement so long as they face a credible threat of any punishment. *Id.*; *Berry v. Schmitt*, 688 F.3d 290, 296 (6th Cir. 2012) (finding standing based on threat of disciplinary action by bar association).

A plaintiff does not need to first violate the law to challenge it. *MedImmune v. Genentech*, 549 U.S. 118, 128–29 (2007). Nor is it a defense to say that a plaintiff can simply comply with the law to avoid sanction; where compliance is coerced by threat of enforcement, that coercion itself constitutes a cognizable injury. *See id.* at 129. For these reasons, courts have described the pre-enforcement standard as "quite forgiving." *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (quoting *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013)).

The analysis differs slightly when the plaintiff is an association or an organization rather than an individual.  In such cases, standing may be established under either of two theories—"associational standing" and "organizational standing."  *OCA*, 837 F.3d at 610 (citing *NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010)).  Under associational standing, the organization sues on behalf of its members and must show that at least one member would have standing to sue in their own name, and that the interests that the organization seeks to protect are germane to its purpose.  *Id.* (citing *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006)); *Young Conservatives of Tex. Found. v. Univ. of N. Tex.*, 609 F. Supp. 3d 504, 509 (E.D. Tex. 2022) (citing *Tex. Ent. Ass'n v. Hegar*, 10 F.4th 495, 504 (5th Cir. 2021)).  By contrast, organizational standing allows the group to sue in its own right, provided it satisfies the same Article III requirements as an individual plaintiff.  *OCA*, 837 F.3d at 610 (citing *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999)).  This often means showing that the challenged law frustrates the organization's mission and forces it to divert resources to counteract the law's effects.  *See City of Kyle*, 626 F.3d at 238 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *La Union*, 751 F. Supp. 3d at 707 (citations omitted).

Here, the record reflects that each Plaintiff either intends to engage in conduct proscribed by GA-37, has members who do, or will be forced to divert resources as a result of the Order's enforcement.

Harbury testifies that she regularly transports migrants released from CBP custody—often in groups—to and from her home, as well as to medical appointments, legal consultations, ICE check-ins, and other destinations.  Harbury Decl. ¶¶ 7–13.  This conduct is prohibited by GA-37, and Harbury faces the credible risk of prosecution—specifically, impoundment of her vehicle—if she continues to engage in it.  She has therefore demonstrated an injury-in-fact.  *See,*

*e.g.*, *Tex. Top Cop Shop, Inc. v. Garland*, 758 F. Supp. 3d 607, 628–29 (E.D. Tex. 2024) (finding individual plaintiffs satisfied injury-in-fact requirement where intended course of conduct subjected them to civil liability).

Annunciation House provides evidence that its staff and volunteers routinely transport migrant groups—including individuals "initially detained by CBP"—using organization-owned vehicles. Garcia Decl. ¶¶ 13, 20–25. It further states that enforcement of GA-37 would deter volunteers and contractors from continuing that work, leaving the organization unable to transfer migrants out of its shelters. *Id.* ¶¶ 31–32. That, in turn, would force the organization to provide long-term care that it is not trained or equipped to deliver. *Id.* Similarly, Angry Tias members regularly drive migrants—typically in small groups—from shelters to bus stations, airports, or medical appointments. Sandefur Decl. ¶¶ 2, 7. If GA-37 were enforced, Angry Tias anticipates having to divert its limited resources toward sheltering those families who would no longer be able to travel—preventing it from carrying out its ordinary work. *Id.* ¶ 13.

Both organizations have thus established both associational and organizational standing. First, members of each—particularly those who transport groups of migrants—face a credible threat of prosecution under GA-37. And providing humanitarian transportation to migrants is plainly germane to each organization's mission. Courts have found associational standing in similar circumstances. *See, e.g.*, *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, 741 F. Supp. 3d 568, 589 (N.D. Tex. 2024) (finding associational standing where organization challenged regulation on behalf of members subject to liability for possessing forced reset triggers (FRTs), and advocacy for gun rights was central to its mission).

Second, both organizations demonstrate direct injury to their operations. They offer uncontested evidence that enforcement of GA-37 would force them to divert resources toward

sheltering migrants stranded by the law—so significantly, in fact, that Angry Tias would be unable to perform its ordinary work and Annunciation House may be forced to shut down entirely. That, at least, constitutes economic injury. *See United States v. Texas (Texas II)*, No. 24-50149, 2025 WL 1836640, at *4 (5th Cir. July 3, 2025) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" (quoting *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017))). Both entities would also have fewer resources available for core services—namely, helping migrants relocate after release by federal officials. These harms—economic loss and programmatic disruption—are paradigmatic examples of organizational injury-in-fact. *See id.* at *4–7; *see also Mi Familia Vota v. Abbott*, 497 F. Supp. 3d 195, 209 (W.D. Tex. 2020).

Finally, FIEL asserts associational standing on behalf of its thousands of members—many of whom were previously detained by CBP, subsequently released, and are now pursuing asylum. Espinosa Decl. ¶¶ 2, 7, 14. Its director testifies that members now fear traveling in groups—either as passengers or drivers—due to the threat of being stopped under GA-37. *Id.* ¶¶ 11–12. Defendants argue that GA-37 only targets "the operator of a vehicle transporting migrants," not "migrants themselves." Defs.' Mot. Summ. J. 13. But FIEL's members are not only the passenger-migrants; many drive groups of migrants themselves, including their own families. *See* Pls.' Compl. ¶¶ 18, 74; Order Granting in Part & Denying in Part Mot. Dismiss II 4. In those instances, they too face a direct threat of enforcement.

Defendants do not dispute these facts, nor do they generally contest that Plaintiffs intend to engage in conduct proscribed by GA-37 or that they face a credible threat of prosecution. *See* Defs.' Mot. Summ. J. 3–4. Instead, they argue that Plaintiffs fail to allege an injury-in-fact because their intended conduct is not "arguably affected with a constitutional interest." *Id.*

(citing *Driehaus*, 573 U.S. at 158–59). Defendants characterize the alleged constitutional interest as "the provision of ground transportation to illegal aliens," which it contends is not constitutionally protected. *Id.* at 4.

