**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF TEXAS and GREG ABBOTT, in his official capacity as Governor of the State of Texas,<br><br>Defendants | Case No. 3:21-CV-00173-KC<br>(Consolidated) |
| ANNUNCIATION HOUSE; ANGRY TIAS & ABUELAS OF THE RIO GRANDE VALLEY; JENNIFER HARBURY; and FIEL HOUSTON,<br><br>Consolidated Plaintiffs,<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of the State of Texas; STEVEN MCCRAW, in his official capacity as Director of the State of Texas Department of Public Safety,<br><br>Consolidated Defendant. | Case No. 3:21-CV-00178-KC |

**PLAINTIFFS' OPENING BRIEF ON THE SCOPE OF THE INJUNCTION**

**INTRODUCTION**

This Court has ordered supplemental briefing regarding the proper scope of the permanent injunction in this case following the Supreme Court's decision in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025). *See* ECF No. 150 ("Order") at 40-41. Specifically, this Court directed the parties to "address the scope of the Court's power to fashion a remedy for the benefit of the organizational Plaintiffs" and to answer the following questions: "Should an injunction's protections extend only to the organizations, their employees and members, or also to volunteers, contractors, or other affiliated individuals? To all potential beneficiaries of their charitable missions? How should state officials identify such individuals in practice to ensure GA-37 is not enforced against them? Should the injunction also cover individuals who become affiliated with the organizations after the injunction issues, and, if so, would that require any form of notice or certification? Does this case present circumstances in which the infeasibility of any piecemeal approach renders a universal injunction the least restrictive means of according complete relief to Plaintiffs?" *Id.*

The Court should issue a statewide permanent injunction, because that is the only feasible way to provide complete relief to Plaintiffs. This case involves the unique context of a policy enforced entirely through traffic stops, with state DPS officers pulling over drivers before they can have any knowledge of whether the driver is associated with one of the Plaintiffs in this case. By the time an officer determines whether the injunction applies to the driver, the harm of an unconstitutional stop will have already occurred. A narrowed injunction thus would not provide complete relief, because it would not prevent preempted stops of Plaintiffs' employees, members, volunteers, and other affiliates.

1

A narrowed injunction would also impose vast new burdens on Plaintiffs, because it would require them to create whole new systems to verify employment, membership, and other affiliation—and to do so rapidly, in the context of fast-moving traffic stops and threatened impoundments—to prove that individuals are protected by the injunction.  This would divert untold resources from Plaintiffs' other activities.  And it would invite countless disputes over affiliation, proof, and privacy, many of which may prompt further rounds of litigation.

In the alternative, if the injunction were narrowed, it would still need to cover the full range of individuals through whom Plaintiffs carry out their missions: employees, members, volunteers, contractors, affiliated drivers, and mission beneficiaries.  These affiliates' transport activities are critical to Plaintiffs' work.  If the injunction did not protect them, GA-37's enforcement would severely undermine and potentially shutter Plaintiffs' operations.  And because Plaintiffs' memberships and affiliations are fluid, the injunction must also protect individuals who become affiliated after issuance.  Excluding future employees, members, and others would plainly deny Plaintiffs "complete" relief, and it may force them to relitigate the same issues that this Court has already resolved.

The Court should issue a statewide permanent injunction to afford complete relief to Plaintiffs.

## ARGUMENT

### I.    The Court Should Enjoin GA-37 Statewide.

### A.  Statewide Relief is Necessary to Provide Complete Relief to Plaintiffs.

*CASA* reaffirmed the longstanding equitable principle "that courts generally 'may administer complete relief between the parties.'"  145 S. Ct. at 2557 (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (same).  While *CASA* cautioned against nationwide injunctions in *some* circumstances, it

expressly recognized that injunctive relief may extend to nonparties when necessary to provide complete relief to the plaintiffs. In that situation, any benefit to nonparties is "incidental[]" to protecting the plaintiffs. *CASA*, 145 S. Ct. at 2557. Underscoring this point, the Supreme Court in *CASA* did *not* hold that the universal injunctions at issue in that case were unjustified; instead, recognizing that plaintiffs might well have arguments that universal relief would be justified by the complete relief principle, the Supreme Court remanded that question to the lower courts to be assessed in the first instance. *Id.* at 2562-63.

