UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>v.<br><br>STATE OF TEXAS and GREG ABBOTT, in his official capacity as Governor of the State of Texas,<br><br>                    Defendants | Case No. 3:21-CV-00173-KC<br>(Consolidated) |
| ANNUNCIATION HOUSE; ANGRY TIAS & ABUELAS OF THE RIO GRANDE VALLEY; JENNIFER HARBURY; and FIEL HOUSTON,<br><br>                    Consolidated Plaintiffs,<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of the State of Texas; STEVEN MCCRAW, in his official capacity as Director of the State of Texas Department of Public Safety,<br><br>                    Consolidated Defendant. | Case No. 3:21-CV-00178-KC |

**PLAINTIFFS' REPLY ON THE SCOPE OF THE INJUNCTION**

**INTRODUCTION**

Defendant presents no reason to limit the scope of the permanent injunction. The Supreme Court recently confirmed in *CASA* that an injunction may extend as far as necessary to provide "complete relief" to the plaintiffs. And in the particular context of traffic stops under GA-37, nothing short of a statewide injunction will provide complete relief. Defendant proposes an unheard-of arrangement, whereby Plaintiffs would have to register a huge and constantly-changing set of members and affiliates with DPS, which would then have to constantly and instantly update all of its officers about thousands of people across the state who are protected by the injunction. Even if fully implemented, Defendant's proposal would not remotely remedy Plaintiffs' harms, because Plaintiffs frequently do not know in advance who is transporting their members and affiliates, and because their members and affiliates cannot notify DPS in real time every single time they are driven anywhere by anyone. And even if Defendant's proposal could remedy the harm of enforcement, it would impose enormous *new* burdens on Plaintiffs, which would thereby deny Plaintiffs anything resembling "complete relief." Plaintiffs should not have to upend their lives and operations just to avoid being punished under a patently unconstitutional executive order.

A statewide permanent injunction is thus required by the unique circumstances of this case. But the jurisdictional landscape has changed in the last two days. Despite this Court's order to brief the scope of relief and ongoing consideration of that issue, Defendant filed a notice of appeal on September 2, 2025, regarding the Court's summary judgment order. Dkt. No. 153 (appeal of Dkt. No. 150). A notice of appeal typically divests a district court of jurisdiction to modify the existing scope of relief or to take further action regarding the order on appeal. Defendant's decision to appeal at this juncture therefore means that this Court may not be able to

decide or modify the scope of injunctive relief until after the appeal.[1]  Until the Court of Appeals remands the case and allows this Court to resolve the scope of permanent relief, the preliminary injunction should remain in place.  *See* Dkt. No. 150 at 41-42.

## ARGUMENT

**I.     *CASA* Reaffirmed the Propriety of Broad Injunctions When Necessary to Provide Complete Relief to Plaintiffs.**

As Plaintiffs explained, *CASA* reaffirmed that courts may extend injunctions as far as needed to provide "complete relief" to Plaintiffs, even if doing so benefits nonparties.  Scope Br., Dkt. No. 151, at 2-3.  Defendant argues that *CASA* categorically foreclosed "relief beyond the parties before it."  Response, Dkt. No. 152, at 2-5.  But Defendant completely ignores the many times *CASA* explicitly and clearly stated that even a *nationwide* injunction may be appropriate where necessary to provide plaintiffs with complete relief.  The Court "agree[d] that the complete-relief principle has deep roots in equity."  *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2556 (2025); *see id.* at 2557 ("courts generally may administer complete relief between the parties") (emphasis omitted).  The question is simply what scope of injunction "will offer complete relief to the plaintiffs before the court."  *Id.* at 2557 (emphasis omitted) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

In fact, the Supreme Court in *CASA* remanded for the district court to consider whether a nationwide injunction was necessary to provide "complete relief" to a particular set of plaintiffs. 145 S. Ct. at 2558.  In doing so, it acknowledged that the district court would have to consider the possibility that the plaintiffs' injuries "cannot be remedied without a blanket ban on the

---

[1] As the bases for appeal, Defendant's notice of appeal cites 8 U.S.C. § 1292(b), which governs appeals of non-final orders with the written permission of the district court, and within 10 days of the order; and 8 U.S.C. § 1292(c)(1), which governs appeals to the Federal Circuit.