But that misframes the issue. Plaintiffs do not a claim constitutional right to transport "illegal aliens" per se. Rather, they assert a right to be free from enforcement of a state law that intrudes upon a domain reserved to the federal government. Pls.' Mot. Summ. J. 9. The constitutional interest at stake, in other words, is not the right to transport others—it is the structural protection of federalism embodied in the Supremacy Clause.

"[I]ndividual[s], in a proper case, can assert injury from governmental action taken in excess of the authority that federalism defines." *Bond v. United States*, 564 U.S. 211, 220 (2011). Federalism is not merely a structural safeguard—it exists to "secure[] to citizens the liberties that derive from the diffusion of sovereign power." *Id.* (quoting *New York v. United States*, 505 U.S. 144, 181 (1992)). A private plaintiff may therefore challenge state action that upsets the federal balance, so long as they suffer a concrete and particularized injury as a result. *Id.* at 224–26; *see also id.* at 222 ("An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States . . . .").

Federal courts have repeatedly affirmed this principle, both implicitly and explicitly. In *Texas II*, for instance, three plaintiffs challenged S.B. 4—a Texas statute that criminalized unauthorized entry or reentry into the state and established a state-level removal process—as preempted by federal law. 2025 WL 1836640, at *1. One plaintiff, Las Americas Immigrant Advocacy Center, asserted standing on the grounds that S.B. 4 would "directly affect its ability to provide legal services to immigrants," by forcing it to navigate new, burdensome, and costly legal terrain. *Id.* at *3, 5–8. The court did not hold that Las Americas had a constitutional right

to provide such services. Rather, it found standing because the organization alleged that S.B. 4 was "preempted by federal statutes and regulations" and that its enforcement would "perceptibly impair" the organization's ability to fulfill its mission. *Id.* at *8; *see also id.* at *17 ("Las Americas can sue in equity to enjoin an allegedly preempted state law. Even if a statute 'does not confer a private right, a plaintiff is not prevented from gaining equitable relief on preemption grounds.'" (citations omitted)). The relevant interest was in maintaining the federal structure—not in the underlying conduct, which merely gave rise to the particularized injury.

Similarly, in *Pharmaceutical Research & Manufacturers of America v. Concannon*, the First Circuit upheld standing for a trade group challenging a state drug pricing law on preemption grounds. 249 F.3d 66 (1st Cir. 2001), *aff'd sub nom. Pharm Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644 (2003). The court held that it was the "Supremacy Clause, not . . . the preempting statute," that supplied the constitutional interest. *Id.* at 73 (citing *St. Thomas–St. John Hotel & Tourism Ass'n v. Virgin Islands*, 218 F.3d 232, 241 (3d Cir. 2000)). And just recently, a district court applied the same reasoning, holding that a hospital operator had standing to challenge a state abortion law as preempted—even absent any freestanding, independent right to perform abortions—because the challenged conduct was "'arguably affected with a constitutional interest' by the Supremacy Clause." *St. Luke's Health Sys., Ltd. v. Labrador*, No. 25-cv-15, 2025 WL 888840, at *5 (D. Idaho Mar. 20, 2025) (citation omitted). In short, an individual can challenge a state law "as preempted by federal law even when the federal law secures no individual substantive rights for the party arguing preemption." *Pharm. Rsch.*, 249 F.3d 73 (quoting *Virgin Islands*, 218 F.3d at 241).

Here, Plaintiffs have shown that GA-37 targets conduct they intend to continue, and that enforcement would cause concrete harm, including the threat of prosecution. And because they

allege that harm results from a statute preempted by federal law and thus violative of the Supremacy Clause, the injury is constitutionally cognizable.  That is sufficient to establish injury-in-fact.

### b.    Traceability and Redressability

The final two elements of standing—traceability and redressability—are closely linked in this case, as they often are.  *See* 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.6 (3d ed. 2008 & Supp. 2025) ("The remedial-benefit dimension of standing analysis blends into causation . . . .").  The Court therefore considers them together. *See, e.g.*, *Ondrusek v. U.S. Army Corps of Eng'rs*, 123 F.4th 720, 734 (5th Cir. 2024) (jointly analyzing the two elements).

Traceability requires that the plaintiff's injury "likely was caused or will be caused by the defendant."  *Texas II*, 2025 WL 1836640, at *9 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 396 (2024)).  Redressability requires a showing that the requested relief would likely alleviate that injury.  *Uzuegbunam v. Preczewski*, 592 U.S. 279, 285 (2021).

Plaintiffs allege injuries—including the threat of enforcement, programmatic disruption, and diversion of organizational resources—that flow directly from Texas's enactment of GA-37 and DPS's threat of enforcement.  *See, e.g.*, *Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297, 302 (5th Cir. 2005) (finding injury traceable to city's adoption and enforcement of ordinance).  And enjoining enforcement of GA-37 would remove that threat, allowing Plaintiffs to resume their intended course of conduct.  *See Consumer Data Indus. Ass'n v. Texas*, No. 21-51308, 2023 WL 4744918, at *5 (5th Cir. July 25, 2023) ("'If a plaintiff is an object of a regulation, "there is ordinarily little question . . . that a judgment preventing . . . the action will redress it."'" (quoting *Contender Farms, LLP v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir.

2015))).  These principles apply to each Plaintiff:  All allege harms resulting from the threatened

enforcement of GA-37, and all seek relief that would eliminate that threat.

Defendants argue that Plaintiffs' injuries are "neither traceable to Governor Abbott nor

redressable by entering the requested relief against him," because "DPS, not the Governor, is

tasked with carrying out GA-37."  Defs.' Mot. Summ. J. 6–7.  But Governor Abbott was

dismissed from this case nearly a year before Defendants filed their Motion.  *See* Dec. 20, 2023,

Order.  The only remaining Defendant is Director Martin, sued in his official capacity as head of

DPS.  And as Defendants acknowledge, DPS, under Director Martin's leadership, is the agency

charged with enforcing GA-37.  *See also* GA-37 (authorizing "DPS" to stop vehicles based on

reasonable suspicion and to reroute and impound vehicles used in violation of the Order).