The facts here present an even more compelling case for statewide relief than those in *CASA*. In *CASA*, many enforcement decisions would play out slowly, with government officials having plenty of time to determine whether an individual was protected by the injunction. For instance, if parents applied for a child's passport, the officials processing the application over a period of weeks or months would have time to check whether the family was a member of a plaintiff organization or a resident of a state that was protected by the injunction. A narrowed injunction in that situation might, theoretically, allow officials to sort out the injunction's application before the asserted harm occurred. *See id.* at 2557 (raising the possibility that a narrowed injunction could still ensure that a protected plaintiff's "child will not be denied citizenship").

This case involves the distinct context of real-time, fast-moving law enforcement interactions. GA-37 is not enforced by government employees considering applications over weeks or months in government offices. It is enforced by state DPS officers making traffic stops. *See* GA-37 § 2 (directing DPS to "stop any vehicle" to initiate enforcement); *id.* §§ 2, 3 (enforcement actions of rerouting or impoundment occur after traffic stop is commenced); Order at 3 (acknowledging that GA-37 "directs the Texas Department of Public Safety ('DPS') to stop

3

vehicles based on reasonable suspicion of a violation, reroute them to their point of origin or a port of entry and, if necessary, impound them."). In this context, there is no way to protect only a limited set of people from the harm of unconstitutional traffic stops. State DPS officers have no way of knowing whether a driver is a member, employee, or other affiliate of one of the Plaintiffs *before* pulling the car over and investigating those questions. It is already unlikely that state DPS officers could know the immigration status of the passengers, which is necessary to enforce the GA-37. *See* ECF No. 52 at 7-9 (enjoining GA-37 based on these unilateral status determinations). But it is impossible for state DPS officers to be sure that the driver of a passing car is not associated with one of the Plaintiffs in this case. This problem is greatly magnified by the fact that Plaintiffs' members, employees, volunteers, and other affiliates number in the thousands and operate all over the State of Texas. *See* Espinosa Decl. ¶¶ 1-2, ECF No. 58-5 (FIEL Houston has 11,000 members); Garcia Decl. ¶¶ 4, 14-16, 20, ECF No. 58-2 (25 volunteers, contractor, and private companies working with Annunciation House); Sandefur Decl. ¶¶ 7-11, ECF No. 58-3 (detailing members, volunteers, and contractor support for Angry Tias operations); *see also* Order at 7-10, 16-17 (same).[1] And such membership and affiliations will naturally evolve over time. A narrowed injunction would guarantee that state DPS officers would perform unconstitutional stops of these people, even though the injunction protects them, and that would plainly deny "complete relief" to the Plaintiffs. These unavoidable stops would, in turn, inflict the very harms that this Court identified in issuing the permanent injunction. *See* Order at 35-36.

---

[1] As this Court correctly recognized, "Defendants do not dispute the substance of these declarations and offer no evidence to the contrary." Order at 7.

The Ninth Circuit's decisions in similar cases underscore this point. *See Vasquez Perdomo v. Noem*, --- F.4th ----, 2025 WL 2181709, at *21-22 (9th Cir. Aug 1, 2025); *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996). In *Vasquez Perdomo*, the court recognized that a plaintiff-only injunction would be unworkable given the challenged conduct—detentions from roving patrols based on broad group profiling. *Vasquez Perdomo*, 2025 WL 2181709, at *21; *see also Easyriders*, 92 F.3d at 1502 (similar). As the court explained, "enjoining Defendants from stopping *only the Plaintiffs* would not afford the Plaintiffs meaningful relief" because officers cannot know whether a person is covered before the stop. *Vasquez Perdomo*, 2025 WL 2181709, at *21*; see also Easyriders*, 92 F.3d at 1502 (concluding that "plaintiffs would not receive [] complete relief" without a statewide injunction because CHP officers were unlikely to verify plaintiff status before impermissibly issuing a citation). Indeed, the court asked: "How would [an agent] who is about to detain a person whose identity is not known, based on some combination of [factors], discern in advance whether that person is on the list of individuals that agents are enjoined from stopping? The agents cannot stop first and then check whether the stopped person is one of the covered individuals; at the point of the stop, the challenged harm has already occurred." *Vasquez Perdomo*, 2025 WL 2181709, at *21. And "[r]equiring organizations to share membership lists with Defendants could raise additional constitutional problems regarding the freedom of association and privacy." *Id.* at *22.