2

enforcement of the Executive Order." *Id.* And it noted the possibility that "a 'patchwork injunction' would prove unworkable" in practical terms. *Id.*

These are the exact same reasons why a statewide injunction is proper in this case. The Supreme Court's remand—which Defendant does not acknowledge—makes clear that these considerations can justify a broad injunction. And since *CASA*, courts have issued broad injunctions based on these same instructions from the Supreme Court. *See Vasquez Perdomo v. Noem*, --- F.4th ----, 2025 WL 2181709, at *20-22 (9th Cir. Aug 1, 2025); *Welty v. Dunaway*, --- F. Supp. 3d ----, 2025 WL 2015454, at *15-16 (M.D. Tenn. July 18, 2025).

II. **There Is No Workable Way to Provide Complete Relief Without a Statewide Injunction.**

As Plaintiffs have explained, statewide relief is required because of GA-37's unique enforcement mechanism, which occurs exclusively through traffic stops where DPS officers make real-time decisions about impoundment and re-routing. Scope Br. 3-8; *see* Response 6, 7 (acknowledging this enforcement mechanism). Officers have no way to know who is affiliated with the Plaintiffs *before* making an unconstitutional stop under GA-37. And in the heat of a stop—potentially hundreds or thousands of stops if GA-37 goes into effect—verifying affiliation and resolving disputes would impose large new burdens on Plaintiffs, and would impose an obvious risk of errors. Scope Br. 3-8. These unique circumstances did not exist in *CASA* and many other cases, where regulated individuals have plenty of time to demonstrate their connection to an injunction before any harm occurs. *See CASA*, 145 S. Ct. at 2557-58. But where a policy is implemented through real-time police stops, courts have acknowledged that broader relief is necessary. Scope Br. 5 (discussing *Vasquez Perdomo* and *Easyriders*). Defendant argues that this would "undermine *CASA*." Response 10. But *CASA* was *explicit* that lower courts should issue broader injunctions when the specific facts of a case require an

3

injunction that extends beyond the parties. *Supra* Part I. Because of GA-37's unique enforcement mechanism, this is one of those cases.

Defendant offers only one proposal for how a narrower injunction could protect the Plaintiffs. He claims that Plaintiffs could provide DPS with a list of all of their members' and affiliates' names or license plates, so that DPS can spare them from enforcement of GA-37. Response 8-11. That proposal fails for two independent reasons. First, even if it could be implemented, it would still not come close to remedying Plaintiffs' injuries that stem from enforcement of GA-37. And second, implementing it would impose enormous new burdens on Plaintiffs that would plainly deny them complete relief.

**A. Defendant's Proposal Would Not Remedy GA-37's Harm to Plaintiffs.**

Defendant's proposal would fail even ignoring the new burdens it would inflict on Plaintiffs. Its primary suggestion is that Plaintiffs provide the "names" of their employees, contractors, and members to DPS. Response 9. But even with a list of a names, DPS officers would have no idea whether a listed person is in a particular car before stopping it, at which point the harm and injunction violation will have already begun. Such a list would therefore provide almost no protection at all. Defendant does not acknowledge or grapple with this obvious defect in its list-of-names proposal.

Alternatively, Defendant suggests that Plaintiffs could provide DPS with the license plate numbers of all of their members, employees, and contractors. Response 9-10. But this, too, ignores many of the harms that GA-37 would continue to inflict on Plaintiffs. FIEL Houston has thousands of members across Texas, many of whom cannot be transported under GA-37. *See* Espinosa Decl. ¶¶ 1-2, Dkt. No. 58-5. Even if members provided their own license plate numbers, that would not remove the barrier to *receiving* transport from other people. And there

is no way for them to provide the license plate numbers of every family member, friend, acquaintance, cab driver, bus driver, and anyone else who may transport them at any time in the future.

Similarly, Annunciation House relies on noncitizens being able to reach their shelters and to receive transport while staying there. *See* Garcia Decl. ¶¶ 2, 4, 14-16, 20, Dkt. No. 58-2. And while this transport is often performed by Annunciation House's own employees and contractors, that will obviously not always be the case. They are often transported by "volunteers," whether affiliated or not, and by friends and family. *Id.* ¶¶ 20-21, 24-26. If noncitizens cannot both reach Annunciation House shelters and obtain necessary services while there, Annunciation House's operations and continued viability as an organization will be threatened. *Id.* ¶¶ 28-33.