Accordingly, Plaintiffs' injuries are both fairly traceable to Director Martin and likely to be

redressed by injunctive relief against him.  *See, e.g.*, *Texas II*, 2025 WL 1836640, at *11.

Accordingly, the Court finds that each Plaintiff has established (1) an injury-in-fact, (2)

fairly traceable to Defendant's conduct, and (3) likely to be redressed by the relief requested.

The Court therefore proceeds to the merits.

## 2.      Permanent Injunction Against GA-37

Plaintiffs seek a permanent injunction barring the enforcement of GA-37, arguing that it

is preempted by federal law.  Pls.' Mot. Summ. J. 18–19.  "To obtain a permanent injunction, a

party must demonstrate that (1) it has achieved actual success on the merits; (2) it has sustained

irreparable injury or there is no adequate remedy at law; (3) considering the balance of hardships

between the plaintiff and defendant, a remedy in equity is warranted; and (4) the injunction will

not disserve the public interest."  *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 657 F. Supp.

2d 795, 820 (S.D. Tex. 2009) (citing *ITT Educ. Servs., Inc. v. Acre*, 533 F.3d 342, 347 (5th Cir. 2008)).

### a.    Success on the Merits

The parties primarily dispute whether Plaintiffs have satisfied the first element—i.e., whether GA-37 is, in fact, preempted by federal law. *See* Pls.' Mot. Summ. J. 10–16; Defs.' Mot. Summ. J. 8–15. This factor is not only the most hotly contested but also of paramount importance. *Cf. Mock v. Garland*, 75 F.4th 563, 587 n.60 (5th Cir. 2023) ("[L]ikelihood of success on the merits . . . is the most important of the preliminary injunction factors." (collecting cases)).

### i.    Preemption Doctrine

The preemption doctrine is rooted in principles of federalism and derives from the Supremacy Clause. *Britt v. Grocers Supply Co.*, 978 F.2d 1441, 1446 (5th Cir. 1992); *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 907 (2000) (Stevens, J. dissenting). "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012) (citations omitted). But "[f]rom the existence of two sovereigns follows the possibility that laws can be in conflict or at cross-purposes." *Id.* at 398–99. The Supremacy Clause resolves such conflicts by declaring that federal law "shall be the supreme Law of the land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." *Id.* at 399 (quoting U.S. Const. art. VI, cl. 2). Pursuant to that principle, Congress has the power to preempt—and thus nullify—state laws. *Id.* (citations omitted).

22

Two core principles guide a court's preemption analysis. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1023 (9th Cir. 2013) (citing *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)).  First, the "purpose of Congress is the ultimate touchstone in every pre-emption case." *Id.* (quoting *Wyeth*, 555 U.S. at 565).  Second, courts must begin with the presumption that "the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (quoting *Wyeth*, 555 U.S. at 565).  That presumption applies with particular force when Congress legislates in areas traditionally governed by the states. *Id.* (quoting *Wyeth*, 555 U.S. at 565).  But it does not apply "when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 109 (2000).

Preemption takes three forms. *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012) (citing *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008)).  First, express preemption occurs when a federal statute explicitly states Congress's intent to displace state laws. *Arizona*, 567 U.S. at 399 (citing *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 592 (2011)).  Second, field preemption applies where the federal regulatory scheme is so comprehensive that there is no room for supplemental state regulation. *Id.* (citations omitted).  And third, conflict preemption occurs when state law is incompatible with federal law. *Id.* (citation omitted).

Conflict preemption, in turn, arises in two situations: (1) when it is impossible to comply with both state and federal law; or (2) when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Texas I*, 97 F.4th at 288 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000)).  In the latter case, courts must examine "the federal statute as a whole and identify[] its purpose and

23

intended effects." *Crosby*, 530 U.S. at 373.  If a state law frustrates those federal objectives, it is "nullified" by the Supremacy Clause.  *Texas I*, 97 F.4th at 288 (quoting *Geier*, 529 U.S. at 873).

Neither side briefs express preemption, and it appears undisputed that no federal statute contains such a provision.  *See generally* Pls.' Mot. Summ. J; Defs.' Mot. Summ. J.  And Plaintiffs expressly disclaim any reliance on field preemption.  Pls.' Resp. 5 n.4.  Instead, they contend only that GA-37 is conflict-preempted.  *Id.; see also* Pls.' Mot. Summ. J. 10–16.  Defendants argue that it is not.  Defs.' Mot. Summ. J. 8–15.

### ii.     Conflict Preemption

Plaintiffs argue that GA-37 poses an obstacle to—and is therefore conflict preempted by—federal immigration law in three distinct ways.  First, they contend that GA-37 authorizes unilateral state immigration decisions "without any input from the Federal Government," in violation of clear Supreme Court and Fifth Circuit precedent.  Pls.' Mot. Summ. J. 11.  Second, they argue that GA-37 is preempted because it "directly contradicts CBP's release decisions." *Id.* at 13.  And third, they assert that GA-37 conflicts with specific provisions of the Immigration and Nationality Act (INA), especially 8 U.S.C. § 1324(a)(1)(A)(ii)–(iii), which regulate materially similar conduct.  *Id.* at 16.

"[C]onstitutional issues should be decided on the most narrow, limited basis."  *United States v. Roberts*, 274 F.3d 1007, 1012 (5th Cir. 2001) (citations omitted).  Stated differently, federal courts should resolve constitutional questions "only where a present necessity for such decision exists, and then only no more broadly than the precise situation in question requires." *Dallas Joint Stock Land Bank v. Davis*, 83 F.2d 322, 323 (5th Cir. 1936) (citations omitted); *see also Staub v. City of Baxley*, 355 U.S. 313, 330 (1958) (Frankfurter, J., dissenting) (describing

the practice of "keeping constitutional adjudication, when unavoidable, as narrow as

circumstances will permit").