Like in *Vasquez Perdomo* and *Easyriders*, a narrowed injunction in this case would raise innumerable questions. How could DPS officers know which individuals are associated with Plaintiffs before pulling them over? Even after stopping them, how would state DPS officers be trained to evaluate drivers' affiliations in roadside stop situations? How would state DPS

officers resolve disputed or unclear questions?  If a driver could not prove their affiliation on the spot for any reason, how could they avoid being impounded or rerouted despite being protected by the injunction?  Who would handle disputes about the burdens of production and proof and disputes about individual questions of membership and other affiliation?  Would people facing erroneous enforcement have to bring emergency actions in this Court to enforce the injunction before their cars are rerouted and impounded?  In this unique context, there is no way for a narrowed injunction to prevent erroneous stops and penalties.  And any attempt to do so would impose enormous new burdens on the Plaintiffs, as explained below.

**B.  Limiting Relief to Members Would Impose New and Severe Burdens on Plaintiffs.**

As explained, a statewide permanent injunction is the least restrictive means to provide complete relief to Plaintiffs, because a narrower injunction could not guarantee that state DPS officers would not unconstitutionally stop people who should be protected by the injunction. That alone is sufficient to permanently enjoin GA-37 statewide.

Even if an injunction could somehow eliminate the obvious risk of erroneous enforcement—already hard to imagine—GA-37 would still harm Plaintiffs in at least two significant ways: It would chill their ordinary, lawful transport activities.  And it would require a massive new effort to verify membership, employment, and other affiliation for individuals facing impoundment and rerouting in the context of real-time traffic stops.  These burdens add to the harms of a narrowed injunction and underscore that a statewide injunction is necessary to provide the Plaintiffs with complete relief.

First, a narrowed injunction would impose a serious chilling effect on activities that the Court concluded are shielded by federal law.  Under a Plaintiffs-only injunction, a mistake about passengers' immigration status, or a driver's membership or employment, could subject a car to

rerouting, impoundment, and fines. *See* Order at 26. Individuals considering providing or accepting transportation would likely refuse altogether if they had any uncertainty about these questions—to avoid losing their car or being forced to cross the state to drive to the border. Conversations with coworkers, neighbors, and relatives would become high-stakes inquiries. And the burden to avoid enforcement would fall squarely on those that the Court has already found entitled to protection. That burden would chill the exercise of people's federal right to live in the United States and avoid the enforcement of unconstitutional state laws. *See* Order at 8 ("Annunciation House's director testifies that many volunteers will stop providing rides if GA-37 is enforced."); *id.* at 9 ("[T]he Order would jeopardize the organization's contract with Imperial Taxi, deter volunteers from transporting migrants, and prevent families from traveling together."); *id.* at 10 ("GA-37 has created an environment in which members risk being profiled or stopped by DP[S] officers simply for driving in groups—effectively deterring some from leaving their homes."). That chilling effect independently justifies statewide relief.

Second, a narrowed injunction would require Plaintiffs to create entirely new systems to quickly verify membership, employment, and other affiliations, often in the fast-moving context of traffic stops. As mentioned, Plaintiffs include large organizations composed of thousands of members, volunteers, contractors, or other affiliated individuals across the State. *See* Order at 7-9, 16-17. If the injunction's protections depended on these affiliations, the need to verify them in real time would potentially overwhelm the organizations. Verification would be needed both by state DPS officers unsure of whether they can take enforcement action and by members and other affiliates seeking to avoid enforcement. And verification would often need to be completed in a matter of minutes to avoid severe consequences for drivers. These new demands could divert substantial resources away from the organizations' ordinary core activities, thereby

7

denying the organization complete relief.  *See* Order at 15 ("[T]he record reflects that each Plaintiff either intends to engage in conduct proscribed by GA-37, has members who do, or will be forced to divert resources as a result of the Order's enforcement.").

In short, anything less than statewide relief would be incomplete, burdensome, and constitutionally deficient.

## II.     If the Injunction is Limited to Plaintiffs, It Should Protect All Who Work With Them and Help Carry Out Their Operations.