Defendants are thus wrong to argue that the injunction should not protect Plaintiffs' "beneficiaries." Response 5-8. The whole premise of Defendant's beneficiary argument is that such protection is not necessary to protect "Plaintiffs' missional activities." Response 6. That is simply not true. Under an injunction that excludes beneficiaries, many noncitizens would not reach Annunciation House at all. And many who did would face new barriers to obtaining medical care, attorney representation, education for their children, and other basic necessities. This would impose severe, ongoing harms on Annunciation House. And it could not be remedied through a list of license plates, because Annunciation House cannot know in advance what non-affiliated drivers will transport people to and from its shelters.

**B. Defendant's Proposal Would Impose New and Severe Burdens on Plaintiffs.**

Even if it could prevent all harms flowing from GA-37's enforcement, Defendant's proposal would impose huge new burdens on Plaintiffs. These would plainly deny Plaintiffs the "complete relief" that the Supreme Court has time and again said they are entitled to. The State

cannot force a person to take on new injuries as the price for asserting their rights under federal law.

At the outset, Defendant claims the opposite—that any new harms to Plaintiffs are irrelevant to the question of remedy, because the overriding imperative is to avoid incidental benefits to non-parties wherever possible.  Response 11 (dismissing "injunction-related burdens" as beside the point).  But Defendant cites no case saying any such thing.  And for good reason, because it would obviously not provide *complete* relief to impose an injunction regime that subjects Plaintiffs to a host of new injuries.  To provide complete relief, an injunction should put Plaintiffs in the position they would have been in had the government never subjected them to an unconstitutional policy in the first place.  *See Milliken v. Bradley*, 433 U.S. 267, 280 (1977) (holding remedies must be "designed as nearly as possible 'to restore the victims of [unconstitutional] conduct to the position they would have occupied in the absence of such conduct'") (citation omitted); *see Lee v. Lee Cnty. Bd. of Educ.*, 639 F.2d 1243, 1253 (5th Cir. 1981) ("all remedies" have this purpose) (quotation marks omitted); *Taylor v. McDonough*, 71 F.4th 909, 942 (Fed. Cir. 2023) ("A remedial decree must be shaped to place persons unconstitutionally denied a right in the position they would have occupied in the absence of that constitutional violation.") (cleaned up) (quoting *United States v. Virginia*, 518 U.S. 515, 547 (1996)).

Defendant's proposed injunction would impose a range of new and severe harms on Plaintiffs.  For starters, it would require them to create a system for constantly reporting an ever-changing set of license plates and driver's licenses to DPS.  Among the Plaintiffs, there are thousands of individual members, employees, volunteers, contractors, and contractors' employees.  *See* Espinosa Decl. ¶¶ 1-2 (FIEL Houston has 11,000 members); Garcia Decl. ¶¶ 4,

14-16, 20 (25 volunteers, contractor, and private companies working with Annunciation House); Sandefur Decl. ¶¶ 7-11, Dkt. No. 58-3 (detailing members, volunteers, and contractor support for Angry Tias operations). Under Defendant's regime, Plaintiffs would first have to gather and report license plate and other information for those thousands of individuals. Plaintiffs would then have to update that list on a near-daily basis, every time the list of members, employees, or volunteers changes. And Plaintiffs would have to submit new license plates every time one of their members, employees, or volunteers buys, rents, or borrows a new car, or changes their license plate. This reporting would have to be instantaneous to avoid severe consequences for these affiliates. And DPS would have to create a system for constantly updating its list and transmitting it to all DPS officers in real time. Defendant notably does not claim that DPS has ever created a process like that or would do so for this case.

Plaintiffs run lean operations with only a small handful of administrative employees. *See* Espinosa Decl. ¶ 1 (8 staff members); Garcia Decl. ¶ 4 (25 volunteers). The kind of reporting regime Defendant envisions—thousands of people's information, updated instantly and constantly on a daily basis—would likely overwhelm Plaintiffs' operations and threaten the viability of their organizations.