Plaintiffs' third argument—that GA-37 conflicts with materially similar existing federal

statutes—provides the narrowest grounds for resolution because it focuses on a handful of

particular provisions in the United States Code and avoids questions about the broader structure

of federal immigration enforcement.  Plaintiffs argue that GA-37 is preempted due to its "stark

mismatch" with 8 U.S.C. § 1324, a federal statute that regulates the harboring and transportation

of noncitizens.  Pls.' Mot. Summ. J. 16.  Defendants, by contrast, contend that GA-37

"complements, rather than conflicts with, § 1324," and is therefore not preempted.  Defs.' Mot.

Summ. J. 14.

To determine whether GA-37 "stands as an obstacle to the accomplishment and execution

of the full purposes and objectives of Congress," *Crosby*, 530 U.S. at 373 (citation omitted), the

Court begins with the text of § 1324:

> Any person who—
>
> …
>
> (ii) knowing or in reckless disregard of the fact that an alien has come to, entered,
> or remains in the United States in violation of law, transports or moves or
> attempts to transport or move such alien within the United States by means of
> transportation or otherwise, in furtherance of such violation of law;
>
> (iii) knowing or in reckless disregard of the fact that an alien has come to, entered,
> or remains in the United States in violation of law, conceals, harbors, or shields
> from detection, or attempts to conceal, or harbor, or shield from detection, such
> alien in any place, including any building or any means of transportation.
>
> …
>
> Shall be punished as provided in subparagraph (B).

25

8 U.S.C. § 1324(a)(1)(A)(ii)–(iii).  Criminal penalties attach for violations of these provisions, including fines, imprisonment, and, in extreme cases, death.  *See id.* § 1324(a)(B).

In substance, both § 1324 and GA-37 regulate the domestic transportation of noncitizens. But that overlap alone does not compel a finding of preemption.  "The mere fact that state laws 'overlap' with federal criminal provisions does not, by itself, make a case for conflict preemption."  *Texas I*, 97 F.4th at 289 (citing *Kansas v. Garcia*, 589 U.S. 191, 140 (2020)).  *But see id.* ("'[C]onflict is imminent' when 'two separate remedies are brought to bear on the same activity.'" (quoting *Corsby*, 530 U.S. at 380)).  At the same time, however, a shared goal—here, limiting the unlawful transportation of aliens—does not foreclose the possibility of conflict preemption.  *Crosby*, 530 U.S. at 379 n.14 ("Identity of ends does not end our analysis of preemption." (citing *Wis. Dep't of Indus., Lab & Hum. Rels. v. Gould, Inc.*, 475 U.S. 282, 286 (1986)).  Even where policies align, a "[c]onflict in technique can be fully as disruptive to the system Congress erected as a conflict in overt policy."  *Arizona*, 567 U.S. at 406 (alteration in original) (quoting *Motor Coach Emps. v. Lockridge*, 403 U.S. 274, 287 (1971)).  The issue, then, is not simply whether the laws overlap—as Plaintiffs emphasize—or share a purpose—as Defendants argue—but whether they impose conflicting legal frameworks.

On the one hand, GA-37 is narrower than § 1324 in two respects—and where a state law is narrower than its federal counterpart, there is often no conflict.  *See, e.g.*, *Boland v. Holder*, 682 F.3d 531, 535 (6th Cir. 2012) (no conflict where "federal law cast[] a wider net" than state law).  First, § 1324 imposes criminal penalties, while GA-37 authorizes only civil or administrative measures—vehicle rerouting and impoundment.  Second, § 1324 prohibits the transportation of "*an* alien," while GA-37 limits its prohibition to transportation of "groups." Defendants stress these distinctions, arguing that because GA-37's "ambit is narrower," "[a]

driver who refrains from violating the offenses listed in § 1324(a) would never afoul of GA-37." Defs.' Mot. Summ. J. 14.

In several ways, however, GA-37 sweeps more broadly than § 1324. First, § 1324 applies only when a person acts *knowingly* or with *reckless disregard* of an individual's unlawful presence in the United States. *See* 8 U.S.C. § 1324(a)(1)(A)(ii)–(iii). GA-37, by contrast, contains no scienter requirement. *See generally* GA-37. It prohibits the transportation of migrant groups outright, regardless of the transporter's knowledge. The Fifth Circuit addressed a similar mismatch in *Villas at Parkside Partners v. City of Farmers Branch*, where it held that a local ordinance criminalizing the rental of housing to noncitizens was preempted by § 1324(a)(1)(A)(iii). 726 F.3d 524, 529–30 (5th Cir. 2013). The ordinance imposed penalties merely for renting to someone later found to be "not lawfully present," without requiring knowledge, recklessness, or any concealment from federal authorities. *Id.* at 530 (citation omitted). In part because it eliminated the *mens rea* requirement, the court found that the ordinance "interfere[d] with the careful balance struck by Congress." *Id.* at 531 (citation omitted). The same is true here. GA-37 imposes liability where federal law does not, thereby disrupting the comprehensive framework Congress enacted.

Defendants respond that GA-37's lack of scienter requirement might raise preemption concerns if "if GA-37 were a criminal statute instead of a public safety measure." Defs.' Mot. Summ. J. 14. But, Defendants argue, because "the order does not create criminal liability . . . it cannot conflict with federal law for criminalizing the same conduct across a broader set of *mens rea*." *Id.* That argument is unpersuasive. Defendants cite no authority for the proposition that a conflict with a federal law's *mens rea* requirement is permissible where the state imposes civil, rather than criminal, penalties. *See id.* Many civil statutes include scienter requirements, and

Defendants could have done so here—but did not.  The result is that GA-37 subjects people to punishment even when their conduct falls outside the scope of the closely related federal prohibition.  That is a paradigmatic example of conflict preemption, regardless of whether the penalty imposed is criminal or civil.  *See, e.g.*, *Villas*, 726 F.3d at 531; *Valle del Sol*, 732 F.3d at 1029 (holding statute preempted where it reached further than the federal harboring statute and criminalized conduct not subject to federal sanction); *Lozano v. City of Hazleton*, 724 F.3d 297, 320 (3d Cir. 2013) (holding ordinance preempted where it prohibited renting to undocumented immigrants based on criteria that would be "highly unlikely" to constitute harboring under federal law).