### A. The Injunction Must Extend to Volunteers, Contractors, Affiliated Individuals, and Mission Beneficiaries.

Complete relief for the organizational Plaintiffs requires protection not only for their members and employees, but also for the full range of individuals through whom they carry out their core work.  FIEL Houston is comprised of thousands of members, and protecting the organization necessarily requires that the injunction protect all its members.  Espinosa Decl. ¶¶ 1-2, 11-12 (describing harms to employees and members); *see also* Order at 9-10, 17 ("[M]embers now fear traveling in groups—either as passengers or drivers—due to the threat of being stopped under GA-37.").  Plaintiffs Annunciation House and Angry Tias rely on a network of members, volunteers, contractors, and affiliated drivers that directly contribute to their core business activities of transporting noncitizens.  *See* Garcia Decl. ¶¶ 4, 14-16, 20, 31-32 (describing harms to volunteers and contractors); Sandefur Decl. ¶¶ 7-11, 13 (describing harms to members, volunteers, and contractors); *see also* Order at 7-9, 16 (same).  As this Court has recognized, GA-37 will cause "direct injur[ies] to their operations,"  and thus force Annunciation House and Angry Tias to "divert resources toward sheltering migrants stranded by the law—so significantly, in fact, that Angry Tias would be unable to perform its ordinary work and Annunciation House may be forced to shut down entirely." *Id.* at 16-17.  Organizational Plaintiffs would have to restructure their missions around the injunction's gaps—vetting or

8

limiting volunteer participation, curtailing use of contracted drivers, or reducing outreach to certain communities. "These harms—economic loss and programmatic disruption—are paradigmatic examples of organizational injury-in-fact." *Id.* Relief that leaves those harms in place is not complete relief.

As explained above, limiting protection to employees and formal members would produce an unworkable enforcement environment. State DPS officers cannot reliably determine whether a driver is an "employee" as opposed to a contractor, volunteer, or affiliated driver—nor can they know whether a passenger is a beneficiary of a Plaintiff's services. In practice, GA-37's broad enforcement triggers would subject all such individuals to the same unconstitutional risks. Without explicit protection for these roles, Plaintiffs would face the constant loss of essential personnel and the chilling of participation by those unwilling to risk stops, rerouting, or vehicle impoundment.

### B. The Injunction Must Cover New Members and Individuals Who Become Affiliated After the Injunction Issues.

New members and new affiliated individuals must also be protected under the injunction. Organizational Plaintiff memberships and affiliations are fluid and dynamic. If new members and affiliated persons are excluded, Defendnats can simply continue enforcing GA-37 against those individuals, forcing the Plaintiff organizations to monitor membership dates and repeatedly return to this Court to litigate the same legal issues for *each new member or affiliated person*. That increases the organizations' costs, and it encourages Defendants to evade judicial review by targeting only new members. It would also plainly deny the organizations complete relief if their members, employees, and others can be targeted for enforcement simply because of the date their employment or membership began.

9

Moreover, the erroneous enforcement issues described above would be magnified by an injunction with a cutoff date, because state DPS officers already cannot determine membership before a stop, and they certainly could not determine the *date* of membership. *See Vasquez Perdomo*, 2025 WL 2181709, at *21; *Easyriders*, 92 F.3d at 1502. Including new members within the scope of the injunction avoids these problems, promotes judicial economy, and ensures that the relief actually stops the harms that this Court has found unlawful. In this context, the practical burdens that such a narrowed injunction would place on the organizations and its members mean that, at the very least, all members, employees, and other affiliates must be protected, not just the ones who joined the organizations before an arbitrary date.

## CONCLUSION

The Court should permanently enjoin GA-37 statewide.

Dated: August 14, 2025

Respectfully submitted,

David Donatti, TX Bar No. 24097612
Adriana Pinon, TX Bar No. 24089768
ACLU FOUNDATION OF TEXAS, INC.
5225 Katy Freeway, Suite 350
Houston, TX 77007
Tel. (713) 942-8146
Fax: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org

/s/ Spencer Amdur
Spencer Amdur
Oscar Sarabia Roman*
Cody Wofsy
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7th Floor
San Francisco, CA 94104
Tel: (415) 343-0770
samdur@aclu.org
osarabia@aclu.org
cwofsy@aclu.org

Omar Jadwat
Noor Zafar*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660
ojadwat@aclu.org
nzafar@aclu.org

*Attorneys for Consolidated Plaintiffs*
*Admitted pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2025, I electronically filed the foregoing with the

Clerk of Court by using the District Court CM/ECF system. A true and correct copy of this

document has been served via the Court's CM/ECF system on all counsel of record.

*/s/ Spencer Amdur*
Spencer Amdur, CA Bar No. 320069
August 14, 2025

12