The harms do not end there. The need to provide state law enforcement with membership lists and volunteer rosters would impose a serious chilling effect, which would harm Plaintiffs both by diminishing their First Amendment association rights and by denying them new members and volunteers. Courts have widely recognized the harms imposed by forcing organizations to keep the government apprised of their members and affiliates. *See, e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) ("[C]ompelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of

association as [other] forms of governmental action."); *Familias Unidas v. Briscoe*, 619 F.2d 391, 399 (5th Cir. 1980) (recognizing "that compulsory disclosure of organizational ties can constitute a significant encroachment on freedom of association."). Organizations should not be subject to new and intrusive inquiries like this just to avoid being punished under unconstitutional laws. Defendant suggests that *CASA* unavoidably requires organizations to produce otherwise-private membership lists. Response 10. But this concern is unique to the present context. In *CASA*, individuals could show their organizational membership—and thus their protection under the injunction—on an individual and as-needed basis, for instance as part of a passport application. 145 S. Ct. at 2557-58. Here, by contrast, enforcement can only happen through real-time traffic stops, re-routing, and impoundment—a situation that is particular to this case.

The chilling effect of providing membership lists is especially stark in this case, given the State's track record of targeting Plaintiffs and similar organizations based on their religious and humanitarian activities. In recent years, the State has made startling and unprecedented claims against Plaintiffs and other non-profits, seeking intrusive information about affiliates and beneficiaries, and seeking immediate judicial dissolution based on uncharged and unproven allegations. *See, e.g.*, Kate Scanlon, *Texas Attorney General Targets Catholic Migrant Ministry*, Catholic Courier (Feb. 23, 2024)[2] (describing efforts to subpoena migrant information and judicially dissolve Annunciation House); Chelsie Kramer, *Texas Attorney General Paxton Continues Fight Against NGOs that Serve Migrants*, Am. Imm. Council (Aug. 21, 2024)[3] (describing attempts to shut down and demand intrusive swaths of information from FIEL

---

[2] https://perma.cc/6X4D-Y62Z.
[3] https://perma.cc/MKX3-TUMP.

Houston and Catholic Charities); Letter from Governor Greg Abbott to Attorney General Ken Paxton (Dec. 14, 2022)[4] (directing Attorney General to investigate NGOs that help immigrants). These troubling efforts make it unlikely that new members, volunteers, or other affiliates would associate with Plaintiffs if it meant that their association would have to immediately be reported to the State. Like the other burdens discussed above, this kind of privacy violation cannot be the price of avoiding enforcement under a blatantly unconstitutional executive order. Defendant's proposal would provide nothing close to complete relief.

### III.   Defendant's Rule 65 Arguments Are Not Relevant to This Issue.

Defendant invokes Rule 65(d)(2) as a reason to deny a statewide injunction. Response 5, 7-8 (citing Fed. R. Civ. P. 65(d)(2)). But Rule 65(d)(2) only specifies which parties can be enjoined by the Court—here, Defendant. *See Regal Knitweat Co. v. NLRB*, 324 U.S. 9, 14 (1945) (rule ensures that "defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors"). It has no impact on who is *protected* by an injunction. That's why *CASA* did not mention or discuss Rule 65 at all, and why Defendant does not cite any decision invoking Rule 65 to analyze how broadly to enjoin a defendant's enforcement activities. Rule 65(d)(2) is simply about which individuals or entities can be enjoined. And Defendant does not dispute that, under that Rule, he can properly be enjoined from enforcing GA-37.

### CONCLUSION

The Court should permanently enjoin GA-37 statewide.

---

[4] https://perma.cc/FY5X-QF43.

Dated: September 4, 2025

David Donatti, TX Bar No. 24097612
Adriana Pinon, TX Bar No. 24089768
ACLU FOUNDATION OF TEXAS, INC.
5225 Katy Freeway, Suite 350
Houston, TX 77007
Tel. (713) 942-8146
Fax: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org

Respectfully submitted,

/s/ Spencer Amdur
Spencer Amdur
Oscar Sarabia Roman*
Cody Wofsy
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7th Floor
San Francisco, CA 94104
Tel: (415) 343-0770
samdur@aclu.org
osarabia@aclu.org
cwofsy@aclu.org

Omar Jadwat
Noor Zafar*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660
ojadwat@aclu.org
nzafar@aclu.org

*Attorneys for Consolidated Plaintiffs*
*\*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2025, I electronically filed the foregoing with the Clerk of Court by using the District Court CM/ECF system. A true and correct copy of this document has been served via the Court's CM/ECF system on all counsel of record.

>*/s/ Spencer Amdur*
>Spencer Amdur, CA Bar No. 320069
>September 4, 2025