Second, § 1324 prohibits only transportation taken in "furtherance" of a migrant's "violation of law."  *See* 8 U.S.C. § 1324(a)(1)(A)(ii)–(iii); *see also United States v. Merkt*, 764 F.2d 266, 272 (5th Cir. 1985) ("Willful transportation of illegal aliens is not, per se, a violation of the statute, for the law proscribes such conduct only when it is in furtherance of the alien's unlawful presence.").  GA-37, however, prohibits the transportation of any migrant previously detained by CBP—regardless of the migrant's current legal status.  *See* GA-37.  That distinction is significant because it extends liability to transporting individuals who may not be violating federal law at all.

Although unauthorized entry and reentry into the United States are federal crimes, *see* 8 U.S.C. §§ 1325(a), 1326(a), "regardless of whether an alien violates these provisions, an immigration officer must still determine whether they may remain in the United States or whether they must be removed."  *Texas II,* 2025 WL 1836640, at *24.  During those proceedings, any noncitizen physically present in the United States, "irrespective of [their] status, may apply for asylum."  8 U.S.C. § 1158(a)(1); *see also Ayvali v. United States*, No. 1:23-

cv-896-RP, 2024 WL 1319751, at *3 (W.D. Tex. Mar. 27, 2024).  And while asylum claims are

pending, immigration officials have broad discretion to release the petitioners from custody.  8

U.S.C. § 1182(d)(5)(A); *Ajayi v. Caplinger*, 19 F.3d 15, 1994 WL 93417, at *2 (5th Cir. 1994)

(citing *United States ex rel. Barbour v. District Dir. of INS*, 491 F.2d 573, 577 (5th Cir. 1974)).

If released, such individuals are—at least temporarily—lawfully present under federal law.

*Texas I*, 97 F.4th at 291 ("Federal law provides that a noncitizen may be permitted to remain in

the United States lawfully even if he has been convicted of illegal entry," pending a decision on

asylum); *United States v. Balde*, 943 F.3d 73, 84 (2d Cir. 2019) (collecting cases for the

proposition that parole constitutes lawful status under long-standing understanding of federal

law; *Kizilyildirim v. Daum*, No. 23-cv-3287, 2024 WL 1722277, at *7 (S.D. Tex. Mar. 29,

2024) ("[A]sylum applicants can live and work in the United States while their applications are

pending." (citation omitted)), *adopted*, 2024 WL 1719924 (Apr. 2, 2024).

　　　Thus, merely transporting such individuals—who are engaged in lawful proceedings and

temporarily lawfully present—does not violate § 1324, because it does not further any unlawful

conduct.  Yet GA-37 prohibits that same transportation.  That, too, places GA-37 in direct

conflict with federal law.[4]

　　　Third, § 1324 includes a safe harbor for certain religious organizations and related

humanitarian conduct.  *See* 8 U.S.C. § 1324(a)(1)(C).  GA-37 does not.  *See* GA-37.  As a result,

individuals and groups engaged in conduct Congress expressly chose to protect from liability

could face penalties under Texas law.  By punishing conduct Congress intended to shield, GA-37

imposes a burden that the federal scheme deliberately avoids.  *See Valle del Sol*, 732 F.3d at

1028 (citing *Arizona*, 567 U.S. at 399); *United States v. South Carolina*, 840 F. Supp. 2d 898

---

[4] For example, Harbury states that she regularly drives groups of migrants to ICE check-ins while they
await a determination on their asylum applications.  Harbury Decl. ¶¶ 7–9.  In doing so, she is furthering
their compliance with federal law.  But if GA-37 were enforced, even this conduct would be penalized.

(D.S.C. 2011) ("Additionally, the inconsistent safe harbor provisions of state and federal law result in conflict preemption."), *modified in part*, 906 F. Supp. 2d 463 (D.S.C. 2012), *aff'd*, 720 F.3d 518 (4th Cir. 2013).

Finally, Congress explicitly defined the limited role of state and local authorities in enforcing § 1324—and thus in regulating the transportation of noncitizens. The statute permits them to arrest individuals for violations of § 1324, but nothing more. *See* 8 U.S.C. § 1324(c). That narrow delegation of enforcement authority reflects Congress's judgment that the broader regulation of transportation, harboring, and related conduct should remain with federal officials. *See Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1264 (11th Cir. 2012) ("The inference from [§ 1324(c)] is that the role of the states is limited to arrest for violations of federal law." (citing *De Canas v. Bica*, 424 U.S. 351, 363 (1976))).

In sum, GA-37 targets the same conduct as an existing federal statute, § 1324, but imposes a broader, inconsistent, and conflicting regulatory scheme. It creates liability where federal law does not, eliminates the safe harbors Congress deliberately enacted, and expands the role of state officials beyond the limits Congress authorized. That is not cooperation with federal law—it is conflict.

Defendants respond, however, that even if GA-37 burdens some lawfully present migrants or reaches some conduct permitted under federal law, the statute still has a "plainly legitimate sweep" that covers the "countless thousands of migrants" who reenter illegally after removal. Defs.' Mot. Summ. J. 11, 12 n.2. In essence, Defendants argue that because Plaintiffs bring a facial challenge, they must show that GA-37 is unconstitutional in all possible applications—conflict or not.

30

### iii.    Facial v. As-Applied Challenges

Constitutional challenges may be brought either facially or as-applied.  *Does #1-7 v. Abbott*, 345 F. Supp. 3d 763, 773 (N.D. Tex. 2018) (citation omitted), *aff'd sub nom. Does 1-7 v. Abbott*, 945 F.3d 307 (5th Cir. 2019).  A facial challenge asserts that a law is unconstitutional in all its applications and must therefore be struck down entirely.  *See id.*  An as-applied challenge, by contrast, targets the law's enforcement only against the particular plaintiffs before the court. *Id.*; *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 691–92 (6th Cir. 2015).  Consequently, courts often state that in facial challenges—but not as-applied ones—the plaintiff must show that there exists "no set of circumstances under which the [law] would be valid," or that the law "lacks a plainly legitimate sweep."  *Texas II*, 2025 WL 1836640, at *18 (alternation in original) (internal quotation marks omitted) (quoting *Ams. for Prosperity Found v. Bonta*, 594 U.S. 595, 615 (2021)).

Plaintiffs allege that GA-37 is "facially unconstitutional" and must be enjoined in full. Pls.' Compl. ¶ 12.  Defendants treat that characterization as dispositive.  They argue that because Plaintiffs have brought a facial challenge, they must—and cannot—show that there exists "no set of circumstances" under which GA-37 would be valid.  Defs.' Mot. Summ. J. 11.  But that argument suffers from several flaws.

First, Defendants rely on a literal reading of the "no set of circumstances" language from *United States v. Salerno*, 481 U.S. 739, 745 (1987), asserting that GA-37 can survive a facial challenge so long as it is valid in any hypothetical application.  Defs.' Mot. Summ. J. 11.  But "it is not clear-cut" that this is the governing standard.  *Texas II*, 2025 WL 1836640, at *19 (collecting cases).  As courts—including the Fifth Circuit just this year—have recognized, the Supreme Court has repeatedly sustained facial preemption challenges even where the state law

31

would be valid in some applications. *Id.* (citing *Arizona*, 567 U.S. at 408–10); *see also Doe v. City of Albuquerque*, 667 F.3d 1111, 1124 (10th Cir. 2012) ("The idea that the Supreme Court applies the 'no set of circumstances' test to every facial challenge is simply a fiction, readily dispelled by a plethora of Supreme Court authority."); *Sonnier v. Crain*, 613 F.3d 436, 463–64 (5th Cir. 2010) (Dennis, J. concurring in part and dissenting in part) (calling the *Salerno* formulation "nothing more than a controversial dictum" and noting that "diligent research" has failed to uncover a single case—including *Salerno* itself—that actually relied on it to resolve a facial challenge), *reiterated on reh'g*, 634 F.3d 778, 779 (2011) (Dennis, J. concurring in part and dissenting in part).

Courts have further cautioned that applying *Salerno's* test mechanically would render facial challenges virtually impossible, since "[i]t is always possible to imagine" a hypothetical in which a law might be valid. *League of Women Voters of Ind., Inc. v. Sullivan*, 5 F.4th 714, 728 (7th Cir. 2021). That approach would effectively bar facial conflict preemption claims "whenever a defendant can conjure up just one hypothetical factual scenario in which implementation of the state law would not directly interfere with federal law." *Club Madonna, Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022) (quoting *Lozano*, 724 F.3d at 313 n.22). As explained above, state laws are often preempted precisely because they expand federal statutes beyond their bounds. But under Defendants' reading of *Salerno*, a state could mimic a federal law, broaden it in all directions, and still avoid preemption so long as one application happens to track a permissible enforcement of the federal counterpart. That "can't be right." *Id.* (citing *Lozano*, 724 F.3d at 313 n.22). Nor is it how courts apply preemption. For example, in *Villas*, the Fifth Circuit upheld a facial challenge to the city ordinance penalizing

landlords for renting to aliens even though the ordinance could theoretically also have been enforced against landlords who knowingly or recklessly harbored them.  *See* 726 F.3d at 529–33.

A literal interpretation of *Salerno*'s "no set of circumstances" language is especially misplaced in the context of obstacle preemption.  Recall that conflict preemption comes in two forms: (1) where it is impossible to comply with both federal and state law, and (2) where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Texas I*, 97 F.4th at 288 (quoting *Crosby*, 530 U.S. at 372–73).  The first prong—impossibility—by its nature assumes that no set of circumstances allows compliance with both laws.  In that setting, *Salerno's* standard and the preemption inquiry overlap entirely.

Obstacle preemption, however, is different.  It targets state laws that conflict with federal objectives—not just those that make compliance impossible.  If *Salerno*'s "no set of circumstances" rule applied literally in this context, it would effectively nullify facial challenges on obstacle preemption grounds altogether.  Indeed, under that view, either (1) the state law is invalid in all applications—making it an impossibility case—or (2) it is valid in some applications, making the fact that it may also obstruct federal purposes legally irrelevant to a facial constitutionality analysis.  This "can't be right," either.  *Club Madonna*, 42 F.4th at 1256.

Courts addressing obstacle preemption have thus clarified that "*Salerno* is correctly understood not as a separate test applicable to facial challenges, but a description of the outcome of a facial challenge in which a statute fails to satisfy the appropriate constitutional framework." *Id.* (quoting *City of Albuquerque*, 667 F.3d at 1123).  In other words, if a statute obstructs federal law, it fails the constitutional test for obstacle preemption, at which point it cannot be validly

applied to anyone. In that sense, there is "no set of circumstances" in which the law is valid.[5]
*See City of Albuquerque*, 667 F.3d at 1127 (collecting cases).

Thus, the relevant inquiry remains the same: whether GA-37 stands as an obstacle to the
accomplishment and execution of Congress's purposes and objectives. And, for all the reasons
explained above, it does. GA-37 is therefore unconstitutional under the Supremacy Clause, and
Plaintiffs have accordingly "achieved actual success on the merits." *Symetra*, 657 F. Supp. 2d at
820.

> ### b.    Irreparable Injury

But success on the merits does not, by itself, entitle a party to injunctive relief. An
injunction remains a matter of equitable discretion—not a mechanical consequence of a legal
violation. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008) (citing *Weinberger v.
Romero-Barcelo*, 465 U.S. 305, 313 (1982)). Plaintiffs must still establish that the remaining
elements necessary for a permanent injunction—irreparable injury, a balance of hardships
favoring relief, and consistency with the public interest—are also satisfied.

Plaintiffs argue that, if enforced, GA-37 would cause irreparable harm by halting the
transportation services provided by Annunciation House, Angry Tias, and Harbury, and by
disrupting the daily lives of migrants living in or traveling through Texas, including members of
FIEL Houston and Angry Tias. Pls.' Resp. 13. Defendants respond with a redux of their
standing argument: Because Plaintiffs have no constitutional right to transport migrants, they
cannot suffer irreparable harm. Defs.' Mot. Summ. J. 19.

---

[5] It is thus unclear, post-*Casa*, to what extent the facial/as-applied distinction continues to matter. For
plaintiffs, the principal advantage of a facial challenge is the potential for universal relief. *See
Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S.
310, 331 (2010)). But *Casa* forecloses that remedy. Nonetheless, Plaintiffs styled their claim as a facial
challenge. And the Fifth Circuit in *Texas II* conducted a facial analysis post-*Casa*. *See* 2025 WL
1836640, at *18–21. This Court has therefore done the same.

The deprivation of a constitutional right "unquestionably constitutes irreparable injury." *Burgess v. Fed. Deposit Ins. Corp.*, 639 F. Supp. 3d 732, 749 (N.D. Tex. 2022) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976). And individuals have a constitutional right to be free from enforcement of state laws that are preempted by federal law. *See Legal Env't Assistance Found., Inc. v. Pegues*, 904 F.2d 640, 643 (11th Cir. 1990) (citing *Shaw v. Delta Air Lines*, 463 U.S. 85 (1983)); *cf. Bond*, 564 U.S. at 220. Irreparable harm thus necessarily results from enforcement of a preempted state law. *See United States v. Texas (Texas III)*, 719 F. Supp. 3d 640, 695 (W.D. Tex. 2024) (collecting cases); *see also United States v. Texas (Texas IV)*, 557 F. Supp. 3d 810, 821 (W.D. Tex. 2021) ("Because the United States has established a likelihood that the Order violates the Supremacy Clause, irreparable harm is presumed.").

Even setting that principle aside, each Plaintiff has demonstrated—directly or through its members—an intent to engage in conduct proscribed by GA-37 and that they face a credible threat of prosecution if they do so. And the threat of prosecution alone constitutes irreparable injury, regardless of whether enforcement has yet occurred. *See VanDerStok v. Garland*, 633 F. Supp. 3d 847, 857 (N.D. Tex. 2022) ("[A] plaintiff's purported choice to comply—or else—with a challenged government dictate . . . is adequate to establish irreparable harm."); *see also Valle del Sol*, 732 F.3d at 1029 (finding irreparable harm where plaintiffs demonstrated a credible threat of prosecution under a preempted statute); *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, No. 23-cv-830, 2023 WL 11950658, at *7 (N.D. Tex. Nov. 16, 2023) (same).

Plaintiffs have also shown that enforcement of GA-37 would cause irreparable organizational harm. Annunciation House and Angry Tias submitted evidence that complying with the statute would severely disrupt their operations. At worst, they may be forced to shut down. *See* Garcia Decl. ¶ 32. At best, they would need to divert resources away from their core

services—such as helping migrants relocate after federal release—to comply with the law. *Id.* ¶ 31; Sandefur Decl. ¶ 13. This kind of ongoing, unrecoverable cost constitutes irreparable harm. *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) ("[T]he nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." (citing *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022))).

Finally, that GA-37 has not yet been enforced is immaterial. Defendants have given no indication that they will refrain from enforcing it if permitted to do so. *See generally* Defs.' Mot. Summ. J. And injunctive relief "need not await the occurrence of a completed legal injury." *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). Its "very purpose" is "to prevent the occurrence of certain kinds of injuries in the first instance." *Id.* Plaintiffs have therefore demonstrated irreparable injury.

### c.    Balance of Equities

Plaintiffs argue that the balance of equities weighs in their favor, emphasizing that Defendants "present no evidence that [they] will be harmed by a permanent injunction." Pls.' Mot. Summ. J. 18. Defendants respond that "[p]ublic health and safety are paramount public interests." Defs.' Mot. Summ. J. 20.

Courts have consistently held that the balance of equities favors enjoining unconstitutional laws—including those that violate the Supremacy Clause—even if doing so imposes some burden on the government. *See Lee v. Lawrence*, No. 23-cv-1229, 2024 WL 3385644, at *12 (M.D. La. July 12, 2024) (citing *Jackson Women's Health Org. v. Currier,* 760 F.3d 448, 458 n.9 (5th Cir. 2014)); *Texas v. Garland*, 719 F. Supp. 3d 521, 594–95 (N.D. Tex. 2024). Some courts have been more forceful, holding that "[t]here is no hardship in requiring that public officials adhere to the Constitution." *Lawson v. Kelly*, 58 F. Supp. 3d 923, 935 (W.D.

Mo. 2014); *see Newsom ex rel. Newsom v. Albermarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th

Cir. 2003) (defendant "in no way" suffers harm from being barred from enforcing an

unconstitutional regulation).

Nor does Defendants' appeal to "public health" shift the balance. *See* Defs.' Mot. Summ.

J. 19. While public health and safety are undoubtedly legitimate government interests, *see Hous.*

*Chronicle Pub. Co. v. City of League City*, 488 F.3d 613, 622 (5th Cir. 2007), the proffered

public health justification here rests on concerns that migrants might spread COVID-19. The

pandemic has largely ended—and with it, that rationale. Certainly, COVID-19 still circulates

and sickens people, sometimes severely. Nonetheless, it is common knowledge that most people

have returned to living their lives as they did before the pandemic. By the time of this Order,

people across Texas routinely travel and gather together in large groups—on buses, in airports, at

restaurants, concerts, and sporting events. In that context, it is unclear how barring migrants

from traveling in groups meaningfully advances public health. *Id.* at 8–9, 12–13. In any event,

"even in a pandemic, the Constitution cannot be put away and forgotten." *Roman Cath. Diocese*

*of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020).

Therefore, and in light of the irreparable harm they established, the balance of equities

weighs in Plaintiffs' favor.

### d.    Public Interest

Finally, Plaintiffs argue that Defendants cannot claim a legitimate public interest in

enforcing an unconstitutional law. Pls.' Mot. Summ. J. 19 (citations omitted). Defendants

respond, again, that public health and safety are paramount public interests, and that "[s]tripping

officials of their ability to carry out the public interest would be extraordinary and harmful."

Defs.' Mot. Summ. J. 20.

"Injunctions preventing the violation of constitutional rights are 'always in the public interest.'" *Mi Familia Vota*, 497 F. Supp. 3d at 220  (quoting *Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996)); *see also Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024) ("[N]either [the State] nor the public has any interest in enforcing a regulation that violates federal law." (second alteration in original)); *Lawson*, 58 F. Supp. 3d at 935 ("[T]he public interest is always served when the Constitution is obeyed.").  This principle applies to preempted laws, because "[f]rustration of federal statutes and prerogatives are not in the public interest."  *Alabama*, 691 F.3d at 1301.

In sum, Plaintiffs have demonstrated actual success on the merits; that GA-37 would cause them irreparable harm; that the balance of equities weigh in their favor; and that the public interest supports an injunction.  The Court therefore finds that GA-37 should be permanently enjoined.  But the proper scope of that injunction must still be determined given the Supreme Court's decision in *Casa*.

### 3.    Breadth of Remedy

As explained, Plaintiffs bring a facial challenge to GA-37.  And even if the label "facial"
or "as-applied" does not materially alter "the substantive rule of law necessary to establish a
constitutional violation," *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (citing *Citizens United
v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010)), it does inform the "breadth of the remedy
employed by the Court," *Citizens United*, 558 U.S. at 331 (citing *United States v. Treasury
Emps.*, 513 U.S. 454, 477–78 (1995)).  Before *Casa*, a successful facial challenge typically
rendered the law "invalid in toto"—"incapable of any valid application"—and thus subject to a
universal injunction.  *Tex. Top Cop*, 758 F. Supp. 3d at 636 (quoting *Vill. of Hoffman Ests. v.
Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982)).

But *Casa* altered that framework.  As discussed, the Supreme Court held that under the
Judiciary Act of 1789, federal courts lack equitable authority to issue universal injunctions.
*Casa*, 145 S. Ct. at 2550.  A federal court may grant injunctive relief only to the parties "actually
or constructively before it," *id.* at 2552 (quoting *Gregory*, 133 U.S. at 586), and only "to the
extent necessary and appropriate to afford them complete relief," *id.* at 2562.

Neither the Supreme Court in *Casa* nor the Fifth Circuit in *Texas II* addressed the
contours of injunctive relief available after a successful facial challenge under this narrowed
remedial scope.  *See id.* at 2559; *Texas II*, 2025 WL 1836640, at *38.  Both courts expressly left
that determination to the district courts in the first instance.  *Casa*, 145 S. Ct. at 2559; *Texas II*,
2025 WL 1836640, at *38.

In light of *Casa*, it appears the Court's current preliminary injunction—which enjoins
"Defendants, their agents, officers, and employees, and all other persons and entities in active
concert or participation with them" from taking "any action to enforce [GA-37]," Order Granting

Prelim. Inj. 18—may sweep more broadly than the Judiciary Act permits. In *Casa*, the Supreme Court partially stayed a similarly broad injunction "to the extent [it was] broader than necessary to provide complete relief to each plaintiff with standing to sue," and remanded for the district court to tailor permanent relief consistent with that limitation. 145 S. Ct. at 2562–63.

Because Plaintiffs here brought a facial challenge and completed their summary judgment briefing pre-*Casa*, the parties did not brief what a proper, plaintiff-specific remedy would look like under *Casa*. The Court declines to fashion such a remedy without the benefit of adversarial briefing. Accordingly, although the Court concludes that GA-37 violates the Supremacy Clause, Plaintiffs' Motion is denied in part as to the request to enjoin GA-37 in its entirety. Such an injunction is improper unless Plaintiffs show that it is the least restrictive means to accord them complete relief. *See id.* The Court neither lifts the preliminary injunction nor issues a permanent injunction, but instead provides the parties an opportunity to address the proper scope of relief.

*Casa's* generalized edict to tailor a permanent injunction so that it extends no further than necessary to provide complete relief to each Plaintiff leaves many questions unanswered. In their briefing, the parties should address the scope of the Court's power to fashion a remedy for the benefit of the organizational Plaintiffs. Should an injunction's protections extend only to the organizations, their employees and members, or also to volunteers, contractors, or other affiliated individuals? To all potential beneficiaries of their charitable missions? How should state officials identify such individuals in practice to ensure GA-37 is not enforced against them? Should the injunction also cover individuals who become affiliated with the organizations after the injunction issues, and, if so, would that require any form of notice or certification? Does this

case present circumstances in which the infeasibility of any piecemeal approach renders a universal injunction the least restrictive means of according complete relief to Plaintiffs?

The parties should address these and other issues they consider pertinent, with citations to relevant authority, and must include proposed language for the injunction.

## III.    CONCLUSION

For the foregoing reasons, Defendants' Corrected Cross-Motion for Summary Judgment, ECF No. 129, is **GRANTED** in part and **DENIED** in part.  Plaintiffs' Motion for Summary Judgment, ECF No. 120, is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that **JUDGMENT** is **ENTERED** in favor of Plaintiffs Annunciation House, Angry Tias & Abuelas of the Rio Grande Valley, Jennifer Harbury, and FIEL Houston and against Defendant Freeman F. Martin, in his official capacity, on Plaintiffs' claim that GA-37 is preempted by federal law.  Plaintiffs are entitled to injunctive relief, the scope of which is to be determined after additional briefing and consideration.

**IT IS FURTHER ORDERED** that Plaintiffs' Fourth Amendment claims are **DISMISSED**.

**IT IS FURTHER ORDERED** that the parties shall submit supplemental briefing addressing how the Court should tailor the permanent injunction to ensure it is no broader than necessary to provide complete relief to each Plaintiff.  Plaintiffs shall file an opening brief— addressing the issue and proposing draft language for the injunction—by **no later than August 14, 2025**.  Defendants shall respond **no later than August 28, 2025**, and Plaintiffs may reply by **no later than September 4, 2025**.

**IT IS FURTHER ORDERED** that until permanent relief is entered, the Court's preliminary injunction—enjoining "Defendants, their agents, officers, and employees, and all

other persons and entities in active concert or participation with them . . . from taking any action

to enforce [Executive Order GA-37]", *see* Order Granting Prelim. Inj.—**shall remain in effect**.

     **SO ORDERED.**

     **SIGNED** this 31st day of July, 2025.

KATHLEEN  CARDONE
UNITED STATES DISTRICT JUDGE